**JOSEPH F. HART, State Bar No. 85056**
**email: joe@joehartlegal.com**
**Law Offices of Joseph F. Hart**
**433 North Camden Drive, Suite 600**
**Beverly Hills, CA 90210-4416**
**Telephone: (310) 274-7157**
**Facsimile: (310) 331-8779**

**WILLIAM C. TANENBAUM, State Bar No. 305030**
**Email: tanenbaum@tanenbaumlaw.com**
**9701 Wilshire Boulevard, Suite 1000**
**Beverly Hills, CA 90212-2010**
**Telephone: 310-628-0989**
**Facsimile: 310-859-1960**

**Attorneys for Defendants Alexander Dallal and Claire Dallal**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| LINCOLN BENEFIT LIFE INSURANCE COMPANY, a Nebraska Corporation,<br><br>Plaintiff,<br>v.<br><br>ALEX DALLAL, an individual; CLAIRE DALLAL, an individual; and DOES 1 through 10, Inclusive,<br>Defendants.<br>ALEXANDER DALLAL, an individual; and CLAIRE DALLAL, an individual,<br>Counterclaimants,<br>v.<br><br>LINCOLN BENEFIT LIFE COMPANY, a Nebraska Corporation,<br><br>Counterdefendant. | CASE NO. 2:16-CV-9307-MWF-E<br><br>Hon. Michael W. Fitzgerald<br><br>MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT, OR ALTERNATIVELY FOR SUMMARY ADJUDICATION<br><br>Hearing Date: April 9, 2018<br>Time: 10:00 a.m.<br>Courtroom: 5A, 1st Street Courthouse |

## Table of Contents

**Page**

Introduction……………………………………………………………………..……4

Procedural status. ……………………………………………………………….……5

Claims made in the complaint………………………………………………………...5

Statement of facts…………………………………………………………………..…5

1. Terms of the Policy…………………………………………………………...5
2. There is no valid dispute as to Alex Dallal's need for assistance or the diagnosis of his cognitive impairment……………………………………..7
3. Alex's doctors submitted Attending Physician Statements annually certifying that Alex met the Policy's eligibility requirements……………10
4. Alex has had constant caregivers since 2004 varying between four caregivers - Helen, Lorena, Maricela, and Narda……………………....11
5. Lincoln Benefit's investigation into Alex's claim was a sham designed to deprive him of his policy benefits……………………………………...12
   - A. Limited, non-comprehensive, biased surveillance ………………..…13
   - B. Plaintiff's medical "review" is shameful………………………….14

The legal standard for summary judgment ……………………………………..…15

Argument. …………………………………………………………………………...17

1. The policy does not allow Lincoln Benefit to terminate coverage………………17
2. Lincoln Benefit cannot prove the claims of fraud that underly the first three causes of action in the First Amended Complaint…………………………….18
   - A. The defendants have not made any misrepresentations as to Alex Dallal's condition. ……………………………………………………...19
   - B. Lincoln Benefit has no evidence of fraudulent intent……………………19
   - C. Lincoln's claims for damages are not tenable…………………………….20

Conclusion…………………………………………………………………………...20

## Table of Authorities

**Cases** **Page**

*Adickes v. S.H. Kress & Co.* (1970) 398 U.S. 144, 90 S.Ct. 1598……………………..16

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)………………………………17

*C.A.R. Transp. Brokerage Co. v. Darden Restaurants*, 213 F.3d 474, (9th Cir. 2000)…16

*Celotex Corp. v. Catrett* (1986) 477 U.S. 317, 106 S.Ct. 2548……….................16, 17, 18

*Coomes v. Edmonds Sch. Dist. No. 15*, 816 F.3d 1255 (9th Cir. 2016) ……………..…16

*Credit Managers Ass'n. of S. California v. Kennesaw Life & Acc. Ins. Co.*, 25 F.3d 743, 749 (9th Cirl 1994)……………………………………………..17

*Erie Railroad Co. v. Tompkins* (1938) 304 U.S. 64, 58 S.Ct. 817, 822. ………………...5

*Holz Rubber Co., Inc. v. American Star Ins. Co.* (1975) 14 Cal.3d 45, 120 Cal.Rptr. 415……………………………………………..18

*Cummings v. Fire Ins. Exchange*, 202 Cal.App.3d 1407, 249 Cal.Rptr. 568 (1988)

*In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, (9th Cir. 2010)…………………………..16

*James River Ins. Co. v. Hebert Schenk, P.C.*, 523 F.3d 915, 920 (9th Cir. 2008)………17

