Melissa M. Cowan (SBN 175326)
E-mail:  mcowan@bwslaw.com
Keiko J. Kojima (SBN 206595)
E-mail:  kkojima@bwslaw.com
BURKE, WILLIAMS & SORENSEN, LLP
444 South Flower Street, Suite 2400
Los Angeles, CA  90071-2953
Tel:  213.236.0600      Fax:  213.236.2700

Attorneys for Plaintiff and Counterdefendant
Lincoln Benefit Life Company

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, CENTRAL DIVISION

LINCOLN BENEFIT LIFE
COMPANY, a Nebraska Corporation,

                    Plaintiff,

v.

ALEXANDER DALLAL, an
individual; CLAIRE DALLAL, an
individual; and DOES 1 through 10,
Inclusive,

                    Defendants.

ALEXANDER DALLAL, an
individual; and CLAIRE DALLAL, an
individual,

                    Counterclaimants,

v.

LINCOLN BENEFIT LIFE
COMPANY, a Nebraska Corporation,

                    Counterdefendant.

Case No.  2:16-cv-9307 MWF (Ex)

**PLAINTIFF AND COUNTER-
DEFENDANT LINCOLN BENEFIT
LIFE COMPANY'S OPPOSITION
TO DEFENDANT AND
COUNTERCLAIMANT
ALEXANDER DALLAL AND
CLAIRE DALLAL'S MOTION FOR
SUMMARY, OR ALTERNATIVELY,
FOR SUMMARY ADJUDICATION**

[Filed Concurrently with Supplemental
Declaration of Melissa M. Cowan with
Exhibits; Request for Judicial Notice;
Objections to Declaration and Exhibits of
William Tanenbaum; Response to
Defendants' Statement of
Uncontroverted Facts & Conclusions of
Law; [Proposed] Order; and Proof of
Service]

**Date:       April 9, 2018**
**Time:       10:00 a.m.**
**Ctrm:       5A, 1st Street Courthouse**

        Plaintiff and Counterdefendant Lincoln Benefit Life Company ("Lincoln")

hereby submits its opposition to Defendant and Counterclaimant Alexander and

Claire Dallal's motion for summary judgment/summary adjudication.

Burke, Williams &
Sorensen, LLP
Attorneys At Law
Los Angeles

LA #4850-9250-8767 v1

CASE NO.  2:16-CV-9307 MWF (EX)
LINCOLN'S OPP TO DALLALS MSJ, OR
ALTERNATIVELY, FOR MSA

# TABLE OF CONTENTS

**Page**

I.      PRELIMINARY STATEMENT ..................................................................... 1

II.     SALIENT FACTS ........................................................................................ 1

    A.      The Dallals Ignore The Policy Requirements for Reimbursement ....... 1

    B.      The Dallals Consistently Crafted Their Story During The Claim ........ 2

    C.      Lincoln Discovers the Dallals' Fraud in mid-2016 ............................. 5

    D.      Lincoln Retroactively Confirms the Dallals' Widespread Fraud
        During Litigation ................................................................................ 9

        1.      The Dallals falsified the claim submissions and care ................ 9

        2.      The Dallals staged Mr. Dallal's incapacity and needs ............ 10

        3.      The Dallals manipulated Dr. Feld and the APS forms ............ 11

        4.      The Dallals concealed Mr. Dallals' true abilities .................... 11

III.    LEGAL STANDARD FOR SUMMARY JUDGMENT ............................. 12

IV.     THE DALLALS CANNOT MEET THEIR BURDEN ............................... 12

    A.      The Court Has Rejected The "Incontestable" Provision Excuse ........ 12

    B.      The "Entitlement to Benefits" Excuse Is Unavailing ........................ 13

        1.      Diagnoses cannot equal entitlement to benefits ..................... 14

        2.      The "doctors support my claim" excuse is fabricated ............. 14

        3.      The "reliance on the APS forms" excuse is futile ................... 15

        4.      The "Mr. Dallal had caregivers" excuse is flawed ................. 17

    C.      The "Reject the Unfavorable Evidence" Excuse Is Contrived .......... 18

V.      THE DALLALS CANNOT DEFEAT LINCOLN'S FRAUD CLAIM ...... 20

        1.      The Dallals misrepresented the truth concerning Mr.
            Dallal's abilities ..................................................................... 20

        2.      The Dallals submitted forged claim forms misrepresenting
            the caregiver's identity, days worked, and location ................ 21

        3.      The Dallals' misrepresentations were made knowingly ......... 23

        4.      The Dallals' misrepresentations and omissions were
            material ................................................................................... 24

        5.      Lincoln is entitled to damages and voiding of the Policy ....... 25

VI.     CONCLUSION .......................................................................................... 25

Burke, Williams &
Sorensen, LLP
Attorneys At Law
Los Angeles

- i -

CASE NO.  2:16-CV-9307 MWF (EX)
LINCOLN'S OPP TO DALLALS MSJ, OR
ALTERNATIVELY, FOR MSA

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### Federal Cases

*Almazni v. United Fin. Cas. Co.*,
   2015 WL 5680312 (C.D. Cal. Sept. 24, 2015) .................................................. 22

*Casual 12, Inc. v. Sentinel Ins. Co., Ltd.*,
   2017 WL 5624293 (C.D. Cal. 2017) .............................................................. 24

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ........................................................................ 12, 13

*Hyland v. Millers Nat. Ins. Co.*,
   91 F.2d 735 (9th Cir. 1937) .................................................................... 21

*Jordan v. Northrop Grumman Corp. Welf. Plan*,
   370 F.3d 869 (9th Cir. 2004) .................................................................. 14

*Nationwide Mut. Ins. Co. v. Ryan*,
   2014 WL 4793890 (N.D. Cal., 2014) ........................................................ 21, 24

*Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*,
   210 F.3d 1099 (9th Cir. 2000) ................................................................. 12

*Paul Revere Life Ins. Co. v. Bass*,
   523 F.Supp. 134 (N.D. Cal. 1981) ............................................................. 13

*Paul Revere Life Ins. Co. v. Fima*,
   105 F.3d 490 (9th Cir. 1997) .................................................................. 12

### State Cases

*Cummings v. Fire Ins. Exch.*,
   202 Cal.App.3d 1407 (1988) .............................................................. 23, 24, 25

*Galanty v. Paul Revere Life Ins. Co.*,
   23 Cal. 4th 368, 97 Cal. Rptr. 2d 67 (2000) ................................................... 12

*N.Y. Life Ins. Co. v. Hollender*,
   38 Cal. 2d 73, 237 P.2d 510 (1951) ........................................................... 12

Burke, Williams & Sorensen, LLP
Attorneys At Law
Los Angeles

LA #4850-9250-8767 v1

- ii -

CASE NO.  2:16-CV-9307 MWF (EX)
LINCOLN'S OPP TO DALLALS MSJ, OR
ALTERNATIVELY, FOR MSA

*Nieto v. Blue Shield of Cal.*,
    181 Cal.App.4th 60 (2010) .................................................................... 23

*Spott Elec. Co. v. Industrial Indem. Co.*,
    30 Cal.App.3d 797 (1973) .................................................................... 13

**State Statutes**

Cal. Ins. Code
    § 330 .................................................................................................... 21
    § 331 .................................................................................................... 21
    § 332 .................................................................................................... 23
    § 358 .................................................................................................... 21
    § 359 .................................................................................................... 25

**Other Authorities**

Fed.R.Civ.P. 35 .......................................................................................... 12

Fed.R.Civ.P. 56(c)(1) .................................................................................. 12

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Burke, Williams &
Sorensen, LLP
Attorneys At Law
Los Angeles

LA #4850-9250-8767 v1                        - iii -                        CASE NO.  2:16-CV-9307 MWF (EX)
                                                                           LINCOLN'S OPP TO DALLALS MSJ, OR
                                                                           ALTERNATIVELY, FOR MSA

1

## I.   <u>PRELIMINARY STATEMENT</u>

2

Lincoln filed this lawsuit because the Dallals submitted a fraudulent long-

3

term care (LTC) insurance claim.  They committed fraud by falsifying monthly

4

claim submissions; portraying Mr. Dallal as helpless during home assessments, in

5

stark contrast to his functional, active presentation on extensive surveillance;

6

manipulating their doctor, who provided Attending Physician forms; and

7

concealing the truth about Mr. Dallal's true activities – such as his return to work in

8

2005.  To pare down issues for trial, Lincoln filed a motion for full or partial

9

summary judgment because the Dallals indisputably committed fraud as of July 29,

10

2016 – when they submitted false claim documents for reimbursement of

11

caregiving expenses by their only identified caregiver, Helen Genovea ("Helen"),

12

but surveillance confirmed she was not even there.  The Dallals cannot refute the

13

content of the falsified forms or the surveillance, nor do they attempt to do so here.

