**JOSEPH F. HART, State Bar No. 85056**
**email: joe@joehartlegal.com**
**Law Offices of Joseph F. Hart**
**433 North Camden Drive, Suite 600**
**Beverly Hills, CA 90210-4416**
**Telephone:  (310) 274-7157**
**Facsimile:  (310) 331-8779**

**WILLIAM C. TANENBAUM, State Bar No. 305030**
**Email: tanenbaum@tanenbaumlaw.com**
**9701 Wilshire Boulevard, Suite 1000**
**Beverly Hills, CA 90212-2010**
**Telephone: 310-628-0989**
**Facsimile: 310-859-1960**

**Attorneys for Defendants Alexander Dallal and Claire Dallal**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| LINCOLN BENEFIT LIFE INSURANCE COMPANY, a Nebraska Corporation,<br><br>                     Plaintiff,<br><br>v.<br><br>ALEX DALLAL, an individual; CLAIRE DALLAL, an individual; and DOES 1 through 10, Inclusive,<br>                     Defendants. | CASE NO. 2:16-CV-9307-MWF-E<br><br>Hon. Michael W. Fitzgerald<br><br>MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT<br><br>Hearing Date: April 9, 2018<br>Time:  10:00 a.m.<br>Courtroom: 5A, 1st Street Courthouse |
| ALEXANDER DALLAL, an individual; and CLAIRE DALLAL, an individual,<br>                     Counterclaimants,<br><br>v.<br><br>LINCOLN BENEFIT LIFE COMPANY, a Nebraska Corporation,<br><br>                     Counterdefendant. | |

# Table of Contents

Introduction…………………………………………………………………...4

Background of the insureds, Alex and Claire Dallal…………………………….4

The Lincoln Benefit Policy……………………………………………………...5

Alex's many medical issues……………………………………………………..6

The Attending Physician Statements (APS)……………………………………..8

Lincoln Benefit decides to ignore the medical experts in order to deny coverage………9

Lincoln Benefit's clandestine surveillance and their false basis of comparison...………9

Lincoln ignores all other evidence…………………………………………...…11

Lincoln's in-house medical opinion…………………………………………...…11

Termination of the policy and litigation…………………………………...……12

Additional defects in the surveillance…………………………………….……12

Caregiver expenditures…………………………………………………………13

Lincoln's motion for summary judgment………………………………………13

Standards to be applied in deciding summary judgment………………………14

Argument………………………………………………………………………15

1.      Alex Dallal has suffered from severe cognitive impairment since his surgery for meningioma in 2004…………………………………………………………15

2.      There is no fraud with respect to the Dallals' caregiver statements……………...19

3.      The court should deny summary judgment on all the grounds sought by Lincoln Benefit………………………………………………………...…21

Conclusion…………………………………………………………….…..21

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

1

**Table of Authorities**

2

**Cases**

3
*Amadeo v. Principal Mut. Life Ins. Co.*, 290 F3d 1152, (9th Cir. 2002)………………..14

4
*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)…………………………………13

5
*Balint v. Carson City*, 180 F.3d 1047 (9th Cir. 1999)……………………………………13

6
*Colacurcio v. City of Kent*, 163 F.3d 545 (9th Cir. 1998)………………………………...13

7
*EEOC v. United Parcel Serv.*, 424 F.3d 1060 (9th Cir. 2005). …………………………13

8
*Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F3d 1119 (9th Cir. 2014)……..14

9
*Frudden v. Pilling*, 877 F.3d 821(9th Cir. 2017)…………………………………………13

10
*Harris v. Itzhaki*, 183 F3d 1043 (9th Cir. 1999)…………………………………………13

11
*McSherry v. City of Long Beach*, 584 F.3d 1129 (9th Cir. 2009)………………………13

12
*Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 988 (9th Cir. 2006)………………...14

13
*Olsen v. Idaho State Bd. of Medicine*, 363 F.3d 916 (9th Cir. 2004). …………………13

14
*SEC v. M & A West, Inc.*, 538 F3d 1043 (9th Cir. 2008). …………………………....…13

15
*Simo v. Union of Needletrades*, 322 F.3d 602 (9th Cir. 2003)…………………………13

16
*Spott Electrical Co. v. Industrial Indem. Co.* (1973)

