Melissa M. Cowan (SBN 175326)
E-mail:  mcowan@bwslaw.com
Keiko J. Kojima (SBN 206595)
E-mail:  kkojima@bwslaw.com
BURKE, WILLIAMS & SORENSEN, LLP
444 South Flower Street, Suite 2400
Los Angeles, CA  90071-2953
Tel:  213.236.0600      Fax:  213.236.2700

Attorneys for Plaintiff Lincoln Benefit Life
Company

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, CENTRAL DIVISION

| | |
|---|---|
| LINCOLN BENEFIT LIFE COMPANY, a Nebraska Corporation,<br><br>                    Plaintiff,<br><br>v.<br><br>ALEXANDER DALLAL, an individual; CLAIRE DALLAL, an individual; and DOES 1 through 10, Inclusive,<br><br>                    Defendants. | Case No.  2:16-cv-9307 MWF (Ex)<br><br>**DEFENDANT'S NOTICE OF MOTION AND MOTION FOR JUDGMENT AS A MATTER OF LAW; POINTS AND AUTHORITIES IN SUPPORT**<br><br>**[F.R.C.P. 50]**<br><br><u>**Trial:**</u><br><br>**Date:  July 31, 2018**<br>**Time:  8:30 a.m.**<br>**Ctrm:  5A**<br><br>[Fed. R. Civ. P. 50(a)]<br><br>**Honorable Michael W. Fitzgerald** |

        TO DEFENDANTS ALEXANDER AND CLAIRE DALLAL, AND THEIR

ATTORNEYS OF RECORD:

        PLEASE TAKE NOTICE that on August 9, 2018 at 8:30 a.m., at the United

States District Court, Central District of California, Plaintiff Lincoln Benefit Life

Company ("Lincoln") will move this Court, pursuant to Rule 50(a) of the Federal

Rules of Civil Procedure, for Judgment as a Matter of Law.

This Motion is made on the grounds that the evidence presented at trial establishes that:

(1)     Plaintiff is entitled to judgment as a matter of law on its Second Cause of Action for Fraud against both Defendants;

(2)     Plaintiff is entitled to judgment as a matter of law on its Third Cause of Action to void the long-term care policy as to both Defendants;

(3)     Plaintiff is entitled to judgment as a matter of law on its Fourth Cause of Action against both Defendants for restitution of fraudulently-obtained benefits;

(4)     Plaintiff is entitled to judgment on its First Cause of Action against Alexander Dallal for lack of entitlement to long-term care benefits;

(5)     Plaintiff is entitled to punitive damages against both Defendants under California Civil Code Section 3294(a).

This Motion is supported by this Notice, the accompanying Memorandum of Points and Authorities, and the evidence presented at trial in this matter.

On August 8, 2018, Plaintiff notified the Court and Defendants of its intention to submit this motion.

Dated:  August 9, 2018

BURKE, WILLIAMS & SORENSEN, LLP
Melissa M. Cowan
Keiko J. Kojima


By: */s/ Keiko J. Kojima*
_____
Melissa M. Cowan
Attorneys for Plaintiff
Lincoln Benefit Life Company

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

- 2 -

CASE NO.  2:16-CV-9307 MWF (EX)
[TITLE OF DOCUMENT]

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................... 1

II.    LEGAL STANDARDS ........................................................................... 2

III.    STATEMENT OF FACTS...................................................................... 2

    A.    The Policy ..................................................................................... 2

    B.    Lincoln Initiates LTC Benefits in 2004 .................................... 3

    C.    Lincoln Continues to Pay Benefits ............................................ 5

    D.    Lincoln Discovers the Dallals' Fraud in 2016 .......................... 7

        1.    The May 2016 APS form raises questions ...................... 7

        2.    The Dallals report extensive care required ................... 7

        3.    Surveillance reveals that Mr. Dallal is active and independent, without caregiver assistance/supervision ............ 8

        4.    Ms. Genovea admits she did not care for Mr. Dallal .............. 10

        5.    Medical professionals confirm Mr. Dallal does not require Substantial Assistance or Substantial Supervision .................. 11

        6.    Lincoln denies the claim.................................................. 11

IV.    LINCOLN IS ENTITLED TO JUDGMENT ON ITS SECOND CAUSE OF ACTION FOR FRAUD ........................................................... 11

    A.    The Dallals Misrepresented The Truth Concerning Mr. Dallal's Abilities and Need for Care ...................................................... 12

    B.    The Dallals Falsified The Claim Submissions And Care .................. 13

    C.    The Dallals Concealed Mr. Dallal's True Activities and Abilities..... 14

    D.    The Dallals' Misrepresentations Were Made Knowingly .................. 15

    E.    The Dallals' Misrepresentations And Omissions Were Material ....... 16

    F.    Lincoln Was Damaged By The Dallals' Fraud................................... 17

V.    LINCOLN'S CLAIMS ARE NOT BARRED BY THE STATUTE OF LIMITATIONS ........................................................................... 18

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

CASE NO.  2:16-CV-9307 MWF (EX)
[TITLE OF DOCUMENT]

**TABLE OF CONTENTS**
**(continued)**

Page

VI.   UNDER ITS THIRD CAUSE OF ACTION, LINCOLN IS ENTITLED TO A DECLARATION VOIDING THE POLICY FOR THE DALLALS' FRAUDULENT CLAIM ................................................. 20

    A.   The Court Should Void the Policy Under Civil Code Section 3412 Due to the Dallas' Fraudulent Claim ....................................... 20

    B.   California Insurance Code Section 359 Authorizes the Voiding of the Policy From the Time of the Fraud ........................................... 22

    C.   Courts Recognize the Voiding of a Contract/Policy Based on Fraud Irrespective of a Fraud Provision ............................................ 23

    D.   The Entire Policy Must Be Voided ...................................................... 23

VII.   THE DALLALS HAVE NOT MET THEIR BURDEN OF PROOF ON LINCOLN'S FIRST CAUSE OF ACTION FOR A DECLARATION FOR ENTITLEMENT TO BENEFITS BEFORE DECEMBER 16, 2016 ................................................................................... 24

VIII.   tHE JURY SHOULD DETERMINE IF MR. DALLAL IS LIABLE FOR PUNITIVE DAMAGES ............................................................................. 24

IX.   CONCLUSION ............................................................................................ 25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### Federal Cases

*American General Life & Accident Insurance Company. v. Findley*,
No. CV 12-01753 MMM PSWX, 2013 WL 1120662, at *10 (C.D.
Cal. Mar. 15, 2013)................................................................................. 23

*Essex v. Hartford Fire Ins. Co.*,
2013 WL 3389549 (C.D. Cal. July 8, 2013) ........................................ 24

*Grisham v. Philip Morris, Inc.*,
670 F.Supp.2d 1014 (C.D. Cal. 2009)................................................... 19

*INS v. St. Cyr*,
533 U.S. 289 (2001) .............................................................................. 23

*Twin City Fire Ins. Co. v. Mitsubishi Motor Credit of Am., Inc.*,
No. SACV 04-00043CASMLGX, 2006 WL 5164189 (C.D. Cal.
Aug. 15, 2006)................................................................................. 22, 23

*Winarto v. Toshiba Am. Elecs. Components, Inc.*,
274 F.3d 1276 (9th Cir.2001) ................................................................. 2

### State Cases

*Aaroe v. First Am. Title Ins. Co.*,
222 Cal. App. 3d 124 (1990) ................................................................ 19

*Corrigan v. Stiltz*,
233 Cal.App.2d 381 (1965) ................................................................... 20

*Cummings v. Fire Ins. Exch.*,
202 Cal.App.3d 1407 (1988) ..................................................... 15, 16, 23

*Engalla v. Permanente Med. Grp., Inc.*,
15 Cal. 4th 951 (1997).......................................................................... 12

*Fullington v. Equilon Enterprises, LLC*,
210 Cal. App. 4th 667 (2012)................................................................ 18

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

- iii -

CASE NO.  2:16-CV-9307 MWF (EX)
[TITLE OF DOCUMENT]

*Grisham v. Philip Morris,*
    40 Cal.4th 623 (2007) ..................................................................... 18

*Jolly v. Eli Lilly & Co.,*
    44 Cal.3d 1103 (1988) ................................................................... 18