*John Hancock Mutual Life Ins. Co. v. Greer* (1998, Cal.App 1st Dist.) 60 Cal.App.4th 877, 71 Cal.Rptr.2d 48 ………………………………17, 20

*Miller v. Glenn Miller Productions, Inc.*, 454 F.3d 975 (9th Cir. 2006)……………..…16

*Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000)…...16

*Spott Electrical Co. v. Industrial Indem. Co.* (1973) 30 Cal.App.3d 797, 106 Cal.Rptr. 710 …………………………………..18

**Statutes**

Cal. Insurance Code Section 10232.3(f)………………………………………17, 20

Cal. Insurance Code Section 10350.2…………………………………………....17, 20

28 U.S. Code §1332. ........................................................................................................ 5

**Rules**

Federal Rules of Civil Procedure, Rule 56……………………………………….15

**Introduction.**

In 2003, Alex Dallal ("Alex") and his wife, Claire Dallal ("Claire") purchased a joint long term care insurance policy - Policy # 10-700137639W – ("the Policy") from Lincoln Benefit Life Insurance Company ("Lincoln Benefit"). In 2004, without warning, Alex was diagnosed with a meningioma - a serious brain tumor to his left temporal lobe – that ultimately required surgery to remove it. Since the surgery, Alex continues to experience many neurological problems documented in his medical history, including seizures, hemorrhages, headaches, blurred vision, memory loss, loss of balance, and speech problems. In addition to his neurological problems, Alex has sustained many physical problems that have required medical attention. Due to his neurological and physical problems, independent doctors have certified to plaintif Alex's eligibility for benefits under the Policy, confirming in every year since 2004 that Alex suffers Cognitive Impairment.

Notwithstanding the consistent determinations that Alex suffers Cognitive Impairment, Lincoln Benefit has arbitrarily terminated Alex's Policy. In this action, Plaintiff Lincoln Benefit seeks to have the court confirm its termination, by claiming – without diagnostic or clinical testing or evaluations, and ignoring MRIs that evidence brain damage and brain tissue loss - that Alex does not suffer Cognitive Impairment. Tellingly, Lincoln Benefit terminated Alex's claim without following its own policy's guidelines, which state the proper procedures for determining Cognitive Impairment, which includes using clinical evidence and taking standardized tests.

Instead, Lincoln Benefit judged Alex not to suffer Cognitive Impairment based solely on clandestine, unprofessional, misleading, and incomplete surveillance footage of Alex.

Lincoln Benefit also asks the court to rubber stamp the termination of the policy as applied to Claire, who has never made a claim for benefits under the Policy.

The Dallals are moving for summary judgment, or in the alternative, for summary

adjudication of the claims that Lincoln Benefit has alleged. The indisputable facts show that Alex Dallal requires assistance in activities of daily living and suffers from cognitive impairment, such that he is fully entitled to benefits under the policy. The Dallals have not made any material misrepresentations. Accordingly, Lincoln Benefit has no right to terminate the policy. Moreover, the policy language permits termination in only limited circumstances, none of which are present here.

**Procedural status.**

Plaintiff filed this action on December 16, 2016. Doc. 1 (filed 12-16-2016).

Jurisdiction is claimed under diversity of citizenship. 28 U.S.Code §1332. Doc. 1, ¶¶4, 5. California substantive law applies. *Erie Railroad Co. v. Tompkins* (1938) 304 U.S. 64, 78, 58 S.Ct. 817, 822.

The current operative complaint is the First Amended Complaint, filed on November 1, 2017. Doc. 51.

**Allegations in the complaint.**

The Complaint alleges four causes of action – declaratory relief (Doc. 51, ¶¶1-53), fraud (Doc. 51, ¶¶54-58), declaratory judgment (Doc. 51, ¶¶59-68), and restitution (Doc. 51, ¶¶69-73). The first three causes of action are based upon fraud, while the fourth cause of action – for restitution – is an equitable remedy that the court has decided to construe as a quasi-contract claim. Doc.29, ¶II.E. at p. 14.

**Statement of facts.**

**1. Terms of the Policy.**

The Policy is denominated as a comprehensive long-term care policy, guaranteed for life. The named insureds are Alex and Claire. Its effective date is August 20, 2003. See Document 1-1 (filed 12/16/2016) at page 3.

Page 1 of the Policy states: "This policy is guaranteed renewable for life" and "We cannot refuse to renew this policy or place any restrictions on it if the premium is paid on time." This is to comply with California Insurance Code Section 10236, which states "'Guaranteed renewable' means that the insured has the right to continue coverage in force if premiums are timely paid. . ."