14

The Dallals' motion is a futile pretext to distract from their fraud.  Their

15

proffered excuses cannot meet their burden of proof at summary judgment to defeat

16

Lincoln's First Amended Complaint (FAC).  The Court has already found the

17

"incontestability clause" excuse does not affect Lincoln's right to void the Policy

18

due to fraud.  The cornerstone of their motion– that Mr. Dallal should get benefits –

19

is based on flagrant misstatements, offers no proof of impairment or actual care,

20

and does not explain their fraud.  Finally, they cannot overcome strong evidence of

21

fraud in the claim forms and surveillance, as established in Lincoln's motion and

22

here.  The Dallals' motion should be denied, with judgment granted to Lincoln.

23

## II.   <u>SALIENT FACTS</u>
### A.   <u>The Dallals Ignore The Policy Requirements for Reimbursement</u>

24

Lincoln issued a joint LTC Policy to the Dallals on August 20, 2003.[1]  The LTC

25

coverage reimburses "actual expenses" incurred for home care services provided to a

26

Chronically Ill insured by a *non-family member*.  [Doc. 68-3, #861,866]  As a threshold

27

28

---

[1] The parties have agreed to refer to and incorporate the ECF "Doc." numbers of the declarations/exhibits previously used in the cross-MSJ process to avoid duplication of exhibits and unnecessarily expanding record. Supp. Cowan ¶2.

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

LA #4850-9250-8767 v1                 - 1 -

CASE NO.  2:16-CV-9307 MWF (EX)
LINCOLN'S OPP TO DALLALS MSJ, OR
ALTERNATIVELY, FOR MSA

for benefits, the insured must first establish he is Chronically Ill under the LTC Policy – meaning, he requires (a) Substantial Assistance (hands-on or standby) with at least 2 of 6 six Activities of Daily Living (ADLs) – eating, bathing, continence, dressing, toileting, and transferring – due to functional capacity loss ["ADL option"], or (b) Substantial ("continual") Supervision to protect the insured from threats to health/safety due to severe cognitive impairment ["Severe CI Option"].  [Docs.68-2,¶3; 68-3,#862-63,865]

Under the ADL Option, the insured's functional capacity loss requires either "Hands-On Assistance," which is "physical assistance of another person without which you would be unable to perform the Activity of Daily Living," or "Standby Assistance," which requires "the presence of another person within arm's reach of you that is necessary to prevent, by physical intervention injury, to you while you are performing the Activity of Daily Living." [Doc. 68-3, #861]   For the Severe CI Option, the insured must demonstrate "the deterioration or loss of your intellectual capacity which ***requires substantial supervision*** by another person to protect yourself or others.  It is measured by clinical evidence and standardized tests which reliably measure your impairment in: a. short or long term memory; b. orientation as to people, places or time; and c. deductive or abstract reasoning.  Cognitive Impairment includes Alzheimer's disease and similar forms of irreversible dementia."  Substantial Supervision" means "***continual supervision*** by another person is necessary to protect insured from threats to his or her health or safety.  Such supervision may include cueing by verbal prompting, gestures, or other demonstrations."  [Doc. 68-3, #862 (emphasis added)]

Reimbursement benefits are not automatic.  Ongoing proof is required, including verification of who provides what home health services, when, where, and the actual expense.  [Doc.68-3,#865,868,Doc.68-2,¶5-9]

## B.    The Dallals Consistently Crafted Their Story During The Claim

Mrs. Dallal submitted her husband's LTC claim in April 2004, following the removal of a meningioma in the left temporal lobe.  [Doc. 68-3, #918-19]  Mrs. Dallal represented her husband through a power of attorney.  [Doc. 68-3, #885-908,

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

LA #4850-9250-8767 v1                - 2 -                CASE NO.  2:16-CV-9307 MWF (EX)
LINCOLN'S OPP TO DALLALS MSJ, OR
ALTERNATIVELY, FOR MSA

919,941,999,1229,1246]  From the outset, the Dallals represented that Mr. Dallal qualified as chronically ill under both the ADL and Severe CI Options.  Lincoln paid reimbursement benefits because all information collected until mid-2016, as discussed below, reflected that Mr. Dallal's condition did not improve. [Doc. 68-2, ¶36; Doc. 68-3, N. Seeman Exs. 5-7, 10-11, 14-35, 37]

**Monthly Claim Submissions Re: Care**:  Lincoln required monthly claim documents to prove who gave home health services, as well as what, when, and where services were provided.  [Doc. 68-2, ¶¶5-9]  This information was included on monthly Caregiver Activity Notes ("Caregiver Notes") received from the Dallals from 2004-2016.  All Notes reflected that the Helen prepared/signed the forms and was Mr. Dallal's only caregiver.  [Doc.68-3,#933-36,951-55;Doc.68-4,#1023-69;Doc.68-5,#1070-1143; Doc.68-6,#1265-1328] Mrs. Dallal reinforced that fact by sending notes "from Helen," on which the caregiver comments stated: "***I am working daily 9:00 a.m. to 5:00 p.m. 8 hours a day.***"  [Doc.68-3, #951,955]

In 2004-2005, the Caregiver Notes said Helen provided Mr. Dallal with constant supervision and substantial assistance with nearly every ADL (except eating) at his home for 8-9 hours/day, 5-6 days/week.  [Doc.68-3,#933-36,951-55;Doc.68-4,#1023-69;Doc.68-5,#1070-80]  Over time, the Notes showed Helen gave increased services, such that by June 2009, she worked 12 hours/day, 7 days/week providing help with toileting, dressing, transferring, showering, continence, and other activities.  [Doc.68-5,#1101-43; Doc.68-6, #1265-1328]

The Caregiver Notes incorporated fraud notices, which verified the accuracy of the Notes and acknowledged the civil and criminal ramifications of submitting misleading or completing information.  [Doc.68-2,¶7]  Lincoln received 74 fraud notices, which represented Helen signed as the person who "completed" the forms. [Doc. 68-2,¶26; Doc.68-5, #1111,1118,1123, 1129,1135,1142-43; Doc. 68-6, #1271-72,1280-81,1289-90,1299-1300,1308-09,1317-18,1326-27]

Lincoln also requested proof of payments to Helen to assess the actual

Burke, Williams & Sorensen, LLP
Attorneys At Law
Los Angeles

LA #4850-9250-8767 v1          - 3 -

CASE NO.  2:16-CV-9307 MWF (EX)
LINCOLN'S OPP TO DALLALS MSJ, OR
ALTERNATIVELY, FOR MSA

expense for the reimbursement benefits sought.  [Doc.68-2,¶16, Doc.68-3,Ex.8]

Mrs. Dallal sent Lincoln copies of handwritten receipts for weekly cash payments

to Helen with dates of service, all of which were purportedly signed by Helen.

[Doc.68-5,#1087,1093-94,1099,1105-06, 1112,1117,1124,1130,1136,1141;Doc.68-

6,1273,1282,1291,1301,1310,1319,1328]

**Nurse Home Assessments**:  Lincoln obtained multiple nurse assessments over

the years, which showed Mr. Dallal's condition declined by both his presentation and

Mrs. Dallal's report.  During the first assessment, six weeks post-surgery in June 2004,

Mrs. Dallal told the nurse her husband was retired and received constant

supervision/assistance from Helen, while she went to work at their custom shirt making

shop (Mr. Alex).  Mr. Dallal only answered 15 of 30 questions correctly on the nurse's

Mini Mental Status Examination (MMSE) --- a standardized cognitive test.  The nurse

advised Mr. Dallal required care five days/week. [Doc.68-2,¶18; Doc.68-3, #939-949]

In October 2005, Lincoln requested a second assessment at the Dallal's

home.  Mrs. Dallal told the nurse Mr. Dallal had a stroke in May 2005, and a

thyroid tumor in June 2005.  She also identified Helen as the only caregiver.  The

nurse's cognitive testing revealed a decline in Mr. Dallal's condition, yielding a

very low score of *4/30 on the MMSE*.  The nurse advised that Mr. Dallal would

"never" regain ADL independence and required substantial care for at least four of

six ADLs (bathing, dressing, transferring, toileting) and severe cognitive

impairment.  [Doc.68-3,#993-96,999,1001-21; Doc.68-10,#1623]

In the third home assessment in August 2014, Mrs. Dallal reported to the

nurse that Mr. Dallal needed hands-on assistance with most ADLs (bathing,

dressing, transferring, toileting, mobility, bladder incontinence), and total assistance

for all instrumental ADLs (shopping, transportation, phone use, etc.).  She said he

could not transfer and used a bedside commode, a cane, a walker, and a wheelchair.

Mrs. Dallal represented that Helen provided care 7 days/week, 12 hours/day.  Mr.