17
           30 Cal.App.3d 797, 106 Cal.Rptr. 710……………………………13

18

19

20

21

22

23

24

25

26

27

28

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

**Introduction.**

The plaintiff insurance company in this case has fabricated a false narrative that accuses a brain-surgery survivor and his hard-working wife of fraud. This false narrative is based on the Big Lie - They repeat false statements over and over, by different individuals so that the lies appear as truths. Quite simply, the Big Lie is that Alex and Claire Dallal have staged Alex's conditions in order to reap a windfall from an unsuspecting insurance company. This is untrue - throughout this litigation, it is the insurance company that has misrepresented facts as to the material, direct representations on which the insurance company relied in certifying Alex for benefits; and therefore, why granting this motion would condone the insurance company's willful, wrongful behavior.

**Background of the insureds, Alex and Claire Dallal.**

Alex Dallal built a successful business through integrity to his craft and a gift of his hands to craft amazing shirts. Born in Egypt, he emigrated with his wife, Claire, to the United States in 1961. Immediately, Alex went to work for his father as a tailor – the only skill he knows, and the only skill he loves. By 1970, Alex started his own store, called Star Shirts. Alex ran the show. He built his reputation by delivering superb hand-crafted shirts. He became so successful at his craft that he was able to move his store to Beverly Hills, and rename it, Mr. Alex – as he become known around town. Claire Dallal deposition, pp. 18:1 – 25:5.

Then in 2004, Alex's life changed forever. Still in his prime working years, only in his early 60s, a meningioma was discovered on his left temporal lobe – the part of the brain responsible for memory, balance, and language – that required surgery to remove. The surgery successfully removed the tumor. However, not celebrated was what the tumor and its resection meant for Alex's life – his passion and his life's work was over. Since 2004, Alex has suffered from persistent physical and cognitive deficits which

turned relegated him mentally to a child who without adult supervision cannot comprehend that he can be a danger to himself. See Alex Dallal's medical history as set out in Defendants' Memorandum of Points and Authorities in Support of Defendants' Motion for Summary Judgment, at pages 7-10. (Document 71, filed 3-12-2018).

The difference between Alex's life now and his life pre-surgery is stark. Alex no longer works in the business that carries his name. An immigrant who lived the American dream, building a successful business from scratch and raising a family, Alex can no longer work and generate income for his family. Since his surgery he has not designed a single shirt or sewn a single button. Instead, he goes to Mr. Alex to sit on a chair off in the recesses of the store, while Claire runs the business. Clare Dallal deposition, p. 49:15-18.

Herself an immigrant from Egypt, whose parents both died by her twelfth birthday, knows what living off very little feels like, Claire did not take Alex's success for granted. Although not endowed with Alex's natural talent, Claire has nevertheless picked up the trade by sheer force of will. Notwithstanding Claire's aneurysm, dangerously high blood pressure, taking diabetes medication, her incredible will power has kept Mr. Alex a success. Claire Dallal deposition, pp. 11:8 – 13:22; pp. 18:1 – 25:5.

**The Lincoln Benefit Policy.**

In 2003, Alex and Claire purchased a joint long-term care insurance policy. The policy is supposed to provide benefits if either of the insureds is unable to perform two "Activities of Daily Living" or suffers a cognitive impairment. The policy was issued by the plaintiff, Lincoln Benefit Life Company. After Alex's meningioma surgery in 2004, the Dallals made a claim with Lincoln Benefit under the policy, and they have been receiving benefits ever since, for reimbursement of monies expended for the cost of

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

caregivers who attend to Alex.

**Alex's medical issues.**

Between 2004 and 2016, Alex suffered from a wide variety of medical problems, including:

- Brain surgery (meningioma). In 2004, Alex had brain surgery to remove a meningioma from his left temporal lobe – the part of the brain that primarily controls memory (both long and short term), balance, and language.

- Strokes/hemorrhages. Alex suffered at least one stroke in 2005. An MRI from 2018 reveals iron deposits in the right side of Alex's brain that is a result of prior bleeding from hemorrhages. The radiologists found that the iron deposits are a brain abnormality and are related to "prior trauma and/or hypertensive micro-hemorrhages."

- Brain damage/loss of brain tissue. An MRI from January 2018 reveals, according to neurologist Dr. William W. Chow, M.D., that Alex has suffered brain damage and has lost brain tissue to his left temporal lobe. Dr. Chow goes on to conclude that the MRI results support a finding that Alex suffers from vascular Parkinsonism.