*Kleinecke v. Montecito Water Dist.,*
    147 Cal. App. 3d 240 (Ct. App. 1983) ......................................... 19

*Nieto v. Blue Shield of California,*
    181 Cal.App.4th 60 (2010) ........................................................... 15

*Panoutsopoulos v. Chambliss,*
    157 Cal.App.4th 297 (2007) ......................................................... 17

*Star Pac. Investments, Inc. v. Oro Hills Ranch, Inc.,*
    121 Cal.App.3d 447 (1981) ........................................................... 20

*Turner v. Turner,*
    167 Cal.App.2d 636 (1959) ........................................................... 21

*U.S. Bank National Assn. v. Naifeh,*
    1 Cal.App.5th 767, 778 (2016) ................................................ 20, 21

*Watts v. Farmers Ins. Exch.,*
    98 Cal.App.4th 1246 (2002) ......................................................... 24

*Wyatt v. Union Mortgage Co.,*
    24 Cal.3d 773 (1979) ..................................................................... 19

**State Statutes**

Civ. Code § 1689 ...................................................................... 20, 21, 22

Civ. Code § 3294(a) ............................................................................ 25

Civ. Code § 3412 ................................................................................ 20

Code Civ. Proc. § 338(d) .................................................................... 18

Insurance Code § 359 .................................................................... 22, 23

**Rules**

Fed.R.Civ.P. 39 .................................................................................. 22

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

- iv -

Fed.R.Civ.P. 50...................................................................................................2

Fed.R.Civ.P. 50(a) ............................................................................................1

Fed.R.Civ.P. 50(a)(1)........................................................................................2

Fed.R.Civ.P. 50(a)(2)........................................................................................2

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

CASE NO. 2:16-CV-9307 MWF (EX)
[TITLE OF DOCUMENT]

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Plaintiff Lincoln Benefit Life Company ("Lincoln") respectfully submits this Motion for Judgment as a Matter of Law pursuant to Federal Rule of Civil Procedure 50(a) at the close of evidence.

This is an insurance fraud action involving a joint long-term care ("LTC") policy issued by Lincoln Benefit Life Company ("Lincoln") to Alexander and Claire Dallal.  Under this policy, the Dallals can receive reimbursement of paid caregiving services only if Mr. Dallal (1) *required* a substantial assistance for two of six Activities of Daily Living *or* substantial (continual) supervision for severe cognitive impairment designed to protect his health and safety; (2) *actually received* that home health care from a non-family member; and (3) proof was provided to satisfy the terms and conditions of the policy.  The Dallals carried out a carefully orchestrated scheme to defraud Lincoln out of over $761,225 in insurance benefits because Mr. Dallal did not require or receive the requisite services from their only identified caregiver – Helen Genovea.

The Dallals' fraud was extensive and intentional – ranging from ongoing forgery of claim submissions to representations of false care to feigned incapacity.  The Dallals intentionally mislead Lincoln about the identity of their caregiver and Mr. Dallal's purported physical and cognitive impairments.  They sought reimbursement for care that was never provided nor needed.  Lincoln relied on the Dallals' misrepresentations/concealments and paid benefits it would not have had it known the truth.

At trial, Lincoln has presented clear evidence establishing the depth of the Dallals' fraudulent claim, which justifies its recovery of all benefits paid to the Dallals.  Lincoln is also entitled to punitive damages against both of the Dallals for their malicious, oppressive, and fraudulent conduct.  The Dallals should likewise

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

- 1 -

CASE NO.  2:16-CV-9307 MWF (EX)
[TITLE OF DOCUMENT]

1   not be permitted to maintain their ill-gotten gains, while forcing Lincoln to

2   maintain a contractual relationship under the mechanism by which they have

3   purported this fraud.  The law and equity mandates that the policy be voided.

## II.   LEGAL STANDARDS

5          Rule 50 of the Federal Rules of Civil Procedure states that a motion for

6   judgment as a matter of law may be granted when "there is no legally sufficient

7   evidentiary basis for a reasonable jury to find for that party on that issue."  Fed.R.

8   Civ. P. 50(a)(1).  The motion must be made before the case is submitted to the jury

9   and must "specify ... the law and facts that entitle the movant to the judgment." Fed.

10  R. Civ. P. 50(a)(2).  A party is entitled to judgment as a matter of law if, under the

11  governing law, there can be but one reasonable conclusion as to the verdict, and

12  that is a finding in favor of the moving party.  *Winarto v. Toshiba Am. Elecs.*

13  *Components, Inc.*, 274 F.3d 1276, 1283 (9th Cir.2001).

## III.   STATEMENT OF FACTS

### A.   The Policy

16         Lincoln issued a joint LTC Policy to the Dallals as co-insureds, effective

17  August 20, 2003.  [Trial Exhibit ("Exh.") 301; Stipulated Fact ("SF") 1]  As a

18  threshold to become eligible for Home Health Care benefits under the Policy, the

19  insured must prove he is "Chronically Ill," which means he must be certified by a

20  licensed health care practitioner as being: (1)  Unable to perform without

21  Substantial Assistance ("Hands-on" or "Standby") from another individual, at least

22  two Activities of Daily Living for a period of at least 90 days due to loss of

23  Functional Capacity ("ADL Option") [1]; or (2) Requiring Substantial Supervision to

---

[1] Under the LTC Policy, "Activities of Daily Living" mean:
  "a.   **Eating**, which shall mean feeding oneself by getting food in the body from a receptacle (such as a plate, cup, or table) or by a feeding tube or intravenously.
  b.   **Bathing**, which shall mean washing oneself by sponge bath or in either a tub or shower, including the act of getting into or out of a tub or shower.
  c.   **Continence**, which shall mean the ability to maintain control of bowel and bladder function; or when unable to maintain control of bowel or bladder function, the ability to perform associated personal hygiene (including caring for a catheter or

BURKE, WILLIAMS & SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

protect himself from threats to health and safety due to severe Cognitive

Impairment[2] ("Severe CI Option").  [SF2]

For the ADL Option, "Hands-On Assistance" requires "**physical assistance of another person** without which you would be unable to perform the Activity of Daily Living." [SF5]  Standby Assistance" requires "the presence of another person **within arm's reach of you** that is necessary to prevent, by physical intervention injury, to you while you are performing the Activity of Daily Living."  [SF5]  For the Severe CI Option, "Substantial Supervision" means "**continual supervision** by another person is necessary to protect insured from threats to his or her health or safety.  Such supervision may include cueing by **verbal prompting, gestures, or other demonstrations**." [Exh . 301-05]  Benefits are not automatic.  The Policy provides *reimbursement* of <u>actual</u> daily caregiving expenses incurred for qualified Home Health Care services by a non-family member.  Reimbursement is not permitted for care by an immediate family member or for which no charge is normally made in the absence of insurance.  [SF8; Exh. 301 pp. 4, 9]  The insured must provide ongoing proof that he qualifies for benefit payments. [Exh. 301 p. 11; TT227:18-20; TT1065:21-1066:1]

## B.   <u>Lincoln Initiates LTC Benefits in 2004</u>

On April 8, 2004, Mr. Dallal had surgery for removal of a meningioma (a benign tumor in the lining of his left temporal lobe).  [Exh. 55]  Mrs. Dallal

---

colostomy bag).
   d.   <u>**Dressing**</u>, which shall mean putting on and taking off all items of clothing and any necessary braces, fasteners, or artificial limbs.
   e.   <u>**Toileting**</u>, which shall mean getting to and from the toilet getting on or off the toilet, and performing associated personal hygiene.
   f.   <u>**Transferring**</u>, which shall mean the ability to move into or out of bed, a chair or wheelchair."
"Functional Capacity" means requiring the Substantial Assistance of another person to perform the prescribed Activities of Daily Living.  [SF6]
[2] "Cognitive Impairment" means "the deterioration or loss of your intellectual capacity which requires substantial supervision by another person to protect yourself or others.  It is measured by clinical evidence and standardized tests which reliably measure your impairment in: a. short or long term memory; b. orientation as to people, places or time; and c. deductive or abstract reasoning.  Cognitive Impairment includes Alzheimer's disease and similar forms of irreversible dementia."   [SF7]