Benefits are payable if the insured (1) is unable to perform, without Substantial Assistance from another individual, at least two Activities of Daily Living for a period of at least 90 days due to loss of Functional Capacity; or (2) requires Substantial Supervision to protect him or herself from threats to health and safety due to severe Cognitive Impairment. Document 1-1 at p. 8.

"Activities of Daily Living" are defined as Eating, Bathing, Continence, Dressing, Toileting, and Transferring. Document 1-1 at p. 5.

"Cognitive Impairment" is defined as:

> "the deterioration or loss of your intellectual capacity which requires substantial supervision by another person to protect yourself or others. It is measured by clinical evidence and standardized tests which reliably measure your impairment in:
>
> a. short or long term memory;
>
> b. orientation as to people, place, or time; and
>
> c. deductive or abstract reasoning." *Id*.

It includes Alzheimer's disease and other forms of irreversible dementia. *Id*.

The Policy lists four specific bases for termination:

1. After the insurer has paid the Total Maximum Amount Payable as shown in the Policy Schedule;
2. Non-payment of premium;
3. When requested in writing by the insured; and
4. Death of the insured.

See Document 1-1, Part 5.D (Policy Termination). None of these four bases for termination are applicable in the case at bar. There are no other bases for termination in the Policy.

The Policy provides that the company has a right to physical examination of the insured, as often as is reasonable while a claim is pending or while benefits are being received. Document 1-1, Part 6.H at page 11.

**2. There is no valid dispute as to Alex Dallal's need for assistance or the diagnosis of his cognitive impairment.**

There have been no misrepresentations regarding Alex Dallal's physical or cognitive deficits, impairments. All physicians who have treated him since 2004 and up to December 2016 when the claim was wrongly terminated agreed that he needed full-time caregivers as required under the long-term care policy to ensure his physical safety. All persons who interact with him, physicians, caregivers, and family, agree that he needs assistance – from constant immediate oversight in the form of standby assistance to actual physical, hands-on aid in his performance of activities of daily living as defined in the long-term care policy. All agree he is cognitively impaired; that his mentality is like that of a child who feels he can cross Santa Monica Boulevard by himself without regard to the dangers swirling around him.

Alex's list of physical injuries from the date of the meningioma surgery is wide-ranging:

- **Brain surgery (meningioma).** In 2004, Alex had brain surgery to remove a meningioma from his left temporal lobe – that part of the brain that primarily controls memory (both long and short term), balance, and language. See "Operation Report" from records of Joy Feld, M.D., attached as Exhibit 1 to the Declaration of William C. Tanenbaum, filed herewith.
- **Strokes and hemorrages.** Alex suffered at least one stroke which resulted

from a brain hemorrhage in 2005. This was confirmed from an MRI taken of Alex's brain on May 30, 2005. [See "Outpatient Radiology Report" document from records of William W. Chow, M.D., attached as Exhibit 2 to Tanenbaum Declaration filed herewith]. An MRI from 2018 presented more current hemorrhagic activity to the right posterior parietal lobe and right basal ganglia. [See "Medical Imaging: MRI of the brain" documents, from records of William W. Chow, M.D., attached as Exhibit 2 to Tanenbaum Declaration filed herewith].

- **Brain damage/Loss of brain tissue.** An MRI from January 2018 reveals, according to neurologist Dr. William W. Chow, M.D., that Alex has suffered brain damage and has lost brain tissue to his left temporal lobe. Dr. Chow goes on to conclude that the MRI results support a finding that Alex suffers from vascular Parkinsonism. See records of William W. Chow, M.D., attached as Exhibit 2 to the Declaration of William C. Tanenbaum, filed herewith.
- **Seizure disorder.** Since 2004 through today, Alex has been diagnosed with a seizure disorder, requiring him to take Tegretol, a strong, anti-seizure medication. He has been prescribed and has taken Tegretol consistently since his brain surgery in 2004. In May 2005, Dr. Feld noted Alex suffered from a facial droop and drooling which were observed to a result of a seizure. Complaints of seizures are noted in 2011. See records of Joy Feld, M.D., attached as Exhibit 1 to the Declaration of William C. Tanenbaum, filed herewith.
- **Kidney tumor – "extremely high" likelihood of renal cancer**. In 2013, Alex was diagnosed with kidney tumor which was causing him severe urinary pain. On December 11, 2013, Dr. Peter Julien performed a microwave ablation to remove the tumor present on Alex's kidney. See records of Joy Feld, M.D., attached as Exhibit 3 to the Declaration of William C. Tanenbaum, filed

herewith.