Dallal again received a very low score of 4/30 on the MMSE.  He presented as so

Burke, Williams &
Sorensen, LLP
Attorneys At Law
Los Angeles

LA #4850-9250-8767 v1                    - 4 -

CASE NO.  2:16-CV-9307 MWF (EX)
LINCOLN'S OPP TO DALLALS MSJ, OR
ALTERNATIVELY, FOR MSA

impaired the nurse recommended a home health aide 24 hours/day, 7 days/week due to physical and cognitive impairments, with transfer to a facility for 24/7 care if care could not be safely provided at home.  [Doc. 68-5, #1173-1182]

**Medical Forms**:  Through the years, Lincoln sought input from Mr. Dallal's treating doctors regarding Mr. Dallal's functionality and "chronically ill" status. For example, Lincoln asked multiple times for Mr. Dallal's surgeon, Dr. Black, to complete forms in 2008; it received a response from Dr. Ananda at Dr. Black's office, verifying Mr. Dallal was "chronically ill."  [Doc.68-2,¶28;68-5,#1145-46]

Lincoln thereafter asked Mrs. Dallal to facilitate Attending Physician Statements ("APS").  She sent Lincoln APS forms signed by internist Dr. Joy Feld, in 2009, 2010, and January 2011.  Lincoln thereafter received the forms directly from Dr. Feld.  [Doc.68-2,¶¶29,30; Doc.68-5,#1149-71,1185-86]  Through 2013, the APS forms indicated Mr. Dallal required at least standby assistance with dressing, bathing, toileting, and transferring; was cognitively impaired; permanently required a caregiver; and was "chronically ill."  [*Id.*, #1149-71] Lincoln received an APS from Dr. Feld, dated July 9, 2015, which reflected a *decline* in Mr. Dallal's condition since the prior APS in 2013.  Dr. Feld noted Mr. Dallal required standby assistance with *all* ADLs, except for hands-on assistance with bathing.  No independent ADLs were indicated.  [Doc.68-5,#1185-86]

Based on the consistent information provided regarding Mr. Dallal's condition and care, Lincoln determined that Mr. Dallal qualified for reimbursement.  It paid the Dallals for the caregiving expenses identified on the Caregiver Notes and receipts, up to $265/day, for the represented 12 hours of daily care.  [Doc. 68-2, ¶¶25,26,33,34,57]

### C.   Lincoln Discovers the Dallals' Fraud in mid-2016

In 2016, Lincoln discovered that the Dallals had misrepresented Mr. Dallal's true health status and caregiving services.  Dr. Feld reported in her May 2016 APS that Mr. Dallal actually required *less care* than in 2015 – he was *independent* in ambulation, continence, and eating (previously standby), needed standby assistance

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

LA #4850-9250-8767 v1          - 5 -          CASE NO.  2:16-CV-9307 MWF (EX)
LINCOLN'S OPP TO DALLALS MSJ, OR
ALTERNATIVELY, FOR MSA

in bathing (previously hands-on), but still needed standby assistance in dressing, toileting, transferring. [Doc. 68-5, #1188-89]  This was unexpected when Mr. Dallal had presented with a chronic, progressive condition. [Doc.68-2,¶37]

Lincoln requested Dr. Feld's medical records, which reflected *no* problems with his mobility, his orientation to person/place/time, and his reports of aches and pains due to potentially activity (little "jog" across the street, lifting, etc.).[2]  Lincoln requested a fourth home assessment by a registered nurse.  [Doc.68-5, #1191-94;Doc.68-6,#1198-99,1202-03,1206,1211,1213,1219]  On June 23, 2016, Mr. Dallal presented to Nurse Lynn Sokolow as lethargic, drowsy, and barely able to open his eyes or respond to questions.  Mrs. Dallal again spoke for her husband, conveying he required hands-on assistance showering and dressing; getting on/off the toilet; moving in/out of a chair or bed; and moving around outside the home, negotiating curbs, ramps, or uneven ground. She indicated he needed standby assistance for moving around inside the home, as well as a cane, walker, or wheelchair for mobility.  During the nurse's cognitive testing, Mr. Dallal scored 4/30 on the MMSE (only correctly answering County and City, identifying one object, and pointing to a pen).  The nurse informed Lincoln that Mr. Dallal would require daily caregiving for his ADLs for 12 hours/day for the rest of his life.[3]  [Doc.68-6, #1229,1233-45]  Notably, Mrs. Dallal told Nurse Sokolow that Helen was the only caregiver.  [Doc. 68-6, #1233, 1245]  The Caregiver Note for the period of the June 23rd assessment reflected Helen had the "day off" – her first in years. [Doc. 68-6, #1277]

With these inconsistencies, Lincoln obtained 18 days of surveillance over three months – July 25-31, September 10-16, and November 2-5, 2016.  The results contradicted everything the Dallals had represented for years:  **Mr. Dallal was quite active, mobile, and independent, without any caregiver.**  [Docs.68-2,¶41; 68-8,¶2-3,#1365-80;68-9,¶2-3,#1397-1442;69,Manual Lodging - Exs.40,42,44,66]

---

[2] The Dallals fail to show any relevance or nexus for their argument Lincoln did not review medical records before 2016.  Why would Lincoln need to do so when (a) all information Lincoln received until 2016 consistently reflected Mr. Dallal required/received care; and (b) the Dallals now assert that all the medical records support the claim?
[3] The Dallals contend Lincoln did not get another nurse visit *after* Nurse Sokolow found Mr. Dallal was bad off.  No need.  He had portrayed himself the *same way* in all prior home visits. Surveillance confirms he staged his condition.

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

LA #4850-9250-8767 v1                           - 6 -                    CASE NO.  2:16-CV-9307 MWF (EX)
LINCOLN'S OPP TO DALLALS MSJ, OR
ALTERNATIVELY, FOR MSA

1    Mr. Dallal was regularly observed at the store he co-owns on little Santa

2  Monica Boulevard, *Mr. Alex*.  He was present before/during/after business hours.

3  Often on weekdays and Saturdays (when the store was open), Mr. Dallal's days

4  typically started before 8:00 a.m., with a family member driving him to Beverly

5  Hills.  Not only did he never use an ambulatory device, he was frequently observed

6  alone outside the store, including going to/from the shop (and to Starbucks), wiping

7  and rearranging outdoor furniture, conversing with others, and using a cell phone

8  kept on his belt.  At the shop, he appeared to use supplies while at a table near the

9  window (e.g., fabric, white paper, collars, etc.) or outside (sharpening things);

10 walked around inside; interacted with customers or visitors; swept the walk; took

11 trash to a dumpster (even using a towel/tissue to open/close the door); closed the

12 blinds; and locked up in the evenings while family waited in the car.  He

13 independently walked up/down stairs and curbs in a steady fashion (even when

14 carrying items), and capably transferred to/from a sitting position.  He moved in/out

15 of cars alone, usually after putting bags in the trunk or back seat, while a family

16 member sat in the driver or passenger seats.  One afternoon (September 12), he

17 even walked from the store with two men to the Peninsula Hotel across the street at

18 4:40 p.m., returned to the store, went back to the Peninsula, and returned to the store at

19 5:48 p.m.   [Docs. 68-8,#1365-80;68-9,#1397-1442;69,Man. Lodging-Ex.40,42,44,66]

20    Mr. Dallal even appeared busy on Sundays – active outside the home for

21 about 7 hours on July 31, and about 4 hours on September 11, 2016.  He left the

22 house early, was dropped off at different apartments, ate out, and independently

23 carried groceries and packages into the house without oversight.  [*Id.*]

24    The behavior of Mrs. Dallal, their adult children, and others on the

25 surveillance was quite telling.  Everyone treated Mr. Dallal as a capable, self-reliant

26 adult.  He was never observed as being touched or given the assistance the Dallals

27 represented he required.  He was communicative, independent and interactive.  [*Id.*]

28    Lincoln obtained surveillance of Helen, which revealed that not once was she

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

LA #4850-9250-8767 v1          - 7 -          CASE NO.  2:16-CV-9307 MWF (EX)
LINCOLN'S OPP TO DALLALS MSJ, OR
ALTERNATIVELY, FOR MSA

observed ever going to the Dallals' home or in their presence.  Rather, she ran errands and worked for an elderly lady in Encino.  [Doc. 68-2,¶42; Doc. 68-8,¶4, Ex.46; Doc.68-9,¶4; Exs.48,49,50,51]  Although Mr. Dallal was never under a hired caregiver's supervision (let alone Helen's supervision) while under surveillance, Mrs. Dallal continued to submit Caregiver Notes, fraud notices, and receipts allegedly signed by Helen in support of their monthly reimbursement claims *for the same period as the surveillance*.  [Doc. 68-6,#1284-1319]

At Lincoln's request, an Archangel Investigations field representative interviewed Helen outside her home on the morning of November 5, 2016.  (A Caregiver Note *falsely* claimed Helen was at the Dallals' home giving 12 hours of care at that same time.  Doc.68-6,#1316,1319; *cf.* Doc.69-9,#1496-98)  Helen confirmed not only that she was working elsewhere, but that she had never completed forms for the LTC claim, had not provided the extensive care reported, and had not seen the Dallals since 2015.  When she had worked, she was paid by check, worked a varied schedule, and had never worked 12 hours/day, 7 days a week, except for shortly after Mr. Dallal's surgery.  She also advised that Mr. Dallal had improved.  [Doc. 68-9,#1496-98]