- Seizure disorder. Since 2004, Alex has been diagnosed with a seizure disorder, requiring him to take Tegretol, a strong, anti-seizure medication. He has been prescribed and has taken Tegretol consistently since his brain surgery. In May 2005, Dr. Feld noted Alex suffered from a facial droop and drooling which were observed to a result of a seizure. Complaints of seizures are noted in 2011.

- Kidney tumor. In 2013, Alex was diagnosed with kidney tumor which was causing him severe urinary pain. He had surgery to remove the tumor.

- Chronic urinary pain, complications. Alex has experienced ongoing urinary tract infections and retention issues. In 2004, Alex was diagnosed with a urinary tract infection, and rushed to the emergency room in November 2005 where a catheter was inserted in the affected region. Alex's urologist, Dr. Dudley Danoff, noted in 2006, that Alex complained of excessive peeing, and dysuria. In 2013, Alex was again diagnosed with a urinary tract infection.

- Chronic foot pain. Since 2006, Alex has seen his podiatrist, Melvin Present, to treat chronic foot pain. Two visits in 2006; four in 2007; five in 2008; six in 2009; five in 2010; four in 2011; three in 2012; six in 2013; six in 2014; five in 2015; at least two in 2016; and at least two in 2017.

- Osteochrondritis/Mirco-fractures/Arthritis in right knee. Throughout 2010, Dr. John Sellman treated Alex's severe knee pain. During these visits, Dr. Sellman aspirated yellow fluid from Alex's knee, observed swelling, and diagnosed Alex with osteochrondritis with micro-fracture and arthritis in his right knee.

- Synovitis of the hips. Dr. Sellman also diagnosed Alex with synovitis of his hips from Alex's constant joint pain in 2010. As a consequence of his knee and hip pain, in 2013, Alex was repeatedly performing physical therapy with Joel Scherr, physical therapist.

- Osteoarthritis of hips/Degeneration of lumbar spine. X-rays in 2013 of Alex's hips and lumbar spine revealed osteoarthritis in his hips, and degeneration of his lumbar spine, which partially accounts for Alex's hunched back, clearly visible when he walks.

- Persistent heart murmurs. In 2005, 2013, and 2014, Dr. Feld, Alex's internist, noted Alex suffers from heart murmurs.

- Hypothyroidism/chronic fatigue. Prior to Alex's surgery in 2004, it was observed that Alex had a growth on his thyroid. His medical records reveal

that as late as 2012, he was diagnosed with hypothyroidism. This diagnosis is remarkable as it explains why Alex has repeated complaints of fatigue, resulting in his need to take multiple naps per day.

- Multiple Emergency Room visits and check-ups for various ailments: In 2005 and 2011, Alex was rushed to the for complications of urinary tract infections and excessive bleeding from a bursting varicose vein that was the result of falling. Since 2004, Alex has also complained of back pain, anemia, skin rashes, groin pain, upper respiratory infections, anxiety, gastroenteritis, arm pain.

The foregoing medical history is repeated from the Defendants' Memorandum of Points and Authorities in Support of Defendants' Motion for Summary Judgment, at pages 7-10. (Document 71, filed 3-12-2018).

**The Attending Physician Statements (APS)**

The APS is the document that Lincoln Benefit singularly relied on to certify Alex for eligibility for benefits under the policy. Unlike the Caregiver Activity Sheets which simply account for the care Alex is receiving, the representations on the APS inform Lincoln Benefit what Alex's physical and mental capabilities and conditions are – for what caregiving is required. This document is produced and sworn to by a licensed health care physician – no other document in the policy requires such licensing, including the Caregiver Activity Sheets. For Alex, it was his doctor, Dr. Joy Feld, who after examining Alex, observing him, and receiving information from Alex's family, provided this material information to Lincoln Benefit. See Exhibit 6 – Deposition of S. Joy Feld.

Staggeringly, however, is, notwithstanding Alex's above-identified medical history, he still presented to Dr. Feld in such an over-representative manner as for her to represent to Lincoln Benefit on her APSs for 2009, 2010, 2011, 2012, 2013, and 2016

that Alex was independent in ambulation, eating, and continence (continence was not independent in 2010). *Id*. From this proper context, the 2016 APS is consistent with and a continuation of Alex's prior representations to Lincoln Benefit.