BURKE, WILLIAMS & SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

1   submitted an LTC claim for benefits, representing her husband through a power of

2   attorney due to his claimed lack of capacity.  [Exh. 303; TT 344:14-345:2; 345:24-

3   346:1]   Mrs. Dallal identified Ms. Genovea as Mr. Dallal's caregiver.  [Exh 302]

4   Mrs. Dallal was notified that a provider's home health report, (which Norman

5   Seeman testified is required for every caregiver), would be sent to Ms. Genovea for

6   completion.  [*Id*.]  Claims Administrator Mick Orend sent Ms. Genovea a letter

7   dated April 16, 2004, providing the provider's home health report and Caregiver

8   Notes, asking <u>Ms. Genovea</u> to complete them.  [Exh. 305]

9        Lincoln received the provider form and "Caregiver Activity Notes" ("Notes")

10   for the period of March through mid-May 2004.  Each of the Caregiver Notes

11   contained a fraud notice, advising of the civil and criminal ramifications of submitting

12   misleading or incomplete information.   Lincoln also received an initial Attending

13   Physician's Statement ("APS"), dated May 17, 2004, from internist Dr. William

14   Young.  To assess Mr. Dallal, Lincoln sent a registered nurse to visit Mr. Dallal in

15   June 2004.  [Exh. 308]  Mrs. Dallal told the nurse that her husband was retired and

16   received constant supervision/assistance from Ms. Genovea (the only identified

17   caregiver), while she was at work.  [*Id*.]   Based on these representations and

18   depiction of Mr. Dallal's status, the nurse advised that he required care five

19   days/week.  [*Id*.]

20        Lincoln began issuing joint checks to the Dallals, reimbursing caregiving

21   costs based on Ms. Genovea's alleged report that she was providing qualified care.

22   [TT1069:25-1070:7]  Lincoln believed she completed the remaining Notes and

23   fraud notices, reinforcing the accuracy of the forms.  Indeed, a June 24, 2004 form

24   with her signature, which stated under caregiver comments, "I am working daily

25   9:00 a.m. to 5:00 p.m. 8 hours a day."  [Exh. 18-01]  Mrs. Dallal confirmed that this

26   Note for services was "from Ms. Genovea."  [Exh. 350-10-14]  For proof of

27   payment, Mrs. Dallal sent Lincoln copies of handwritten "receipts" showing near-

28   weekly cash payments to Ms. Genovea, also purportedly signed by Ms. Genovea.

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

- 4 -

CASE NO.  2:16-CV-9307 MWF (EX)
[TITLE OF DOCUMENT]

1   The Dallals continued to seek benefits, representing that Mr. Dallal required

2   private caregiver assistance (hands-on or stand-by) with at least two of his ADLs.

3   Thus, reimbursement benefits continued, with the Dallals seeking reimbursement

4   for 9 hours/day, 6 days/week of caregiving by September 2005.  In October 2005,

5   Lincoln requested a second nurse assessment at the Dallal's home.  [Exh. 312] Mrs.

6   Dallal informed the nurse during this visit that Mr. Dallal's condition continued to

7   decline in light of a stroke in May 2005, and a thyroid tumor in June 2005.

8   [TT239:7-13; Exh. 312]  The nurse's cognitive testing revealed a decline in Mr.

9   Dallal's condition.  The nurse advised Lincoln that Mr. Dallal would "never" regain

10  ADL independence and required substantial care for four of six ADLs (bathing,

11  dressing, transferring, toileting) and his severe cognitive impairment.  [Exh. 312]

12  ## C.   Lincoln Continues to Pay Benefits

13  Lincoln did not anticipate Mr. Dallal's condition would likely improve based

14  on the consistent information provided regarding his needs.  [TT239:14-16]  That

15  was reinforced by the increased services reported on the Caregiver Notes, with Ms.

16  Genovea's care amounting to 12 hours/day, 7 days/week by 2009.  [Exh. 355-23]

17  Over the years, Lincoln continued paying the claim based on information from the

18  claim submissions (purportedly from Ms. Genovea), the Dallals, the home visits,

19  and Mr. Dallal's medical providers.  [TT:1906:11-19]  Lincoln also received

20  additional "fraud notice" forms allegedly signed by Ms. Genovea (identified as the

21  "person completing this form").  [Exhs. 350-362]

22  Lincoln also obtained re-certifications for Mr. Dallal's functioning from his

23  medical providers through APS forms.  For example, Dr. Ananda from Dr. Black's

24  office (surgeon), signed a form verifying Mr. Dallal as "chronically ill" in early

25  2008.  [Exh. 61]  Mrs. Dallal sent Lincoln APS forms signed by internist Dr. Joy

26  Feld, in 2009-2011.  [Exh. 51, 52]  Lincoln thereafter received the forms directly

27  from Dr. Feld.  [Ex. 53, 191,194]  Through 2013, the APS forms indicated that Mr.

28  Dallal required at least stand-by assistance with dressing, bathing, toileting, and

Burke, Williams &
Sorensen, LLP
Attorneys At Law
Los Angeles

- 5 -

CASE NO.  2:16-CV-9307 MWF (EX)
[TITLE OF DOCUMENT]

transferring; was cognitively impaired; permanently required a caregiver; and was "chronically ill." [3]  [Exh. 191, 194]  The Caregiver Notes reiterated assistance for these ADLs.  [Exh. 33]

In August 2014, Lincoln requested that Mr. Dallal submit to a third home nurse assessment, which took place at the Dallals' home on August 22, 2014. [Exh. 48]  Mrs. Dallal again confirmed that Ms. Genovea was the only caregiver 7 days/week, 12 hours/day.  [Exh. 48-02]  As in prior years, Mr. Dallal was portrayed as unable to fend for or speak for himself.  [Exh. 48-02 to 48-05]  Mrs. Dallal reported that Mr. Dallal needed hands-on assistance with most ADLs and total assistance for all instrumental ADLs (shopping, transportation, driving, phone use, etc.).  [Exh. 48-09]  He was also at risk for falls and unable to transfer.  *Id.*  He used a bedside commode, a cane, a walker, and a wheelchair.  [Exh. 48-08]  The nurse reported Mr. Dallal was unable to correctly answer any questions on the cognitive exam.  [Exh. 48-02]  He presented as so deeply impaired that the nurse recommended he have a home health aide 24 hours/day, 7 days/week due to physical and cognitive impairments, and he should be transferred to a facility for 24/7 care if care could not be safely provided at home.  [Exh. 48-08]

The next year, Lincoln received an APS from Dr. Feld, dated July 9, 2015. [Exh. 195]  The APS reflected a <u>decline</u> in Mr. Dallal's condition since the prior APS in 2013, indicating he now required stand-by assistance with *all* ADLs, except for hands-on assistance with bathing.  [Exh. 195-02]  No independent ADLs were identified.  Lincoln continued to pay benefits because all information provided reflected that Mr. Dallal required and received Substantial Assistance (standby or hands-on) for two of six ADLs and Substantial Supervision for severe cognitive

---

[3] Dr. Feld will testify through deposition that (1) the APS forms with her name on them for 2009, 2010, and January 2011, were altered or augmented, such that she could not attest to their validity regarding ADL functioning; (2) she did not recall the bases for comments on the APS forms, except she believed or "speculated" the information came from the Dallal family; and (3) she accepted what the family told her as true in preparing the forms.

Burke, Williams &
Sorensen, LLP
Attorneys At Law
Los Angeles

- 6 -

CASE NO.  2:16-CV-9307 MWF (EX)
[TITLE OF DOCUMENT]

1  impairment, with actual expenses incurred for Ms. Genovea's reported services.

2  [TT240:8-14; 243:12-19]

3  ### D.  Lincoln Discovers the Dallals' Fraud in 2016

4  From 2004 through 2016, the Dallals represented that Mr. Dallal needed and

5  received care by Ms. Genovea, for which they sought reimbursement of up to

6  $265/day for alleged care of 12 hours/day, 7 days/week.  [Exh. 403]  However, in

7  2016, Lincoln discovered the Dallal's fraud, which included evidence of falsified

8  claim forms, no caregiver activity for Mr. Dallal (and with Ms. Genovea working

9  elsewhere), and Mr. Dallal captured on surveillance without the oversight or severe

10  impairment reported.   [Exh. 315; 362-61 and 62]

11  ### 1.  *The May 2016 APS form raises questions*

12  On May 9, 2016, Lincoln received Dr. Feld's annual APS form, dated May 6,

13  2016.  [Exh. 46]  Lincoln noticed that the APS reflected that Mr. Dallal required

14  *less care* than reported on the 2015 APS.  The improvement in four ADLs was

15  unexpected in light of the consistent representations by the Dallals, medical

16  personnel, and claim submissions that no improvement was expected.  [TT1075:2-

17  22]  Lincoln requested Dr. Feld's medical records, which raised questions.