- **Chronic urinary pain, complications**. On November 2, 2005, Alex required an emergency procedure requiring placement of an indwelling catheter to his penis by his urologist, Dr. Dudley Danoff. This emergency procedure was caused by Alex's acute urinary retention. See Dudley Seth Danoff dated November 2, 2005 document attached as part of Exhibit 3 to Tanenbaum Declaration. Throughout 2013, Alex sought treatment for a urinary tract infection. See Tower Urology, dated 10/07/2013, document attached hereto as part of Exhibit 3 to Tanenbaum Declaration.
- **Chronic foot pain**. Since 2006, Alex has seen his podiatrist, Melvin Present, to treat chronic foot pain. Two visits in 2006; four in 2007; five in 2008; six in 2009; five in 2010; four in 2011; three in 2012; six in 2013; six in 2014; five in 2015; at least two in 2016; and at least two in 2017. See records of Dr. Melvin Present, M.D., attached as Exhibit 4 to the Tanenbaum Declaration.
- **Osteochrondritis/Micro-fractures/Arthritis in right knee.** Throughout 2010, Dr. John Sellman treated Alex's severe knee pain. During these visits, Dr. Sellman aspirated yellow fluid from Alex's knee, observed swelling, and diagnosed Alex with osteochrondritis with micro-fracture and arthritis in his right knee. See records of John R. Sellman, M.D., attached as Exhibit 5 to the Tanenbaum Declaration.
- **Synovitis of the hips.** Dr. Sellman also diagnosed Alex with synovitis of his hips from Alex's constant joint pain in 2010. As a consequence of his knee and hip pain, in 2013, Alex was repeatedly performing physical therapy with Joel Scherr, physical therapist. See records of John R. Sellman, M.D., attached as Exhibit 5 to the Tanenbaum Declaration, and See records of Joy Feld, M.D., attached as Exhibit 1 to the Tanenbaum Declaration.
- **Osteoarthritis of hips/Degeneration of lumbar spine.** X-rays in 2013 of

Alex's hips and lumbar spine revealed osteoarthritis in his hips, and degeneration of his lumbar spine, which partially accounts for Alex's hunched back, clearly visible when he walks. See records of Cedars Sinai Medical Center, attached as Exhibit 6 to the Tanenbaum Declaration.

- **Persistent heart murmur.** In 2005, 2013, and 2014, Dr. Feld, Alex's internist, noted Alex suffers from heart murmurs. See records of Joy Feld, M.D., attached as Exhibit 1 to the Tanenbaum Declaration.
- **Hypothyroidism/Chronic fatigue.** Prior to Alex's surgery in 2004, it was observed that Alex had a growth on his thyroid. His medical records reveal that as late as 2012, he was diagnosed with hypothyroidism. This diagnosis is remarkable as it explains why Alex has repeated complaints of fatigue, resulting in his need to take multiple naps per day. See records of Joy Feld, M.D., attached as Exhibit 1 to the Tanenbaum Declaration.
- **Emergency Room visits, confusion, and other various ailments**: In 2005 and 2011, Alex was rushed to the for complications of urinary tract infections and excessive bleeding from a bursting varicose vein that was the result of falling. In 2015, his confusion was singled out by Dr. Danoff. See records of Joy Feld, M.D., attached as Exhibit 3 to the Tanenbaum Declaration. Since 2004, Alex has also complained of back pain, anemia, skin rashes, groin pain, upper respiratory infections, anxiety, gastroenteritis, arm pain. See records of Joy Feld, M.D., attached as Exhibit 1 to the Tanenbaum Declaration.

**3. Alex's doctors submitted Attending Physician Statements annually certifying that Alex met the Policy's eligibility requirements.**

With the exception of 2008, Dr. Joy Feld – Alex's internist - submitted the Attending Physician Statement ("APS") to Lincoln Benefit certifying Alex's eligibility for benefits under the long-term care policy. Dr. Feld met with Alex personally every

three months on average every year since 2004. Throughout that time, Dr. Feld got to observe Alex often. She noted many of his various ailments, diseases, diagnoses, and complications. While typically she noted that he seemed normal. Alex did not make his quarterly visits to appear incapacitated, disabled, or incompetent he is a man of dignity and pride, and presented himself as such. Dr. Feld confirmed to the Lincoln Benefit that Alex was chronically ill as defined under the policy and, thus, eligible for benefits. In her words, she did so because, irrespective of his physical condition at any one time, Dr. Feld always has determined that Alex "has poor insight and judgment into his own medical condition." That poor insight and judgment can affect his safety, as well as his ability to perform activities of daily living. See Exhibit 2 to Tanenbaum Declaration.