On December 7, 2016, Mrs. Dallal called Lincoln and complained about the caregiver being contacted without her permission.  Lincoln offered to meet with Mrs. Dallal to discuss her concerns.  She declined.  In the same call, Lincoln asked the status of the claim forms.  Mrs. Dallal replied with another lie:  "*Helen does the paperwork every month around the 5th. So she just completed it. I just put it for you in the mail yesterday.*"  [Docs. 68-2, ¶¶45-46; 69, Manual Lodging-Ex. 54; Doc. 68-10, #1515-16]

To assess the medical issues, Lincoln asked the nurse who evaluated Mr. Dallal in June 2016, to review the surveillance.  She verified the Dallals' identities, noted the inconsistencies in the Dallals' representations, and found Mr. Dallal would not require any assistance or supervision.  [Doc. 68-6, #1330-31]  Lincoln also asked consulting neuropsychologist, Lori Folk-Barron, Psy.D., to review the

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

LA #4850-9250-8767 v1                        - 8 -

CASE NO.  2:16-CV-9307 MWF (EX)
LINCOLN'S OPP TO DALLALS MSJ, OR
ALTERNATIVELY, FOR MSA

file and surveillance.  Dr. Folk-Barron confirmed Mr. Dallal's activities on surveillance were inconsistent with Cognitive Impairment or the need for Substantial Supervision or Substantial Assistance under the Policy terms. Significant inconsistencies existed between Mrs. Dallal's report of Mr. Dallal's functional capacities and his filmed activities.  She found Mr. Dallal did not demonstrate neurological impairments, but displayed intact functional capacity without obvious neurological deficit to impede his ADLs.  [Doc. 68-6, #1333-38]

As such, Lincoln determined Mr. Dallal did not meet the Policy requirements and denied the claim on December 16, 2016.  The Dallals appealed without offering any new evidence.  Lincoln upheld its decision.  [Doc 68-6, #1340-55]

### D. Lincoln Retroactively Confirms the Dallals' Widespread Fraud During Litigation

Lincoln's investigative and discovery efforts have proven quite fruitful in peeling back the layers of the Dallals' fraudulent scheme through false claim forms, staging Mr. Dallal's helplessness in comparison to the surveillance, selectively reporting to their doctor, and concealing Mr. Dallal's inconsistent activities through the years – including his return to work, financial transactions, and other activities.

### 1. The Dallals falsified the claim submissions and care

In discovery, **Mrs. Dallal admitted she has completed and signed Helen's name on all Caregiver Notes and fraud notices, since June 2004**.  [Doc. 68-10, #1556,1559,1561,1568-96] Helen testified that she saw Mrs. Dallal prepare the Caregiver Notes on which Mrs. Dallal signed her name.  However, she did *not* authorize Mrs. Dallal to sign the fraud notices, never reviewed any Notes or fraud notices, never knew if false information had been submitted, and never agreed false or misleading information could be submitted. [Doc.68-10,#1518,1523-24,1536-41]

Mrs. Dallal also falsified the cash receipts submitted in support of the claim. She admitted that after purchasing "receipt" books, she wrote out receipts depicting payments to Helen for services (even when Helen was not there), signed Helen's

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

LA #4850-9250-8767 v1                    - 9 -                    CASE NO.  2:16-CV-9307 MWF (EX)
LINCOLN'S OPP TO DALLALS MSJ, OR
ALTERNATIVELY, FOR MSA

1   name, submitted them to Lincoln, and then shredded them.  [Doc.68-5,#1087,1093-

2   94,1099,1105-06,1112,1117,1124,1130,1136,1141;Doc.68-6,#1273,1282,1291,

3   1301,1310,1319,1328; Doc.68-10,#1562-63,1568-69]  Helen cannot recall

4   preparing, giving, or seeing such receipts for payment.  [Doc.68-10,#1544-45]

5          The claim documents were riddled with false representations:

6   ►Since 2009, all claim forms and receipts represented that Helen worked and was

7   paid for services of 12 hours/day, 7 days a week.  Yet, Helen testified that she has

8   never worked a full month more than 2-3 times, and *since 2011*, had only worked

9   2-3 days/week.  She did not get paid when she did not work.  [Doc.68-10,#1525-34]

10  ►All documents reflected Helen was the only caregiver. [Doc.68-3,#951-55; Doc.

11  68-4,1023-69;Doc.68-5,#1070-1143;Doc.68-6,#1265-1328] The Dallals now claim

12  in litigation they had three other caregivers, whom they never revealed to Lincoln.

13  ►Mrs. Dallal indicated on the forms that all full-time, daily care was provided at

14  the Dallals' home.  [*Id.*]  Yet, the surveillance revealed Mr. Dallal was rarely at

15  home.  [Doc.68-8,#1365-92; Doc.68-9,#1397-1442; Doc. 69, Exs. 40, 42, 44, 66]

16  Mr. and Mrs. Dallal also took more than a dozen trips to Europe, Mexico, Hawaii,

17  and other places, plus twice-a-year trade shows in Las Vegas, *without a caregiver*;

18  yet, when they traveled, Mrs. Dallal still sought reimbursement from Lincoln and

19  falsely wrote on the Notes and receipts that daily services were being provide *at*

20  *home* by Helen.  [Doc.68-3,#951-55; Doc. 68-4, 1023-69; Doc.68-5,#1070-1143;

21  Doc.68-6,#1265-1328; Supp. Cowan Decl., ¶9, Ex. 9 (Claire Depo., 224:9-11,

22  227:5-9, 451:18-452:18,453:23-455:1,455:11-465:7,465:15-466:13,467:1-3)]

23          **2.    The Dallals staged Mr. Dallal's incapacity and needs**

24          The Dallals cannot explain why they portrayed Mr. Dallal as helpless, when

25  surveillance showed he was fully functional, ambulatory and active *without* a

26  caregiver.  The Dallals cannot justify why Mrs. Dallal wrote on claim forms that

27  Helen gave daily care for toileting, transferring, dressing, bathing, and occasionally

28  continence when she did not.  Beyond surveillance, Helen admitted Mr. Dallal

Burke, Williams &
Sorensen, LLP
Attorneys At Law
Los Angeles

LA #4850-9250-8767 v1                          - 10 -                          CASE NO.  2:16-CV-9307 MWF (EX)
LINCOLN'S OPP TO DALLALS MSJ, OR
ALTERNATIVELY, FOR MSA

could perform those ADLs: he can dress and shower, take himself to the bathroom, perform his hygiene, and transfer to/from bed and a chair.[4]  [Doc. 68-10, #1546-52]

### 3.  The Dallals manipulated Dr. Feld and the APS forms

Dr. Feld testified in litigation that (1) she based the APS forms on the Dallal family's report, which she accepted as true; (2) the APS forms with her name on them for 2009, 2010, and January 2011, were altered or augmented, such that she could not attest to their validity regarding ADL functioning; (3) she did not recall the bases for comments on the APS forms, except she believed or "speculated" the information came from the Dallal family; (4) her conclusions regarding Mr. Dallal's cognitive impairment were based on the family's report; and (5) in 2005, she understood Mr. Dallal needed no care, except for heavy chores.  [Docs. 68-5, 1148-60; Doc. 68-10, #1599-1604, 1606-20; Supp. Cowan Decl. ¶¶12, 8, Ex. 85; Ex. 81 (Feld Depo., 189:11-191:19)]

### 4.  The Dallals concealed Mr. Dallals' true abilities

Lincoln has obtained admissions by Mr. Dallal, which confirm that the Dallals misrepresented his condition, capabilities, activities, and involvement in *Mr. Alex*:  (1) Mr. Dallal admitted in May 2005 and again in 2006, that he had returned to work full-time as a tailor [Supp. Cowan, ¶¶10-11, 15; Exs. 83, p.83, 88, p.118; (2) he renewed his driver's license in 2005 and 2010, leased a BMW in 2009, filed an insurance claim, and tried to negotiate settlement after someone rear-ended his car [Supp. Cowan, ¶¶13-15; Exs. 86-88]; (3) *without power of attorney*, he signed checks for the business, made changes to the business bank account, and obtained a line of credit [Supp. Cowan, ¶; Ex. 90];  (8) he repeatedly identified himself as the primary borrower and long-time owner of *Mr. Alex* with a healthy business income on many loan applications for the Dallals' properties, which he also signed *without power of attorney* [Supp. Cowan, ¶¶16-17; Exs. 89, 127-29; 90, 138-42, 158-75]; and (9) feigned his condition to neurologist Dr. Gold and

---

[4] The limited services Helen said she gave – meals, laundry, driving, and being with him when he walks – would not qualify him for reimbursement benefits.  [Supp. Cowan Decl., ¶4, Ex. 77 (Helen Depo., 208:24-209:13)]

BURKE, WILLIAMS & SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

LA #4850-9250-8767 v1                    - 11 -          CASE NO. 2:16-CV-9307 MWF (EX)
LINCOLN'S OPP TO DALLALS MSJ, OR
ALTERNATIVELY, FOR MSA

1  neuropsychologist Dr. Hinkin in F.R.C.P. 35 exams. [Doc. 68-10, #1501,1633-86]

2  ## III.   LEGAL STANDARD FOR SUMMARY JUDGMENT

3  The moving party on summary judgment bears the initial burden to establish

4  that there are no genuine issues of material fact that should be decided at trial.