**Lincoln Benefit decides to ignore the medical experts in order to deny coverage.**

Dissatisfied with Alex's prognosis, Lincoln Benefit went into attack mode, pulling out all stops to create an illusion that Alex did not qualify for long-term care. Lincoln's strategy was to ignore the medical evidence from the last twelve years and to set up a false narrative about Alex's condition that was not based upon any medical examination, but upon a few minutes of secretly-obtained video footage. Lincoln did not speak or ask to speak with any of the doctors who had been treating Alex. They did not speak with Dr. Feld, the internist who had certified Alex for many years. They did not speak with Dr. Danoff, the urologist. Nor did they speak with Dr. John Sellman, who treated Alex for joint pain, in his hips and knee. See Folk-Barron Deposition, pp. 23 – 26.

**Lincoln Benefit's clandestine surveillance and their false basis of comparison**

Instead, Lincoln commissioned surveillance teams, who made clandestine observations of Alex in July, September, and November of 2016. Total time spent on the surveillances was at least 123 hours. As part of the surveillance, Lincoln's operatives produced approximately one hour of video footage of Alex, which Lincoln now claims is determinative of Alex's condition, to the exclusion of the opinions of all medical professionals who have examined and treated Alex. The footage was shot primarily outside of the Mr. Alex store and outside the Dallals' home. There is no footage of Alex inside his home or inside the store, save some inconsequential activities of short duration that were shot through the store window and blinds. There is no footage of him using the toilet, no footage of him dressing, no footage of him bathing.

The footage does not have sound; one cannot determine from the footage the words that Alex uses, the level of his verbal interactions, the coherence of his verbiage. It is impossible to tell if Alex is getting verbal cues from anyone else.

Lincoln Benefit does not disclose what Alex's activities were when the camera was not activated. There is no way to tell what happened in the 15 seconds before or the 15 seconds after any particular video clip. As a result, for example, there is no way to tell whether or not Alex was truly alone when the video clip was filmed, if he had company, if he walked away from someone, or if someone came up to him right after the camera was turned off.

For the above reasons, the video footage should be inadmissible as lacking foundation and hearsay.

Yet, to the extent the video footage can reveal anything about Alex's abilities, it confirms the representations on the May 2016 APS that Lincoln Benefit received from Dr. Feld. The crucial APS for 2016 on which Lincoln Benefit singularly relied to certify Alex's eligibility for benefits for 2016 represented that Alex was independent in ambulation and eating. See Exhibits 2 and 4 to Defendants' Memorandum of Points and Authorities in Support of Defendants' Motion for Summary Judgment. (Document 71, filed 3-12-2018).

Intentionally, Lincoln Benefit rarely refers to the 2016 APS when drawing attention to their "smoking-gun" surveillance. If the basis for Lincoln Benefit's understanding of Alex is based on the May 2016 APS then substantially thwarted are Lincoln Benefit's twin objectives of cancelling Alex and Claire's policy, and pursuing this litigation.

In its place, they proffer nurse visits from 2014 and June of 2016. We know from the nurse herself that the June 2016 visit was woefully incomplete – she performed no tests on Alex's abilities and never asked him to attempt any physical activities. Lincoln Benefit prefers this report because it, unlike the May 2016 APS, gives the appearance

that Alex and Claire portray Alex as having less than his actual abilities.

However, no matter how many people say it wrongly, when initiating the surveillance, Lincoln Benefit knew Alex was independent in ambulation, eating and continence. That knowledge came directly from APS's of Dr. Feld.

**Lincoln ignores all other evidence.**

In the course of their secret surveillance, until the time that it terminated the Dallals' policy, Lincoln Benefit's operatives did not interview a single person who had interactions with Alex over the dozen years after his meningioma surgery – or at least there is no record of such interviews. No interviews of the Dallals' neighbors, no interviews of the customers of the Mr. Alex business, no interviews of the vendors of the business, no interviews of the adjacent business operators, no interviews with Dr. Feld to ask how or why she certified him year after year both as suffering from cognitive impairment, and chronically ill, even though she noted Alex was independent in ambulation, eating and continence in 2009, 2010, 2011, 2012, 2013, and 2016.