18  [TT1076:3-5; Exh. 313]  The available records provided since 2012 reflected that

19  Dr. Feld consistently found Mr. Dallal had normal exams; had no significant

20  problems with his mobility; and had reported aches/pains due to activity (e.g., a

21  little "jog" across the street and heavy lifting).  [Exh. 313]

22  ### 2.  *The Dallals report extensive care required*

23  With this new information, Lincoln requested a home nurse assessment.  On

24  June 23, 2016, Mr. Dallal presented to nurse Lynn Sokolow as lethargic, drowsy,

25  and having difficult responding to questions.  [Exh. 1027:TT1027: 17-21]  Mrs.

26  Dallal again identified Ms. Genovea as the only caregiver, but she had the day

27  "off."  [Exh. 314-05]  Mrs. Dallal again acted as her husband's spokesperson,

28  conveying his need for hands-on assistance with showering and dressing; getting on/off

the toilet; moving in/out of a chair or bed; and moving around outside the home. [Exh. 314-09]  She advised her husband required stand-by assistance for moving around inside the home, hands-on assistance to walk outside, and use of ambulatory devices (cane, walker, or wheelchair).  [Exh. 314-12]  During Ms. Sokolow's cognitive testing, Mr. Dallal scored as quite impaired.  [Exh. 314-06- 314-07]  Based on Mrs. Dallal's report, her observation of Mr. Dallal, and the testing, Ms. Sokolow reported that Mr. Dallal required caregiving for his ADLs for 7 days/week, 12 hours/day.  [Exh. 314-35]

### 3.  *Surveillance reveals that Mr. Dallal is active and independent, without caregiver assistance/supervision*

Lincoln performed an activity check to assess Mr. Dallal's activity level and whether he was receiving care.  It obtained 18 days of surveillance over three months—July 25-31,[4] September 10-16, and November 2-5, 2016.  [Exhs. 315, 317, 319, 323, 325]  The eye-opening results were contrary to the Dallals' representations and claim submissions.  *Id.*  Mr. Dallal was active, mobile, and independent from 4 to over 11 hours/day outside the home.  *Id.*  He was *never* seen with a private caregiver, let alone Ms. Genovea.  *Id.*

Instead, Mr. Dallal was regularly observed at his store, Mr. Alex.  [Exh. 315 – 7/29/16; 315 – 7/30/16; 317 – 9/10/16; 317 – 9/11/16; 319 – 11/2/16]  He was present before/during/after business hours.  [Exh. 315 – 7/29/16; 315 – 7/30/16; 317 – 9/12/16; 317 – 9/16/16; 319 – 11/5/16]  Not only was he frequently alone, but when observed outside the store, he was seen rearranging outdoor furniture, conversing with others, and using a cell phone.  [Exh. 315 – 7/29/16; 315 – 7/30/16; 317 – 9/10/16; 317 – 9/11/16; 319 – 11/2/16]  At the shop, he interacted with customers and visitors; swept the walk; took out the trash; and closed up the shop.  [Exh. 315 – 7/30/16; 317 – 9/10/16, 9/13/16, 9/15/16; 319 – 11/4/16]  The behavior

---

[4] Mr. Dallal's home was observed at various times of the day from July 25-28.  Neither he nor any caregiver was seen. However, the Dallals' daughter who lives back East was apparently visiting around this time, as she was observed on July 30-31.

of Mrs. Dallal, their adult son, adult daughter, and others on the surveillance was also quite telling.  Everyone treated Mr. Dallal as a capable, self-reliant adult. [Exh. 315-7/29/16, 7/30/16; 317 – 9/10/16, 9/11/16, 9/12/16, 9/14/16]   He was never observed as being touched or given the assistance the Dallals represented he required.  *Id*.  He appeared communicative and interactive.  [Exh. 315-7/29/16, 7/30/16, 7/31/16; 317-9/10/16, 9/11/16, 9/12/16]  He ambulated freely, without a cane, walker, or wheelchair.  [Exh. 315 – 7/29/16 to 7/31/16; 317 – 7/10/16 to 9/16/16; 319 – 11/2/16 to 11/5/16]  He walked up and down stairs and curbs in a steady fashion (even when carrying items), and capably transferred to and from a sitting position.  [Exh. 317 – 9/14/16]  He moved in and out of cars alone, usually after putting bags in the trunk or back seat, while a family member sat in the driver or passenger seats.  [Exh. 315 – 7/26/16, 7/31/16; 317 – 9/10/16 to 9/16/16; 319 – 11/2/16, 11/3/16, 11/5/16]

Lincoln obtained separate surveillance of Ms. Genovea during this time. [Exh. 323, 325]  Not once was Ms. Genovea observed going to the Dallals' home or in the presence of any of the Dallals.  [Exh. 315, 317, 319, 323, 325] Rather, she ran errands and worked for an elderly lady.  [Exh. 323, 325] Although Ms. Genovea had not been observed at the Dallals' home in late July, Mrs. Dallal called Lincoln on August 19, 2016 to ask for more claim forms.  [Exh. 365] She represented on a recorded line that Ms. Genovea was completing the forms:  "And I've been photocopying them for her and you almost hardly could see them anymore so could you send them – send us few new forms?"  *Id*.

Lincoln continued to receive Caregiver Notes, fraud notices, and receipts purportedly signed by Ms. Genovea in support of the Dallals' monthly reimbursement claims.  [Exh. 319, Exh. 362-87]  The Notes still stated that Ms. Genovea provided the same services from 8:00 a.m. to 8:00 p.m. on the same days (July 29-31, September 10-16, and November 2-5, 2016), although surveillance (and her testimony) confirmed Ms. Genovea was not with him and he was not at

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

- 9 -

CASE NO.  2:16-CV-9307 MWF (EX)
[TITLE OF DOCUMENT]

1    home for the hours of represented care.  [Exh. 362]

2    ### 4.    *Ms. Genovea admits she did not care for Mr. Dallal*

3    Lincoln sent field representative Jacqueline Sachen to interview Ms.

4    Genovea on Saturday, November 5, 2016.  [TT902:14-17]  Ms. Genovea told Ms.

5    Sachen that she hadn't seen Mr. Dallal since 2015; she only worked a couple days

6    here and there; her schedule varied; she had maybe only once worked 7 days

7    straight after Mr. Dallal's surgery (in 2004); when Mr. Dallal's condition had

8    improved after the surgery, such that he sometimes would go to work while she

9    went grocery shopping or performed housekeeping; she did not work 8:00 a.m. to

10   8:00 p.m., except for when Mr. Dallal had his surgery; that she was called over to

11   put up the Dallals' Christmas tree in 2014 but did not care for Mr. Dallal.

12   [TT904:10-17; 908:18]   When asked about caregiver logs, Ms. Genovea indicated

13   she had used them for other employers, but she had never filled out a log or used

14   her signature to verify the dates and hours she worked during her employment with

15   the Dallals.  Ms. Genovea told Ms. Sachen that it had been about a year since she

16   last heard from Mrs. Dallal, but that Mrs. Dallal had recently called her to set up a

17   time to discuss coming back to work with her again.   [TT:908-4-18]

18   Ms. Genovea's representations directly contradicted the history of Caregiver

19   Notes and fraud notices submitted with her name (as well as Mrs. Dallal's

20   representations about care).  The Monday after the interview with Ms. Genovea,

21   Mrs. Dallal complained to Lincoln and insisted any contact with "the caregiver" be

22   made through her.  [Exh. 368]

23   On December 6, 2016, Lincoln called Mrs. Dallal to ask whether she would

24   be willing to talk about her concerns.  The next day, Mrs. Dallal called back and

25   declined the interview.  [Exh. 369]  However, when talking about claim forms, she

26   advised, "*Ms. Genovea does the paperwork . . . every month, around the 5th.  So,*

27   *she just completed it.  I just put it for you in the mail yesterday.*"  [*Id.*]

28

Burke, Williams &
Sorensen, LLP
Attorneys At Law
Los Angeles

- 10 -

CASE NO.  2:16-CV-9307 MWF (EX)
[TITLE OF DOCUMENT]

### 5. *Medical professionals confirm Mr. Dallal does not require Substantial Assistance or Substantial Supervision*

Lincoln asked Nurse Sokolow who evaluated Mr. Dallal in June 2016, to review the surveillance.  On December 12, 2016, Nurse Sokolow responded with a written report, which verified the Dallals' identities and retracted her June 2016 assessment.  [Exh. 134]  She noted inconsistencies in the Dallals' representations and found Mr. Dallal would not require any assistance or supervision.  [*Id*.]