In 2008, Alex's neurosurgeon, Dr. Jay Ananda, submitted the APS to Lincoln Benefit, reaching the same conclusions as Dr. Feld did with respect to Alex's condition. See records of Jay Ananda, M.D. Exhibit 7 to Tanenbaum Declaration.

**4. Alex has had constant caregivers since 2004 varying between four caregivers - Helen, Lorena, Maricela, and Narda.**

Claire employed four caregivers over the years to help care for Alex. The original caregiver was Helen Genovea ("Helen"). In addition, two other women – Lorena and Marciela – performed caregiver services for Alex prior to 2011. Deposition of Helen Genovea, at pp. 64, 67-69, 71-72, Exhibit 14 to Tanenbaum Declaration. Since 2011, Alex's primary caregiver has been Disnarda Sosnowski ("Narda"). Helen Genovea Declaration, pp. 66, 71; Narda Deposition, Exhibit 15 to Tanenbaum Declaration, pp. 17-39. The caregivers support the claim that Alex should be receiving benefits under the Policy.

Helen confirms Alex's need for constant caregiver services. Helen Genovea Declaration, pp. 118. She observes that he always had bending problems and has displayed consistent difficulty walking. She notes that his need for walking assistance

has varied over the years, but she feels he shouldn't walk without a cane. She asserts that Alex cannot hold a conversation and simple speaks with a few words at a time. Repeatedly, Helen analogizes Alex to a kid – as the representation of the age at which Alex's mind operates. She has never seen him work in the family store. She has seen him try to pick up trash around the store which sometimes he can or cannot do. She notes that he wears a diaper. Helen Genovea Deposition, at 156-198.

Narda repeatedly refers to Alex as a kid. She calls him a "seven years old kid." She describes Alex as dealing with confusion. See Narda Deposition, Exhibit 15 to Tanenbaum Declaration, at pp. 110-115. She states she always has to be next to him. Id. She observed his incontinence and need for constant supervision. Narda Deposition at p. 118.

**5. Lincoln Benefit's investigation into Alex's claim was a sham designed to deprive him of his policy benefits.**

Lincoln Benefit outsources the work of claims administration to a third-party administrator, LifeCare Assurance ("LifeCare"). At LifeCare, three individuals were primarily responsible for making the determination to cancel Alex's claim: Trudy Sabihy, Norman Seeman, and Meg Sarkisian. The medical basis for the determination came from Lori Folk-Barron. Sabihy is the supervisor to Norman Seeman, who is a supervisor in the claims department. Sabihy confirms in her deposition that she never reviewed medical records for Alex prior to 2016:

Q: Okay. So you never requested medical records before 2016; is that correct?
A: That's correct.

See Deposition of Trudy Sabihy, p. 36, lines 9-11, attached to Tanenbaum Declaration as Exhibit 9.

Prior to making that admission Sahiby all but dismissed the need for LifeCare to review earlier medical records whatsoever, as being irrelevant. Sabihy Deposition at pp.

35-36, Exhibit 9 to Tanenbaum Declaration.

From the depositions of all participants, there appears to have been no review of Alex's medical records prior to 2015.

Seeman and Sabihy confirm that they relied on a nurse report from June 2016 as a dispositive account of Alex's condition. At that meeting, Alex appeared drowsy and unable to perform certain physical tests. Based on what the nurse observed, she did not require Alex to undergo testing. However, the nurse never made a repeat visit to come back on a different occasion when Alex was potentially feeling better. See the exhibit page from Lynn Sokolow's report, attached as Exhibit 10 to the Tanenbaum Declaration. As well, no one at LifeCare asked the nurse to make another visit, accepting Alex's condition as completely drowsy and physically incapable. All stated that Alex's medical records are inconsistent with his reported assistance with ADLs. This is patently untrue. His ability to perform ADLs without hands-on assistance varied from year to year. What remained constant was Dr. Feld's and Dr. Ananda's determination of Alex's status as "Chronically Ill." It was this crucial aspect of Alex's status that the participants refused to investigate.