5  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "If a moving party fails to

6  carry its initial burden of production, the nonmoving party has no obligation to

7  produce anything. . ."  *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.,* 210

8  F.3d 1099, 1102 (9th Cir. 2000))  The moving party must cite "to ***particular parts***

9  ***of materials in the record***, including depositions, documents . . . other materials,"

10  or "show that the materials cited do not establish the . . . presence of a genuine

11  dispute." Fed.R.Civ.P. 56(c)(1) (emphasis added).

12  ## IV.   THE DALLALS CANNOT MEET THEIR BURDEN

13  The Dallals cannot defeat the First Amended Complaint through their

14  unsupported excuses, which fail to meet their burden of proof.

15  ### A.   The Court Has Rejected The "Incontestable" Provision Excuse

16  The Dallals argue that because the Policy became "incontestable" in 2005,

17  Lincoln cannot "terminate" the Policy outside of the "termination provision."

18  Lincoln has not sought to "terminate" the policy, but to void the Policy for the

19  Dallals' fraudulent insurance claim, as permitted by law.  (FAC, ¶¶59-68)  The

20  Court already rejected their *same* argument in denying their motion to dismiss.

21  [Doc. 29]  Neither the "incontestability" clause nor the "termination" provision can

22  insulate the Dallals from their fraud.  As this Court previously held:

23  > "Where the incontestability period has run, incontestability clauses
> prevent lawsuits to rescind disability insurance policies based upon claims
> of fraud or misrepresentation **in the procurement of the policy**." *Paul*

24  > *Revere Life Ins. Co. v. Fima*, 105 Cal. 490, 492 (9th Cir. 1997) (emphasis

25  > added). The relevant case law does not treat the incontestability clause as

26  > applying to fraudulently submitted claims. *See, e.g., Galanty v. Paul*
> *Revere Life Ins. Co.*, 23 Cal. 4th 368, 381–82, 97 Cal. Rptr. 2d 67 (2000) .

27  > . . ; *N.Y. Life Ins. Co. v. Hollender*, 38 Cal. 2d 73, 78, 237 P.2d 510 (1951)

28

Burke, Williams &
Sorensen, LLP
Attorneys At Law
Los Angeles

LA #4850-9250-8767 v1                    - 12 -

CASE NO.  2:16-CV-9307 MWF (EX)
LINCOLN'S OPP TO DALLALS MSJ, OR
ALTERNATIVELY, FOR MSA

("The denial of liability under a policy by reason of fraud or misrepresentation **in its procurement** is the 'contest' which is governed by the incontestable clause . . . .") (emphasis added).

Here, Lincoln Benefit does not seek rescission of the contract due to any alleged fraud in procuring the Policy. Rather, Lincoln Benefit alleges that the Dallals submitted claims, at least as far back as 2015, for services that they were not actually receiving and to which they could not possibly be entitled. These claims are simply not the sort that are contemplated by the incontestability clause, and thus are not barred under the language of that clause." [Doc. 29, pp. 12-13; Exh. 91 to Supp. Cowan Decl.]

*See Paul Revere Life Ins. Co. v. Bass*, 523 F.Supp. 134, 137 (N.D. Cal. 1981).

The "termination" provision also has no bearing on whether Lincoln can void the Policy due to the Dallals' fraudulent claim.  The Dallals have no authority that would give them carte blanche to commit fraud.  Their only case, *Spott Elec. Co. v. Industrial Indem. Co.*, 30 Cal.App.3d 797 (1973), has nothing to do with voiding a Policy or a fraudulent claim.   This excuse fails.

### B.   The "Entitlement to Benefits" Excuse Is Unavailing

Despite the Dallals' argument, Lincoln's first cause of action for lack of entitlement to benefits is not tied to the Dallals' fraud, but his inability to satisfy the Policy's terms.  The Dallals broadly claim he gets benefits because "there is no valid dispute as to Alex Dallal's need for assistance or the diagnosis of his cognitive impairment." (Mtn., 7:8-9)  They offer generic reasoning:  (1) Mr. Dallal has many diagnoses; (2) *Every* physician "agrees" he is entitled to Policy benefits; (3) Dr. Feld submitted APS forms; and (4) Mr. Dallal had caregivers.  These arguments are disconnected, have no time reference, and are wholly unsupported by their proffered evidence.  Even if the Dallals could establish these points (which they cannot), it still does not prove they did not submit a fraudulent claim – especially as of the time of the surveillance.  The Dallals have not satisfied their burden of proof on this motion.  *Celotex, 477 U.S. at 323*.  They have not even asked for judgment on this first claim.

///

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

LA #4850-9250-8767 v1            - 13 -

CASE NO.  2:16-CV-9307 MWF (EX)
LINCOLN'S OPP TO DALLALS MSJ, OR
ALTERNATIVELY, FOR MSA

### 1.   Diagnoses cannot equal entitlement to benefits

The Dallals allege that 13 diagnoses (11 "facts" in their Separate Statement) are proof of Mr. Dallal's "physical injuries."  Simply having diagnoses or injuries cannot equate with entitlement to Policy benefits, let alone satisfy the "Chronically Ill individual" definition.  *See Jordan v. Northrop Grumman Corp. Welf. Plan*, 370 F.3d 869, 880 (9th Cir. 2004) (overruled on other grounds by *Abatie v. Alta Health & Life Ins. Co*., 458 F.3d 955, 969 (9th Cir. 2006)).  There is no evidence these "diagnoses" amount to loss of functional capacity necessitating Substantial Assistance (hands-on or standby assistance) for two of six ADLs (toileting, transferring, dressing, bathing, continence, and eating), as the "ADL Option" mandates.  None of these "diagnoses" satisfy the Severe CI Option, particularly since no cognitive testing has been offered to meet Mr. Dallal's burden of proving Cognitive Impairment under the Policy definition.  None prove the severity of Cognitive Impairment under the Policy to necessitate Substantial (continual) supervision.  No medical declaration supports their position.  The "diagnoses" excuse must fail.  Indeed, even someone with these diagnoses can commit fraud.

### 2.   The "doctors support my claim" excuse is fabricated

The Dallals tout that "All physicians who have treated [Mr. Dallal] since 2004 and up to December 2016" believe he "needed full-time caregivers," needs "standby assistance to actual assistance", is cognitively impaired, and qualifies for benefits.  Repeating false statements does not make them true.  The Dallals have no supportive medical declarations, nor do any of the "medical records" attached to Mr. Tanenbaum's declaration substantiating these self-serving proclamations.

The Dallals' fraudulent scheme was based on tactics of diversion, withholding evidence, and false representations.  This motion is no different.  Here, the Dallals cherry-picked medical records, withholding the admissions and proof of Mr. Dallals' true functioning.  They failed to produce medical records *where Mr. Dallal admitted he returned to work*.  [Supp.Cowan Exs. 83,84]  They did not

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

LA #4850-9250-8767 v1                          - 14 -

CASE NO.  2:16-CV-9307 MWF (EX)
LINCOLN'S OPP TO DALLALS MSJ, OR
ALTERNATIVELY, FOR MSA

produce Dr. Ananda's testimony that he never found Mr. Dallal was cognitively impaired or required ADL assistance.  [Supp. Cowan Decl., ¶6, Ex. 6 (Ananda Depo., 39:20-42:16, 44:7-46:12, 47:15-50:13, 51:2-21, 52:18-53:23, 54:8-57:1, 57:20-58:15  60:5-8, 70:25-71:3, 72:9-73:13, 73:20-74:1)]  They withheld Dr. Feld's form on which confirmed Mr. Dallal required no assistance in 2005 (which she failed to produce to Lincoln).  [Supp. Cowan Decl., ¶¶8, 12, Ex. 85; Ex. 81 (Feld Depo., 189:11-191:19)]  Dr. Feld even testified she had no independent knowledge of what Mr. Dallal required – all her information came from the family.  [Doc.68-10,#1599-1604,1606-20]  Instead, the Dallals rely on scribbling on an MRI report in Exhibit 2 to Mr. Tanenbaum's declaration as proof "Dr. Chow," a late-designated expert, believes Mr. Dallal *currently* has problems.  That document is unsupported hearsay: the MRI report was **altered** by an unidentified person's scribbling *and was not produced by Dr. Chow's office in response to Lincoln's subpoena*.  [Supp. Cowan Decl., ¶3; Ex. 76; *cf.* Tanenbaum Ex. 2].