**Lincoln's in-house medical opinion.**

Lincoln next took the edited video footage to Lori Folk-Barron, an in-house psychologist based in the Insurance Capitol of the World - Hartford Connecticut. Dr. Folk-Barron is not an independent expert; she has given opinions for Lincoln Benefit in over 100 cases in the last year. Predictably, she was unconcerned with not having examined Alex, not having the benefit having any cognitive testing of Alex, not hearing Alex speak, or not consulting with Alex's treating physicians. She knew her role, and produced an opinion that Alex did not qualify for benefits under the policy. The lack of substantive support for the opinion did not matter to Lincoln Benefit; what mattered was that it now had "cover" to cancel the Dallal's policy.

Of course, the effect from Dr. Folk-Barron's conclusions come from a false

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

comparison of Alex in the surveillance with the Alex from the June 2016 nurse visit, not from the APSs from 2009, 2010, 2011, 2012, 2013, 2015, and 2016.

**Termination of the policy and litigation.**

Once it had Folk-Barron's report, Lincoln Benefit wasted no time in cancelling the Dallal's policy. On December 16, 2016, only four days after Folk-Barron rendered her report, its claims department wrote the Dallals and stated that Alex does not meet the policy's definition of Chronically Ill, nor does he require Substantial Supervision as defined in the policy. Lincoln now contends that this letter was not a termination of the policy, but the letter states unequivocally that "Mr. Dallal's claim is now closed and no benefits are due."

The instant litigation was filed on the same day as the claims department letter, obviously part of a choreographed assault on the Dallals.

**Additional defects in the surveillance.**

Lincoln's conclusions from the surveillance cannot support its conclusion of fraud for another important reason – the observations are fully consistent with the APS forms that Lincoln required Alex's doctor provide every year to certify Alex's eligibility for policy benefits. The APS form is *sine qua non* on which Lincoln relies in making its decision about whether to pay benefits. Dr. Feld's certifications in the years 2009 through 2016 noted that Alex was independent in ambulation, and she generally marked him to be independent in eating and continence as well. Lincoln should not have been at all surprised to see Alex walking without support, or to observe him eating with utensils. The idea that Alex was doing something unpredictable has no basis in fact. Alex's walking or eating independently cannot support Lincoln's claim of fraud, when the APS forms that it relied upon disclosed his abilities in those areas.

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

**Caregiver expenditures.**

Lincoln also seeks to terminate the contract on the alleged ground that Claire Dallal made material misrepresentations on statements that she sent to Lincoln Benefit for the purposes of obtaining reimbursement for caregiver expenditures. Lincoln complains that Helen Genovea, previously identified as Alex's caregiver, was not observed with him during the 2016 surveillance. But in addition to Ms. Genovea, Disnarda Sopsnowski, who was licensed as a caregiver, took care of Alex. She had been a live-in caregiver with the Dallals since 2011.

Lincoln has no evidence of any damage due to Claire's putting the wrong name on caregiver forms. Simply, this is not a material misrepresentation.

**Lincoln's motion for summary judgment.**

Lincoln Benefit's motion for partial summary judgment is full of misstatements of the record. Lincoln Benefit misrepresents the medical evidence in support of Alex's need for Substantial Supervision as defined in the policy. The Separate Statement of Material Facts filed here by the Dallals refutes these misstatements. The issues raised in Lincoln Benefit's motion for partial summary judgment are in many instances reflected in the Dallal's motion for summary judgment (Doc  ); in this brief we will try not to belabor points that have been made in those motion papers. Because of the sheer volume of papers in Lincoln Benefit's motion – Lincoln has violated the informal but useful-for-judicial-economy "two pound rule" that mandates denial of motions where the supporting papers weigh more than two pounds - some repetition is unfortunately necessary.

Lincoln's motion should be denied. There are disputed, triable issues of fact with respect to all material matters that Lincoln Benefit raises. In fact, in many instances, Lincoln's alleged "facts" do not actually support its claims. Moreover, Lincoln has no right under the terms of the insurance contract to cancel the Dallal's policy.

**Standards to be applied in deciding summary judgment.**

The court must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact. *See Frudden v. Pilling*, 877 F.3d 821, 828 (9th Cir. 2017); *Olsen v. Idaho State Bd. of Medicine*, 363 F.3d 916, 922 (9th Cir. 2004). The court must not weigh the evidence or determine the truth of the matter but only determine whether there is a genuine issue for trial. *See Balint v. Carson City*, 180 F.3d 1047, 1054 (9th Cir. 1999). Summary judgment may be appropriate when a mixed question of fact and law involves undisputed underlying facts. *See EEOC v. United Parcel Serv.*, 424 F.3d 1060, 1068 (9th Cir. 2005); *Colacurcio v. City of Kent*, 163 F.3d 545, 549 (9th Cir. 1998). However, summary judgment is not proper if material factual issues exist for trial. *See Simo v. Union of Needletrades*, 322 F.3d 602, 610 (9th Cir. 2003).