Lincoln also requested that consulting neuropsychologist, Lori Folk-Barron, Psy.D., review the file, including the surveillance.  Dr. Folk-Barron confirmed that Mr. Dallal's activities on surveillance were inconsistent with Cognitive Impairment or the need for Substantial Supervision or Substantial Assistance, as defined under the policy.  [TT727:10-13]  Significant inconsistencies also existed between Mrs. Dallal's report of Mr. Dallal's functional capacities and his activities on surveillance.  [TT727:14-16]   Mr. Dallal was independent; there was an absence of substantial supervision, including by his family members, who were not attending to him or prioritizing his supervision.  [TT731:2-9; 736:1-4]

### 6. *Lincoln denies the claim*

Based on its overall investigation, Lincoln determined that Mr. Dallal did not satisfy the Policy requirements, including that he did not require or get Substantial Supervision or Substantial Supervision, nor did he satisfy the ADL or Severe CI Options.  In a detailed letter dated December 16, 2016, it explained its decision, including the investigation, the inconsistencies uncovered, and that no further benefits would be paid.  [Exh. 330]  The Dallals appealed the decision through counsel, without any new evidence.  [TT1079:18-1080:1]  Lincoln Benefit upheld its decision on appeal.  [TT1080:12-13]  Further evidence of the Dallals' fraud was revealed in discovery and at trial.

## IV. LINCOLN IS ENTITLED TO JUDGMENT ON ITS SECOND CAUSE OF ACTION FOR FRAUD

Lincoln satisfies each of the elements for fraud, which are:  "(a)

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

- 11 -

CASE NO.  2:16-CV-9307 MWF (EX)
[TITLE OF DOCUMENT]

misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e. to induce reliance; (d) justifiable reliance; and (e) resulting damage." *Engalla v. Permanente Med. Grp., Inc.*, 15 Cal. 4th 951, 974 (1997), as modified (July 30, 1997). Although Lincoln need only prove one instance of fraud to prevail, at trial, Lincoln presented evidence documenting the Dallals' ongoing and continued fraudulent scheme. The following represents examples of some of the many misrepresentations and concealments by the Dallals.

### A.    the Dallals Misrepresented The Truth Concerning Mr. Dallal's Abilities and Need for Care

- The Dallals portrayed Mr. Dallal as helpless, when surveillance showed he was fully functional, ambulatory and active *without* a caregiver. [Exhs. 315, 317, 319, 323, 325]
- Mrs. Dallal wrote on claim forms that Ms. Genovea gave daily care for toileting, transferring, dressing, bathing, and occasionally continence when she did not. [Exh. 350-362]
- Ms. Genovea admitted Mr. Dallal could perform those ADLs: he could dress and shower, take himself to the bathroom, perform his hygiene, and transfer to/from bed and a chair. [TT784:23-789:5; 781:24-782:12; 782:16-784:20; 789:6-24; 789:25-791:6; SF22]
- Mr. Dallal feigned his condition to the four nurse evaluators. He presented as lethargic and unable to answer basic questions, scoring very low on the MMSE. [Exh. 48, 133, 308, 312]
- Mrs. Dallal reported Mr. Dallal as essentially helpless without a private caregiver – requiring hands-on assistance for bathing, showering, dressing, getting off/on toilet, moving in/out of chair or bed, and moving around outside home. She represented he required ambulatory devices for mobility. She continued this charade when preparing/signing the claim forms with Ms. Genovea's name and during her December 2016 call with Lincoln. [Exh. 350-362; 369]
- Dr. Feld testified that she prepared the APS forms based on what the Dallals told her and does not know the bases for why she wrote down the information as to Mr. Dallal's ADLs on the APS forms, particularly for 2015 and 2016. She also acknowledged that the basis for her cognitive impairment conclusion was based on the Dallal family's report. [Feld Depo. at Trial, 134:8-135:3, 215:22-216:6; 94:16-18, 95:13-24, 138:19-

21, 204:9-16]

In stark contrast to the Dallals' representations, Mr. Dallal functioned independently and capably throughout the surveillance in July, September, and November 2016 – for the same days the Notes reflected he required 12-hour daily care by Ms. Genovea at home.  At no point was he seen with a caregiver, and certainly did not receive Substantial Supervision (stand-by/arm's length or hands-on assistance) or Substantial (continual) supervision by the absent Ms. Genovea.  Mr. Dallal's behavior and actions on surveillance were completely contrary to how the Dallals had presented Mr. Dallal since the outset of the claim.  Nurse Sokolow even confirmed that the Dallals' portrayal of Mr. Dallal's functioning was markedly different than the surveillance.  Mr. Dallal also feigned cognitive impairment with neurologist Michael Gold, M.D. and neuropsychologist Charles Hinkin, Ph.D. Both found his responses to their evaluation/testing not credible.

### B.    The Dallals Falsified The Claim Submissions And Care

- Ms. Genovea admits that she only signed the first Caregiver Notes in April 2004; Mrs. Dallal signed the rest.[5] [TT, 820:25-821:5]  <u>Mrs. Dallal admitted she has completed and signed Ms. Genovea's name on all Caregiver Notes and fraud notices, since June 2004.</u>  Ms. Genovea testified that she saw Mrs. Dallal prepare the Caregiver Notes on which Mrs. Dallal signed her name.  However, she did *not* authorize Mrs. Dallal to sign the fraud notices, never reviewed any Notes or fraud notices, and never agreed false or misleading information could be submitted.
- Mrs. Dallal falsified the cash receipts submitted in support of the claim.  She admitted that she wrote out receipts depicting payments to Ms. Genovea for services (even when Ms. Genovea was not there), signed Ms. Genovea's name and submitted them to Lincoln.  Ms. Genovea cannot recall preparing, giving, or seeing such receipts for payment.
- Since 2009, all claim forms and receipts represented that Ms. Genovea

---

[5] "Q.  And after the first form that you filled out, dated April 21, 2004, Mrs. Dallal is the one that filled out all of
these caregiver activity notes after that, correct?
A. Yes.
Q. And she signed your name to all those forms, correct?
A. Yes." [TT, 820:25-821:5]

Burke, Williams &
Sorensen, LLP
Attorneys At Law
Los Angeles

- 13 -

CASE NO.  2:16-CV-9307 MWF (EX)
[TITLE OF DOCUMENT]

worked and was paid for services of 12 hours/day, 7 days a week.  Yet, Ms. Genovea has never worked a full month more than 2-3 times, and *since 2011*, had only worked 2-3 days/week.  She did not get paid when she did not work.

- All documents reflected Ms. Genovea was the only caregiver.  The Dallals now claimed at trial they had three other caregivers, including Disnarda Sosnowski, whom they never revealed to Lincoln prior to litigation.

- The Dallals have no documents to evidence the payment of the alleged caregiving.  The cash receipts were not signed by Ms. Genovea.  The caregiver logs are fabricated and were written in 2017, not contemporaneously as claimed by Ms. Genovea.  The logs contain multiple alterations changing the year from 2017 to a prior backdated year (e.g. 2010, 2011, 2013).  [Exh. 403]  Linton Mohammed, Ph.D. testified that the entries in all the caregiver logs were backdated from 2017.  [TT1-12]

- Ms. Genovea never reviewed the forms, Ms. Genovea did not provide the represented care, Ms. Genovea was not paid when she did not work, and Helen never agreed to false or misleading information being submitted.