In fact, Meg Sarkisian, escalated claims unit coordinator for LifeCare, confirmed that, at no point prior to deciding to cancel Alex's claim, did they speak to Alex's attending physician. See Page 25, Lines 9-12 of Meghedie Sarkisian's deposition attached as Exhibit 12 to the Tanenbaum Declaration. Plaintiff did not consult or even speak to any of Alex's physician's because they only wanted information that served the singular purpose of canceling Alex's claim. They decided to initiate a surveillance whose purpose was to falsely portray Alex's abilities. And for medical authority, they got what they needed from their hired-gun, neuropsychologist Dr. Lori Folk-Barron.

**A. Limited, non-comprehensive, biased surveillance**

Lincoln Benefit's case rests squarely upon the clandestine surveillance of Alex

that took place in 2016. The surveillance is limited and biased. The video footage that has been made available shows Alex for no more than a matter of *seconds* at any one time. There is no continuous footage of him that, for example, shows him exiting his house, entering a vehicle, sitting in the vehicle, exiting the vehicle, then entering the next location. Furthermore, there is no footage of him inside his home or inside the family store, both places where he sits and naps for hours on end by himself with a caretaker nearby. There is no continuous stream of footage of Alex because that does not support Lincoln Benefit's case. See the surveillance reports from Horseman Investigations and Archangel Investigations and Protection, attached as Exhibit 13 to Tanenbaum Declaration.

There is no sound in the video footage, so that it is impossible to determine what Alex says to anyone, the level of his conversation, whether he talks in complete sentences, or whether he speaks coherently at all. *Id*.

Alex was surveilled for seven days in July, seven days in September, and four days in November of 2016, a total of more than 123 hours. However, only three hours of video footage was taken, which Lincoln Benefit distilled down to approximately 23 minutes. *Id*. Lincoln Benefit clearly wants to present an extremely limited view of Alex.

**B. Plaintiff's medical "review" lacks any credibility.**

Dr. Lori Folk-Barron provided the medical review as support for Plaintiff's determination to cancel Alex's policy. She is a purported neuropsychologist. She confirms that she has reviewed over *one hundred claims* for the Plaintiff in the past year alone. See Page 18, Lines 1-3 of Dr. Lori Folk-Barron's Deposition, attached as Exhibit 12 to Tanenbaum Declaration. She never contacted Alex before diagnosing him. She never met him. She performed no standardized test and conducted no in-person clinical assessment. See Pages 20-23 of Dr. Lori Folk-Barron's deposition – Exhibit 12 - where she discusses how it is not common practice to meet or consult with insured before

making an evaluation of him. She did not speak with Dr. Feld, nor with any of Alex's numerous physicians. She never spoke with Mrs. Dallal. See Folk-Barron Deposition, p. 26, lines 15-22 (Exhibit 12). She never sought to speak with Alex's caregivers. Her stated reason for not reaching out to Alex is that her relationship is with the insurance company, even though she knows that they rely on her report as a medical basis to cancel claims. See Folk-Barron Deposition, pp. 23-26 (Exhibit 12). For record review, she states she only considered records from Dr. Feld going back to 2012, claiming that prior records are less relevant as the company wants an assessment of how Alex is presently.

She admits that the typical time for a review is two weeks. For Alex, she completed her review in less than four days, probably in only one day – she was emailed the assignment on December 8, 2016, and submitted her report on December 12, 2016. See Folk-Barron Deposition, p. 20, lines 1-8, for the Dec. 8, 2016, date of the claim review; and p. 33, lines 13-17 for the Dec. 12, 2016, date of submitting her report (Exhibit 12. As she knew Lincoln Benefit's desires, Dr. Folk-Barron determined that Alex does not suffer from cognitive impairment. To arrive at this expected conclusion, she relies almost exclusively on watching clips of surveillance. Signficantly, she confirms that, by December 11, 2016, one day before her report is submitted, she had not viewed the surveillance from Archangel who performed surveillance in August and September 2016 of Alex – constituting nearly half of the surveillance. There is an email from her that she had not viewed the Archangel surveillance on December 11, 2016. See Folk-Barron Deposition, pp. 29-31 (Exhibit 12).

**The legal standard for summary judgment**

A party may seek summary judgment if the uncontroverted facts show that the party is entitled to judgment as a matter of law. F.R.Civ.P. Rule 56. The moving party may obtain judgment if it submits affirmative evidence that disproves an essential

element of the opposing party's claim or defense. *Adickes v. S.H. Kress & Co.* (1970) 398 U.S. 144, 158-160, 90 S.Ct. 1598, 1608-1609.