Even records attached to Mr. Tanenbaum's declaration contradict the dire depiction of Mr. Dallal.  Orthopedic surgeon Sellman confirmed in January 2010 that Mr. Dallal was "a tailor," had a normal review of systems, was alert and in good spirits, and walking a half hour every morning.  [Tanenbaum Ex. 5, Doc.71-6, #1794,1796].  Dr. Feld's records reflect Mr. Dallal was alert/oriented to person, place, time; had no assistance in ambulating to exam room; had a normal gait, and had no seizures, neurological deficits, pain, or incontinence. [Tanenbaum Ex. 1, Doc.71-2, #1741,1744,1746-1749,1751]  No evidence supports this "every doctor believes I get benefits" excuse.

### 3.    The "reliance on the APS forms" excuse is futile

The Dallals contend that Drs. Ananda and Feld submitted APS forms "certifying Alex's eligibility for benefits."  However, they do not produce any APS from either doctor in Exhibits 2 or 7 to Mr. Tanenbaum's declaration, do not offer declarations from these doctors, and do not show how the forms apply in the face of the 2016 surveillance.  Even so, the APS documents are unreliable.

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

LA #4850-9250-8767 v1                    - 15 -                    CASE NO.  2:16-CV-9307 MWF (EX)
LINCOLN'S OPP TO DALLALS MSJ, OR
ALTERNATIVELY, FOR MSA

First, Dr. Ananda did not complete an APS, but signed a fax form regarding "Chronic Illness" *in February 2008*, after Lincoln had issued a second request for this form to Mr. Dallal's surgeon, Dr. Black. Dr. Ananda testified he did not recall why he signed the form, but it was *very possible* he did so at the request of Dr. Black's assistant. [Supp. Cowan Decl., ¶6; Ex. 79 (Ananda Depo., 69:6-11, 74:15-75:7)] Even so, the Dallal's over-interpretation of the form is belied by Dr. Ananda's testimony. He found Mr. Dallal had normal neurological examinations in March 2006 and December 2007, and was doing well overall after his surgery. He did *not* determine Mr. Dallal required any assistance with his ADLs, did *not* make any determination of functional capacity loss, did *not* impose any restrictions on Mr. Dallal, and did *not* find that Mr. Dallal was cognitively impaired. [*Id.*, Ex. 79 (Ananda Depo., 39:20-42:16,44:7-46:12, 47:15-50:13, 51:2-21, 52:18-53:23, 54:8-57:1, 57:20-58:15  60:5-8, 70:25-71:3, 72:9-73:13, 73:20-74:1)] Mr. Dallal was also communicative and interactive with him. [Ex. 79 (Ananda Depo., 82:2-20)]

Second, Dr. Feld's APS forms are tainted. ***The APS forms with her name on them for 2009, 2010, and January 2011, were altered or augmented after she signed them.*** She could not attest to their validity regarding Mr. Dallal's ADL functioning. Mrs. Dallal had those forms before sending them to Lincoln.

Third, the Dallals fed information to Dr. Feld to perpetuate their fraud. Dr. Feld testified that the APS forms are based on what the Dallals told her. She does not know the bases for why she wrote down the information as to Mr. Dallal's ADLs.[5] Any conclusions regarding cognitive impairment are also based on the family's report. Her uninformed testimony that Mr. Dallal may "lack insight" into his medical needs therefore lacks relevance.

Finally, the APS forms are even more untrustworthy in hindsight because the

---

[5] Dr. Feld incorrectly believes "standby assistance" only requires someone to be on the "premises [Supp. Cowan Decl., ¶8; Ex. 81 (Feld Depo., 223:15-18)]; but "standby assistance" requires someone within arms-length. For Substantial Supervision, Dr. Feld said Mr. Dallal should just not be left alone for prolonged periods, which would not meet the Policy requirement of "continual supervision." [*Id.* (Feld, 216:20-23)]

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

LA #4850-9250-8767 v1          - 16 -          CASE NO.  2:16-CV-9307 MWF (EX)
LINCOLN'S OPP TO DALLALS MSJ, OR
ALTERNATIVELY, FOR MSA

1  Dallals never furnished Dr. Feld with the surveillance showing Mr. Dallal's true

2  functioning.  Even so, Dr. Feld expressed concerns about the validity of her

3  assessments and being misled if it were true that Mr. Dallal returned to work (as

4  reported to Dr. Ananda), renewed his driver's license, etc.  [Supp., Cowan, ¶8, Ex.

5  81 (Feld Depo. 328:14-329:11)]  The Dallals' "APS reliance" excuse fails.

6  ### 4.   The "Mr. Dallal had caregivers" excuse is flawed

7  Even if Mr. Dallal could prove that he met the threshold requirements for

8  benefit eligibility based on Substantial Assistance or Supervision (which he

9  cannot), he could not qualify for benefit payments because he has not proven he

10  received full-time services by an approved caregiver for every day Lincoln was

11  billed and benefits were paid.  Their motion now claims <u>four</u> caregivers cared for

12  him, with Disnarda Sosnowski ("Narda"), not Helen, acting as his primary

13  caregiver since 2011.  *They have admitted to deceiving Lincoln for over 12 years!*

14  Simply having a caregiver is not enough.  The Dallals have not provided any

15  evidence that valid home health care services were provided to Mr. Dallal from

16  2004 through 2016, let alone that these purported caregivers submitted the required

17  information to Lincoln.  The Dallals have not cited or produced *any* Caregiver

18  Notes, cash receipts, or other documentation of actual care – because they cannot!

19  Those documents sent to Lincoln are evidence of the Dallals' fraudulent claim.

20  The Dallals instead rely on isolated, unspecified testimony from Helen and

21  Narda, which *does not prove that care was actually given.*  Their generic references

22  to Mr. Dallal's ambulation or speech (neither of which are Policy ADLs and which

23  the surveillance contradicts) or their personal beliefs about him acting like a "kid"

24  do not establish that qualified home health services were given for over 12 years.

25  Testimony actually confirms Mr. Dallal does not need and has not been given

26  the care identified in the Caregiver Notes submitted for the same time frame as

27  surveillance:  toileting, transferring, dressing, bathing, and occasionally continence.

28  [Doc. 68-10,#1546-52]  Toileting/Continence:  Helen admitted Mr. Dallal was able to

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

LA #4850-9250-8767 v1                          - 17 -                          CASE NO.  2:16-CV-9307 MWF (EX)
LINCOLN'S OPP TO DALLALS MSJ, OR
ALTERNATIVELY, FOR MSA

take himself to/from the bathroom and care for his hygiene, even when he had one accident in 2004.   He does <u>not</u> wear adult diapers, as the motion asserts.  [Supp. Cowan,¶4,7, Ex.77 (Helen Depo., 198:19-200:4); Ex. 80 (Narda Depo., 119:18-19)] <u>Bathing/Dressing</u>:  No caregiver has ever showered or dressed him.  Helen said he can do this himself.  Narda doesn't know!  [*Id.*, Ex. 80 (Narda Depo., 113:22-24, 119:22-23)] <u>Transferring</u>:  Helen admitted Mr. Dallal was capable of transferring in/out of bed and a chair. (Surveillance confirms his ability to transfer. Doc.68-1, LBL's UF41(l))

## C.   The "Reject the Unfavorable Evidence" Excuse Is Contrived

The Dallals' final excuse is to ask the Court to reject the surveillance and Dr. Folk-Barron's report.  They do not even address the substance of this evidence.