Issues of credibility, the weighing of evidence, and the drawing of inferences from the facts should be left to the jury. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-255 (1986); *Harris v. Itzhaki*, 183 F3d 1043, 1051 (9th Cir. 1999). Summary judgment should be denied where an issue as to a material fact cannot be resolved without observation of the demeanor of witnesses in order to evaluate their credibility. *SEC v. M & A West, Inc.*, 538 F3d 1043, 1054-1055 (9th Cir. 2008) (Error by district court in rejecting evidence of good faith that turned on credibility).

The court must view the evidence presented on the motion in the light most favorable to the opposing party *Anderson v. Liberty Lobby, Inc.,* supra, 477 US at 255.All reasonable inferences must be drawn in the opposing party's favor; the non-movant's version of any disputed issue of fact is presumed correct. *McSherry v. City of Long Beach*, 584 F3d 1129, 1135 9th Cir. 2009). Summary judgment should be denied "where divergent ultimate inferences may reasonably be drawn from the undisputed facts" *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F3d 1119, 1125 (9th Cir. 2014), *quoting, Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 988 (9th Cir. 2006).

In insurance bad faith cases, the reasonableness of an insurer's denial of coverage is normally a question of fact. *Amadeo v. Principal Mut. Life Ins. Co.*, 290 F3d 1152, 1161 (9th Cir. 2002).

In the case at bar, on the Lincoln Benefit motion for summary judgment, the evidence must be viewed most favorably to the Dallals, and all issues of credibility, weighing of evidence, and drawing of inferences should be resolved in the Dallals' favor. The Dallals' version of any disputed factual issue is deemed correct. The question of whether Lincoln Benefit acted reasonably should be left to the jury.

**Argument.**

**1.    Alex Dallal has suffered from severe cognitive impairment since his surgery for meningioma in 2004.**

Lincoln Benefit's long-term care policy provides that benefits are payable if the insured (1) is unable to perform, without Substantial Assistance from another individual, at least two Activities of Daily Living for a period of at least 90 days due to loss of Functional Capacity; or (2) requires Substantial Supervision to protect him or herself from threats to health and safety due to severe Cognitive Impairment. Document 1-1 at p. 8.

"Activities of Daily Living" are defined as Eating, Bathing, Continence, Dressing, Toileting, and Transferring. Document 1-1 at p. 5.

"Cognitive Impairment" is defined as:

> "the deterioration or loss of your intellectual capacity which requires substantial supervision by another person to protect yourself or others. It is measured by clinical evidence and standardized tests which reliably measure your impairment in:
>
> a. short or long term memory;
>
> b. orientation as to people, place, or time; and

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

c. deductive or abstract reasoning." *Id.*

Alex Dallal's condition after his 2004 meningioma surgery qualified him for benefits under either prong of the policy, i.e., inability to perform at least two Activities of Daily Living without Substantial Assistance, or Cognitive Impairment requiring Substantial Supervision.

Lincoln Benefit bases its termination of the Dallals' policy almost entirely on the clandestine surveillance of Alex Dallal in 2016. Using the surveillance footage alone, Lincoln concludes that Alex does not need substantial assistance or substantial supervision. This conclusion – created without any actual examination of Alex - is completely at odds with the opinion of every medical professional who has examined or treated Alex since his 2004 meningioma surgery – including those retained by Lincoln Benefit. The professional medical conclusions include:

- APS from Dr. William Young, internist, in 2004 (Separate Statement of Material Facts at Fact 21).

- In-home assessment by Lincoln Benefit-retained nurse case manager in June, 2004. Separate Statement of Material Facts at Fact 22.

- In-home assessment by another Lincoln Benefit-retained nurse case manager in May 2005. Separate Statement of Material Facts at Fact 24.

- Office of Dr. Black, neurosurgeon, on February 22, 2008. Separate Statement of Material Facts at Fact 26.