- The Dallal's theory of obtaining consent from Lincoln for a Spanish-speaking caregiver is irrelevant and not believable.  As testified by Norman Seeman, there is no evidence a call was made; Mrs. Dallal did not speak to Faby Alvarez, who was no longer the adjuster on the claim at that time; nor did Mrs. Dallal call Lincoln to ask for permission so that she could sign <u>Helen's</u> forms.  [TT1101:17-22; 1105:11-14]  Mrs. Genovea never gave consent to lie.   Nor can Mrs. Genovea give consent for people who were allegedly giving care when Mrs. Genovea .

## C.   <u>The Dallals Concealed Mr. Dallal's True Activities and Abilities</u>

- Since his surgery, Mr. Dallal has taken multiple trips with Mrs. Dallal – locally and internationally – without a caregiver; yet still sought LTC benefits from Lincoln during that time  [TT459:2-466:22]
- Mr. Dallal admitted in May 2005 and again in 2006, that he had returned to work full-time as a tailor [Exh. 59-01, Exh. 97-1]
- Mr. Dallal renewed his driver's license in 2005 [Exh. 88] and 2010 [Exh. 89], leased a BMW in 2009 [Exh. 94], filed an insurance claim, and tried to negotiate settlement after someone rear-ended his car; [Exh. 97-1]
- Without power of attorney, Mr. Dallal signed checks for the business [Exh. 115-1 to 115-3];  made changes to the business bank account [Exh. 117], and obtained a line of credit [Exh. 380]

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

- 14 -

CASE NO.  2:16-CV-9307 MWF (EX)
[TITLE OF DOCUMENT]

- On October 14, 2005, Mr. Dallal wrote a letter to negotiate a settlement with his 21st Century his insurance carrier. [Exh 97]

The Dallals provided false information pertaining to Mr. Dallal's level of care, his health, his activities, his physical and cognitive abilities, his tolerances, his need for a power of attorney, and grounds for payment of benefits under the Policy. With each claim submission, nurse assessment, and telephone call, the Dallals made these misrepresentations and omissions to induce Lincoln to pay a significant sum on the insurance claim.

### D.   The Dallals' Misrepresentations Were Made Knowingly

The Dallals were obligated to communicate in good faith all that they knew with regard to Mr. Dallal's health and caregiving status with respect to the claim and documents submitted.  Cal. Ins. C. § 332; see, e.g., *Nieto v. Blue Shield of California*, 181 Cal.App.4th 60, 70 (2010) (confirming appellant must either be aware the representations were false or exhibited a reckless disregard of the truth). "[T]he intent to defraud the insurer is necessarily implied when the misrepresentation is material and the insured willfully makes it with knowledge of its falsity."  *Cummings v. Fire Ins. Exch.*, 202 Cal.App.3d 1407, 1418 (1988) ("the law presumes every man to intend the natural consequences of his acts").

The Dallals knew that their representations were false.  They were warned on the fraud notice of the risks associated with providing any "materially false, incomplete, or misleading information," including "civil or criminal penalties" and "denied coverage and/or benefits."  Mrs. Dallal even knew that they could not seek benefits for which care was not provided.  Her insurance broker, Leonard Roberts told her. [552:2-6]  Yet, Mrs. Dallal knew when she completed the Notes, fraud notices, and cash receipts with Helen's name that she was representing (1) Ms. Genovea completed/signed the documents; (2) Ms. Genovea was the sole caregiver; (3) Mr. Dallal required and was receiving the daily care identified from Helen on the forms for 12 hours/day, 7 days/week; (4) the receipts represented payments for

1    daily services by Ms. Genovea; and (5) the services were provided at the Dallals'

2    home.  Mrs. Dallal had to have known that information was false because Ms.

3    Genovea was not providing any care, let alone 12/hours of daily care, on any day of

4    the surveillance (or since 2011).  Mrs. Dallal also knew that she – not Helen –

5    completed and signed the claim submissions, yet she represented otherwise on the

6    phone to Lincoln in August and December 2016.

7        The Dallals' behavior on surveillance and knowledge of Helen's limited

8    work schedule since 2011 reinforces that they knowingly misrepresented of Mr.

9    Dallal's true capabilities and the caregiving services during the June 23, 2016 home

10   visit.  If they now argue they had a different caregiver instead of Helen, they admit

11   to concealment.  They failed to reveal any other caregiver for whose services they

12   sought reimbursement, despite opportunities with every claim submission, nurse

13   visit, and contact with Ms. Genovea.  Mrs. Dallal never disclosed Ms. Sosnowski.

14       There is no doubt the Dallals' representations on the claim forms, in calls,

15   and at the nurse assessment were intended to secure reimbursement of benefits.

16   Monthly benefits were paid in response to the claim submissions and

17   representations to the nurse assesssor.

18       **E.       The Dallals' Misrepresentations And Omissions Were Material**

19       "A false representation is material if it relates to the insurer's "'investigation

20   to determine its obligations under the policy.'"  *Id.* at *7 (citation omitted).   "[A]

21   statement is not material only if it relates to a matter which ultimately proves to be

22   significant in the ultimate disposition of the claim.  Rather, if the misrepresentation

23   concerns a subject reasonably relevant to the insured's investigation, and if a

24   reasonable insurer would attach importance to the fact misrepresented, then it is

25   material." *Cummings*, 202 Cal.App.3d at 1417.

26       Each misrepresentation made by the Dallals materially impacted Lincoln's

27   ability to evaluate the claim (particularly when "Proof of Loss" is required), to

28   assess whether Mr. Dallal met the Policy requirements, and to ultimately assess its

Burke, Williams &
Sorensen, LLP
Attorneys At Law
Los Angeles

- 16 -

CASE NO.  2:16-CV-9307 MWF (EX)
[TITLE OF DOCUMENT]

1   liability for reimbursement of daily caregiving expenses.  [TT1068:5-13; 1070:2-

2   25]   The misrepresentations were relevant to Lincoln's ability to evaluate (a) the

3   identity, services, hours, and rates of the caregiver to know who is providing what

4   care, and to ensure the caregiver was not a family member;  (b) the identity of who

5   signed the Notes and fraud notices to verify the hired caregiver recognized truthful

6   information must be provided;  (c) whether the care identified by the Dallals and

7   the caregiver rose to the level of required Substantial Assistance and/or Substantial

8   Supervision; (d) whether the true hours of care were actually provided to assess

9   whether the Policy's standards are met and that hours correlated with the

10   reimbursement being sought; (e) proof that payment has actually been made, to

11   whom, and the amount of payment; and (f) the location of care because "Home" for

12   purposes of "Home Health" benefits means "your residence" under the Policy.   A

13   reasonable insurer would attach importance to these points to determine whether

14   further investigation was necessary and to assess its ultimate liability.

### F.   Lincoln Was Damaged By The Dallals' Fraud

16       Lincoln was damaged by the Dallals' fraud because it paid out benefits to

17   which they were not entitled.  Norman Seeman testified that Lincoln paid benefits

18   As a proximate result of Defendants' material misrepresentations and omissions,

19   Lincoln was damaged in the amount of benefits paid based on such fraud

20   ($761,225.89), together with interest at the legal rate.  The Dallals also received

21   ongoing insurance coverage to which they were not entitled.

22       Lincoln anticipates that Defendants will argue it cannot prevail on the

23   damages element for fraud if the Dallals are now able to prove they were entitled to

24   LTC benefits irrespective of their fraud.  Their position is contrary to the law.  "The

25   causation aspect of actions for damage for fraud and deceit involves three distinct

26   elements: (1) actual reliance, (2) damage resulting from such reliance, and (3) right

27   to rely or justifiable reliance."  *Panoutsopoulos v. Chambliss*, 157 Cal.App.4th 297,

28   308 (2007).  Lincoln suffered harm from the Dallals' fraud – and thus damages –

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

- 17 -

CASE NO.  2:16-CV-9307 MWF (EX)
[TITLE OF DOCUMENT]

because it paid benefits in the past based on their fraudulent misrepresentations and concealments.   Defendants cannot now attempt to negate their fraud and Lincoln's resulting damages by manufacturing a setoff or offset for entitlement to benefits. *See, e.g., Fullington v. Equilon Enterprises, LLC*, 210 Cal. App. 4th 667 (2012) (franchisee's prior recovery of compensatory damages subject to offset did not negate damages element of fraud).   Defendants have never raised an affirmative defense of setoff/offset, nor do they have grounds to do so.   Any attempt rectify their fraud post-hoc would be inconsistent with the law of fraud damages and violate public policy, which requires Defendants to be held accountable for their fraudulent conduct

## V.   LINCOLN'S CLAIMS ARE NOT BARRED BY THE STATUTE OF LIMITATIONS

The Dallals have asserted one affirmative defense – that Lincoln's fraud claim is barred by the three-year statute of limitations under Code of Civil Procedure Section 338(d).   Under the "delayed discovery rule," a cause of action accrues and the limitations period begins to run when the "plaintiff has notice or information of circumstances to put a reasonable person on inquiry." *Jolly v. Eli Lilly & Co.*, 44 Cal.3d 1103, 1110 (1988).