Summary judgment not a disfavored shortcut, but rather an integral part of the Federal Rules, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett* (1986) 477 U.S. 317, 327, 106 S.Ct. 2548, 2555.

"The moving party initially bears the burden of proving the absence of a genuine issue of material fact. Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case. Where the moving party meets that burden, the burden then shifts to the non-moving party to designate the specific facts demonstrating the existence of genuine issues for trial." *Coomes v. Edmonds Sch. Dist. No. 15*, 816 F.3d 1255, 1259 n.2 (9th Cir. 2016), *citing*, *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010). "When the party moving for summary judgment would bear the burden of proof at trial, 'it must come forward with evidence which would entitle it to a directed verdict if the evidence were uncontroverted at trial.'" *Miller v. Glenn Miller Productions, Inc.*, 454 F.3d 975, 987 (9th Cir. 2006), *quoting*, *C.A.R. Transp. Brokerage Co. v. Darden Restaurants, Inc.*, 213 F.3d 474, 480 (9th Cir. 2000).

As the moving parties the Dallals have the burden to show that there is no triable issue of fact as to each element of their affirmative defenses and counterclaims - entitling them to judgment as a matter of law - or to show a lack of any genuine issue of material fact as to plaintiff's claims by identifying those issues on which plaintiff cannot meet his burden of proof at trial. See *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

"Once the moving party comes forward with sufficient evidence, "the burden then moves to the opposing party, who must present significant probative evidence tending to support its claim or defense." *C.A.R. Transp. Brokerage Co. v. Darden Restaurants,*

*Inc.*, 213 F.3d at 480, *quoting*, *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991). To avoid summary judgment, the plaintiff must demonstrate the existence of a genuine dispute as to any material fact on all matters as to which he has the burden of proof. *Celotex Corp. v. Catrett* (1986) 477 U.S. 317, 325-326, 106 S.Ct. 2548, 2553-2554. "A motion for summary judgment may not be defeated, however, by evidence that is 'merely colorable' or 'is not significantly probative.' *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-250 (1986).

The court has a duty to evaluate the evidence independently when it decides a dispositive pre-trial motion. *Credit Managers Ass'n. of S. California v. Kennesaw Life & Acc. Ins. Co*., 25 F.3d 743, 749 (9th Cirl 1994). The court must grant summary judgment if it ultimately determines that no rational or reasonable jury might return a verdict in the nonmoving party's favor based on all the evidence. *James River Ins. Co. v. Hebert Schenk, P.C.*, 523 F.3d 915, 920 (9th Cir. 2008).

**Argument.**

**1. The policy does not allow the insurer to terminate coverage.**

Plaintiff seeks to terminate the policy at this time. The policy has been in effect since 2003. California law requires that a policy may not be contested by the insurance policy after two years. Cal. Insurance Code Sections 10232.3(f) and 10350.2. In addition, the Policy here contains an incontestability clause – Part 5.B., which bars any termination after the policy has been in effect for two years. Because this policy became effective on August 20, 2003, the Policy became incontestable on August 20, 2005. See *John Hancock Mutual Life Ins. Co. v. Greer* (1998, Cal.App 1st Dist.) 60 Cal.App.4th 877, 71 Cal.Rptr.2d 48, 1998 Cal.App LEXIS 16 - Incontestability clauses are given broad effect and are strictly enforced even in the face of gross fraud in procuring the policy).

Once a policy becomes incontestable, it may not be terminated except according

to its terms. *Spott Electrical Co. v. Industrial Indem. Co.* (1973) 30 Cal.App.3d 797, 806, 106 Cal.Rptr. 710, 716. The policy here lists four specific bases for termination none of which apply in this case: 1. After the insurer has paid the Total Maximum Amount Payable as shown in the Policy Schedule; 2. Non-payment of premium; 3. When requested in writing by the insured; and 4. Death of the insured. See Document 1-1 (filed 12/16/2016) at Part 5.D (Policy Termination).

Lincoln Benefit is trying to re-write the Policy to allow additional grounds for termination beyond those that are expressed in the Policy. This runs afoul of the general rule that any ambiguity in a policy is normally resolved against the insurer: "(A)n insurer who wishes to condition its contractual liability upon the insured's conformance with certain conduct must do so in clear, unambiguous language." *Holz Rubber Co., Inc. v. American Star Ins. Co.* (1975) 14 Cal.3d 45, 59, 120 Cal.Rprt. 415, 423.