The Dallals cannot undermine the surveillance when they have not and cannot explain Mr. Dallal's inconsistent functioning and the lack of caregiver.  Mr. Dallal is observed on surveillance performing the very activities that Helen and Narda claim he cannot perform (including bending, walking alone and without a device, being alone, locking/unlocking the store, walking up steps alone, carrying bags, sweeping, communicating with others, helping him in/out of car).[6]  [Doc. 68-1, LBL's UF41(including 41(a), (f)-(p))]  They offer no sworn explanation of why the Dallals submitted false Caregiver Notes and receipts for the same 14 days of surveillance in which Mr. Dallal was unsupervised by Helen or any "caregiver".  They also ignore the surveillance of Helen, which proves she *never* went to the Dallals' home despite the Dallals reporting that she did. [Doc. 68-9, #1456-1498]

The Dallals' attacks on the surveillance are flawed.  They falsely claim only 23 minutes of surveillance is available.  As the videos produced with Lincoln's motion confirm (and as the Court can judicially notice), the film from 14 days of surveillance amounts to about 202 minutes from Archangel (September and

---

[6] Contrary to the Dallals' allegation that Helen believes Mr. Dallal cannot bend, he was observed bending repeatedly throughout the surveillance without any issues.  [*See* Flash Drive Lodged with Lincoln's MSJ, Ex. 40 (7/29/16, 6:26 a.m.; 7/31/16, 9:20 a.m., 10:08 a.m., 2:22 p.m.); Ex. 42 (9/10/16, 7:30 p.m., 8:09 a.m., 10:36 a.m.; 9/14/16, 18:16, 18:34, 7:42 a.m., 7:46 a.m.); Ex. 44 (11/3/16, 8:19 a.m.; 11/4/16, 7:52 a.m.; 11/5/16, 8:48 a.m.); Ex. 66]

BURKE, WILLIAMS & SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

LA #4850-9250-8767 v1                    - 18 -                    CASE NO.  2:16-CV-9307 MWF (EX)
LINCOLN'S OPP TO DALLALS MSJ, OR
ALTERNATIVELY, FOR MSA

1   November 2016) and about 30 minutes from Horsemen.  [Supp. Cowan Decl., ¶18,

2   Doc. 69. Manual Lodging-Exs.40,42,44]  The highlight reel provided with

3   Lincoln's motion is over an hour long.  [*Id.*; Doc. 69, Manual Lodging-Ex. 66]

4        The Dallals argue that Mr. Dallal is only seen for a "matter of seconds" at

5   any one time or without audio.  To the contrary, he is observed as consistently

6   functional and active, without a caregiver, throughout the day, over 14 days in three

7   different months.  As Dr. Folk-Barron testified, "***you cannot fake capacity.***  Even

8   regardless of the length of time shown there, he's showing an ability to perform these

9   tasks to be independent, to be unsupervised, and he's demonstrating that across settings and

10  across time frames." [Supp. Cowan Decl., ¶5, Ex. 78 (Folk-Barron, 87:18-88:2, 77:1-23)]

11       The Dallals claim Lincoln should have obtained film of him getting into a

12  car, being driven, and then being let out, but what would that show except him

13  sitting in a car?  The investigators' reports recorded their <u>observations</u> when they

14  were not able to film over those 14 days.  The Dallals conveniently failed to attach

15  the full reports to Tanenbaum's Exhibit 13 or provide the films to the Court.

16       The Dallals lastly claim that Lincoln did not observe Mr. Dallal sitting or

17  napping inside his home or shop with his caregiver (which if obtained, they would

18  claim was a privacy violation).  Yet, they do not address the significant time Mr.

19  Dallal was observed with demonstrated capacity *outside of his home* for up to 12

20  hours on weekdays, acting normally in public areas, engaged in work-like activities

21  and visitor interaction in plain view, and without Substantial Assistance and

22  Supervision.  The surveillance is a death-knell to their case.

23       The Dallals cannot connect-the-dots to argue Dr. Folk-Barron is "biased."  It

24  is immaterial that she reviewed the surveillance video the day before she submitted

25  her report.  Her report and deposition confirm she reviewed the entire claim file,

26  surveillance reports, and all the film (quite unlike Dr. Feld who had nothing).  They

27  have no evidence of bias by her mere review of 100 files (with duplicate claims) in

28  the prior *1½ to 2* years.  They ignore her clinical practice and lack of involvement

Burke, Williams &
Sorensen, LLP
Attorneys At Law
Los Angeles

LA #4850-9250-8767 v1                    - 19 -           CASE NO.  2:16-CV-9307 MWF (EX)
                                                          LINCOLN'S OPP TO DALLALS MSJ, OR
                                                          ALTERNATIVELY, FOR MSA

1   in legal cases.  [Supp. Cowan Ex. 78 (Folk-Barron 18:1-6, 19:12-16, 79:3-12)]

2         The Dallals then misinterpret the Policy terms and Dr. Folk-Barron's

3   opinions to argue surveillance cannot show "cognitive impairment".  As Dr. Folk-

4   Barron explained, she applied the Policy definition of Cognitive Impairment, *which

5   requires substantial ("continual") supervision*.  Mr. Dallal was never observed

6   receiving *continual* supervision by Helen (or any other caregiver) on film.  [Doc.

7   68-6, #1333-37; Supp. Cowan Ex. 78 (Folk-Barron, 52:11-24, 53:15-54:10, 90:18-

8   91:2)]  She explained that Mr. Dallal's filmed activities and cognition across weeks,

9   months, and situations were incongruent with severe cognitive impairment; his

10  functioning was the polar opposite of his portrayal in the nurse assessments with an

11  MMSE of 4/30 and on APS forms.  [*Id.*, (Folk-Barron, 82:9-21)]  On film, he

12  showed purposeful, organized, goal-directed behavior; ability to initiate behaviors

13  without observable cues; social reciprocity and fluid interactions with others; lack

14  of confusion; an ability to be on his own without threats to his safety; and an

15  awareness of his own safety.  [*Id.* (Folk-Barron, 83:1-87:14]

16        Lastly, the Dallals cannot discount Dr. Folk-Barron's analysis by claiming

17  Lincoln should have done cognitive testing to comport with the "Cognitive

18  Impairment" definition.  The Dallals have it backwards because *they have the*

19  *burden of proof to establish Mr. Dallal meets the Cognitive Impairment definition* –

20  including substantial supervision <u>and</u> testing to substantiate cognitive decline.

21  Defendants have no evidence refuting surveillance or Dr. Folk-Barron's opinions.

## V.   **THE DALLALS CANNOT DEFEAT LINCOLN'S FRAUD CLAIM**

23        The Dallals' challenges to Lincoln's fraud claims fail.  Lincoln has already

24  established in its summary judgment motion that all elements of fraud are met as of

25  July 29, 2016 – the first day Mr. Dallal was observed on surveillance without a

26  caregiver, when the Dallals falsely reported in forms he had 12 hour care by Helen.

### 1.   <u>The Dallals misrepresented the truth concerning Mr. Dallal's abilities</u>

28  A misrepresentation occurs "when the facts fail to correspond with its

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

LA #4850-9250-8767 v1                - 20 -

CASE NO.  2:16-CV-9307 MWF (EX)
LINCOLN'S OPP TO DALLALS MSJ, OR
ALTERNATIVELY, FOR MSA

assertions or stipulations." Cal. Ins. Code § 358. Insurance Code § 330 defines concealment as "[n]eglect to communicate that which a party knows, and ought to communicat[e]. . . ." "Concealment, whether intentional or unintentional, entitles the injured party to rescind insurance." Cal. Ins. Code § 331. An overstated claim constitutes a material misrepresentation. *Nationwide Mut. Ins. Co. v. Ryan*, 2014 WL 4793890, **1, 7-11 (N.D. Cal., 2014); *Hyland v. Millers Nat. Ins. Co*., 91 F.2d 735, 743 (9th Cir. 1937). The standards for analyzing intentional misrepresentation and concealment are the same. *Nationwide*, 2014 WL 4793890, at *11.

The Dallals overstated their claim, provided false information, and omitted the truth to Lincoln. They misrepresented the truth about Mr. Dallal's capabilities in the claim submissions and the home nurse assessments. They painted Mr. Dallal as a chronically ill, feeble man requiring continual hands-on care and devices to move around. [Doc. 68-1, LBL's UF24, 33, 39] Mrs. Dallal continued this charade when preparing/signing claim forms with Helen's name and in her December 2016 call with Lincoln.

In stark contrast, Mr. Dallal was functional, independent and active an average of 4-12 hours/day outside the home over the course of 14 days of surveillance in July, September, and November 2016 – for the same days the Notes reflected he required 12-hour daily care by Helen at home. He easily moved about indoors and outdoors, repeatedly transferred to/from a sitting position, walked without any devices, interacted with others, and acted alone without assistance or supervision when observed. At no point was he seen with a caregiver, and certainly did not receive Substantial Supervision (standby/arm's length or hands-on assistance) or Substantial (continual) supervision by the absent Helen. [Doc. 68-1, LBL's UF40-43] Nurse Sokolow even confirmed that the Dallals' portrayal of Mr. Dallal's functioning was markedly different than the surveillance. [*Id.* LBL's UF50]

### 2. The Dallals submitted forged claim forms misrepresenting the caregiver's identity, days worked, and location

The Dallals' claim submissions and statements regarding their *only reported*

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

LA #4850-9250-8767 v1                    - 21 -

CASE NO. 2:16-CV-9307 MWF (EX)
LINCOLN'S OPP TO DALLALS MSJ, OR
ALTERNATIVELY, FOR MSA

caregiver, Helen, are rife with misrepresentations.  Each independently constitutes a fraudulent act and is "not the result of inadvertent error."  *Almazni v. United Fin. Cas. Co*., 2015 WL 5680312, at *5 (C.D. Cal. Sept. 24, 2015).