- APS's from Dr. Joy Feld, internist, for 2009, 2010, 2011, 2012, and 2013. Separate Statement of Material Facts at Fact 27.

- In-home assessment by Lincoln Benefit-retained nurse case manager in August 2014. Separate Statement of Material Facts at Fact 33.

- APS from Dr. Feld dated July 9, 2015. Separate Statement of Material Facts at Fact 34.

- APS from Dr. Feld dated May 6, 2016. Separate Statement of Material Facts at

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Fact 36.

- In-home assessment by Lincoln Benefit-retained nurse case manager on June 23, 2016. Separate Statement of Material Facts at Fact 39.

Lincoln Benefit's answer to the unanimous opinion of the doctors and nurses that Alex qualifies for policy benefits is to imply - without any evidence in support – that the doctors opinions are based on incomplete examinations and three different nurses from three different services were somehow separately bamboozled by the Dallals into forgetting how to conduct a proper in-home evaluation.

Lincoln Benefit's primary focus of attack is on Dr. Feld; it suggests that Dr. Feld's evaluation of Alex's condition is flawed because it is based upon information provided by the Dallal family. Separate Statement of Material Facts at Fact 29. Lincoln of course ignores reality – any person who is Cognitively Impaired likely has difficulties in effective communication so that family members can be helpful, even invaluable, in providing information. But putting that aside, Dr. Feld testified repeatedly that her evaluation of Alex was based on three criteria: 1) her examination of Alex; 2) general observations and assessments of Alex; and 3) information provided by the family. Separate Statement of Material Facts at Fact 29.

Dr. Feld enumerated the reasons for finding that Alex suffers cognitive impairment:

- "My overall assessment and judgment of [Alex] based on the reporting of the fam – family saying that he does have episodes of con – occasional confusion and my overall knowledge that [Alex] has poor insight into the severity of his medical – underlying medical conditions. I use those two pieces of information to formulate my opinion that there is cognitive impairment." Dr. Feld Depo. 239:10-240:18.
- "He's had a history of strokes with some weakness in ability. He's had a brain tumor. So it was based on the assessment that risk of falls, risk of instability, you know, risk of dizziness, all these things that could cause injury to him. . . . If there

wasn't somebody close by during [ADLs], you know, on the same premises and he was left unattended for several hours and decided to take a shower and became dizzy and passed out or fell or tripped or something like that, then it would be dangerous to him." Dr. Feld Depo., 222:23 - 223:14.

- The bases for Alex's cognitive impairment, for Dr. Feld, is "having poor insight into what his abilities are." . . . "I've seen him get angry and frustrated with his family" . . . "he doesn't want to be cared for. He doesn't – you know, he wants to have – he doesn't want to be helped. You know, he doesn't want to be sick, basically." Dr. Feld Depo., p 100: 15 – p. 105: 22.

Separate Statement of Material Facts at Fact 31. This last excerpt from Dr. Feld's deposition illustrates why Alex has no interest in faking his condition. He has pride. He wants to be what he used to be. He wants to be able to work in his trade and provide for his family. If he could go back to work he would do it in a second.

Lincoln Benefit argues that the surveillance videos justify a diagnosis that Alex is not cognitively impaired. It has nothing other than the videos; even its in-house psychologist – Dr. Lori Folk-Barron – bases her opinion on the videos, as she has never examined Alex. Lincoln's position is that the surveillance videos show Alex to be markedly different than he has been described by the medical professionals over the years. Lincoln's argument is not borne out by the facts. Dr. Feld has repeatedly diagnosed Alex as having the very abilities that Lincoln thinks it has "uncovered" by its surveillance. On the 2016 APS, Dr. Feld marked the form stating that Alex was independent in ambulation, eating, and continence. In 2009, she marked him as independent in ambulation, continence, and eating. In 2010, she marked him as independent in ambulation and continence. In 2011, 2012, and 2013, she marked him as independent in ambulance, eating, and continence.

In light of the APS forms that Dr. Feld had completed since 2009, Lincoln Benefit should not have been surprised that its surveillance showed Alex walking

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

independently or eating independently. The surveillance simply verified Dr. Feld's conclusions. But once it had completed the surveillance, Lincoln decided without any additional evidence to terminate the Dallas' policy on the ground that his abilities exceeded what had been reported in the past. The conclusion to be drawn is that Lincoln's decision to terminate the policy was done in bad faith and unreasonably.