Here, Lincoln did not discover the Dallals' fraud until mid-2016, so the Complaint was timely.   The clock would not start until Lincoln discovered or knew the facts constituting Mr. and/or Mrs. Dallal's fraud.   In May 2016, the Attending Physician Statement changed the Dallals' narrative by showing that he actually required less care than previously reported.   Surveillance conducted in July, September, and November 2016 reflected that Mr. Dallal did not require and was not receiving the care represented.   The Complaint was therefore timely filed on December 16, 2016.   A "defendant's fraud in concealing a cause against him will toll the statute of limitations, and that tolling will last as long as a plaintiff's reliance on the misrepresentations is reasonable." *Grisham v. Philip Morris*, 40

Cal.4th 623, 637 (2007).  Here, the Dallals' consistent reporting that Mr. Dallal qualified for benefits and their submission of forged claim forms which contained false information – from the outset of the claim in 2004 – constituted a continuing fraud.  Indeed, the fraud was perpetrated on a monthly basis – every time they sought benefits based on the claim submissions and then received benefits as a result.  The Dallals' continuing fraud therefore halted the statute of limitations from running until their last overt act.  *See Wyatt v. Union Mortgage Co.*, 24 Cal.3d 773 (1979); *Aaroe v. First Am. Title Ins. Co.*, 222 Cal. App. 3d 124, 128 (1990).

Lincoln's fraud  claim is likewise not barred because the Dallals are estopped from asserting that the statute of limitations applies (*i.e,*. by their fraudulent conduct).  *See Kleinecke v. Montecito Water Dist.*, 147 Cal. App. 3d 240, 245 (Ct. App. 1983).  If ongoing fraud perpetrated by the Dallals prevented Lincoln from discovering the claims, there is no time bar.  *Grisham v. Philip Morris, Inc.*, 670 F.Supp.2d 1014, 1021 (C.D. Cal. 2009) ("A plaintiff who exercises reasonable diligence in attempting to discover a cause of action may be prevented from discovering relevant information due to a defendant's wrongdoing ... [and a] defendant's fraud in concealing a cause of action against him will toll the statute of limitations[.]").  Every representation by the Dallals -- even up until Lincoln denied the claim – was designed to conceal the truth regarding their fraudulent claim.  They methodically represented to Lincoln throughout the claim that Mr. Dallal required approved caregiving services, that Ms. Genovea provided the represented caregiving services, and that their "proof of loss" submitted by Ms. Genovea was legitimate.  Why else would Mrs. Dallal report on December 7, 2016, that Ms. Genovea completed the claim forms – when she knew Ms. Genovea did not do so, did not sign the forms, and was not even working for her?  The Dallals' current attempt to change the narrative offered to Lincoln – by claiming that they actually had different caregivers and admitting that Mrs. Dallal pretended to be Ms. Genovea since the claim onset -- further demonstrates their repeated concealment of

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

- 19 -

CASE NO.  2:16-CV-9307 MWF (EX)
[TITLE OF DOCUMENT]

the truth to Lincoln, such that the statute of limitations could not bar Lincoln's claim.

## VI.   UNDER ITS THIRD CAUSE OF ACTION, LINCOLN IS ENTITLED TO A DECLARATION VOIDING THE POLICY FOR THE DALLALS' FRAUDULENT CLAIM

Distinct from Lincoln's claim for fraud damages, which is a jury issue, Lincoln seeks an additional remedy – a judicial declaration that the LTC policy is void based on the fraudulent claim.  It would be inequitable and unjust to force Lincoln to continue to insure the Dallals, when they have engaged in a continuing course of deliberate, calculated, and pervasive fraud.  Doing so would also inequitably violate public policy and frustrate Lincoln's contractual relationship with proven frauds.  Cal.Civ. Code §§ 1689, 3412.  The Court should declare the policy void as of the time of the fraud *or* at least as of December 16, 2016.

### A.   The Court Should Void the Policy Under Civil Code Section 3412 Due to the Dallals' Fraudulent Claim

California Civil Code Section 3412 authorizes courts to cancel instruments due to fraud.  *See U.S. Bank National Assn. v. Naifeh*, 1 Cal.App.5th 767, 778 (2016) (documents can be voided based on fraud).  Section 3412 states:

> "A written instrument, in respect to which there is a reasonable apprehension that if left outstanding it may cause serious injury to a person against whom it is void or voidable, may, upon his application, be so adjudged, and ordered to be delivered up or canceled."

The remedy of cancellation of instruments is equitable; it exists to redress harms.  *Corrigan v. Stiltz*, 233 Cal.App.2d 381, 387 (1965) ("In California a suit to have an instrument canceled or adjudged void is akin to a common suit in the old chancery practice and is purely equitable.")  Fraud is a permissible ground upon which to void a contract.  *Star Pac. Investments, Inc. v. Oro Hills Ranch, Inc.*, 121 Cal.App.3d 447, 461 (1981) ("*Fraud may render a contract void* or may be grounds for rescission or reformation.")  (emphasis added).   To prevail on a claim to cancel an instrument, a plaintiff must establish (1) the instrument is void or voidable due

to, for example, fraud; and (2) there is a reasonable apprehension of serious injury including pecuniary loss or the prejudicial alteration of one's position. *U.S. Bank,* 1 Cal.App.5th at 778; *Turner v. Turner*, 167 Cal.App.2d 636, 641 (1959).

Lincoln meets both requirements.  The Dallals committed fraud in submitting false claims for policy benefits.  Their fraud was continuous, intentional, and ripe to be repeated.   To this day, the Dallals dispute they did anything wrong and strongly maintain that they are entitled to benefits based on Mr. Dallal's alleged debilitating condition.  They have also revealed further lies and concealment of the truth in litigation.  It would be wholly inequitable to force Lincoln to continue insuring the Dallals, who have abused the claim process and Lincoln's trust by submitting false claims under the policy.  Lincoln would be significantly harmed if the Dallals remained insured and were entitled to keep the very contract that served as the basis for the ongoing fraud they perpetrated for years.

The Dallals contend that even if a fraud verdict is rendered against them, they can pursue <u>additional</u> LTC benefits without any recourse or penalty.  They cannot and should not be rewarded for their misconduct.  This is akin to forcing a party (i.e. buyer) to a contract to continue accepting goods from the other party (i.e. seller) even though it has discovered that the seller has been providing it with fake merchandise for years.  The buyer should not have to continue working with this fraudulent seller based strictly on a contract.

This case serves as a prime example of a situation ripe for a declaratory judgment to void the policy.   Requiring a defrauded party to continue its contractual relations that are so immersed in fraud would be highly inequitable and unjust.   The Dallals should not get a second chance to defraud Lincoln again.  Indeed, Civil Code Section 1689, which pertains to the extinguishment of contracts generally (i.e. not merely in the insurance context), specifically permits contracts to be rescinded if the "public interest will be prejudiced by permitting the contract to stand" or if "contract is unlawful for causes which do not appear in its terms or

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

- 21 -

CASE NO.  2:16-CV-9307 MWF (EX)
[TITLE OF DOCUMENT]

1   conditions." Cal.Civ. Code § 1689.   The Dallals' unlawful acts in claiming

2   fraudulent benefits while trying to keep the policy in force certainly defies public

3   policy.   The public interest would be best be served by not permitting the Dallals to

4   further profit off their wrongful conduct.

5        Equity requires that the policy be voided.  If the Court finds necessary,

6   Lincoln is open to posing this issue to the jury for an advisory verdict pursuant to

7   Rule 39 of the Federal Rules of Civil Procedure.

8        **B.      California Insurance Code Section 359 Authorizes the Voiding of
         the Policy From the Time of the Fraud**

9

10  California Insurance Code Section 359 requires the voiding of an insurance

11  policy based on an insured's misrepresentations.  Section 359 provides: "If a

12  representation is false in a material point, whether affirmative or promissory, the

13  injured party is entitled to rescind the contract *from the time the representation

14  becomes false*."  (Emphasis added).   This means that a contract can be rescinded –

15  i.e. voided – *following its inception, not merely at inception*.

16       Section 359 broadly refers to both rescission and voiding of the policy as

17  demonstrated by the inclusion of the provision "from the time the representation

18  becomes false."   If rescission could only mean that contracts are void *ab initio* (i.e.

19  the contract had never existed), there would be no reason to include the phrase

20  "from the time the representation becomes false" unless it was meant to permit the

21  voiding of the contract starting at a future point in time.  Indeed, if the policy could

22  only be voided based on a technical rescission (void *ab initio*), then Section 359

23  would have just stated "If a representation is false in a material point, whether

24  affirmative or promissory, the injured party is entitled to rescind the contract."

25  Lincoln's interpretation of Section 359 makes particular sense given that certain

26  insurance contracts, such as disability or LTC policies, contain the potential for

27  subsequent claims.  Section 359 permits the policy to be voided without affecting

28  prior (non-fraudulent) claims under the policy.  *See Twin City Fire Ins. Co. v.*

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

- 22 -

CASE NO.  2:16-CV-9307 MWF (EX)
[TITLE OF DOCUMENT]

*Mitsubishi Motor Credit of Am., Inc.*, No. SACV 04-00043CASMLGX, 2006 WL 5164189, at *11 (C.D. Cal. Aug. 15, 2006) (Section 359 applies to post-issuance misrepresentations based on the inclusion of the phrase "from the time the representation becomes false.")  Defendants may maintain that Section 359 can only refer to representations made during the issuance of policy based on the fact that Section 359 is stated within Division 1, Part 1, and Chapter 3 of the Insurance Code (Negotiations Before Execution).  However, section titles and headings are not part of the statute itself and are not determinative.  *See INS v. St. Cyr*, 533 U.S. 289, 308 (2001) ("[A] title alone is not controlling."]).

**C.   Courts Recognize the Voiding of a Contract/Policy Based on Fraud Irrespective of a Fraud Provision**

Defendants may argue that Lincoln cannot seek to void the policy because the policy does not contain a fraud provision that expressly states that the insurer may void the policy based on fraud.  No such provision is required.  Courts uphold the voiding of contracts due to fraud in the absence of termination provisions.  For example, in *American General Life & Accident Insurance Company. v. Findley*, No. CV 12-01753 MMM PSWX, 2013 WL 1120662, at *10 (C.D. Cal. Mar. 15, 2013), in addition to granting summary judgment on fraud claim, the court ordered the voiding of policy based on fraud even though the policy did not have a fraud termination provision.  The court held that California Insurance Code Section 359 governs post-issuance misrepresentations as well as misrepresentations to procure a policy, citing *Twin City Fire Ins. Co. v. Mitsubishi Motor Credit of Am., Inc.*, 2006 WL 5164189.   As such, California cases on voiding of policies, such as *Cummings v. Fire Ins. Exch.*, 202 Cal.App.3d 1407, 1416 (1988), are not distinguishable simply because these policies contain fraud termination provisions.  These cases are still applicable to the instant claim.

**D.   The Entire Policy Must Be Voided**

Lincoln issued a joint policy to Mr. and Mrs. Dallal.  Lincoln seeks to void

BURKE, WILLIAMS & SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

the policy as to <u>both</u> Dallals based on their fraudulent conduct.  The Court confirmed in ruling on the motion to dismiss that the policy can be voided as to Mrs. Dallal.  [Doc. 29]  ("It stands to reason that as an active participant in furthering the alleged fraud, Mrs. Dallal is just as culpable for any wrongdoing as Mr. Dallal, and should be subject to the same remedies." )  A co-insured's coverage may be voided if he or she is not "innocent" of the fraud.  *Watts v. Farmers Ins. Exch.*, 98 Cal.App.4th 1246 (2002).  However, "innocence" need not be shown if the party committing the fraud was an assignee of the insured's rights and claims. *Essex v. Hartford Fire Ins. Co.*, 2013 WL 3389549, **9-10 (C.D. Cal. July 8, 2013).  Both Dallals engaged in fraud in inducing Lincoln to pay $761,225.89 in LTC benefits through forgery, false claim submissions, and feigned impairment. As the Court noted in its order granting partial summary judgment, Mrs. Dallal supplied false statements to Lincoln.  [Doc. 89]   Together, the Dallals made knowing, intentional misrepresentations regarding the identity of the caregiver and the specific hours she provided care to Mr. Dallal.  [Doc. 89]  Neither Mr. nor Mrs. Dallal should be able to benefit from their fraud.

## VII.   THE DALLALS HAVE NOT MET THEIR BURDEN OF PROOF ON LINCOLN'S FIRST CAUSE OF ACTION FOR A DECLARATION FOR ENTITLEMENT TO BENEFITS BEFORE DECEMBER 16, 2016

Lincoln filed a declaratory judgment action regarding Mr. Dallal's lack of entitlement to benefits.  Mr. Dallal has not been receiving home health care services by his stated caregiver, Ms. Genova, as represented in the claim submissions. Lincoln likewise contends that Mr. Dallal is not Chronically Ill, nor does he require Substantial Supervision or Substantial Assistance, pursuant to the terms and conditions of the policy.

## VIII.   THE JURY SHOULD DETERMINE IF MR. DALLAL IS LIABLE FOR PUNITIVE DAMAGES

Mr. Dallal, through his own independent and purposeful fraudulent conduct, is liable for punitive damages.   Mr. Dallal engaged in clear acts of oppression,

Burke, Williams &
Sorensen, LLP
Attorneys At Law
Los Angeles

- 24 -

CASE NO.  2:16-CV-9307 MWF (EX)
[TITLE OF DOCUMENT]

fraud, or malice for his role in submitting an intentionally false insurance claim. He is subject to punitive damages just like Mrs. Dallal.  Cal. Civ.Code § 3294(a). Mr. Dallal feigned his alleged severe brain and physical impairments during each of his four in-home nurse assessments (as supported by his performance and effort in the exams conducted by Drs. Gold and Hinkin) and his office visits with Dr. Feld, who signed APS forms certifying that he was chronically ill.  [Exh. 48, 133, 308, 312]   Mr. Dallal presented as lethargic, not able to engage in conversation, and not able to answer basic questions.  [*Id.*]  Mr. Dallal knew his own capabilities (as seen on the surveillance), yet he grossly feigned his condition to obtain continued benefits from Lincoln.  Lincoln relied on Mr. Dallal's presentation and information in order to initiate and pay ongoing benefits.  Accordingly, Mr. Dallal should remain as a defendant on the punitive damages portion of the verdict form.  Further, Plaintiff in its Opening Statement referenced punitive damages as against both defendants (i.e. "they").  [TT202:19-20 ("But they committed fraud and that they should have to pay punitive damages.")]   If Mr. Dallal is removed as a defendant on this claim, the jury may improper infer that the Court has made findings as to the merits of the claim against Mr. Dallal  and speculate as to the Court's reasons, which could then impact its assessment of the punitive damages claim against Mrs. Dallal to Lincoln's detriment.

## IX.   CONCLUSION

Lincoln is entitled to judgment in its favor on all counts of the First Amended Complaint.

Dated:  August 9, 2018

BURKE, WILLIAMS & SORENSEN, LLP
Melissa M. Cowan
Keiko J. Kojima


By: */s/ Keiko J. Kojima*
        Melissa M. Cowan
Attorneys for Plaintiff Lincoln Benefit Life Company

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

- 25 -

CASE NO.  2:16-CV-9307 MWF (EX)
[TITLE OF DOCUMENT]