Lincoln Benefit's attempt to void the Policy fails as a matter of law. It's remedy in this situation, if any, is to make a breach of contract claim for damages. This would not alter the contract to deprive the insureds of the benefits for which they have paid premiums. The court should grant summary judgment because the Policy does not allow Lincoln Benefit to terminate at this time.

**2. Lincoln Benefit cannot prove the claims of fraud that underly the first three causes of action in the First Amended Complaint.**

The first three causes of action are all based upon fraud that does not exist.

Plaintiff cannot prove its claims of fraud; there is no evidence of any fraud in the inducement to form an insurance contract, and there is no fraud in the performance of a contract as a matter of law. Because Lincoln Benefit has no evidence of fraud, the court should grant summary judgment. *Celotex Corp. v. Catrett* (1986) 477 U.S. 317, 106 S.Ct. 2548.

**A. The defendants have not made any misrepresentations as to Alex Dallal's condition.**

There have been no misrepresentations regarding Alex's physical or cognitive impairments. All physicians prior to Lincoln's purported termination of the contract agree that he is entitled to the policy benefits. All persons who interact with him agree that he needs assistance in the performance of the activities of daily living as defined in the policy and is cognitively impaired. This has been true since the inception of the policy. Lincoln terminated the policy despite not performing any examination of Alex's cognitive impairment.

The policy provides that the company has a right to physical examination of the insured, and there is no allegation that such an examination was sought after the nurse's visit in June 2016, when she concluded that Alex still required long-term care.

Lincoln Benefit's case instead rests upon a clandestine surveillance in 2016. Given the fact that Lincoln Benefit is advancing only 23 minutes of video footage culled from 123 hours of surveillance, there is no true foundation to establish its accuracy. The use of the surveillance is even more problematic in that there is no connection between what is depicted and the level of Alex's cognitive impairment. The court should disregard the opinion of Lincoln Benefit's captive medical doctor, who based her opinion no on the criteria in the Policy but on the suspect video footage.

Lincoln Benefit should not be permitted to define cognitive impairment in the contract as a condition requiring in-person evaluation and testing, and then have its in-house doctor ignore the definition in formulating an "opinion" on the issue.

**B. Lincoln Benefit has no evidence of fraudulent intent.**

While the insurance policy in this case does not allow for rescission (See Section 1 above), even if it did, Lincoln Benefit's claims fail, because there has been no fraudulent intent on the part of the Dallals. Rescission for false claims requires a

fraudulent intent; the false statement must have been made knowingly and willfully with the intent of deceiving the insurer. *Cummings v. Fire Ins. Exchange*, 202 Cal.App.3d 1407, 1414-1415, 249 Cal.Rptr. 568, fn. 7 (1988).

The Dallals have not made any false claims here, certainly none that Lincoln Benefit relied on. Lincoln Benefit relied instead on the APLs from Alex's doctors, whose independent evaluations confirmed Alex's condition. The court should grant the Dallals' motion for summary judgment, because Lincoln is unable to prove fraudulent intent.

**C. Lincoln's claims for damages are not tenable.**

Lincoln is claiming damages of "up to $761,225.89" on its claims for fraud. Doc. 51, paras. 47, 58. Those "damages" represent the entirely of the benefits paid to the Dallals since the inception of the Policy. Id, para. 50, 58.

These claims are an attempt to avoid the incontestiblity clause in the Policy and the California law providing that policies become incontestable after two years. Cal. Insurance Code Sections 10232.3(f) and 10350.2. *John Hancock Mutual Life Ins. Co. v. Greer* (1998, Cal.App. 1st Dist.) 60 Cal.App.4th 877, 71 Cal.Rptr.2d 48. The court should not allow Lincoln Benefit to circumvent the incontestability clause in this manner. Lincoln cannot prove damages based upon claims dating back to the incontestability deadline.

The court should grant the motion for summary adjudication as to the second cause of action in the complaint, for fraud.

## Conclusion.

Alex Dallal should not be deprived of the benefits under his long term care policy because of Lincoln Benefit's blatant attempt to manipulate the truth about his cognitive

impairment. The court should grant the Dallal's motion for summary judgment as to all the plaintiff's claims.

If the court does not grant the motion for summary judgment on the entirety of the claims, it should summarily adjudicate the second cause of action in favor of the Dallals.

**Respectfully submitted,**

**Dated: March 2, 2018** **Law Offices of Joseph F. Hart**

/s/ *Joseph F. Hart*

**Joseph F. Hart,**
**Attorneys for defendants Alex Dallal and Claire Dallal**