▶The Caregiver Notes misrepresented that Helen was the only person who provided services to Mr. Dallal for 12 hours/day, 7 days/week for every day of the surveillance in 2016.  ***It is undisputed that Helen did not care for Mr. Dallal at all on each day of the surveillance; she did not even work for the Dallals in September or early November.***  [Doc. 68-1, LBL's UF40-43,57-60,65-67]

▶Mrs. Dallal falsified the Caregiver Notes by misrepresenting <u>Helen</u> completed and signed  [Doc. 68-1, LBL's UF17,18,19,20,60]  The Notes are clearly directed to the Caregiver and require the Caregiver's name/signature. [*Id.* UF61]   ***Whether or not Helen consented to Mrs. Dallal signing her name is irrelevant when Helen never reviewed the forms, did not provide the represented care, was not paid when she did not work, and never agreed to false or misleading information being submitted***. [*Id.*, UF58-60,65-74]

▶Mrs. Dallal falsified 74 fraud notices by printing and signing Helen's name and writing "NONE" for the "relationship" on the forms.  ***The fraud notices in 2016 explicitly required the signature and name "of person completing this form" and the "relationship to claimant," but Mrs. Dallal pretended to be Helen.  Had she been truthful, she would have written her own name and her relationship as "wife."  Helen never even saw those notices and did not give authority for Mrs. Dallal to sign for her.*** [Doc. 68-1, LBL's UF75-78]

▶ Mrs. Dallal fabricated the cash receipts as *de facto* invoices to portray Helen as the only caregiver working and getting paid for home health services for every day of the 2016 surveillance.  ***Mrs. Dallal knew Helen was not working those days, but still wrote out the receipts (representing Helen's daily services, listing herself as the payer, and identifying services for which she sought reimbursement), signed Helen's signature to the receipts, and submitted them to Lincoln.***  [Doc 68-1, LB's UF79-81]

▶Mrs. Dallal misrepresented the location of purported care on the Notes.  The

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

LA #4850-9250-8767 v1         - 22 -         CASE NO.  2:16-CV-9307 MWF (EX)
LINCOLN'S OPP TO DALLALS MSJ, OR
ALTERNATIVELY, FOR MSA

form asks for "the address where the insured received the above care."  Pretending to be Helen, Mrs. Dallal wrote the Dallals' home address on each Note.  Not only did this conceal Mr. Dallal's true whereabouts, but this depicted he was so bad off he stayed home.  ***During surveillance starting July 29, 2016, Mr. Dallal was not provided with daily care from 8:00 a.m. to 8:00 p.m. <u>at home</u>.***  [Doc. 68-1, LB's UF40-43, 61-63, 65]

Lastly, is undisputed that Mrs. Dallal acted on Mr. Dallal's behalf and in conjunction with him for the claim under a power of attorney.  She also prepared, signed, and submitted each of the monthly claim submissions to procure LTC benefits from Lincoln – both during the surveillance periods and since 2004.

### 3.     The Dallals' misrepresentations were made knowingly

The Dallals were obligated to communicate in good faith all that they knew with regard to his health and caregiving status with respect to the claim and documents submitted.  Cal. Ins. C. § 332; *see Nieto v. Blue Shield of Cal.*, 181 Cal.App.4th 60, 70 (2010)(appellant must either be aware representations were false or exhibited reckless disregard of truth).  "[T]he intent to defraud the insurer is necessarily implied when the misrepresentation is material and the insured willfully makes it with knowledge of its falsity."  *Cummings v. Fire Ins. Exch.*, 202 Cal.App.3d 1407, 1418 (1988)("law presumes every man to intend the natural consequences of his acts").  In *Cummings*, the Court granted the insurer summary judgment for an insured's fraudulent claim.

The Dallals knew that their representations were false.  They were warned on the fraud notice of the risks associated with providing any "materially false, incomplete, or misleading information," including "civil or criminal penalties" and "denied coverage and/or benefits."  Mrs. Dallal knew when she completed the Notes, fraud notices, and cash receipts with Helen's name that she was falsely representing (1) Helen completed/signed the documents; (2) Helen was the sole caregiver; (3) Mr. Dallal required and received daily care *by Helen* 12 hours/day, 7 days/week; (4) Helen was paid for those daily services; and (5) services were given

BURKE, WILLIAMS & SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

LA #4850-9250-8767 v1                                           - 23 -

CASE NO.  2:16-CV-9307 MWF (EX)
LINCOLN'S OPP TO DALLALS MSJ, OR
ALTERNATIVELY, FOR MSA

1   at the Dallals' home.  Mrs. Dallal had to have known that information was false

2   because Helen was not present on any day of surveillance (let alone 12/hours of

3   daily care).  Mrs. Dallal further misled Lincoln about Helen's care and completion

4   of the forms in the December 2016 call.   The Dallals' behavior on surveillance and

5   knowledge of Helen's limited work schedule since 2011 further reinforces they

6   knowingly misrepresented Mr. Dallal's true capabilities and care.

7       The Dallals' current position that they had different caregivers establishes

8   they knew they concealed the truth.  They failed to identify any other caregiver for

9   whose services they sought reimbursement, despite opportunities with every claim

10  submission, nurse visit, and contact with Lincoln. Although *Cummings* does not

11  require evidence of intent to defraud, there is no doubt the Dallals' representations

12  on claim forms, in calls, and the nurse assessment were intended to secure

13  reimbursement of benefits.  They made the misrepresentations and got paid – every month.

14      **4.   The Dallals' misrepresentations and omissions were material**

15      Materiality can be determined as a matter of law.  *Cummings*, 202

16  Cal.App.3d at 1417.  When an insurer seeks to void a policy for fraud in the claims

17  process, the insurer need not prove reliance.  The question is not whether the

18  insurer actually relied on the misrepresentation, but whether a reasonable insurer

19  would think the representation was important.  *Nationwide*, 2014 WL 4793890, at

20  *7, n. 7.  "A false representation is material if it relates to the insurer's

21  "'investigation to determine its obligations under the policy.'"  *Id.* at *7 (citation

22  omitted). "[I]*f a reasonable insurer would attach importance to the fact*

23  *misrepresented, then it is material*." *Cummings*, 202 Cal.App.3d at 1417; *Casual*

24  *12, Inc. v. Sentinel Ins. Co., Ltd*., 2017 WL 5624293, at *10 (C.D. Cal. 2017).

25      Each misrepresentation made by the Dallals was material.  As shown in the

26  Seeman Declaration for Lincoln's MSJ, the misrepresentations were relevant to

27  Lincoln's ability to evaluate (a) the identity, services, hours, and rates of the caregiver to

28  know who is providing what care *and* ensure the caregiver was not a family member;

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

LA #4850-9250-8767 v1                    - 24 -                    CASE NO.  2:16-CV-9307 MWF (EX)
LINCOLN'S OPP TO DALLALS MSJ, OR
ALTERNATIVELY, FOR MSA

(b) the caregiver's identity to verify they recognized truthful information must be provided;  (c) whether the care identified rose to the level of required Substantial Assistance and/or Substantial Supervision; (d) whether the hours of care were actually provided; (e) proof that payment has actually been made, to whom, and the amount of payment; and (f) location of care.   Had the Dallals been truthful, Lincoln would have required separate information from each caregiver.  Each would have needed to sign separate Notes and fraud notices.  This would have allowed Lincoln to verify who provided care (including whether family was involved), ensure hours/payments were not duplicated, and allow assessment of reimbursable services.  [Doc. 68-2, ¶¶5-10, 51]

A reasonable insurer would attach importance to these points to determine whether further investigation was necessary and to assess liability.   Lincoln would have conducted further investigation and not issued benefits had it known about Mr. Dallal's true abilities as shown on surveillance, the false claim forms, and how care was not consistently being provided at the Dallals' home or by Helen.

### 5.   Lincoln is entitled to damages and voiding of the Policy

Lincoln was damaged by the Dallals' fraud because it paid out benefits to which they were not entitled.  It is entitled to recover the $33,920.00 in benefits paid between the surveillance on July 29, 2016 and the denial on December 16, 2016.  It is likewise entitled to a declaration the Policy is voided as of the time of this fraud.  Cal. Ins. C. § 359; *Cummings*, 202 Cal.App.3d at 1417-19.

## VI.   CONCLUSION

The Dallals have failed to meet their burden on this motion and cannot defeat Lincoln's FAC.  Their motion should be denied it in its entirety.

Dated:     March 13, 2018

BURKE, WILLIAMS & SORENSEN, LLP
Melissa M. Cowan
By:*/s/ Melissa M. Cowan*
Melissa M. Cowan
Attorneys for Plaintiff and Counterdefendant
Lincoln Benefit Life Company

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

LA #4850-9250-8767 v1                                 - 25 -

CASE NO.  2:16-CV-9307 MWF (EX)
LINCOLN'S OPP TO DALLALS MSJ, OR
ALTERNATIVELY, FOR MSA