Lincoln conflates the need for substantial assistance with the actual providing of assistance. It argues that because Alex was observed in surveillance without apparent assistance – even though Dr. Feld had certified him as being independent in ambulation – that he therefore did not require any assistance. Of course, Alex's "observers" did not see him indoors, or at home, or dressing, or bathing; nor did they converse with him or even hear him speaking. The conclusion that Lincoln wants to draw – that Alex is only entitled to have assistance if he already has full-time assistance - does not follow logically. As Dr. Feld observed, Alex does not always make good decisions for his welfare. Nor does the policy define the need for assistance in that manner. Lincoln professes some concern for Alex is saying that he should have full time assistance, but its solution to Alex not having full-time assistance on isolated occasions is to deny him any assistance at all.

## 2.    There is no fraud with respect to the Dallas' caregiver statements.

Lincoln Benefit argues as an additional ground to terminate the Dallas' policy an alleged fraud with respect to the caregiver statements that the Dallas completed over the years.

While Lincoln Benefit claims to have relied upon the caregiver statements in deciding whether or not to pay benefits, its decision as to whether to pay benefits was based upon the doctor-generated APS's. That makes logical sense; benefits are supposed to be paid if the insured qualifies under the policy definitions as either needing assistance in the Activities of Daily Living or being Cognitively Impaired. The

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

caregiver statements are provided to determine the amount of reimbursement.

Over a twelve-year period, Alex had two primary caregivers, Helen Genovea and Disnarda Sosnowski ("Narda"). Narda was a live-in caregiver since 2011, working five days per week. Helen had been with Alex since his 2004 surgery. Helen allowed Claire to sign all caregiver statements for her. Claire would prepare the forms and send them in, to obtain reimbursement for the monies that she paid the caregivers.

The policy does not require that a caregiver be licensed or be employed by a licensed agency. "Services may be provided by, but are not limited to, an employee of a licensed Home Health Agency . . ." Policy at Part 3.E. at p. 8. In any event, Narda has obtained a caregiver's license, as an in-home supportive service provider. Separate Statement of Material Facts at Fact 60.

The policy does not contain a particular form or method of claiming reimbursement for caregiver expenses.

With respect to its claim of fraud, Lincoln Benefit has not relied upon the caregiver statements, nor has it been damaged by any caregiver statements that are not correct. Alex has been receiving the care, from licensed or otherwise qualified caregivers, and the Dallals should be reimbursed for those expenses.

As discussed in the defendant/counterclaimants' own motion for summary judgment, the policy does not allow Lincoln Benefit to terminate coverage after it has been in effect for two years – incontestability. Once a policy is incontestable, it may only be terminated according to its terms. *Spott Electrical Co. v. Industrial Indem. Co.* (1973) 30 Cal.App.3d 797, 806, 106 Cal.Rptr. 710, 716. The policy in this case contains only four bases for termination, and false statements in caregiver reports is not one of those bases.

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

**3.     The court should deny summary judgment on all the grounds sought by Lincoln Benefit.**

The court should deny Lincoln Benefit's motion for summary judgment in its entirety. The facts set forth in the Separate Statement of Material Facts filed herewith are largely disputed, precluding Lincoln's claims on its four causes of action. None of Lincoln's claims are proved by undisputed facts. Indeed, as discussed in defendants' motion, the Lincoln Benefit claims should all be dismissed.

With respect to the Dallals' counterclaims, there is ample evidence of Lincoln Benefits' bad faith and breaches of contract so that Lincoln's motion for summary judgment as to those claims should be denied. Lincoln has terminated the Dallals' policy without cause. The reasons it gives for the termination are concocted and insupportable; it wanted to terminate the policy in 2016 come hell or high water, and it created a false narrative about Alex's condition to justify its illegal actions after the fact. The Dallals have been damaged indisputably in that they have lost their policy benefits.

**Conclusion.**

Lincoln Benefit is committed to manipulate thtruth about Alex Dallal's cognitive impairment. The court should deny its motion for partial summary judgment and grant the Dallal's motion for summary judgment as to all the plaintiff's claims.

**Respectfully submitted,**

**Dated:  March 12, 2018**              **Law Offices of Joseph F. Hart**

**/s/ Joseph F. Hart**
**Joseph F. Hart,**
**Attorneys for defendants Alex Dallal and**
**Claire Dallal**

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT