Collin Seals (SBN 249534)
**THE LAW OFFICES OF COLLIN SEALS**
790 E. Colorado Blvd., Suite 900
Pasadena, California  91101
Telephone:    626.240.0632
Facsimile:      626.240.0700
Email:  collin.seals@seals-law.com

Joseph F. Hart (SBN 85056)
E-mail:  joe@joehartlegal.com
LAW OFFICES OF JOSEPH F. HART
433 North Camden Drive, Suite 600
Beverly Hills, CA  90210-4416
Tel:  310.274.7157        Fax:  310.331.8779

*Attorneys for Defendants*
*Alexander Dallal and Claire Dallal*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA – CENTRAL DIVISION

| | |
|---|---|
| LINCOLN BENEFIT LIFE COMPANY, a Nebraska Corporation,<br><br>                    Plaintiff,<br><br>  vs.<br><br>ALEXANDER DALLAL, an individual; CLAIRE DALLAL, an individual; and DOES 1 through 10, Inclusive,<br><br>                    Defendants. | Case No.  2:16-cv-9307 MWF (Ex)<br><br>Hon. Michael W. Fitzgerald<br><br>DEFENDANTS' OPPOSITION TO PLAINTIFF'S PROPOSED FINDINGS OF FACT<br><br>Trial Date: July 31, 2018 – August 13, 2018<br><br>Courtroom 5A, 1st Street Courthouse |

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

Defendants Alexander and Claire Dallal's hereby submit the following opposition and objections to Plaintiff's proposed findings of fact and conclusions of law submitted on August 27, 2018, at Dkt. No. 189-1.

1
2
3
4
5
6
7

Defendants object generally to Plaintiff's proposed findings of fact, on the ground that they are not ultimate facts that are necessary to either the jury's verdict or the court's judgment; instead, the findings of fact proposed are evidentiary facts. The jury's verdict did not include any findings of fact, and thus Plaintiff's proposed findings are speculative. Moreover, Plaintiff's proposing of a huge volume of findings of fact – 189 separate findings of evidentiary facts – goes far beyond what is reasonable or necessary for this litigation, and appears intended to cloud the issues rather than reveal them.

8
9
10

The responses and objections are filed concurrently with Defendants' Proposed Findings of Fact, consisting of 27 proposed facts, and Defendants' Proposed Conclusions of Law.

11
12
13
14
15

In this memorandum, defendants respond individually to each of plaintiff's proposed findings of fact. Plaintiff's proposed factual findings and headings are repeated verbatim, with Defendants' comment/opposition following each fact.  All references to the Trial Transcript and to the Deposition of Dr. Joy Feld are copied for the Court's convenience in Exhibits 1 and 2, respectively, filed concurrently herewith.

16
17
18
19
20
21
22
23
24
25
26
27
28

DEFENDANTS' OPPOSITION TO PLAINTIFF'S PROPOSED FINDINGS OF FACT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# DEFENDANTS' RESPONSES AND OBJECTIONS TO PLAINTIFF'S PROPOSED FINDINGS OF FACT

**The Policy**

2.      Lincoln issued a joint comprehensive long-term care ("LTC") Policy to the Dallals as co-insureds, effective August 20, 2003.  [Trial Exhibit ("Exh.") 301; Admitted Fact ("AF") 1]

   **DEFENDANTS RESPOND: Undisputed.**

3.      As a threshold to become eligible for Home Health Care benefits under the Policy, the insured must prove he is "Chronically Ill," which means he must be certified by a licensed health care practitioner as being: (1)  Unable to perform without Substantial Assistance ("Hands-on" or "Standby") from another individual, at least two Activities of Daily Living for a period of at least 90 days due to loss of Functional Capacity ("ADL Option"); or (2) Requiring Substantial Supervision to protect himself from threats to health and safety due to severe Cognitive Impairment ("Severe CI Option").  [AF2]

   **DEFENDANTS RESPOND: Undisputed.**

4.      For the ADL Option, "Hands-On Assistance" requires "**physical assistance of another person** without which you would be unable to perform the Activity of Daily Living."  [AF5]  Standby Assistance" requires "the presence of another person **within arm's reach of you** that is necessary to prevent, by physical intervention injury, to you while you are performing the Activity of Daily Living."   [AF5]

   **DEFENDANTS RESPOND: Undisputed.**

5.      Under the Policy, "Activities of Daily Living" mean:

   "a.   **Eating**, which shall mean feeding oneself by getting food in the body from a

receptacle (such as a plate, cup, or table) or by a feeding tube or intravenously.

b. **Bathing**, which shall mean washing oneself by sponge bath or in either a tub or shower, including the act of getting into or out of a tub or shower.

c. **Continence**, which shall mean the ability to maintain control of bowel and bladder function; or when unable to maintain control of bowel or bladder function, the ability to perform associated personal hygiene (including caring for a catheter or colostomy bag).

d. **Dressing**, which shall mean putting on and taking off all items of clothing and any necessary braces, fasteners, or artificial limbs.

e. **Toileting**, which shall mean getting to and from the toilet getting on or off the toilet, and performing associated personal hygiene.

f. **Transferring**, which shall mean the ability to move into or out of bed, a chair or wheelchair."

"Functional Capacity" means requiring the Substantial Assistance of another person to perform the prescribed Activities of Daily Living.  [AF6]

**DEFENDANTS RESPOND: Undisputed.**

6.      For the Severe CI Option, "Substantial Supervision" means "**continual supervision** by another person is necessary to protect insured from threats to his or her health or safety.  Such supervision may include cueing by **verbal prompting, gestures, or other demonstrations**."  [AF6a]

**DEFENDANTS RESPOND: Undisputed.**

7.      "Cognitive Impairment" means "the deterioration or loss of your intellectual capacity which requires substantial supervision by another person to protect yourself or others.  It is measured by clinical evidence and standardized tests which reliably measure your impairment in: a. short or long term memory; b. orientation as to people, places or time; and c. deductive or abstract reasoning.  Cognitive Impairment includes Alzheimer's disease and similar forms of irreversible dementia."  [AF7]

**DEFENDANTS RESPOND: Undisputed.**

8.      Not only must the requisite level of care for chronic illness be required and

certified by a licensed health care practitioner, the insured must be actually receiving Home Care and submit ongoing proof of loss under the Policy for benefits to be considered.  [AF8; Exhs. 301-8, 11; 302; 305; 360-190; Meg Sarkisian ("Sarkisian") Trial Testimony ("TT") 227:3-20; Norman Seeman ("Seeman") TT 1058:14-1066:10]

**DEFENDANTS RESPOND: Undisputed.**

9.     "Home Care" includes Home Health Care, which was sought by the Dallals.  "'Home Health Care' means Qualified Long Term Care Services, including but not limited to skilled nursing or other professional services performed in your Home, part-time and intermittent skilled nursing services, home health aide services, physical therapy, occupational therapy or speech therapy and audiology services and medical social services by a social worker."  [AF3]

**DEFENDANTS RESPOND: Disputed**.  The Home Care benefit also includes "Adult Day Care", "Personal Care", "Instrumental Activities of Daily Living," "Homemaker Services", "Hospice Services," and "Respite Care."  Exh. 301-07.

10.     Under the Policy, Home "means your residence, including a rest home. 'Home' does not include a Nursing Facility, a Residential Care Facility, or a hospital." [AF3]

**DEFENDANTS RESPOND: Undisputed.**

11.     Benefits are not automatic.  The Policy provides *reimbursement* of <u>actual</u> daily caregiving expenses incurred for qualified Home Health Care services by a non-family member.  Reimbursement is not permitted for care by an immediate family member or for which no charge is normally made in the absence of insurance.  [AF8; Exh. 301-4, 9]

**DEFENDANTS RESPOND: Undisputed.**

12.     Lincoln requires information from different sources to evaluate and pay an

insured's LTC claim – medical information (such as from nurse assessments or attending physicians), the initial Provider's Home Health and Community Based Care Preliminary Report from the caregiver, Caregiver Activity Notes, fraud notices and proof of payment to the caregiver.  From these different sources, Lincoln can cross-check information and verify that truthful information is provided in order to evaluate and validate the claim. [Seeman TT 1058:14-1060:17; 1065:9-1067:9 1068:5-13; 1095:20-1096:21; 1118:1-16; Exhs. 6; 301-11 (notice of claim, proof of loss); 350-362]

**DEFENDANTS RESPOND: Disputed and Objected to.** Lincoln's requirements are not the Policy's requirements. The Policy does not require any particular method of proving a right to reimbursement. Exh. 301-11, Parts 6A, 6B, and 6C. Eligibility for benefits for a chronically ill individual is determined pursuant to a certification by a Licensed Health Care Practitioner. Exh. 301-6 at para. 3.A, definition of "Chronically Ill Individual."

13.     Norman Seeman testified that this Provider Home Health Report is required for every caregiver to confirm the caregiver's existence, the dates and times the caregiver plans to work, and the rate they charge.  This information likewise ensures the caregiver is not a family member, is not being paid by another entity and provides an idea of what is going on in the insured's care needs.  With this information, Lincoln can verify who is providing services, ensure that hours and payments are not duplicated, and assess whether services are reimbursable in line with the Policy requirements.  [Exhs. 6, 301-08, 302, 305, 360-190; Seeman TT 1061:16-1062:21; 1064:12-1066:1].

**DEFENDANTS RESPOND: Disputed and Objected to**.  Lincoln's requirements for proof are not the Policy's requirements. The Policy does not require any particular method of proving a right to reimbursement. Exh. 301-11, Parts 6A, 6B, and 6C. Eligibility for benefits for a chronically ill individual is determined pursuant to a certification by a Licensed Health Care Practitioner. Exh. 301-6 at para. 3.A, definition of "Chronically Ill Individual." Seeman also testified that the Provider Home Health

Report is essentially an invoice, while the Attending Physician's Statements are determinative of what the insured's care needs are. Seeman TT 1124:5-13; 1126:24 – 1127:2; 1137:21 – 1139:23; 1140:9-18. Seeman acknowledged that the Policy doesn't require multiple pieces to the puzzle to qualify the insured for benefits only that a licensed physician provide that certification. Seeman TT 1139:10-23. No ADL requirements were needed when certified as severely cognitively impaired. Seeman TT 1182:23 -183:6.

14.    To determine whether reimbursable services are actually provided to the insured and evaluate liability on a Home Health claim, it is important for Lincoln to obtain ongoing proof and know (a) the identity, services, hours, and rates of the caregiver (whether one or multiple caregivers) to know who is providing what care; (b) the identity of who signed the Caregiver Activity Notes and fraud notice to verify that the hired caregiver recognized truthful information must be provided; (c) whether the services identified by the insured and/or the caregiver rose to the level of care required by the Policy (including ADLs, severity of cognitive impairment, Substantial Assistance and/or Substantial Supervision); (d) whether the true hours of care provided correlate with the Policy's standards and reimbursement sought; (e) confirmation through the fraud notice that the caregiver recognized that providing misleading information in the claim could have civil or criminal consequences; and (f) proof that payment has actually been made, to whom, and the amount of payment.  Moreover, such information is necessary because the Policy does not permit reimbursement for services by an immediate family member or for which no charge is normally made in the absence of insurance.  [Exhs. 301-07, 08, 09, 11; 350-362; Seeman TT 1058:14-1067:9; 1068:5-13; 1090:3-14; 1095:20-1096:21; 1147:14-1148:2; Sarkisian TT 227:21-229:12, 230:3-236:6]

**DEFENDANTS RESPOND: Disputed.** Lincoln's form did not allow for multiple caregivers. Seeman TT 1180:22 – 1181:2. It did not contain require a signature on a fraud notice before 2010, Seeman TT 1128:6-9. It did not contain information as to

what particular level of care was being given. Exhs. 15 – 29. The Policy had no guidelines as to the standards of care to be provided or what was an acceptable level of reimbursement. Exh. 301-11, Parts 6A, 6B, and 6C.

**The Dallals Submitted a Claim Eight Months After Obtaining the Policy and Before Mr. Dallal Had Surgery, But The Pattern of Deceit Began When Mrs. Dallal Surreptitiously Took Over the Claim Documents, Identified Ms. Helen Genovea as the Sole Caregiver, and Reported Ongoing Care That Was Neither Needed Nor Given**

15.     On April 5, 2004 – about eight months after the Policy was in effect – Mrs. Dallal called Lincoln to initiate a claim.  [AF10; Mrs. Dallal TT 344:5-11]  The claim was premised on Mr. Dallal's anticipated surgery for removal of a meningioma (a benign tumor in the lining of his left temporal lobe).  A meningioma is a growth outside the brain.  [Dr. Ajay Ananda ("Ananda") TT 479:11-23; Dr. Michael Gold ("Gold") TT 938:25-939:7]

**DEFENDANTS RESPOND: Undisputed.**

16.     Before the surgery, on April 6, 2004, Mrs. Dallal told Lincoln that she would be submitting a claim, identifying Helen Genovea as Mr. Dallal's only caregiver.  [Exhs 302; 363-1; Seeman TT 1183:11-1184:4]

**DEFENDANTS RESPOND: Undisputed.**

17.     When Mrs. Dallal first decided to apply for LTC benefits for Mr. Dallal, she told Ms. Genovea about the Policy.  [Mrs. Dallal TT 354:25-355:4]  Ms. Genovea had been a licensed insurance producer in California since 2000.[1]  She was well aware

---

[1] Ms. Genovea even sold Mrs. Dallal a life insurance policy, which was delivered in January 2011, and for which she was paid commissions.  [Genovea TT 811:6-8; 811:21-812:4]

DEFENDANTS' OPPOSITION TO PLAINTIFF'S PROPOSED FINDINGS OF FACT

1  that she was obligated (as well as Mrs. Dallal) to be truthful in connection with any
2  insurance claim.  [Helen Genovea ("Genovea") TT 775:1-7; 777:9-20; 778:11-19]

3         **DEFENDANTS RESPOND: Undisputed.**

4

5         18.     On April 6, 2004, Lincoln responded to Mrs. Dallal's notice of claim.  In a
6  letter of that date, it informed Mrs. Dallal of the Policy provisions, advised that Ms.
7  Genovea would need to complete a Provider's Home Health Report, and that the forms
8  provided "necessary information that will assist us in determining if the caregiver meets
9  the Home Care provision of the policy."  [Exh. 302]

10        **DEFENDANTS RESPOND: Undisputed.**

11

12        19.     Mr. Dallal successfully underwent the surgery on April 8, 2004, where the
13 meningioma was removed in its entirety, without complications.[2]  The meningioma has
14 not returned.  [Ananda TT 483:22-484:1; 485:21-486:4; 486:19-23; 500:23-501:3; 513:2-
15 11; Gold TT 938:25-939:7]  Dr. Ananda indicated that the primary restriction post-
16 surgery would have been to avoid exercise for three weeks.  [Ananda TT 487:3-6]

17        **DEFENDANTS RESPOND: Undisputed.**

18

19        20.     The day after the surgery, Mrs. Dallal sent Lincoln a Power of Attorney so

20

21 _____

22 **DEFENDANTS RESPOND: Objected to as irrelevant.**

23 [2] Dr. Ananda confirmed that the potential areas of brain functioning that could possibly be affected by
   the removal of Mr. Dallal's meningioma – word-finding/language comprehension, some memory, and
24 vision on the right side  – were not certain to occur or definite outcomes.  [Ananda TT  484:2-20]
   With the exception of mild word-finding problems 12 days post-surgery, which resolved, neither Dr.
25 Das nor Dr. Ananda ever identified any such problems when examining Mr. Dallal through 2007.  Mr.
   Dallal had normal neurological exams, without any indication of language, memory, vision, cognitive,
26 or physical problems.  [Exhs. 58, 59, 60, 200-66, 67, 68, 69; Ananda TT 492:2-10 (12 day post-
   surgical visit), 495:24-496:8 (6 month post-surgery visit); 497:15-500:19 (1-year post-surgery visit);
27 513:14-514:21 (2-year post-surgical visit);  514:22-515:19 (3-1/2 years post-surgery)]
28 **DEFENDANTS RESPOND: Disputed.** The examinations referred to were performed by surgeons,
   not by neurologists or even internists.

9

that she could be the spokesperson and contact on the claim.  She conveyed that the Power of Attorney was needed because her husband was not capable.[3]  [Exh. 303; Mrs. Dallal TT 344:5-11; 344:19-345:8; 345:16-346:1]  Lincoln viewed the Power of Attorney as further proof that Mr. Dallal had such severe cognitive impairment that he needed someone to make decisions for him.  [Sarkisian 229:23-230:2; Seeman TT 1069:13-22]

**DEFENDANTS RESPOND: Disputed and Objected to**. Lincoln's view of the Power of Attorney was not proof of Mr. Dallal's cognitive impairment; it is an assumption that it made without any additional basis beyond the Attending Physician's Statements. Under the Policy, eligibility for benefits for a chronically ill individual is determined pursuant to a certification by a Licensed Health Care Practitioner. Exh. 301-6 at para. 3.A, definition of "Chronically Ill Individual."

21.     Claims adjuster Mick Orend was assigned to the claim on April 8, 2004. [Exh. 363-01; Seeman TT 1062:22-1063:7]  On April 16, 2004, Mr. Orend sent Ms. Genovea a letter dated April 16, 2004, asking that she complete the enclosed Provider's Home Health Report and Caregiver Activity Notes.  [Exh. 305]  In another letter that same date, Mr. Orend also advised Mrs. Dallal, "We are sending Ms. Genovea the forms we will need from her if she undertakes the care."  [Exh. 363-190]

**DEFENDANTS RESPOND: Undisputed.**

22.     Mrs. Dallal testified that (a) she understood that the LTC Policy with Lincoln was a reimbursement policy; (b) to get reimbursement of caregiving expenses she understood that information had to be submitted to Lincoln in support of the claim; (c) the company only paid if it established Mr. Dallal qualified for benefits and incurred

---

[3] Mrs. Dallal's representation regarding the need for a Power of Attorney was consistent with the APS forms reflecting Mr. Dallal was legally incompetent.  [Seeman TT 1185:4-14]  However, Dr. Feld was basing her APS forms on what the Dallals told her.  [Feld TT 134:1-3; 134:8-135:3]

DEFENDANTS' OPPOSITION TO PLAINTIFF'S PROPOSED FINDINGS OF FACT

actual expenses for Home Health Care; (d) to pursue and get benefits, Caregiver Activity Notes, fraud notices, and proof of actual caregiving expenses had to be submitted; (e) she had an obligation to be truthful to the insurance company in making the LTC claim and in acting as Mr. Dallal's Power of Attorney very month; and (f) all the information that would be submitted to the insurance company would be used to determine whether benefits should be paid out under the Policy.  [Mrs. Dallal TT 346:23-348:1; 351:2-11]

**DEFENDANTS RESPOND: Undisputed.**

23.     By April 15, 2004, Mr. Dallal was discharged from the hospital in stable condition, with his post-operative examination with Dr. Das on April 20, 2004, viewed as normal.  [Exh. 058; Ananda TT 487:12-20; 492:2-4]  Dr. Das remarked on that date:  "His wife notes that his word-finding abilities have improved.  [Mr. Dallal] denies any limb weakness, numbness or incoordination."  On examination, Dr. Das found Mr. Dallal was "awake, alert and oriented x3.  His memory is intact.  He does have some mild-word-finding difficulties."  Dr. Ananda testified that such mild word-finding difficulties were to be expected 12 days post-surgery, but were expected to improve.  The examination was normal, with Mr. Dallal having no limitations.  [Exh. 058; Ananda TT 489:14-490:11; 492:2-10] Mr. Dallal had no residual effects from the meningioma removal.  [Gold TT 941:12-21]

**DEFENDANTS RESPOND: Disputed.**  These medical reports were made by the surgeons and not by neurologists, and do not address whether or not the insured was eligible for benefits under the Policy. Lincoln had the right under the policy to examine Mr. Dallal, and to review his medical records, but did not do so. Exh. 301-11, Part 6.H.

24.     However, during this same time period and despite Mrs. Dallal being aware of Mr. Dallal's improvement, she still pursued the LTC claim for benefits, representing her husband through a Power of Attorney due to his claimed lack of capacity.  [AF11; Exh. 303]  She claimed that Mr. Dallal needed assistance with all ADLs and required substantial supervision.  [Mrs. Dallal TT 344:12-345:2; 345:23-346:1; Seeman 1060:3-7; Exh. 308-

1   02]

2   **DEFENDANTS RESPOND: Disputed.** Mrs. Dallal's claims that Mr. Dallal

3   needed assistance with ADL's or had severe cognitive impairment were based on fact.

4   Exhs. 308, 38.

5

6   25.   The Dallals' pattern of deceit started from the beginning of the claim.

7   **DEFENDANTS RESPOND: Disputed.** This is a conclusion without a factual

8   basis.

9

10   **Fraud Re: Preparation of Caregiver Activity Notes**

11   26.   The Provider's Home Health Report sent to Ms. Genovea for completion

12   stated at the top of the form, "This form must be completed by an authorized

13   representative of the home healthcare agency or other home health provider."  [Exh. 6]

14   Ms. Genovea was that alleged provider.  Despite this instruction, and although Lincoln

15   had asked Ms. Genovea to complete and submit the Provider's Home Health Report,

16   Mrs. Dallal filled out the Report and had Ms. Genovea sign it on April 21, 2004.  [Exh.

17   6; Genovea TT 814:21-816:1]  Mrs. Dallal changed her story on the stand, claiming she

18   and Ms. Genovea filled it out together.  However, she was impeached with her prior

19   testimony that she alone filled out the Report.  [Mrs. Dallal TT 361:14-362:10]

20   **DEFENDANTS RESPOND: Disputed.** Mrs. Genovea signed the Report.

21   Beyond that, it is irrelevant who filled out the document. The Policy does not require

22   that any particular person fill out the Provider's Home Health Report form.

23

24   27.   On April 21, 2004, Ms. Genovea signed her first and only Caregiver

25   Activity Note.[4]  [Genovea TT 820:25-821:5; Exh. 009]  Thereafter, Mrs. Dallal took

26

27   _____

28   [4] "Q.  And after the first form that you filled out, dated April 21, 2004, Mrs. Dallal is the one that filled
out all of these caregiver activity notes after that, correct?
A. Yes.

DEFENDANTS' OPPOSITION TO PLAINTIFF'S PROPOSED FINDINGS OF FACT

control of the claim and told Ms. Genovea she would be handling the Caregiver Activity Notes. [Genovea TT 821:6-822:25; Mrs. Dallal 365:16-21; Exh. 350-04-9]

**DEFENDANTS RESPOND: Undisputed.**

28.     For the next 12 years, Mrs. Dallal submitted 139 false Caregiver Activity Notes, 79 false fraud notices, and 431 false cash receipts under the guise of Ms. Genovea's name. Mrs. Dallal ignored that the Caregiver Activity Notes were directed to the caregiver and required the caregiver signature. [*See, e.g.,* Exh. 362-52; Sarkisian TT 230:15-231:9] From May 2004 through December 2016, Mrs. Dallal represented to Lincoln that Ms. Genovea was completing the claim submissions, although Mrs. Dallal was, in fact, doing so without Lincoln's knowledge. Some examples of how Mrs. Dallal misled Lincoln regarding the claim submissions include the following:

(a)     Mrs. Dallal submitted her first false claim forms on or about May 17, 2004, completing and signing the forms as if she were Ms. Genovea. Mrs. Dallal even sent a letter of that date, accompanying the Caregiver Activity Notes for the period of April 4 to May 16, 2004, stating "the caregiver filled the Activity form for the Home Care. She works Daily 9 a.m. to 5 p.m. [Exh. 307-01; Genovea TT 820:12-20]

(b)     The following month, when Mrs. Dallal had not been paid yet following a nurse assessment, she sent a letter to Lincoln, dated June 25, 2004, which stated: "I haven't receive [sic] the check yet I would appreciate a payment soon. Enclosed is a report from Helen the caregiver who is taking care of my husband Alex. She works for me from 9 a.m. to 5 p.m. . . ." Along with that letter were provided the Caregiver Activity Notes, dated June 24, 2004, purportedly signed by Ms. Genovea. Although Mrs. Genovea was not completing or signing the forms, Mrs. Dallal surreptitiously wrote under caregiver comments on the Notes, "*I am working* daily 9:00 a.m. to 5:00 p.m. 8 hours a day." [Exh. 18-01 (emphasis added)] Misleading Lincoln further, Mrs.

---

Q. And she signed your name to all those forms, correct?
A. Yes." [Genovea TT 820:25-821:5]

DEFENDANTS' OPPOSITION TO PLAINTIFF'S PROPOSED FINDINGS OF FACT

Dallal confirmed that this Note for services was "from Ms. Genovea." [Exh. 350-10-14]

(c)     In a September 29, 2004 letter to Lincoln, Mrs. Dallal stated: "Enclosed a list of Day Caregiver activity.  Helen worked 7 days a week.  I needed her to be with my husband.  He is very weak, fatigue, and under medication and cannot be left alone. . . . She worked 8 a.m. to 5 p.m.  . . . After 5 p.m., I am home taking care of him." [Exh. 350-29]  With that letter, Lincoln received Caregiver Activity Notes purportedly signed by Ms. Genovea, dated September 29, 2004, but which Mrs. Dallal had really completed and signed. [Exh. 350-26-28]

(d)     Pretending to be Ms. Genovea on Caregiver Activity Notes, dated January 28, 2005, Mrs. Dallal signed Ms. Genovea's name and wrote: "*I worked* 8 a.m. to 5 p.m. Daily 9 hours." [Exh. 351-6 (emphasis added)]

(e)     Pretending to be Ms. Genovea on Caregiver Activity Notes, dated April 7 and May 16, 2007, Mrs. Dallal signed Ms. Genovea's name and wrote: "*I worked* 6 days a week from 8 a.m. to 6 p.m." [Exhs. 353-25-27, 353-31-33 (emphasis added)]

(f)     When Lincoln asked about the claim submissions on December 7, 2016, Mrs. Dallal advised: "*Yes.  I gave the paperwork.  She does – Helen does the paperwork every month around the 5th.  So, she just completed it.  I just put it for you in the mail yesterday.*" [Exh. 369 (emphasis added)]

**DEFENDANTS RESPOND: Disputed.**  Ms. Genovea gave Mrs. Dallal permission to fill out the forms and sign her name to them. Genovea TT 821:6-21; 822:10-25; 827:3-19. The Caregiver Activity Notes are not materially misleading.

29.     Ms. Genovea confirmed that she never signed any Caregiver Activity Notes, after the initial April 21, 2004 form.  [Genovea TT 820:25-821:5]  Ms. Genovea also never reviewed any Caregiver Activity Note that Mrs. Dallal prepared and signed with Ms. Genovea.  [Genovea TT 826:11-15]

**DEFENDANTS RESPOND: Undisputed**.

1

2    **Fraud In Caregiver Activity Notes Re: Alleged ADL Care Received and Mrs.**

3    **Genovea's Services**

4        30.     On every Caregiver Activity Note, Mrs. Dallal wrote, as if she were Ms.

5    Genovea, that Ms. Genovea provided Mr. Dallal with the requisite assistance for

6    dressing, bathing, toileting, and transferring.  Lincoln relied on the truth of this

7    information to pay benefits.  [Exh. 352-360; Seeman TT 1080:23-1081:20]  However,

8    Mrs. Dallal lied to Lincoln for 12 years because Ms. Genovea – the caregiver she

9    claimed gave this care – testified that Mr. Dallal could perform these ADLs on his own.

10        **DEFENDANTS RESPOND: Disputed and Objected to.** Plaintiff offers no

11    factual proof of the last contention, and Plaintiff's conclusion – that "Mrs Dallal lied" –

12    is without any support in the record, and is purely Plaintiff's hyperbole, not a fact.

13

14        31.     The Dallals admitted at trial that "No caregiver has ever dressed or

15    showered Mr. Dallal."  [AF22]  This admission alone confirmed that the Dallals

16    committed fraud by concealing and/or misrepresenting the truth.

17        **DEFENDANTS RESPOND: Disputed and Objected to.**  Plaintiff's conclusion

18    is unreasonable given the factual support offered.  Whether or not a caregiver dressed or

19    showered Mr. Dallal does not mean that he was not in need of assistance, or that

20    someone other than a caregiver assisted Mr. Dallal in those areas.

21

22        32.     Ms. Genovea testified that Mr. Dallal could dress himself.  Specifically,

23    Mr. Dallal could put on and button his own shirt, put on a jacket, and put on his briefs

24    (underwear), pants, shoes, and pajamas.  Ms. Genovea further testified that Mr. Dallal

25    was capable of undressing himself.  He could remove his socks, shoes, underwear, pants

26    and shirts all on his own.  [Genovea TT 784:23-789:5]

27        **DEFENDANTS RESPOND: Disputed and Objected to.**  The fact of Ms.

28    Genovea's testimony is not a fact for purposes of the determination of Plaintiff's First

and Third Claims for Relief.  Further, whether Mr. Dallal could perform some of these tasks on occasion does not mean he did not need assistance, at least on a standby basis.

33.    Ms. Genovea testified that Mr. Dallal could bathe and shower on his own and further confirmed that she never showered Mr. Dallal.  [Genovea TT 781:24-782:12; 782:16-784:22]

**DEFENDANTS RESPOND: Disputed and Objected to.**  The fact of Ms. Genovea's testimony is not a fact for purposes of the determination of Plaintiff's First and Third Claims for Relief.  Further, whether or not Ms. Genovea bathed or showered Mr. Dallal does not mean he was not in need of assistance, or that someone other than a caregiver assisted Mr. Dallal in those areas.

34.    Ms. Genovea testified that Mr. Dallal could toilet without assistance and perform his own hygiene.  Specifically, Mr. Dallal was capable of taking himself to the bathroom without any assistance and coming back out on his own.  [Genovea TT 789:25-791:6]

**DEFENDANTS RESPOND: Disputed and Objected to.**  The fact of Ms. Genovea's testimony is not a fact for purposes of the determination of Plaintiff's First and Third Claims for Relief.  Further, whether or not Ms. Genovea assisted Mr. Dallal with toileting does not mean that he was not in need of assistance, or that someone other than a caregiver assisted Mr. Dallal in those areas.

35.    Ms. Genovea testified that Mr. Dallal could transfer to/from a chair and bed on his own.  [Genovea TT 789:6-24]. Mr. Dallal also repeatedly transferred to and from a sitting position without any assistance on nearly every day of the surveillance.  [Exh. 315 (7/29/16, 7:51 a.m., 6:12 p.m.); Exh. 315 (7/30/16, 4:54 p.m., 5:06 p.m.); Exh. 315 (7/31/16, 7:27 a.m., 9:21-9:22 a.m., 10:44 a.m., 11:36 a.m., 2:17 p.m.); Exh. 317 (9/10/16, 7:30 a.m., 8:09 a.m., 9:51 a.m.); Exh. 317 (9/11/16, 12:32 p.m., 12:39 p.m.

12:46 p.m., 12:47 p.m., 12:56 p.m., 13:02 p.m., 13:12 p.m., 13:23 p.m. 13:41 p.m.); Exh. 317 (9/12/16, 7:37 a.m., 7:48 a.m., 6:43 p.m.); Exh. 317 (9/13/16, 6:10 p.m.); Exh. 317 (9/14/16, 10:33 a.m., 18:34 p.m.); Exh. 317 (9/15/16, 8:20 a.m., 14:08 p.m., 14:38 p.m.,); Exh. 317 (9/16/16, 7:42 a.m.); Exh. 319 (11/2/16 , 6:29); Exh. 319 (11/3/16, 7:36 a.m.); Exh. 319 (11/5/16, 8:44 & 8:47 a.m.)]

**DEFENDANTS RESPOND: Disputed and Objected to.** The fact of Ms. Genovea's testimony is not a fact for purposes of the determination of Plaintiff's First and Third Claims for Relief. Further, whether or not Mr. Dallal transferred on a particular occasion does not mean he was not in need of assistance in that area.

36.     Mrs. Dallal testified that although she filled out the Caregiver Activity Notes representing Ms. Genovea was taking care of Mr. Dallal the entire time, she knew that Ms. Genovea was not working that schedule. [Mrs. Dallal TT 456:19-25]

**DEFENDANTS RESPOND: Objection.** The fact of Ms. Genovea's testimony is not a fact for purposes of the determination of Plaintiff's First and Third Claims for Relief.

**Fraud Re: Fraud Notices**

37.     The Caregiver Activity Notes contained fraud notices on the back side of the forms until 2010. Starting in 2010, Lincoln required the caregiver's signature on separate forms called "Fraud Notices," which advised the caregiver and signer of the form of the criminal and civil consequences of providing false and/or misleading information in connection with the claim. [Sarkisian TT 233:18-234:5; 234:17-235:3; Exhs. 356-362]

**DEFENDANTS RESPOND: Undisputed.**

38.     Mrs. Dallal admitted that she signed all the fraud notices with Ms. Genovea's name. [Mrs. Dallal TT 453:25-454:2] Although the fraud notices asked for the

"Signature of person completing this form" and "Printed name of person completing this form," Mrs. Dallal still signed all of the fraud notices using Ms. Genovea's name, rather than her own signature.  Mrs. Dallal even wrote "none" when the form asked the signer of the form about "Relationship to claimant".  [Mrs. Dallal 454:6-15; Genovea TT 823:12-18; 835:14-17; Sarkisian TT 234:6-16; 279:9-19; 280:25-281:8; 282:16-283:1; Exhs. 356-362]

    **DEFENDANTS RESPOND: Undisputed** as to the factual contention.  However, Mrs. Dallal had Ms. Genovea's permission to sign her name. Genovea TT 821:6-21; 822:10-25; 827:3-19.

**Fraud Re: Cash Receipts**

    39.    The LTC Policy reimburses only actual daily expenses for the identified caregiver.  As proof of purported payment, Mrs. Dallal sent Lincoln copies of handwritten "receipts" showing near-weekly cash payments to Ms. Genovea, also purportedly signed by Ms. Genovea.  [Exhs. 351-362]

    **DEFENDANTS RESPOND: Undisputed.**

    40.    Mrs. Dallal testified that she purchased receipt books and filled the receipts out with the date, money received from (writing Claire Dallal), dates of service, and purpose for caregiving.  Mrs. Dallal then signed Ms. Genovea's name to all receipts and submitted them to Lincoln.  [Mrs. Dallal TT 454:16-455:7; Exhs. 351-362]  Mrs. Dallal represented on the receipts that Ms. Genovea received all the money identified on the receipts, but she changed her testimony at trial claiming that Ms. Genovea did not receive all that money.  [Mrs. Dallal TT 455:21-456:3; 457:20-24]

    **DEFENDANTS RESPOND: Disputed.** Mrs. Dallal did not change her testimony.

    41.    Ms. Genovea confirmed that she never saw or signed these so-called receipts.  [Genovea TT 832:16-22; 835:18-836:2]

DEFENDANTS' OPPOSITION TO PLAINTIFF'S PROPOSED FINDINGS OF FACT

**DEFENDANTS RESPOND: Undisputed.**

42.     Mrs. Dallal had no excuse for preparing false receipts and was a sophisticated enough businesswoman to know the importance of having accurate receipts.  Indeed, for *Mr. Alex*, she made certain that receipts were given to customers and that they were accurate.  She also knew that she would not get paid if the product she produced was not made in accordance with the business agreement with the customer. [Mrs. Dallal TT 340:11-13; 340:19-341:4]

**DEFENDANTS RESPOND: Disputed and Objected to.** It is misleading to attempt to equate the retail business *Mr. Alex* with the plaintiff's insurance company. Plaintiff's conclusion is unreasonable and inaccurate, particularly based on the testimony offered.

43.     Lincoln believed Ms. Genovea completed all Caregiver Activity Notes, fraud notices, and cash receipts.  [Seeman TT 1099:23-1100:24; Sarkisian TT 230:3-236:6; Exhs. 18; 307; 350-362; 369]

**DEFENDANTS RESPOND: Disputed and Objected to.** Lincoln's belief was irrelevant to the determination of the First and Third Claims for Relief, and was unreasonable. Mrs. Dallal informed Lincoln regarding the documents that she was submitting to it.  [C. Dallal TT 355:14 – 356:2; 357:21 – 358:2.]

**Following A Nurse Assessment, Lincoln Starts Paying the Claim**

44.     Lincoln received an initial Attending Physician's Statement ("APS") from internist Dr. William Young, dated May 17, 2004.  [AF14]

**DEFENDANTS RESPOND: Undisputed.**

45.     To assess Mr. Dallal, Lincoln sent a registered nurse to visit Mr. Dallal in June 2004.  [Exh. 308]  Lincoln received a report from that visit, dated June 13, 2004, which indicated, among other things, that (1) Mrs. Dallal provided information during the assessment; (2) Mr. Dallal had a paid caregiver, Ms. Genovea, 5 days a week while his wife "works"; (3) post-surgery, Mr. Dallal needed constant supervision and assistance; (4) Mr. Dallal needed a walker; (5) Mr. Dallal scored 15/30 on the Mini Mental Status Exam ("MMSE"); and (6) Mr. Dallal was "retired" and was a "clothing designer in Beverly Hills."  [AF15]  Based on these representations and depiction of Mr. Dallal's status, the nurse advised that he required care five days/week.  [Exh. 308-01 to 02]

**DEFENDANTS RESPOND: Undisputed.**  Moreover, there is nothing inaccurate or false about the report. The nurse who prepared the report did not testify at trial.

46.     Lincoln began issuing joint checks to the Dallals, reimbursing caregiving costs based on Ms. Genovea's alleged report that she was providing qualified care. [Seeman TT 1069:25-1070:7; Sarkisian TT 236:7-17; Mrs. Dallal TT 351:12-16; Exh. 349-01]

**DEFENDANTS RESPOND: Undisputed.**

**The Dallals Misrepresented Mr. Dallals' Claim and True Functioning:  He Returned to Work, Continued Driving, Had Normal Exams, and Obtained A Property Loan**

47.     Over the course of the claim, the Dallals misrepresented and/or concealed the circumstances of Mr. Dallal's claim and functioning to Lincoln.

**DEFENDANTS RESPOND: Disputed and Objected to.** This is a conclusion of law without factual support being cited.

DEFENDANTS' OPPOSITION TO PLAINTIFF'S PROPOSED FINDINGS OF FACT

48.     For example, the Dallals reported to Lincoln from the outset of the claim that Mr. Dallal was "retired" from their custom clothing business, *Mr. Alex*. [Exh. 308-02; Mrs. Dallal TT 399:22-25] Lincoln understood that this retirement reinforced that Mr. Dallal was severely impaired and required ongoing caregiving services. [Sarkisian TT 237:8-17; Seeman TT 1096:22-1097:18]

**DEFENDANTS RESPOND: Disputed.** Mr. Dallal was retired. TT 537:20 – 538:2; 561:21 – 564:4; 1338:21 – 1339:10; 1451:21 – 1452:2; 1251:116 – 1252:18; 1257:12-24.

49.     The Dallals further reported to Lincoln throughout the course of the claim that Mr. Dallal's condition was declining; indeed, Mrs. Dallal represented Mr. Dallal was even wholly dependent on his family and/or caregiver for transportation, driving, finances, and telephone use, among other things. [Exhs. 48-05, 08; 308-09; 312-16, 23, 27; 314-15, 33] Indeed, Mrs. Dallal reiterated throughout the claim that she had to represent Mr. Dallal by Power of Attorney due to his incapacity, and she never reported to Lincoln that the Power of Attorney was not in use. [Mrs. Dallal TT 345:5-8; 345:16-346:14] All such information was highly relevant to Lincoln because it reflected on Mr. Dallal's level of functioning. [Sarkisian TT 229:17-230:2; Seeman TT 1095:20-1097:18]

**DEFENDANTS RESPOND: Disputed and Objected to.** Lincoln's view of the Power of Attorney was not proof of Mr. Dallal's cognitive impairment; it is an assumption that it made without any additional basis beyond the Attending Physician's Statements. Under the Policy, eligibility for benefits for a chronically ill individual is determined pursuant to a certification by a Licensed Health Care Practitioner. Exh. 301-6 at para. 3.A, definition of "Chronically Ill Individual."

50.     However, unbeknownst to Lincoln, Mr. Dallal continued to live his life as a normal individual.  He repeatedly represented to the outside world that he had returned to work, was functioning well, had continued driving, and was obtaining property loans without a Power of Attorney.  Mr. Dallal also consistently had normal medical evaluations, which Mrs. Dallal would have known because she testified that she accompanied him to his doctor visits.  [Mrs. Dallal TT 579:19-23]

**DEFENDANTS RESPOND: Disputed and Objected to.**  No witness testified that Mr. Dallal did any of the things attributed to him.  The existence of a power of attorney is irrelevant with respect to the claim of fraud, or the diagnosis of cognitive impairment.

51.     Although Mrs. Dallal reported to Lincoln that Mr. Dallal was retired, she did not share that they continued to be joint owners of *Mr. Alex.*  [Mrs. Dallal TT 341:5-10]  Mrs. Dallal never reported to Lincoln or the nurses who evaluated him at his home that Mr. Dallal went into *Mr. Alex.*  [Mrs. Dallal TT 573:2-11]

**DEFENDANTS RESPOND: Disputed and Objected to**.  Mrs. Dallal had no obligation to inform Lincoln as to the ownership of *Mr. Alex.* Moreover, the fact that Mrs. Dallal held a power of attorney did not mean that Mr. Dallal was divested of his ownership of the business. Nor was Mrs. Dallal required to stated when or if Mr. Dallal went to the business. The existence or non-existence of a power of attorney is irrelevant with respect to the claim of fraud, or the diagnosis of cognitive impairment.

52.     On April 19, 2005, Mr. Dallal signed a note for a loan on his Huntington Beach property, without a Power of Attorney.  The Dallals never told the lender that at the same time, Mr. Dallal was claiming LTC benefits for being severely cognitively impaired and that Mrs. Dallal had Mr. Dallal's Power of Attorney.  [Exh. 380-01, 02; Mrs. Dallal TT 401:4-403:11] Despite representing that Mr. Dallal required a Power of Attorney and was totally dependent on his caregiver/wife for finances, Mrs. Dallal also

1  never disclosed this loan on which Mr. Dallal signed off to the nurse who assessed Mr.

2  Dallal in October 2005. [Mrs. Dallal TT 400:17-23]

3      **DEFENDANTS RESPOND: Disputed and Obejected to.**  Plaintiff's factual

4  offering, and the existence or non-existence of a power of attorney, is irrelevant to the

5  determination of the First and Third Claims for Relief, or any diagnosis of cognitive

6  impairment.  Further, Plaintiff's conclusions are unreasonable and hyperbolic, without

7  any support in the record.  Signing a note at a lender's request was simply a requirement

8  of getting the loan. Nor was Mrs. Dallal obligated to inform Lincoln of every financial

9  transaction in which she and her husband engaged.

10

11      53.    On March 14, 2005, Mr. Dallal renewed his driver's license by mail.  [Exh.

12  392-17] Former DMV Safety Hearing Officer Darrell Kidd testified that in order to

13  renew his driver's license, Mr. Dallal had to certify under penalty of perjury on the

14  license renewal application that he had no medical issues that would affect his ability to

15  drive. If Mr. Dallal responded "yes" to the medical question, he would not have been

16  allowed to renew his license by mail.  [Darrell Kidd ("Kidd") TT 695:4-697:5; Exh. 90]

17      **DEFENDANTS RESPOND: Disputed and Objected to.** The facts proffered

18  are irrelevant to the determination of the First and Third Claims for Relief.  Indeed, the

19  witness admitted the irrelevance of this fact on cross examination. TT 704:14-25.

20

21      54.    Although the Dallals denied that Mr. Dallal completed the DMV license

22  renewal applications, their representation is not credible based on the evidence.  Mrs.

23  Dallal claimed her husband had not driven since his surgery and implausibly testified

24  that Mr. Dallal's new driver's license just appeared in the mail one day and automatically

25  renewed for ten years.  [Mrs. Dallal TT 379:25-382:11]

26      **DEFENDANTS RESPOND: Disputed and Objected to.** The facts proffered

27  are irrelevant to the determination of the First and Third Claims for Relief.  TT 704:14-

28  25. Mrs. Dallal's testimony about the driver's license was not materially incorrect,

particularly as the license was renewed by mail after five years without Mr. Dallal having to go to the DMV.  TT 696:4-19.  Mrs. Dallal was simply mistaken as to the time between renewals, believing it to be ten years instead of five.

55.     Inconsistent with the Dallals' representations to Lincoln and the nurse assessors, Mr. Dallal admitted that he did not report his medical problems to the DMV. [Mr. Dallal TT 672:15-17] Mrs. Dallal likewise admitted she did not report his medical problems to the DMV.  [Mrs. Dallal TT 384:22-385:3]

**DEFENDANTS RESPOND: Disputed and Objected to.** The facts proffered are irrelevant to the determination of the First and Third Claims for Relief.  The Dallals' obligations vis-a-vis the DMV have no bearing on any claim. TT 704:14-25.

56.     Dr. Feld further testified that she never reported any medical problems to the DMV and was unaware that Mr. Dallal was driving.  [Joy Feld ("Feld") TT[5] 307:1-7; 327:11-15; 328:14-329:11]

**DEFENDANTS RESPOND: Disputed and Objected to.** The facts proffered are irrelevant to the determination of the First and Third Claims for Relief.  The Dallals' obligations vis-a-vis the DMV have no bearing on any claim. TT 704:14-25.

57.     The Dallals even maintained car insurance with 21st Century on Mr. Dallal throughout the claim, with receiving a Good Driver Discount from 2004 on. [Exh. 96 (the insurance declarations reflect "GDD," which is Good Driver Discount; Mrs. Dallal TT 388:15-19]  Although the Dallals continued to renew their insurance, Mrs. Dallal never informed 21st Century that (a) she was using a Power of Attorney for Mr. Dallal with Lincoln, (b) she believed he was severely cognitively impaired, (c) he had experienced a stroke in 2005, or (d) he was (allegedly) getting full-time caregiving

---

[5] Dr. Feld's deposition was read at trial on the last day, August 9, 2018.  The transcript was not transcribed by the court reporter at the court's request, but the marked copy was submitted.

services.  [Mrs. Dallal TT 388:20-389:21]

**DEFENDANTS RESPOND: Disputed and Objected to.** The facts proffered are irrelevant to the determination of the First and Third Claims for Relief.  The Dallals' obligations vis-a-vis 21st Century have no bearing on any claim.

58.    Furthermore, on May 20, 2005, Mr. Dallal had a rear-end car accident for which he filed an insurance claim with his auto insurance carrier, 21st Century, and sought reimbursement of medical costs.  [Exh. 097]. A letter in support of that claim, signed by Mr. Dallal and dated October 14, 2005, reflected that he even tried to negotiate a $5,000 settlement with 21st Century for injuries experienced as a result of this accident. [Exh. 097-1]

**DEFENDANTS RESPOND: Disputed and Objected to.**  The letter's recitation of facts is hearsay. Mr. Dallal never testified on the subject at trial, and the letter was not authenticated by either Mr. Dallal or 21st Century.  The factual details and accuracy are not established.

59.    As reflected in the documentation submitted to 21st Century by Mr. Dallal, he sought medical treatment from chiropractor, Dr. Daher, as of May 23, 2005, three days after his car accident, as shown in a submitted report and a list of treatment dates. Mr. Dallal also sent in notices of assignment for the cost of that care to the auto insurance carrier.  [Exh. 097]

**DEFENDANTS RESPOND: Disputed and Objected to.**  The letter's recitation of facts is hearsay. Mr. Dallal never testified on the subject at trial, and the letter was not authenticated by either Mr. Dallal or 21st Century.  The factual details and accuracy are not established.

60.    Mr. Dallal admitted to Dr. Daher that after the car accident on May 20, 2005, he was "off work for 2 days due to the car accident" *–meaning that he was still*

1  *working after his surgery*.  [Exh. 097-7]

2        **DEFENDANTS RESPOND: Disputed and Objected to.**  The recitation of facts

3  in Dr. Daher's notes is hearsay. Mr. Dallal never testified on the subject at trial, and the

4  letter was not authenticated by either Mr. Dallal or 21st Century.  The factual details and

5  accuracy of its contents are not established.

6

7        61.      Dr. Daher was not the only doctor to whom Mr. Dallal admitted that he was

8  working.  In the one-year post-operative visit with Dr. Ananda on May 4, 2005, Mr.

9  Dallal told him he was "back to work as a tailor."  [Exh. 200-68] On that date, Dr.

10 Ananda reported that Mr. Dallal was "back to baseline," with which Mr. Dallal's son

11 agreed.  [*Id*.]  Mr. Dallal had a normal examination, with no identification of problems

12 relating to language, memory, or vision from the meningioma removal and no motor

13 deficits from the blood-pressure related stroke.  Mr. Dallal also had good conversational

14 abilities, which Dr. Ananda found to be a good litmus test in assessing his recovery.

15 [Ananda TT 497:15-500:19; 505:22-506:9]

16        **DEFENDANTS RESPOND: Disputed.**  Dr. Ananda's memory of the event is

17 limited. He did not give Mr. Dallal a neuropsych exam or a memory test. He ultimately

18 certified that Mr. Dallal was eligible for policy benefits. TT 497:11-12; 504:20; 506:3-5;

19 507:15-508:1; 522:21 – 523:2; 525:3-11; 526:2-15; Exh. 61.

20

21        62.      This information reinforced Dr. Das' prior notes from the six-month post-

22 operative visit on November 2, 2004, that Mr. Dallal had a "normal" exam with no

23 language, memory, or vision problems.  [Exh. 200-66 to 67; Ananda TT 495:21-496:19]

24        **DEFENDANTS RESPOND: Disputed and Objected to.**  Plaintiff is indulging

25 in argument alone, without new facts.

26

27

28

63.     Mr. Dallal again reported to Dr. Ananda at the two-year post-operative visit on March 27, 2006, that he was "back to working as a tailor full-time." At that time, Mr. Dallal reported that he was doing well. Dr. Ananda also found that Mr. Dallal had a normal exam, with no restrictions and no indication of any language, memory, visual, cognitive, or physical problems. [Exh. 59-01; Ananda TT 508:20-510:17; 513:14-514:21]

**DEFENDANTS RESPOND: Disputed.** Dr. Ananda's memory of the event is limited. He did not give Mr. Dallal a neuropsych exam or a memory test. He ultimately certified that Mr. Dallal was eligible for policy benefits. TT 497:11-12; 504:20; 506:3-5; 507:15-508:1; 522:21 – 523:2; 525:3-11; 526:2-15; Exh. 61.

64.     At Mr. Dallal's 3-1/2 year post-operative visit on December 11, 2007, Mr. Dallal again reported that he was doing well. Dr. Ananda likewise found that Mr. Dallal had a normal examination, with no restrictions and no indication of language, memory, cognitive, or physical problems. [Exh. 60; Ananda TT 514:22-515:19; 517:4-519:1]

**DEFENDANTS RESPOND: Disputed.** Dr. Ananda's memory of the event is limited. He did not give Mr. Dallal a neuropsych exam or a memory test. He ultimately certified that Mr. Dallal was eligible for policy benefits. TT 497:11-12; 504:20; 506:3-5; 507:15-508:1; 522:21 – 523:2; 525:3-11; 526:2-15; Exh. 61. .

**Mrs. Dallal Sought Reimbursement for Periods When the Dallals Traveled Without A Caregiver From 2004-2016, When She Knew These Purported "Expenses" Were Not Reimbursable**

65.     The Dallals knew that they could not seek reimbursement for days that caregiving was not provided to Mr. Dallal. Their longtime insurance broker, Leonard Roberts, specifically instructed Mrs. Dallal not to do this. Mr. Roberts testified: "I explained to her, 'You have to have the caretaker there. And if the caretaker is not, you—you can't bill.' . She said 'Okay, I understand that now.'" [Roberts TT 551:23-

552:6; *see also* Exhs. 301, 302]

**DEFENDANTS RESPOND: Undisputed.**

66.     Despite this warning, Mrs. Dallal submitted fraudulent claims to Lincoln for phantom caregiving for every time the Dallals took trips from 2004 through 2016, without ever taking a caregiver.  [Exhs. 350-362]  Mrs. Dallal testified that she still wrote down on claim submissions that Ms. Genovea provided physical care to Mr. Dallal during those trips and sought reimbursement from Lincoln for monies allegedly paid to Ms. Genovea for caregiving services, even though no caregiver actually took care of her husband during those trips.  [Mrs. Dallal TT 459:2-25; 466:10-12; 466:20-22]  Mrs. Dallal knew she had no caregiver on the days of those trips, but did not mark on the Caregiver Activity Notes that the caregiver had any days off.  [Mrs. Dallal TT 463:1-9].

**DEFENDANTS RESPOND: Disputed.** Mrs. Dallal testified that she believed she was obligated to pay the caregivers because they work week by week and have families to support. TT 459:12-19.

67.     Mrs. Dallal admitted that the she and Mr. Dallal went to fabric shows twice a year in Las Vegas, but no caregiver went with them.  [Mrs. Dallal TT 461:1-6]  She also admitted that the Dallals took the following specific trips without a private caregiver, even though she still sought and obtained reimbursement from Lincoln during the time periods of those trips:  Pittsburgh, Pennsylvania (June 2005); Honolulu, Hawaii (November 2005); Italy (September 13-20, 2006 for fabric show); Kailua-Kona, Hawaii (April 2007); Las Vegas, Nevada (August 29-September 3, 2007 for fabric show);  Las Vegas, Nevada (December 30, 2007 and a few days thereafter over New Year's); Rome, Italy (December 2008); Pittsburgh, Pennsylvania (May 2009); Princess cruise to Greece and Italy (July 2009); Las Vegas, Nevada (December 2009); Las Vegas, Nevada (June 2010 for fabric show); Washington, D.C. (July 2010); New York City, then Washington, D.C. (November 2010); Las Vegas, Nevada (December 30, 2010 - New Year's);  Rancho

Mirage (February 2011); Big Island of Hawaii (April 2011);  Las Vegas, Nevada (August 4-7, 2011 for fabric show); Punta de Mita, Mexico (November 2013); Washington, D.C. (December 2013); Las Vegas, Nevada (February 16-18, 2014 for fabric show); Barcelona, Spain and Rome, Italy (including Vatican tour – 2014); Las Vegas, Nevada (August 30 – September 2014 for fabric show); Puerto Rico (February 2016); and Oregon (August and November 2016).  For all except the Rancho Mirage trip, the Dallals took airplane flights.  [Mrs. Dallal 460:1-462:25; 463:12-465:23; 466:18-19]

**DEFENDANTS RESPOND: Disputed.** Mrs. Dallal testified that she believed she was obligated to pay the caregivers because they work week by week and have families to support. TT 459:12-19.

68.     In deposition, Ms. Genovea denied under oath being "given money by the Dallals at a time when [she] did not provide care for Mr. Dallal."  Ms. Genovea also denied being "given money by the Dallals when [she] did not work for them."  [AF20; Genovea TT 780:8-14; 856:14-18]

**DEFENDANTS RESPOND: Undisputed.**

69.     Beyond what Mr. Roberts told Mrs. Dallal, she also knew better than to seek reimbursement for days qualified caregiving services were not physically provided because Lincoln had previously not paid her for days when no caregiver was present. Early in the claim, Mrs. Dallal had reported paying Ms. Genovea for holidays, but the Caregiver Activity Notes reflected that Ms. Genovea had those days off.  Lincoln did not reimburse the Dallals for those holidays identified as days off for Ms. Genovea. [Seeman TT 1094:16-1095:19]

**DEFENDANTS RESPOND: Undisputed** as to the fact that Lincoln did not reimburse the Dallals for Ms. Genovea's identified days off; **disputed and Objected to** in all other respects, as speculative and conclusory.

70.     The Dallals never told Lincoln that they took trips during the course of the claim.  Rather, Mrs. Dallal, pretending to be Ms. Genovea, consistently represented on the claim submission that Mr. Dallal received care from Ms. Genovea at home.  [Exhs. 350-362]  Mr. Dallal's ability to go on trips, particularly without a caregiver, was highly relevant to Lincoln because it reflected on Mr. Dallal's level of functioning and caregiving situation.  Had Lincoln known the truth about the Dallals' trips and falsified claim submissions relating to those trips, it would not have reimbursed benefits; the claim would not have qualified for reimbursement because the designated caregiver was not actually providing the represented services to Mr. Dallal.  [Exhs. 350-362; Seeman TT 1092:19-1094:15]

**DEFENDANTS RESPOND: Disputed.** Mrs. Dallal testified that she believed she was obligated to pay the caregivers because they work week by week and have families to support. TT 459:12-19.

## Mr. Dallal Feigned Incapacity at his 2005 Nurse Assessment

71.     Lincoln requested a second nurse assessment at the Dallal's home, which occurred on October 20, 2005.  Rather, Mrs. Dallal represented in the nurse assessment that Mr. Dallal's condition continued to decline in light of a "stroke" in May 2005[6], and a thyroid tumor in June 2005.  [Exh. 312; Sarkisian TT 229:6-230:2; 239:4-16]  However, the Dallals did not inform the nurse that they had gone to Pittsburgh in June 2005 or that they were leaving for a Hawaiian vacation in November 2005.  [*Cf.* Exh. 312; Mrs. Dallal TT 460:1-10] Although Mrs. Dallal used a Power of Attorney for that nurse assessment, the Dallals never disclosed that Mr. Dallal had obtained a loan on the Dallals' Huntington Beach property without using a Power of Attorney only a few months before the assessment.  [Exhs. 312-16, 27; 380-01, 02; Mrs. Dallal TT 400:6-23]

---

[6] By November 22, 2005, an MRI showed that the stroke had resolved.  [Exh. 200-85; Gold TT 941:22-943:1]

DEFENDANTS' OPPOSITION TO PLAINTIFF'S PROPOSED FINDINGS OF FACT

**DEFENDANTS RESPOND: Disputed.** There was no obligation on the part of the Dallals to inform the nurse about any travel, nor was there an obligation to inform the nurse about any loan transaction.

72.     Mr. Dallal portrayed himself to this nurse as severely cognitively impaired on October 20, 2005 (just 6 days after the letter he sent to 21st Century to negotiate a settlement). On the nurse's cognitive testing, Mr. Dallal scored 4 out of 30 on the MMSE, which represented a decline in his condition since 2004 (where he had a score of 15 of 30) and severe cognitive impairment. [Exhs. 308-10, 11; 312-19, 20; Sarkisian TT 239:4-240:10; Dr. Lori Folk-Barron ("Folk-Barron") TT 725:22-726:1] Upon this testing, Mr. Dallal provided very delayed responses and feigned answers; he said he 40 years old; he thought he was in Santa Monica; he could not identify he day of the week, the season, the year, the month, current President; his telephone number, etc. [Exh. 312-19-21]

**DEFENDANTS RESPOND: Disputed.** There is no evidence of Mr. Dallal feigning anything. There is no evidence that his cognitive state was anything other than severely impaired. Dr. Weiss testified that Mr. Dallal didn't portray himself to be brain damaged by choosing not to answer or lack of being conversational as Hinkin testified. Dr. Weiss also testified that in all the years she's seen geriatric patients they don't respond well to testing. Weiss stated that testing could not elicit a valid representation and Mr. Dallal wasn't trying to make himself look worse off. Dr. Weiss testified that if someone's attention is severely or significantly disrupted it can affect performance on the measurement. [Weiss TT 1428:3-19; 1430:18-21;1433:22-25;1443:1-7; 1435:12-23.

73.     Mrs. Dallal also represented during this nurse assessment that Mr. Dallal frequently or always needed hands-on assist to dress, bathe, toilet, and transfer. Specifically, he required a walker and was unable to transfer from a sit to a stand position without physical assistance. [Exh. 312-11, 12, 13]

**DEFENDANTS RESPOND: Undisputed.**

74.   Mrs. Dallal reported that Mr. Dallal was only "sometimes" oriented and could not even call 911 or get out of the house in case of an emergency.  [Exh. 312-22]

**DEFENDANTS RESPOND: Undisputed.**

75.   From this evaluation, the nurse advised Lincoln that Mr. Dallal would "never" regain ADL independence and required substantial care for four of six ADLs (bathing, dressing, transferring, toileting) and had his severe cognitive impairment. [Exh. 312, and specifically 312-18, 29].

**DEFENDANTS RESPOND: Undisputed.**

76.   Lincoln did not anticipate Mr. Dallal's condition would likely improve based on the nurse assessments, as well as the ongoing, consistent representations provided regarding Mr. Dallal's reported needs and caregiving situation.  [Sarkisian TT 239:4-240:14; Seeman TT 1068:17-1069:7] Reimbursement benefits continued, with the Dallals seeking reimbursement for 10 hours/day, 7 days/week of caregiving through 2008.  [Exhs. 349, 354]

**DEFENDANTS RESPOND: Undisputed.**

77.   Nonetheless, and unbeknownst to Lincoln, the Dallals' representations to Lincoln and the nurse were in sharp contrast to the truth, as outlined in the Admitted Facts, Ms. Genovea's testimony regarding Mr. Dallal's capabilities, Mr. Dallal's representations regarding his return to work, his driving, his license renewal, travel (without a caregiver), communications with 21st Century, signing of financial documents without a Power of Attorney, and Mr. Dallal's true functioning and caregiving situation.

**DEFENDANTS RESPOND: Disputed and Objected to.**  These alleged facts are not properly established and speculative, and are conclusions without support.

1

2   **The Dallals Continued To Withhold the Truth About Mr. Dallal's Activities,**

3   **Functioning, and Alleged Care Through 2009, While Increasing Ms. Genovea's**

4   **Alleged Caregiving Services For Which They Sought Reimbursement**

5       78.     Mrs. Dallal maintained at trial that Mr. Dallal was severely physically and

6   cognitively impaired, such that he required full-time ADL assistance and continual

7   supervision from Ms. Genovea of 12 hours/day, 7 days/week by mid-2009.  [Exh. 355-

8   23]  Mrs. Dallal reiterated that Mr. Dallal required a Power of Attorney due to his

9   inability to function.  She likewise testified he had no involvement with and did not

10  operate in any capacity within their business, *Mr. Alex*; he was unable to write checks; he

11  did not sweep, sharpen anything at the business, or carry out the trash except once when

12  her knee was hurting; he was not involved in advertising; and he did not interact with

13  customers.  [Mrs. Dallal TT 417:6-22; 418:19-423:22]

14      **DEFENDANTS RESPOND: Undisputed.**

15

16      79.     Mr. Dallal implausibly testified as follows:  he did not know if he owned a

17  business called *Mr. Alex*; if he went to the store, he would only pray the rosary, sit, and

18  do nothing else; he would not talk with customers; he did not know anything about a

19  LTC claim; "his wife" handled everything both before and after his surgery (his life, the

20  bank, medicines, doctors); he did not know if he left the store on his own, if he took

21  walks, how he got places, or if he could open the gate at his house; he claimed he had to

22  be helped in/out of the car since the surgery; he claimed his son always got him coffee

23  (that he would not get it); he said he could not carry anything, could not (and did not)

24  sweep[7], or take out the trash; since his surgery, he had walked only with a cane and could

25

---

26  [7] Alexander Dallal, Jr. testified that he would not allow his father to sweep at the store.  [A. Dallal, Jr.

27  TT 1285:8-1285:17]  However, he is seen on the surveillance video for September 10, 2016 fist-
    bumping his father who was sweeping and continues sweeping as Alexander Dallal, Jr. walks by.

28  [Exh. 317, 9:56 – 9:57 a.m.; A. Dallal, Jr. TT 1285:18-1286:3]  Alexander Dallal, Jr. also testified at
    trial that the caregivers had keys to the store, they would sometimes come in after the family, and that

not walk by himself anywhere; he did not recall anything about his car accident in 2005, let alone his representations or treatments with Dr. Daher; he did not remember anything about his leasing of a BMW in 2009 (even saying he did not remember when a question was not pending); he never wrote any checks and could not remember signing any checks; he did not change the name of the business bank account and could not remember what his signature looked like; he claimed he did not know if the person on the surveillance was him, but then later admitted he was at his mother's home, but thereafter said he did not know if he was the person crossing the street to the Peninsula Hotel; when shown the surveillance, he could not say where his caregiver was, he could not remember why he had no one assist him into a vehicle, but he could remember where his mother's house was; he claimed he was carrying a cane when he clearly was not; he claimed he had never been by himself; and he could not explain why his son did not help him into his car or put items in the car for him [Mr. Dallal TT 661:15-662:1, 662:15-25, 663:1-664:19, 665:3-25, 667:16-668:4, 668:12-670:14; 672:12-21; 672:24-673:3, 673:9-676:17, 677:19-678:6, 678:14-21, 678:24-679:1, 679:5-14, 679:22-680:9, 680:12-22, 681:5-22, 682:17-683:13, 684:5-19].

**DEFENDANTS RESPOND: Disputed.** Mr. Dallal's cognitive abilities have gravely been suffering over the years so the answers provided at deposition are consistent of the findings from Dr.Weiss. Weiss TT 1428:3-19;1430:18-21;1433:22-25;1443:1-7; 1435:12-23]. Dr. Weiss testified that Mr. Dallal didn't portray himself to be brain damaged by choosing not to answer or lack of being conversational as Hinkin

---

they come in through the back door.  [A. Dallal, Jr. TT 1284:10-18]  He was impeached through his deposition testimony, where he had testified exactly the opposite:
"Q. Does the caregiver have a key to the store?
A. No.
Q. How does the caregiver get in?
A. The caregiver will always come in after us.
Q. How does the caregiver get into the store? Through the front door?
A. Yeah, through the front door.
Q. Do you have a back door?
A. No."  [A. Dallal, Jr. TT 1284:23-1285:6]

testified. She also testified that in all the years she's seen geriatric patients they don't respond well to testing. Dr. Weiss stated that testing could not elicit a valid representation and Mr. Dallal wasn't trying to make himself look worse off. She testified that if someone's attention is severely or significantly disrupted it can affect performance on the measurement.

80.     However, the undisputed evidence at trial directly contradicted the Dallals' respective testimonies, as well as the alleged severity of Mr. Dallal's condition and purported need for full-time caregiving.  Such evidence is included in these Findings of Fact, and includes the following:

**DEFENDANTS RESPOND: Disputed and Objected to.**  This is argument and not a factual finding.  Dr. Feld testified that her medical chart notes indicated that Mr. Dallal suffered at least two neurological and neurosurgical events which changed Mr. Dallal's neurological behavior. Feld explained that the two events: resection of the the brain tumor and the small strokes caused cognitive changes which could be both intermittent and permanent. Feld also testified that her medical chart notes indicated that Mr. Dallal had poor insight into his own abilities, issues with falling and wandering, and always refusing care including medications and medical exam follow ups. Feld testified that Mr. Dallal was severely cognitively impaired for many reasons including his poor judgment for his safety expressing severe concerns and need for supervision. Feld's medical chart notes include her recommendation for Namenda a dementia medication and further neuropsychiatric testing in 2015. Importantly Feld testified that the duplication of boxes being checked and other information listed on the APS forms could have been an oversight on her part and would not properly represent Mr. Dallal's overall health condition as noted in Mr. Dallal's medical records and her testimony. Feld Depo 76:25 – 77:19; 92:14 - 93:3; 93:21 – 94:3; 95:13-22; 101:1 - 102:4; 103:20 -104:21; 147:4 – 148:1; 160:14-24; 190:1-21; 211:19 - 212:4; 223:2-14; 237:19 - 238:8; 273:13-22.

Ananda testified that the area resection of the brain tumor in the front temporal lobe could cause issues with learning, memory and vision except that wasn't the reason for the follow up with Mr. Dallal. Ananda explained to the jury that although the tumor was removed and required follow up there are thousands of cells that remain and that the recurrence could be months, years or even a decade. Ananda testified that her certified Mr. Dallal and that his signatures were authentic at trial. Ananda TT 481:3-16; 482:5-7; 484:10-25; 485:1-17; 503:21-25; 504:1-14; 521:18-25; 522:1-5; 526:7-21.

81.     On April 25, 2006, the Dallals represented in a signed, notarized document, *under penalty of perjury*, that Mr. Dallal was not "incapacitated" and could independently (without consent of another person) borrow money and pledge, mortgage and encumber the Dallals' real estate.  [Exh. 380-26, 27] Mrs. Dallal conceded she never told any lenders/financial institutions that Mr. Dallal was incapacitated, was cognitively impaired (or had any cognitive problems at all) , or required a Power of Attorney.  [Mrs. Dallal TT 407:21-408:4; 409:4-17]  That same day and again without a Power of Attorney, Mr. Dallal obtained a home equity line of credit in his name only on the Dallals' Huntington Beach property.  [Exh. 076-1, 14; Mrs. Dallal TT 414:10-415:8]

**DEFENDANTS RESPOND: Disputed and Objected to.**  This financial transaction is irrelevant to the determination of the First and Third Claims for Relief. Plaintiff is trying to claim that the Dallals somehow committed fraud in the financial transaction, a transaction to which plaintiff was not a party. The lenders have never claimed that they were defrauded by the Dallals. The existence of a power of attorney did not mean that Mr. Dallal could not sign financial documents at the request of a lender.

Importantly Mr. Dallal's primary care physician certified and portrayed Mr. Dallal independent in ambulation, walking, eating, and transferring. She also testified that the neurological and neurosurgical events: the resection of the brain tumor and the small strokes following caused cognitive changes that are both intermittent and

1  permanent. Feld TT 76:25; 77:1-19; 210:5-12; 211:1-7.

2

3      82.      For the duration of the LTC claim, Mr. Dallal remained on the Dallals'

4  business and personal bank accounts.  [Mrs. Dallal TT 423:24-424:11]  Mrs. Dallal

5  admitted at trial that the business accounts had to be switched over to the name of *Mr.*

6  *Alex, Inc.* after they incorporated the business in 2002.  [Mrs. Dallal TT 424:12-16]  On

7  May 24, 2007, and without a Power of Attorney, Mr. Dallal submitted a change request

8  for the name of *Mr. Alex'*s bank accounts – changing the name from Mr. Alex Custom

9  Shirt Design to *Mr. Alex Inc.* – to reflect the incorporation of the business; he even kept

10  both Mrs. Dallal and him as signatories on the business accounts.  [Exh. 117-1]

11      **DEFENDANTS RESPOND: Disputed and Objected to.**  The banking account

12  designations and the power of attorney have nothing to do with the determination of the

13  First and Third Claims for Relief.  The fact that Mr. Dallal had executed a power of

14  attorney did not mean that he was divested of all rights with respect to his property and

15  business, or that he was prohibited from signing financial documents.

16      Mrs. Dallal testified that Mr. Dallal signed approximately 20 checks over the

17  twenty years the Lincoln subpoena financial records from the Dallal's. Lincoln

18  represented to the jury that the checks were for business to negotiate and tender when

19  most of the checks that were admitted into evidence were in the amounts of $5 and $10

20  for Church donations. Mrs. Dallal TT 565:1; 566:1-18.

21

22      83.      On September 24, 2008, the Dallals filed a "Certificate of Amendment of

23  Articles Incorporation" to identify a new corporation of which Mr. Dallal was the

24  President – JCA Home Care Inc.  The California corporate filing was signed under

25  penalty of perjury and without a Power of Attorney.  [Exh. 170-1; Mrs. Dallal TT 441:3-

26  442:3]

27      **DEFENDANTS RESPOND: Disputed and Objected to.**  The proffered fact is

28  irrelevant to the determination of the First and Third Claims for Relief. The fact that Mr.

Dallal had executed a power of attorney did not mean that he was divested of all rights with respect to his property and business.

84.    Mr. Dallal signed off in four different locations on documents in support of a credit application to lease a BMW on November 9, 2009.  He represented on that application that his occupation was "owner" with *Mr. Alex* for 40 years.  [Exh. 94-01-07; Mrs. Dallal TT 427:4-25]

**DEFENDANTS RESPOND: Disputed and Objected to.**  The proffered fact is irrelevant to the determination of the First and Third Claims for Relief. The fact that Mr. Dallal had executed a power of attorney did not mean that he was divested of all rights with respect to his property and business, or that he was prohibited from signing financial documents.

85.    During this time period, Mrs. Dallal also continued to mislead Lincoln about Mr. Dallal's functioning and caregiving situation.  In January 2009, she submitted a "Care Plan Schedule" to Lincoln, representing "caregiver assisting in shampooing, skincare, bathing and dressing him [Mr. Dallal] and putting socks and clean clothes." [Exh. 45-01, 02]

**DEFENDANTS RESPOND: Disputed and Objected to.**  Plaintiff here offers a conclusion, not an evidentiary fact.  Further, Mr. Dallal was certified under both policy requirements with the severe cognitive impairment section superseding any of the ADL requirements under the policy. In determining whether any benefits should be paid Lincoln had no right to challenge a Board Certified Attending Physician who was more than qualified to make that determination. Lincoln chose to investigate the Dallal claim erroneously on the ADL alleged improvement when Mr. Dallal continued to received certification from his primary care physician that he was chronically ill and qualified to received benefits under the severe cognitive impairment section under the policy. Feld testified to certifying Mr. Dallal which until today Lincoln refuses to acknowledge.

DEFENDANTS' OPPOSITION TO PLAINTIFF'S PROPOSED FINDINGS OF FACT

Dr. Feld testified that her medical chart notes indicated that Mr. Dallal suffered at least two neurological and neurosurgical events which changed Mr. Dallal's neurological behavior. Feld explained that the two events: resection of the the brain tumor and the small strokes caused cognitive changes which could be both intermittent and permanent. Feld also testified that her medical chart notes indicated that Mr. Dallal had poor insight into his own abilities, issues with falling and wandering, and always refusing care including medications and medical exam follow ups. Feld testified that Mr. Dallal was severely cognitively impaired for many reasons including his poor judgment for his safety expressing severe concerns and need for supervision. Feld's medical chart notes include her recommendation for Namenda a dementia medication and further neuropsychiatric testing in 2015. Importantly Feld testified that the duplication of boxes being checked and other information listed on the APS forms could have been an oversight on her part and would not properly represent Mr. Dallal's overall health condition as noted in Mr. Dallal's medical records and her testimony. Feld Depo 76:25 – 77:19; 92:14 - 93:3; 93:21 – 94:3; 95:13-22; 101:1 - 102:4; 103:20 -104:21; 147:4 – 148:1; 160:14-24; 190:1-21; 211:19 - 212:4; 223:2-14; 237:19 - 238:8; 273:13-22.

86.     Mrs. Dallal knew that information was false.  It is undisputed that no caregiver has ever dressed or showered Mr. Dallal, and she never told Lincoln the truth about these facts.  [AF22; Mrs. Dallal TT 415:22-417:3]  Ms. Genovea reinforced at trial that Mr. Dallal was capable of dressing and showering on his own.  [Genovea TT 781:24-782:12; 782:16-784:22; 784:23-789:5]

**DEFENDANTS RESPOND: Disputed and Objected to.**  Plaintiff is conflating facts. If a caregiver dressed or showered Mr. Dallal does not mean that he was capable of dressing or showering on his own.  Mr. Dallal was certified under both policy requirements with the severe cognitive impairment section superseding any of the ADL requirements under the policy. In determining whether any benefits should be paid

Lincoln had no right to challenge a Board Certified Attending Physician who was more than qualified to make that determination. Lincoln chose to investigate the Dallal claim erroneously on the ADL alleged improvement when Mr. Dallal continued to received certification from his primary care physician that he was chronically ill and qualified to received benefits under the severe cognitive impairment section under the policy. Feld testified to certifying Mr. Dallal which until today Lincoln refuses to acknowledge.

Further, Dr. Feld testified that her medical chart notes indicated that Mr. Dallal suffered at least two neurological and neurosurgical events which changed Mr. Dallal's neurological behavior. Feld explained that the two events: resection of the the brain tumor and the small strokes caused cognitive changes which could be both intermittent and permanent. Feld also testified that her medical chart notes indicated that Mr. Dallal had poor insight into his own abilities, issues with falling and wandering, and always refusing care including medications and medical exam follow ups. Feld testified that Mr. Dallal was severely cognitively impaired for many reasons including his poor judgment for his safety expressing severe concerns and need for supervision. Feld's medical chart notes include her recommendation for Namenda a dementia medication and further neuropsychiatric testing in 2015. Importantly Feld testified that the duplication of boxes being checked and other information listed on the APS forms could have been an oversight on her part and would not properly represent Mr. Dallal's overall health condition as noted in Mr. Dallal's medical records and her testimony. Feld Depo 76:25 – 77:19; 92:14 - 93:3; 93:21 – 94:3; 95:13-22; 101:1 - 102:4; 103:20 -104:21; 147:4 – 148:1; 160:14-24; 190:1-21; 211:19 - 212:4; 223:2-14; 237:19 - 238:8; 273:13-22.

87.     Yet, at trial, Mrs. Dallal continued the charade to pursue benefits by asserting that she dressed and showered her husband.  [Mrs. Dallal TT 563:4-17]  Mrs. Dallal knew that if she performed caregiving tasks as Mr. Dallal's spouse, she could not seek reimbursement benefits; yet she still wrote on the Caregiver Activity Notes that Ms.

Genovea performed these ADL tasks, such that she could secure reimbursement benefits. [Exhs. 301-09; 302; 303; 350-362]  The Dallals never responded to this clear evidence of misrepresentation and concealment at trial.

**DEFENDANTS RESPOND: Disputed and Objected to.**  Lincoln is once again conflating facts. If a caregiver dressed or showered Mr. Dallal does not mean that he was capable of dressing or showering on his own.  Lincoln claims and relied on the caregiver activity notes as part of the "puzzle" but didn't explain to the jury that the caregiver activity notes are not medical records and do not represent Mr. Dallal's health condition. At anytime Lincoln had the authority to conduct its own examination of Mr. Dallal which they chose not to. Mr. Dallal's primary care physician of twelve years provided that information on what the policy required but Lincoln wants to create its own new requirements and rules.

Further, Dr. Feld testified that her medical chart notes indicated that Mr. Dallal suffered at least two neurological and neurosurgical events which changed Mr. Dallal's neurological behavior. Feld explained that the two events: resection of the the brain tumor and the small strokes caused cognitive changes which could be both intermittent and permanent. Feld also testified that her medical chart notes indicated that Mr. Dallal had poor insight into his own abilities, issues with falling and wandering, and always refusing care including medications and medical exam follow ups. Feld testified that Mr. Dallal was severely cognitively impaired for many reasons including his poor judgment for his safety expressing severe concerns and need for supervision. Feld's medical chart notes include her recommendation for Namenda a dementia medication and further neuropsychiatric testing in 2015. Importantly Feld testified that the duplication of boxes being checked and other information listed on the APS forms could have been an oversight on her part and would not properly represent Mr. Dallal's overall health condition as noted in Mr. Dallal's medical records and her testimony. Feld Depo 76:25; 77:1-19; 92:14-25; 93:1-3; 93:21-25; 95:13-22; 101:1-25; 102:1-4; 103:20-25; 104:1-21; 147:12-25; 160:14-25; 190:1-21; 211:19-25; 212:1-4; 223:2-14; 237:19-25;

1    238:1-8; 273:13-22.

2

3       88.     The Dallals also continued to travel during this time without a caregiver,

4    with Mrs. Dallal falsely representing on the Caregiver Activity Notes that Mr. Dallal was

5    receiving direct assistance from Ms. Genovea.  The Dallals traveled to Italy in September

6    2006; to Hawaii in April 2007; to Las Vegas in August 2007, December 2007, and

7    February 2008, and to Italy in December 2008; to Pittsburgh in May 2009; to Greece and

8    Italy in July 2009; and Las Vegas in December 2009.  [Mrs. Dallal TT 460:11-462:5;

9    Exhs. 352-48 to 49 (September 13-20, 2006); 353-26, 27, 31, 32, 55 (April 2007 and

10   August 29 to September 3, 2007); 354-1, 2, 7, 8, 9 (December 2007 and February 2008);

11   355-1, 2, 3, 24, 25, 28, 29, 35, 36, 37, 59, 60 (December 2008 and May, July and

12   December 2009); 356-1 to 2 (December 2009)]

13       **DEFENDANTS RESPOND: Disputed.** Mrs. Dallal testified that she believed

14   she was obligated to pay the caregivers because they work week by week and have

15   families to support. TT 459:12-19.

16

17

18   **The Dallals Continued to Deceive Lincoln Through Manipulation of Mr. Dallal's**

19   **Activities and APS Forms, Such that Lincoln Continued to Pay Benefits**

20       89.     Lincoln continued to pay the Dallals' claim based on their representations

21   and claim submissions.  [Sarkisian TT 238:22-24; 292:8-13; Seeman TT 1096:11-21;

22   Exhs. 349; 350-362]

23       **DEFENDANTS RESPOND: Disputed.**  Lincoln determined Mr. Dallal's

24   eligibility for benefits based upon the Attending Physician Statements. Lincoln's

25   requirements for proof are not the Policy's requirements. Eligibility for benefits for a

26   chronically ill individual is determined pursuant to a certification by a Licensed Health

27   Care Practitioner. Exh. 301-6 at para. 3.A, definition of "Chronically Ill Individual."

28   Seeman also testified that the Provider Home Health Report is essentially an invoice,

1   while the Attending Physician's Statements are determinative of what the insured's care

2   needs are. Seeman TT 1124:5-13; 1126:24 – 1127:2; 1137:21 – 1139:23; 1140:9-18.

3   Seeman acknowledged that the Policy doesn't require multiple pieces to the puzzle to

4   qualify the insured for benefits only that a licensed physician provide that certification.

5   Seeman TT 1139:10-23. No ADL requirements were needed when certified as severely

6   cognitively impaired. Seeman TT 1182:23 -183:6.

7

8       90.    As part of its overall analysis, Lincoln obtained Attending Physician

9   Statements ("APS") from Mr. Dallal's medical providers.  [Sarkisian TT 237:2-5;

10   Seeman TT 1095:20-1096:21]  Testimony at trial, however, demonstrated that the APS

11   forms were unsupported by the findings and notes of these medical providers, as well as

12   obtained by the Dallals' manipulation of Dr. Feld.

13       **DEFENDANTS RESPOND: Disputed and Objected to.**  The APS forms were

14   the basis for Lincoln determining that Mr. Dallal was eligible for benefits. Lincoln

15   alleged that is was the apparent improvement of Mr. Dallal in the 2016 APS compared

16   with the 2015 APS that raised suspicions about Mr. Dallal's claim. TT 244:6-23.

17   Lincoln's requirements for proof are not the Policy's requirements. Eligibility for

18   benefits for a chronically ill individual is determined pursuant to a certification by a

19   Licensed Health Care Practitioner. Exh. 301-6 at para. 3.A, definition of "Chronically Ill

20   Individual." Seeman also testified that the Provider Home Health Report is essentially

21   an invoice, while the Attending Physician's Statements are determinative of what the

22   insured's care needs are. Seeman TT 1124:5-13; 1126:24 – 1127:2; 1137:21 – 1139:23;

23   1140:9-18. Seeman acknowledged that the Policy doesn't require multiple pieces to the

24   puzzle to qualify the insured for benefits only that a licensed physician provide that

25   certification. Seeman TT 1139:10-23. No ADL requirements were needed when

26   certified as severely cognitively impaired. Seeman TT 1182:23 -183:6.

27

28

91.     For example, in early 2008, Lincoln twice sent an APS request to Dr. Black, Mr. Dallal's neurosurgeon, for completion.  In return, Lincoln received a form signed by Dr. Ananda, verifying Mr. Dallal was "chronically ill" as of February 2008. [Exh. 61]

**DEFENDANTS RESPOND: Undisputed.**

92.     Dr. Ananda testified, however, that Mr. Dallal had normal examinations with him and that he had never determined Mr. Dallal had severe cognitive impairment and had never identified that he has any physical restrictions; all exams had been normal with no indication of any residual effects from the removal of the meningioma or resolved stroke.  [Exhs. 58, 59, 60, 200-66 to 69;  Ananda TT 492:2-10; 495:24-496:8; 497:15-500:19; 506:10-507:14; 508:20-509:19; 513:14-514:21; 514:22-515:19; 517:4-519:1; 521:18-522:20]  Notably, he testified that he routinely signed insurance forms for patients.  He did not know why he signed this form, and it was certainly a possibility he just signed this Lincoln form because Dr. Black's assistant asked him to do to so. [Ananda TT 522:6-20]

**DEFENDANTS RESPOND: Disputed and Objected to.**  The "possibility" of why Dr. Ananda signed the form is speculation. Dr. Ananda's memory of the event is limited. He did not give Mr. Dallal a neuropsych exam or a memory test. He ultimately certified that Mr. Dallal was eligible for policy benefits. Ananda TT 497:11-12; 504:20; 506:3-5; 507:15-508:1; 522:21 – 523:2; 525:3-11; 526:2-15; Exh. 61.

Dr. Ananda testified that the area resection of the brain tumor in the front temporal lobe could cause issues with learning, memory and vision except that wasn't the reason for the follow up with Mr. Dallal. Ananda explained to the jury that although the tumor was removed and required follow up there are thousands of cells that remain and that the recurrence could be months, years or even a decade. Ananda testified that her certified Mr. Dallal and that his signatures were authentic at trial. Ananda TT 481:3-16; 482:5-7; 484:10-25; 485:1-17; 503:21-25; 504:1-14; 521:18-25; 522:1-5; 526:7-21.

93.     The Dallals also influenced how their family internist Dr. Joy Feld completed the APS forms from 2009 through 2016.  Dr. Feld was the internist for Mr. Dallal, Mrs. Dallal and their son, Alexander Dallal, Jr.  [Mrs. Dallal TT 579:24-25, 580:4-6; A. Dallal, Jr. TT 1267:18-19]

**DEFENDANTS RESPOND: Disputed.**  The Dallals did not influence how Dr. Feld completed the forms.

94.     Dr. Feld testified that her protocol in preparing the APS forms was to discuss with the Dallal family and Mr. Dallal when the form was presented, and that she would go through what care they believed he required.  She accepted the accuracy of what the Dallal family and Mr. Dallal told her in preparing the APS forms.  [Feld TT 134:1-3; 134:8-135:3]

**DEFENDANTS RESPOND: Disputed and Objected to.**  There is no reason that Dr. Feld should have consulted anyone other than the Dallal family about Mr. Dallal's condition. Surely Lincoln did not expect her to go to the Dallal's house and physically observe his living situation and evaluate his condition over an extended period of time. Lincoln's form does not require such an activity on the part of an attending physician.

95.     It is undisputed that Mrs. Dallal sent Lincoln APS forms signed by Dr. Feld in 2009-2011.  [AF17; Exhs. 51-02 to 03; 52; 53; 190; 191]  Significantly, however, Dr. Feld testified that these APS forms were <u>altered</u> and, as such, refused to discuss them. [Feld TT 139:21-141:21; 142:21-143:25; 144:15-17; 144:22-25; 146:17-147:3; 149:1-9; 149:16-20; 152:6-12; 152:16-153:23; 154:1-6; 155:3-156:2; 156:17-157:17; 159:7-12; 159:21-160:5; 168:25-169:16; 195:10-196:15; 208:8-18; 209:2-19; 211:19-212:4]

**DEFENDANTS RESPOND: Disputed.**  Plaintiff incorrectly implies that all APS forms were altered, which is incorrect.  Exhs. 52, 53, 190, 191, 194, 195, 197.

Further, Dr. Feld did not disavow any of her conclusions as to Mr. Dallal's eligibility for benefits. Dr. Feld testified that her medical chart notes indicated that Mr. Dallal suffered at least two neurological and neurosurgical events which changed Mr. Dallal's neurological behavior. Feld explained that the two events: resection of the the brain tumor and the small strokes caused cognitive changes which could be both intermittent and permanent. Feld also testified that her medical chart notes indicated that Mr. Dallal had poor insight into his own abilities, issues with falling and wandering, and always refusing care including medications and medical exam follow ups. Feld testified that Mr. Dallal was severely cognitively impaired for many reasons including his poor judgment for his safety expressing severe concerns and need for supervision. Feld's medical chart notes include her recommendation for Namenda a dementia medication and further neuropsychiatric testing in 2015. Importantly Feld testified that the duplication of boxes being checked and other information listed on the APS forms could have been an oversight on her part and would not properly represent Mr. Dallal's overall health condition as noted in Mr. Dallal's medical records and her testimony. Feld Depo 76:25 – 77:19; 92:14 - 93:3; 93:21 – 94:3; 95:13-22; 101:1 - 102:4; 103:20 -104:21; 147:4 – 148:1; 160:14-24; 190:1-21; 211:19 - 212:4; 223:2-14; 237:19 - 238:8; 273:13-22.

96.     No evidence was presented by the Dallals to refute the implication that Mrs. Dallal altered those APS forms before they were submitted to Lincoln for the period of 2009-2011.  Rather, in contrast to Dr. Feld's repeated testimony about her discussions with and reliance on the Dallals' representations to complete those forms, Mrs. Dallal falsely testified that she never spoke with Dr. Feld about her husband's condition.  [Mrs. Dallal TT 580:7-13]

**DEFENDANTS RESPOND: Disputed.**  Not all the APS forms had alterations.  Dr. Feld did not disavow any of her conclusions as to Mr. Dallal's eligibility for benefits. There is no reason that Dr. Feld should have consulted anyone

other than the Dallal family about Mr. Dallal's condition. Surely Lincoln did not expect her to go to the Dallal's house and physically observe his living situation and evaluate his condition over an extended period of time. Lincoln's form does not require such an activity on the part of an attending physician.

97. From 2012-2016, Lincoln received APS forms directly from Dr. Feld. [AF17; Exhs. 191-02, 03; 194-03, 04; 195-02, 03; 197-02, 03]. Dr. Feld again testified that each of these APS forms was completed based on information provided by the Dallal family. [Feld TT 205:21-206:14; 210:5-212:4; 228:16-17; 229:25-230:6; 232:16-233:13; 238:4-8; 253:19-22; 256:6-257:6; 276:20-278:24; 281:20-283:9]

**DEFENDANTS RESPOND: Disputed and Objected to.** Plaintiff offers no reason Dr. Feld should have consulted anyone other than the Dallal family about Mr. Dallal's condition. Surely Lincoln did not expect her to go to the Dallal's house and physically observe his living situation and evaluate his condition over an extended period of time. Lincoln's form does not require such an activity on the part of an attending physician. Dr. Feld did not disavow her conclusions that Mr. Dallal was eligible for benefits.

98. Dr. Feld's APS forms received by Lincoln were inconsistent with the information in her medical notes discussed in her deposition read at trial and that were in evidence, as well as information that the Dallals had provided Lincoln. [Exhs. 187, 188, 313; Feld TT 186:5-25; 187:3-22; 189:11-191:10; 191:13-19; 197:8-199:14; 199:17-22; 199:25-200:22; 201:3-202:5; 203:24-204:7; 204:9-16; 204:19-205:1] Dr. Feld reflected that Mr. Dallal was consistently oriented times three during her medical visits, he had "did a little jog" across the street (6/18/2015 medical visit), he did not have gait issues, he had never used a wheelchair, and she had never assessed what Mr. Dallal's abilities were (i.e., dressing/undressing, toilet, transfer). Her notes also did not reflect that Mr. Dallal was severely cognitively impaired, but rather that the family reported he had

occasional confusion and anxiety.  [Feld TT 87:1-88:1; 119:8-120:11; 197:8-199:14; 199:17-22; 199:25-200:22; 201:3-202:5; 203:24-204:7; 204:9-16; 204:19-205:1;  248:2-8; 248:15-250:10; 253:6-14; 260:20-261:4; 281:25-282:6; Exh. 313]  Dr. Feld even testified that Mr. Dallal was quite communicative and responsive when she saw him. [Feld TT 282:7-283:9]

**DEFENDANTS RESPOND: Disputed.**  None of this evidence changes Dr. Feld's opinions about Mr. Dallal's eligibility for benefits. Dr. Feld testified that her medical chart notes indicated that Mr. Dallal suffered at least two neurological and neurosurgical events which changed Mr. Dallal's neurological behavior. Feld explained that the two events: resection of the the brain tumor and the small strokes caused cognitive changes which could be both intermittent and permanent. Feld also testified that her medical chart notes indicated that Mr. Dallal had poor insight into his own abilities, issues with falling and wandering, and always refusing care including medications and medical exam follow ups. Feld testified that Mr. Dallal was severely cognitively impaired for many reasons including his poor judgment for his safety expressing severe concerns and need for supervision. Feld's medical chart notes include her recommendation for Namenda a dementia medication and further neuropsychiatric testing in 2015. Feld testified that the duplication of boxes being checked and other information listed on the APS forms could have been an oversight on her part and would not properly represent Mr. Dallal's overall health condition as noted in Mr. Dallal's medical records and her testimony. Feld testified that there are people who are cognitively impaired who are oriented to person, place and time. Weiss testified same. Feld Depo 76:25 – 77:19; 92:14 - 93:3; 93:21 – 94:3; 95:13-22; 101:1 - 102:4; 103:20 - 104:21; 147:4 – 148:1; 160:14-24; 190:1-21; 211:19 - 212:4; 223:2-14; 237:19 - 238:8; 273:13-22.

99.     In accepting the Dallals' representations as true and signing the APS forms for Lincoln, Dr. Feld also ignored her own findings for Mr. Dallal's disability insurance carrier, Monarch Insurance Company, for which she signed APS forms in 2004 and 2005.  Dr. Feld noted on those forms that as of September 2004, Mr. Dallal had no focal deficits in September 2004, and as of May 2, 2005, that Mr. Dallal was able to "dress/bathe & feed self needs help w/ heavy chores, housework."  [Exhs. 187, 188; Feld TT 186:5-25; 187:3-22; 189:11-191:10, 191:13-19; Mrs. Dallal TT 377:15-378:4, 378:13-18]

**DEFENDANTS RESPOND: Disputed and Objected to.** Statements by Dr. Feld regarding a disability policy in 2004 have nothing to do with the determination of the First and Third Claims for Relief. Lincoln attempted before trial to prevent the term "disabled" from being used at trial on the ground that there was a significant difference between a long-term care policy and a disability policy.

100.    The Dallals kept Dr. Feld in the dark about activities inconsistent with their reports to her, including Mr. Dallal's license renewal, his ability to drive, his insurance claim with 21st Century, and his ability to travel.  [Feld TT 306:14-18; 313:1-20; 317:22-318:2; 322:1-10; 323:11-25; 324:8-19; 325:7-326:20; 327:11-15; 328:14-329:11]

**DEFENDANTS RESPOND: Disputed and Objected to.**  The Dallals had no obligations to inform Dr. Feld or anyone else about the activities described, none of which are relevant to the claims of fraud in this case.

## Mr. Dallal Represented Himself As Fully Functional in 2010-2014 to Entities Other than Lincoln

101.    In early 2010, Mr. Dallal again renewed his driver's license by mail, verifying under penalty of perjury that he did not have any impairing medical conditions – the very conditions he was using to get benefits from Lincoln. Kidd TT 693:11-19;

695:4-697:5; Exh. 90.

**DEFENDANTS RESPOND: Disputed.** There has been no showing of fraud with respect to the drivers' license renewal, which is not pertinent to the determination of the First and Third Claims for Relief. TT 704:14-25. Mrs. Dallal's testimony about the driver's license was not materially incorrect: The license was renewed by mail after five years without Mr. Dallal having to go to the DMV. TT 696:4-19.

102.    Contrary to Mrs. Dallal's claim that Mr. Dallal had no involvement with the business, did not write checks, and needed a Power of Attorney, Mr. Dallal signed checks from 2010 through 2014 on both the Dallals' personal and business accounts. He wrote various checks for sewing machine repairs, to the cleaners, for the Dallals' medication from the pharmacy, and for charitable contributions. None of the checks were signed by Power of Attorney. [Exh. 115-01-24; Mrs. Dallal TT 431:13-24, 432:6-13, 432:25-433:25]

**DEFENDANTS RESPOND: Disputed.** Mr. Dallal signed only a few checks for small amounts of money. The Power of Attorney did not legally stop Mr. Dallal from signing checks. The Policy does not require the Dallals to disclose the existence or non-existence of a power of attorney.

103.    In 2010, the Dallals opened an investment account on which *both* have privileges and which Mr. Dallal can directly access. [Mrs. Dallal TT 434:6-17] Mr. Dallal also obtained a variable annuity, without a Power of Attorney. [Exh. 116-1, 2; Mrs. Dallal TT 435:4-436:5, 436:10-13]

**DEFENDANTS RESPOND: Disputed and Objected to.** Mr. Dallal's joint ownership of the investment account and annuity – community property assets – is irrelevant to the determination of the First and Third Claims for Relief in this matter. The Power of Attorney does not prevent Mr. Dallal from ownership of the assets.

104.    Contrary to Mrs. Dallal's claim her husband was not engaged in finances or deals with the bank, Mr. Dallal opened a bank account for *another* business, California Skilled Services, for which he was the Vice President.  He signed under a Certificate of Authority that this Health and Social Assistance business was operating at the same location as his custom clothing store, *Mr. Alex*, and had made a half million dollars in 2012.  Again, he did not sign with a Power of Attorney.  [Exh. 107-01-05; Mrs. Dallal TT 442:4-444:9]

**DEFENDANTS RESPOND: Disputed and Objected to.** The signature of Mr. Dallal on bank documents is irrelevant to the determination of the First and Third Claims for Relief. The Power of Attorney does not prevent him from owning business assets. There was no evidence that he actually did any work with respect to this business.

105.    Throughout this time, the Dallals also continued to travel without a caregiver to Las Vegas, New York, Washington, DC, Hawaii, Mexico, Europe, and Las Vegas.  [Mrs. Dallal TT 462:6-465:12]  Mrs. Dallal continued to represent to Lincoln every month that Mr. Dallal was getting actual care from Ms. Genovea when she was not there.  [Exh. 356-360]  By this time Mrs. Dallal was also signing fraud notices although she was told of the consequences of misleading the company.  Mrs. Dallal still pretended to be Ms. Genovea and submitted false cash receipts.  Dr. Feld's APS forms in 2010-2011, which came through Mrs. Dallal, were again altered after Dr. Feld signed them. Exhs. 52, 53, 190; Feld TT 153:1-23; 154:1-6; 166:8-11; 166:18-24; 168:25-169:16; 195:10-196:15.

**DEFENDANTS RESPOND: Disputed.**  Mrs. Dallal testified that she believed she was obligated to pay the caregivers because they work week by week and have families to support. TT 459:12-19. Dr. Feld testified she certified every APS form submitted to Lincoln for the LTC claim and didn't waver throughout her testimony.

Feld testified that her signatures were authentic on the 2009, 2010, & 2011 APS forms that Lincoln has misrepresented to the jury as being altered. Fled testified over and over again why she certified Mr. Dallal. Importantly Feld testified that the duplication of boxes could've been an oversight. Feld TT 134:1-3; 153:21-23; 211:19-25; 223:2-14. Mrs. Genovea testified that she provided Mrs. Dallal consent to prepare and sign the caregiver activity notes and all the paperwork and fraud notices that go along with the claim submission consistently without wavering at trial. Genovea TT 113:4-9; 114:20-25; 115:22-25; 116:1-3; 119:3-10; 120:9-12; 169:21-25.

106.    Mrs. Dallal continued to lie on Caregiver Activity Notes, fraud notices, and cash receipts, never revealing Mr. Dallal's true activities, but representing that Ms. Genovea gave full time care – 7 days a week, 12 hours a day, for ADLs like dressing/showering/transferring, and toileting Mr. Dallal.  [Exh. 356-360]  Ms. Genovea admitted at trial that she did not perform these ADLs.  Ms. Genovea also admitted that she had never worked 7 days/week, 12 hours/day.  [Genovea TT 781:24-782:12; 782:16-784:22; 784:23-789:5; 789:6-24; 789:25-791:6; 810:2-9; 851:14-852:1; AF22]

**DEFENDANTS RESPOND: Disputed and Objected to.**  The Caregiver Activity Notes were not lies, and Plaintiff's suggestion they are lies is prejudicially inflammatory.

107.    The APS forms from Dr. Feld continued to indicate that Mr. Dallal required assistance with dressing, bathing, toileting, and transferring; was cognitively impaired; permanently required a caregiver; and was "chronically ill."  [Exhs. 191; 194; 356-360]

**DEFENDANTS RESPOND: Disputed.** The APS forms indicated that Mr. Dallal had improved with respect to the activities of daily living, needing less assistance. Dr. Feld testified that Mr. Dallal was severely cognitively impaired for many reasons including his poor judgment for his safety expressing severe concerns and need

for supervision. Feld Depo. 147:12 -148:1.

Seeman testified that in 2005 Lincoln obtained a nurse assessment which clearly stated that Mr. Dallal would never regain functions in his ADL's. Seeman TT 1145:10-25; 1146:1-5. Under cross Seeman lied in his testimony and couldn't answer why the previous information submitted from the 2005 nurse assessment and the information on the APS forms which showed improvements in 2009-2013 didn't trigger an investigation. Seeman TT 1162:17-25; 1163:1-25; 1164:1-13. Seeman continued to contradict and lie when under cross he explained that the reason why the Feld didn't check the box for 'no change in improvement expected" as being an oversight and something that they physician missed. Seeman TT 1165:3-11.

**Mr. Dallal Feigned Incapacity in his 2014 Nurse Assessment, But Mr. Dallal Continued to Act Differently to the Outside World**

108.    In 2014, Lincoln requested another nurse case manager assessment with independent home care agency, Univita.  [AF18; Exh. 48]  The report from the August 22, 2014 home visit, reflected to Lincoln that (1) information was obtained from Mr. and Mrs. Dallal; (2) it was represented that Mr. Dallal "has weakness, loss of balance, sleeps a lot as his meds are very strong"; (3) Ms. Genovea was still the private caregiver, represented as working 12 hours/day, 7 times a week; (4) it was reported that Mr. Dallal needed hands-on assistance with most of his ADLs (bathing, dressing, transferring, toileting, mobility, bladder incontinence); (5) it was reported that Mr. Dallal used a cane, walker and wheelchair; (6) Mr. Dallal received a very low score of -6.44 on the MCAS Composite Score cognitive testing given at that visit; (7) the nurse indicated Mr. Dallal required substantial assistance for at least two ADLs and substantial supervision for severe cognitive impairment; and (8) the nurse recommended that Mr. Dallal have a home health aide 24 hours/day, 7 days/week, and he should be transferred to a facility for 24/7 care if care could not be safely provided at home.  [AF18; Exh. 048]

**DEFENDANTS RESPOND: Undisputed.**

109.    However, Mr. Dallal faked severe cognitive impairment on the Minnesota Cognitive Acuity Screening (MCAS) to generate the -6.44 score.  [Exh. 048-05; Hinkin 1228:14-1229:23;1238:4-14; Exh. 313-01, 02, 08. 09, 12 to 30]. He claimed he did not recall his former occupation; did not know what season it was; did not know what state he lived in; and did not know his address.  [Exh. 048-10]. He received zeros for the testing on multiple subsections (orientation, attention, repetition, etc.).  [*Id.*]

**DEFENDANTS RESPOND: Disputed.**  There is no evidence that Mr. Dallal was anything other than severely cognitively impaired. Mr. Dallal's cognitive abilities have gravely been suffering over the years so the answers provided at deposition are consistent of the findings from  Dr.Weiss. [Weiss TT 1428:3-19;1430:18-21;1433:22-25;1443:1-7; 1435:12-23] Dr. Weiss testified that Mr. Dallal didn't portray himself to be brain damaged by choosing not to answer or lack of being conversational as Hinkin testified. She also testified that in all the years she's seen geriatric patients they don't respond well to testing. Dr. Weiss stated that testing could not elicit a valid representation and Mr. Dallal wasn't trying to make himself look worse off. She testified that if someone's attention is severely or significantly disrupted it can affect performance on the measurement.


110.    Mrs. Dallal, as Power of Attorney, advised Mr. Dallal could not be left alone and needed help for everything – ADLs, finances, driving, social interaction, and had no involvement in the business.  The Dallals knew that was not true; unbeknownst to Lincoln Mr. Dallal was engaged in the very acts the Dallals said he was not performing. He was still writing checks without a Power of Attorney.  He still had car insurance.  He was still taking trips; shortly before the assessment (and without telling the nurse), the Dallals had just returned from Barcelona and Rome, touring the Vatican, all without a caregiver.  [Exhs. 48-05; 96; 115; Mrs. Dallal TT 464:16-24]  In February and March 2015, the Dallals obtained refinance loans for their properties on which Mr. Dallal was a

1  primary borrower, representing he was self-employed with and the owner of *Mr. Alex*,

2  and earning income.  Mrs. Dallal confirmed that the information provided to the lender

3  was accurate and truthful, and that Mr. Dallal signed on his own without a Power of

4  Attorney.[8]  [Exh. 79, 85; Mrs. Dallal TT 436:14-440:12]  Mr. Dallal was also being used

5  in social media (Instagram) advertising of *Mr. Alex*, using the tools of the trade, cutting

6  cloth, and sewing buttons.  [Exhs. 171, 172, 174]

**DEFENDANTS RESPOND: Disputed.** The Policy did not require disclosure of
any of the matters described. None of those matters are inconsistent with Mr. Dallal's
cognitive impairment.

10

11  111.    The next year, Lincoln received an APS from Dr. Feld, dated July 9, 2015.

12  [Exh. 195]  The APS reflected a <u>decline</u> in Mr. Dallal's condition since the prior APS in

13  2013, indicating he now required stand-by assistance with *all* ADLs, except for hands-on

14  assistance with bathing.  [Exh. 195-02]  No independent ADLs were identified.  Dr. Feld

15  testified that she prepared the APS forms based on what the Dallals told her.  Indeed,

16  from her testimony and July 9, 2015 medical note, Mrs. Dallal came into the office for

17  completion of the LTC "paperwork" and reported that her husband had worsened.  Dr.

18  Feld signed an APS that same day, reflecting that Mr. Dallal now needed assistance with

19  all of his ADLs.  [Feld TT 134:8-135:3; 215:22-216:6; 253:19-22; 254:25-255:4; 256:16-

20  257:25; 258:9-259:5; Exhs. 195, 313-6]

21  **DEFENDANTS RESPOND: Undisputed.**

22

23  112.    Lincoln continued to pay benefits because all information provided

24  reflected that Mr. Dallal required and received Substantial Assistance (standby or hands-

25  on) for two of six ADLs and Substantial Supervision for severe cognitive impairment,

26  with actual expenses incurred for Ms. Genovea's reported services.  [Sarkisian TT 240:1-

27

28  _____

[8] Mr. Dallal represented his involvement with *Mr. Alex* in the same fashion both before and after his surgery – identifying himself as the owner of *Mr. Alex*.  [Exh. 72; Mrs. Dallal TT 440:20-23]

14; 243:12-19; Seeman TT 1068:5-13; 1070:2-25; 1080:14-1081:20; 1090:3-14;
1095:20-1096:21; 1099:23-1100:24; 1113:6-1115:9; 1118:1-16; 1119:6-8]

**DEFENDANTS RESPOND: Disputed.** Lincoln paid benefits because the APS forms from Mr. Dallal's physicians certified that he was entitled to benefits and the Policy provided that eligibility for benefits was determined by a Licensed Health Care Practitioner. Exh. 301-6 at para. 3.A, definition of "Chronically Ill Individual."

**Lincoln Discovers the Dallals' Fraud in 2016**

113.   From 2004 through 2016, the Dallals represented that Mr. Dallal needed and received care by Ms. Genovea, for which they sought reimbursement of up to $265/day for alleged care of 12 hours/day, 7 days/week. [Exhs 350-362] However, in 2016, Lincoln discovered the Dallals' fraud, which included evidence of falsified claim forms, no caregiver activity for Mr. Dallal (and with Ms. Genovea working elsewhere), and Mr. Dallal captured on surveillance without the oversight or severe impairment reported.

**DEFENDANTS RESPOND: Disputed.** As of 2012, Plaintiff was on notice as to the facts ultimately prompting its investigation, and should have known by the hours spent that further investigation was needed. *See* Defendants' concurrently filed Proposed Findings of Fact at ¶¶ 23-27.

114.   On May 9, 2016, Lincoln received Dr. Feld's annual APS form, dated May 6, 2016. [Exh. 197] Lincoln noticed that the APS reflected that Mr. Dallal required *less care* than reported on the 2015 APS. The improvement in four ADLs was unexpected in light of the consistent representations by the Dallals, the medical history reported, the claim submissions, and Dr. Feld's prior representation that Mr. Dallal's condition would not improve. [Exh. 197-02; Seeman TT 1075:2-22, 1185:15-1186:16; Sarkisian TT 242:19-244:23]

**DEFENDANTS RESPOND: Disputed.** The improvement in the 2016 APS was not atypical; similar improvement occurred in the past, notably in the 2012 APS. Exhs. 52, 53, 101, 199, 191.

115.    Despite her prior representation on the 2015 APS that Mr. Dallal was not expected to improve, Dr. Feld testified that the 2016 APS would represent improvement in Mr. Dallal's condition if he needed assistance with fewer ADLs.  [Exh. 197-02; Feld TT 276:20-278:24; 279:16-280:13; 281:20-24].

**DEFENDANTS RESPOND: Disputed.** The APS forms are not a guarantee of the insured's future condition. Improvement by the insured is always a possibility.

116.    Lincoln requested Dr. Feld's medical records, which raised questions.  The available records provided since 2012 reflected that Dr. Feld consistently found Mr. Dallal had normal exams; had no significant problems with his mobility; and had reported aches/pains due to activity.  [Exh. 313 (including 313-08, 09 for "little jog" across the street on 6/18/15, and 313-12, 13 for "heavy lifting" on 9/30/14, and exams at Exh. 313-01, 02, 08. 09, 12 to 30]; Seeman TT 1076:1-6, 7-17; Sarkisian TT 244:24-245:24]

**DEFENDANTS RESPOND: Disputed.** Lincoln's review of records since 2012 ignores all the previous APS forms and medical records.

### Mr. Dallal Feigned His Functioning at the 2016 Nurse Assessment

117.    With this new information, Lincoln requested a home nurse assessment. On June 23, 2016, Mr. Dallal presented to nurse Lynn Sokolow as lethargic, drowsy, and having difficulty responding to questions.  [Exh. 314-06, 07, 14, 16; Lynn Sokolow ("Sokolow") TT 1015:16-18; 1022:16-1023:1; 1023:18-1024:8; 1027:17-21; Seeman TT 1076:1-17]  Mrs. Dallal again identified Ms. Genovea as the only caregiver, but she had the day "off."  [Exhs. 314-05, 362-52]  Lincoln found that unusual because Ms. Genovea

1  had not taken a day off in years.  [Sarkisian TT 232:11-17]

2      **DEFENDANTS RESPOND: Disputed.**  Lincoln's finding that it was unusual

3  for Ms. Genovea to have a day off is disingenuous. What was unusual is that Ms.

4  Genovea did not have a day off for many years, working 12 hours per day every day of

5  the year. Previous nurse assessments in 2014, 2005, and 2004 also show no caregiver

6  present so Lincoln's statement as to that being one part of the puzzle for investigating is

7  completely false. Exh. 101, 102.

8

9      118.    Nurse Sokolow testified and confirmed in her report that Mrs. Dallal

10  "supplied all info" for this assessment.  [Sokolow TT 1027:1-9; Exh. 314-15]  Thus,

11  Mrs. Dallal again acted as her husband's spokesperson, conveying his need for hands-on

12  assistance with showering and dressing; getting on/off the toilet; moving in/out of a chair

13  or bed; and moving around outside the home.  [Sokolow TT 1025:7-1027:9; 1047:22-

14  1050:6; Exh. 314-09 to 17]  Mrs. Dallal lied and advised that her husband required stand-

15  by assistance for moving around inside the home, hands-on assistance to walk outside,

16  and use of ambulatory devices for transfers and mobility (cane, walker, or wheelchair).

17  [Sokolow TT 1020:23-1022:7; 1028:13-1029:25; 1041:6-1042:5; 1050:7-1051:3; Exh.

18  314-12, 14]

19      **DEFENDANTS RESPOND: Disputed and Objected to.** Plaintiff urges an

20  unreasonable and unsupported conclusion, but there is no reason that Mrs. Dallal should

21  not have spoken for her husband. Her statements about his needs for assistance were

22  accurate.

23

24      119.    During Nurse Sokolow's exam, Mr. Dallal faked the cognitive testing.

25  [Exh. 314-06, 07]  Like many times before, he claimed not to know the year, month,

26  season ("hot") and could not perform on the basic screening tests.  He only scored a 4

27  out of 30 on the MMSE.  Based on Mrs. Dallal's report, her observation of Mr. Dallal,

28  and the testing, Ms. Sokolow reported that Mr. Dallal required caregiving for his ADLs

for 7 days/week, 12 hours/day.  [Exh. 314-17]

**DEFENDANTS RESPOND: Disputed and Objected to.**  There was no proof that Mr. Dallal "faked" the cognitive testing, and Plaintiff's use of that term is unreasonably inflammatory and prejudicial.

Dr. Weiss found that Mr. Dallal was severely cognitively impaired. She performed the Rey 15 performance validity test and found Mr. Dallal to be severely cognitively impaired due to the poor results. She also conducted another performance validity test Long Delay Forced Recognition test which was also consistent with her findings that Mr. Dallal suffered severe cognitive impairment. Weiss stated that the she had to go beyond what the test scores indicate and offer her professional opinion as an expert. Weiss TT 1434:15-25; 1435:1-23; 1437:8-13.

Dr. Weiss also testified that malingering is only one part of the test and she has to observe the patient's effort as well and that there are several factors that could subdue a patient's effort not malingering. Weiss TT 1393:25; 1394:1-12.

## Lincoln Conducted Surveillance

120.    Due to the inconsistencies in the Dallal's claim, Lincoln's Special Investigations Unit ("SIU") became involved in the claim.  Meg Sarkisian of the SIU ordered surveillance, the results of which she found shocking and revealing.  Lincoln obtained 18 days of surveillance over three months —July 25-31,[9] September 10-16, and November 2-5, 2016, of which Mr. Dallal was seen on 14 days.  Mr. Dallal was not the feeble man portrayed to Lincoln.  These eye-opening results were directly contrary to the Dallals' representations and claim submissions.  Mr. Dallal was active, mobile, and independent from about 4 to 13 hours/day outside the home.  He was *never* seen with a private caregiver, let alone Ms. Genovea.  [Exhs. 315, 317, 319, 323, 325; Sarkisian TT

---

[9] Mr. Dallal's home was observed at various times of the day from July 25-28.  Neither he nor any caregiver was seen. However, the Dallals' daughter who lives back East was visiting around this time, as she was observed on July 30-31.  [Sarkisian TT 263:21-264:17; 277:14-21; Exh. 315]

DEFENDANTS' OPPOSITION TO PLAINTIFF'S PROPOSED FINDINGS OF FACT

253:12-24; 253:25-254:3; 258:16-261:9; 261:16-270:9; 270:16-277:13; Folk-Barron TT 726:16-25; 727:12-728:25; Farrell TT 596:23-597:16; Peters TT 634:21-635:1; 635:24-636:3]

**DEFENDANTS RESPOND: Disputed:** The video footage of Mr. Dallal amounted to approximately 20 minutes per day. The remainder of the time was unaccounted for.

Dr. Feld testified that all the APS forms sent to Lincoln that she certified and signed for Mr. Dallal all represented someone that could ambulate, eat and transfer. Mr. Dallal's functions on the surveillance were all consistent of those found on all the APS forms Feld certified and signed. Feld Depo 134:1-3; 153:21-23; 210:5-12; 211:1-7; 249:19-21.


121.   Mr. Dallal was regularly observed at his store, *Mr. Alex*, attending to his daily routine and various tasks.  He was present before/during/after business hours.  He was observed both unlocking the store in the morning and locking the store at night.  Not only was he frequently alone, but when observed outside the store, he was seen rearranging outdoor furniture, conversing with others, and using a cell phone.  He was observed alone – walking to coffee shops, purchasing coffee at Bouchon,[10] and then being alone outside.  At the shop, he interacted with customers and visitors; swept the walk; and took out the trash.  [Exhs. 315, 317, 319; Sarkisian TT 260:23-261:9, 261:16-270:9; 270:16-277:13; Gold TT 954:11-955:13; 957:13-958:11; 962:10-963:2; 967:4-969:3; 969:4- 970:11; Folk-Barron TT 727:12-728:1; 730:16-731:1; 735:14-736:4; Farrell TT 605:3-21; 605:22-606:6; Peters TT 640:22-641:6]

**DEFENDANTS RESPOND: Disputed.** While Mr. Dallal was usually filmed without other persons in the frame, other people were nearby and/or could have been out of the filmed frame. Dr. Feld testified that all the APS forms sent to Lincoln that she

---

[10] Mr. Dallal's credit card in *his name* was used to purchase coffee at Bouchon, including the day that he was seen on surveillance.  [Exh. 104-03, 04; Alex. Jr. TT 1291:11-1293:17]

DEFENDANTS' OPPOSITION TO PLAINTIFF'S PROPOSED FINDINGS OF FACT

certified and signed for Mr. Dallal all represented someone that could ambulate, eat and transfer. Mr. Dallal's functions on the surveillance were all consistent of those found on all the APS forms Feld certified and signed. Feld Depo 134:1-3; 153:21-23; 210:5-12; 211:1-7; 249:19-21.

122.    The behavior of Mrs. Dallal, their adult son, adult daughter, and others on the surveillance was also quite telling.  Everyone treated Mr. Dallal as a capable, self-reliant adult.  He was never observed as being touched or given the assistance the Dallals represented he required.  He ambulated freely, without a cane, walker, or wheelchair.  He walked up and down stairs and curbs in a steady fashion (even when carrying items), and capably transferred to and from a sitting position.  He moved in and out of cars alone, usually after putting bags in the trunk or back seat, while a family member sat in the driver or passenger seats.  [Exhs. 315, 317, 319; Sarkisian TT 261:16-270:9; 270:16-277:13; Gold TT 959:5-961:13; 963:6-22; 970:1-11; Farrell TT 606:20-607:24; 608:12-609:6; Folk-Barron TT 728:2-25; 730:16-731:13; 732:8-23; 733:25-734:25; 735:6-18; 736:11-737:6]

**DEFENDANTS RESPOND: Disputed.** Mr. Dallal's pace of ambulation was limited. It cannot be determined how his family "treated" him when they may be just outside the frame. Dr. Feld testified that all the APS forms sent to Lincoln that she certified and signed for Mr. Dallal all represented someone that could ambulate, eat and transfer. Mr. Dallal's functions on the surveillance were all consistent of those found on all the APS forms Feld certified and signed. Feld Depo 134:1-3; 153:21-23; 210:5-12; 211:1-7; 249:19-21.

123.    The Dallals never refuted or explained away Mr. Dallal's functionality displayed on the surveillance.

**DEFENDANTS RESPOND: Disputed and Objected to.**  Plaintiff is offering inflammatory argument, not facts.

124.    Lincoln obtained separate surveillance of Ms. Genovea during this time. [Exhs. 323, 325]  Not once was Ms. Genovea observed going to the Dallals' home or in the presence of any of the Dallals.  Rather, she ran errands and worked for an elderly lady.  [Exh. 323, 325; *see also* Exhs. 315, 317, 319; Sarkisian TT 276:21-25; Farrell TT 596:23-597:5; Peters TT 634:21-635:1; 635:12-23]  Lincoln continued to receive Caregiver Activity Notes, fraud notices, and receipts purportedly signed by Ms. Genovea in support of the Dallals' monthly reimbursement claims, when the surveillance showed she was not there.  The Notes still stated that Ms. Genovea provided the same services from 8:00 a.m. to 8:00 p.m. on the same days (July 29-31, September 10-16, and November 2-5, 2016), although surveillance (and her testimony) confirmed Ms. Genovea was not with him and he was not at home for the hours of represented care.  [Exhs. 362-58 to 65; 362-75 to 82; 362-83 to 90; Exhs. 315, 317, 319, 323, 325; Sarkisian TT 277:1-6, 279:14-283:11; Genovea TT 830:21-832:10; 833:4-835:11; 836:11-18; 847:14-16; 862:16-864:12; 866:19-867:4; 867:11-14; 867:24-868:18: 868:19-869:13]

**DEFENDANTS RESPOND: Undisputed.**

## Jacqueline Sachen Interviewed Ms. Genovea

125.    Ms. Sarkisian sent field representative Jacqueline Sachen of Archangel Investigations to interview Ms. Genovea on Saturday, November 5, 2016.  [Sachen TT 902:6-19; Sarkisian TT 277:1-25]  Ms. Genovea told Ms. Sachen that she had not seen Mr. Dallal since 2015; she only worked a couple days here and there; her schedule varied; she had maybe only once worked 7 days straight after Mr. Dallal's surgery (in 2004); when Mr. Dallal's condition had improved after the surgery, such that he sometimes would go to work while she went grocery shopping or performed housekeeping; she did not work 8:00 a.m. to 8:00 p.m., except for when Mr. Dallal had his surgery; that she was called over to put up the Dallals' Christmas tree in 2014 but did not care for Mr. Dallal.  [Sachen TT 904:10-905:24; 906:15-20; 907:9-20; Genovea TT

850:2-853:16; 854:24-856:1]

**DEFENDANTS RESPOND: Disputed.** Ms. Genovea was threatened by Ms. Sachen's threatening questioning, and was less than forthcoming as a result. Genovea TT 886:3 – 887:10.

126. When asked about caregiver logs, Ms. Genovea indicated she had used them for other employers, but she had never filled out a log or used her signature to verify the dates and hours she worked during her employment with the Dallals. Ms. Genovea told Ms. Sachen that it had been about a year since she last heard from Mrs. Dallal, but that Mrs. Dallal had recently called her to set up a time to discuss coming back to work with her again. [Sachen TT 908:1-18; 912:1-9; Genovea TT 853:22-25; 854:5-15] Ms. Genovea also told Ms. Sachen that it had been at least a year since she received a paycheck from Mrs. Dallal and that she had never been to Mr. Dallal's place of business. [Sachen TT 911:16-25]

**DEFENDANTS RESPOND: Disputed.** Ms. Genovea was threatened by Ms. Sachen's threatening questioning, and was less than forthcoming as a result. Genovea TT 886:3 – 887:10.

127. Ms. Genovea's representations directly contradicted the history of Caregiver Activity Notes and fraud notices submitted with her name (as well as Mrs. Dallal's representations about care).

**DEFENDANTS RESPOND: Disputed and Objected to.** Plaintiff offers inflammatory argument, not facts with evidentiary support.

DEFENDANTS' OPPOSITION TO PLAINTIFF'S PROPOSED FINDINGS OF FACT

**Medical Professionals Confirmed Mr. Dallal Did Not Require Substantial Assistance or Substantial Supervision**

128.    Lincoln asked Nurse Sokolow who evaluated Mr. Dallal in June 2016, to review the surveillance.  On December 12, 2016, Nurse Sokolow responded with a written report, which verified the Dallals' identities and retracted her June 2016 assessment.  She noted inconsistencies in the Dallals' representations and found Mr. Dallal would not require any assistance with ADLs and that he did not reflect cognitive impairment.  [Exh. 134; Sokolow TT 1035:25-1036-4; 1036:8-12; 1037:14-1038-8; 1038:18-1039-15]

**DEFENDANTS RESPOND: Undisputed.**

129.    Lincoln also requested that consulting neuropsychologist, Lori Folk-Barron, Psy.D., review the file, including the surveillance.  Up until May 2016, the information in the file depicted Mr. Dallal as an individual who appeared to be totally dependent on others for his daily activities and for his safety, based on what was reported.  [Folk-Barron TT 724:22-25]

**DEFENDANTS RESPOND: Disputed.** Dr. Folk-Barron is not a disinterested expert witness. She is employed by plaintiff. Dr. Feld testified that her medical chart notes indicated that Mr. Dallal suffered at least two neurological and neurosurgical events which changed Mr. Dallal's neurological behavior. Feld explained that the two events: resection of the the brain tumor and the small strokes caused cognitive changes which could be both intermittent and permanent. Feld also testified that her medical chart notes indicated that Mr. Dallal had poor insight into his own abilities, issues with falling and wandering, and always refusing care including medications and medical exam follow ups. Feld testified that Mr. Dallal was severely cognitively impaired for many reasons including his poor judgment for his safety expressing severe concerns and need for supervision. Feld's medical chart notes include her recommendation for Namenda a dementia medication and further neuropsychiatric testing in 2015. Feld

Depo 76:25 – 77:19; 92:14 - 93:3; 93:21 – 94:3; 95:13-22; 101:1 - 102:4; 103:20 - 104:21; 147:4 – 148:1; 160:14-24; 190:1-21; 211:19 - 212:4; 223:2-14; 237:19 - 238:8; 273:13-22. Exh. 313-4.

130.    Dr. Folk-Barron confirmed that Mr. Dallal's activities on surveillance were inconsistent with Cognitive Impairment or the need for Substantial Supervision or Substantial Assistance, as defined under the Policy.  [Folk-Barron TT 727:9-16]  Mr. Dallal demonstrated behaviors that were inconsistent with severe cognitive impairment requiring Substantial Supervision.  [Folk-Barron TT 727:4-16]. Mr. Dallal demonstrated an ability to be independent in the community without supervision.  He was able to initiate purposeful behaviors without any cuing by others.  He was seen engaging in commercial transactions, social interactions, and self-protective behaviors.  [Folk-Barron TT 727:12-728:1].   Mr. Dallal was seen transferring multiple times without any assistance; he was at his business interacting with others; he was walking purposefully down the street without hesitation, no confusion, no disorganization; he bought a beverage with no cuing or prompting and independently gathered the materials needed for his drink.  [Folk-Barron TT 727:9-736:4].

**DEFENDANTS RESPOND: Disputed**. Dr. Folk-Barron is not a disinterested expert witness. She is employed by plaintiff. Dr. Feld testified that her medical chart notes indicated that Mr. Dallal suffered at least two neurological and neurosurgical events which changed Mr. Dallal's neurological behavior. Feld explained that the two events: resection of the the brain tumor and the small strokes caused cognitive changes which could be both intermittent and permanent. Feld also testified that her medical chart notes indicated that Mr. Dallal had poor insight into his own abilities, issues with falling and wandering, and always refusing care including medications and medical exam follow ups. Feld testified that Mr. Dallal was severely cognitively impaired for many reasons including his poor judgment for his safety expressing severe concerns and need for supervision. Feld's medical chart notes include her recommendation for

Namenda a dementia medication and further neuropsychiatric testing in 2015. Feld Depo 776:25 – 77:19; 92:14 - 93:3; 93:21 – 94:3; 95:13-22; 101:1 - 102:4; 103:20 - 104:21; 147:4 – 148:1; 160:14-24; 190:1-21; 211:19 - 212:4; 223:2-14; 237:19 - 238:8; 273:13-22.

131.    Dr. Folk-Barron noted that Mr. Dallal was seen being able to multi-task, being able to keep track of multiple behaviors, without any sign of confusion or disorganization. [Folk-Barron TT: 736:5-737:6]. He was even seen using his cell phone on multiple occasions, with no cuing or assistance, contrary to what was reported on the nursing assessments. [Folk-Barron TT: 736:23-737:6]. Mr. Dallal also crossed the street safely, looking both ways, acknowledging cars, checking traffic, and looking purposeful. [Folk-Barron TT 733:25-734:21]. He acted appropriately socially, greeting people, conversing with the police officers, ushering them towards his store, showing them a level of deference and awareness that would not be typical of an individual who is so severely cognitively impaired. [Folk-Barron TT 741:23-743:23]

**DEFENDANTS RESPOND: Disputed**. Dr. Folk-Barron is not a disinterested expert witness. She is employed by plaintiff. Dr. Feld testified that her medical chart notes indicated that Mr. Dallal suffered at least two neurological and neurosurgical events which changed Mr. Dallal's neurological behavior. Feld explained that the two events: resection of the the brain tumor and the small strokes caused cognitive changes which could be both intermittent and permanent. Feld also testified that her medical chart notes indicated that Mr. Dallal had poor insight into his own abilities, issues with falling and wandering, and always refusing care including medications and medical exam follow ups. Feld testified that Mr. Dallal was severely cognitively impaired for many reasons including his poor judgment for his safety expressing severe concerns and need for supervision. Feld's medical chart notes include her recommendation for Namenda a dementia medication and further neuropsychiatric testing in 2015. Feld Depo 776:25 – 77:19; 92:14 - 93:3; 93:21 – 94:3; 95:13-22; 101:1 - 102:4; 103:20 -104:21; 147:4 –

148:1; 160:14-24; 190:1-21; 211:19 - 212:4; 223:2-14; 237:19 - 238:8; 273:13-22.

132.    Dr. Folk-Barron noted the absence of substantial supervision, including by Mr. Dallal's family members, who were not attending to him or prioritizing his supervision.  [Folk-Barron TT 731:2-9; 736:1-4].  No one was in arms reach to provide him with the supervision.  [Folk-Barron TT 728:2-25].  His family members were otherwise engaged.  [Folk-Barron TT 728:2-14].  Dr. Folk-Barron testified that a caregiver who is caring for an individual who has such severe cognitive impairment is usually hypervigilant, but that level of supervision was not seen by Mr. Dallal's family members.  [Folk-Barron TT 728:20-25].  Mr. Dallal was dropped off by his family members on the street, unaccompanied.  He transferred without assistance.  [Folk-Barron TT 735:6-10].

**DEFENDANTS RESPOND: Disputed.** Dr. Folk-Barron is not a disinterested expert witness. She is employed by plaintiff. Dr. Feld testified that her medical chart notes indicated that Mr. Dallal suffered at least two neurological and neurosurgical events which changed Mr. Dallal's neurological behavior. Feld explained that the two events: resection of the the brain tumor and the small strokes caused cognitive changes which could be both intermittent and permanent. Feld also testified that her medical chart notes indicated that Mr. Dallal had poor insight into his own abilities, issues with falling and wandering, and always refusing care including medications and medical exam follow ups. Feld testified that Mr. Dallal was severely cognitively impaired for many reasons including his poor judgment for his safety expressing severe concerns and need for supervision. Feld's medical chart notes include her recommendation for Namenda a dementia medication and further neuropsychiatric testing in 2015. Feld Depo 76:25 – 77:19; 92:14 - 93:3; 93:21 – 94:3; 95:13-22; 101:1 - 102:4; 103:20 - 104:21; 147:4 – 148:1; 160:14-24; 190:1-21; 211:19 - 212:4; 223:2-14; 237:19 - 238:8; 273:13-22.

133.    Dr. Folk-Barron found it significant that Mr. Dallal's sample behavior in the videos occurred across hours, days, weeks, and months, as well as different situations, settings, and locations.  They were not isolated samples of behavior.  [Folk-Barron TT 729:5-15]  Mr. Dallal was showing his capacity to function, which cannot be faked.  [Folk-Barron TT 746:10-747:8]  If someone lacked capacity, they would not be able to demonstrate functionality – Mr. Dallal demonstrated capacity, which means he had capacity to function.  [Folk-Barron TT 747:1-8]

**DEFENDANTS RESPOND Disputed and Objected to**. What Dr. Folk-Barron finds significant is not a fact relevant to the determination of the First and Third Claims for Relief.  Further, Dr. Folk-Barron is not a disinterested expert witness. She is employed by plaintiff. Dr. Feld testified that her medical chart notes indicated that Mr. Dallal suffered at least two neurological and neurosurgical events which changed Mr. Dallal's neurological behavior. Feld explained that the two events: resection of the the brain tumor and the small strokes caused cognitive changes which could be both intermittent and permanent. Feld also testified that her medical chart notes indicated that Mr. Dallal had poor insight into his own abilities, issues with falling and wandering, and always refusing care including medications and medical exam follow ups. Feld testified that Mr. Dallal was severely cognitively impaired for many reasons including his poor judgment for his safety expressing severe concerns and need for supervision. Feld's medical chart notes include her recommendation for Namenda a dementia medication and further neuropsychiatric testing in 2015. Feld Depo 76:25 – 77:19; 92:14 - 93:3; 93:21 – 94:3; 95:13-22; 101:1 - 102:4; 103:20 -104:21; 147:4 – 148:1; 160:14-24; 190:1-21; 211:19 - 212:4; 223:2-14; 237:19 - 238:8; 273:13-22.

**Lincoln Denied the Claim**

134.    Lincoln offered to talk with Mrs. Dallal about the claim, but she declined an interview during a recorded call with Lincoln on December 7, 2016.  During that call, she expressed displeasure that Lincoln would investigate the claim, including through the

1  nurse assessment in June 2016 and Lincoln's contact with Ms. Genovea.  She said, "You
2  want information about my caregiver call me. . . . Don't go to her.  It was over the top,
3  and I hope the case is closed.  And I move forward.  I just want my husband to be taken
4  care of."  When subsequently asked about claim forms, Mrs. Dallal advised, "*Yes.  I gave*
5  *the paperwork.  She does – Helen does the paperwork every month around the 5th.  So,*
6  *she just completed it.  I just put it for you in the mail yesterday.  . . . So we're all good. .*
7  *. Thank you so much, Christopher for your call.  I really appreciate it.  . . .  and I just*
8  *want this to move forward.  And just to forget what happened.  And just make sure my*
9  *husband is being taken care of  . . . That's all I want from Lincoln Benefit.  That's all.'"*
10 [Exh. 369 (emphasis added); [Sarkisian TT 286:20-288:4]  Not only was Mrs. Dallal
11 continuing to lie to Lincoln, but she was again trying to distract Lincoln from pursing the
12 truth.

**DEFENDANTS RESPOND: Disputed and Objected to.**  Plaintiff's final
characterization is prejudicially inflammatory argument without evidentiary support.

15     135.    Based on its overall investigation, Lincoln determined that Mr. Dallal did
16 not satisfy the Policy requirements, including that he did not require or get Substantial
17 Supervision or Substantial Supervision, nor did he satisfy the ADL or Severe CI Options.
18 In a detailed letter dated December 16, 2016, it explained its decision, including the
19 investigation, the inconsistencies uncovered, and that no further benefits would be paid.
20 [Exh. 330; Seeman TT 1077:23-1079:14]

**DEFENDANTS RESPOND: Disputed.** Plaintiff never exercised its right under
the Policy to have Mr. Dallal examined. Exh. 301-11, Part 6.H. It had no independent
evidence that Mr. Dallal did not satisfy the Policy requirements. The Policy doesn't
require multiple pieces to the puzzle to qualify the insured for benefits only that a
licensed physician provide that certification. Seeman TT 1139:10-23. Seeman testified
that Feld met all the requirements of a qualified physician in certifying Mr. Dallal and
that was all that was required to certify and insured as eligible under the Policy. Seeman
TT 1140:1-25; 1141:1-8.

1

2   136.    The Dallals appealed the decision through counsel, without any new

3   evidence. [Seeman TT 1079:15-1080:9] Lincoln Benefit upheld its decision on appeal.

4   [Seeman TT 1080:10-13]

5       **DEFENDANTS RESPOND: Disputed.** The Dallals presented new evidence.

6   Exh. 331.

7

8   137.    As discussed above, Lincoln was unaware until its investigation in 2016

9   that Ms. Genovea was not providing the care represented, that the alleged caregiving

10   situation and services were not as described in the claim submissions and by Mrs. Dallal,

11   that the claim submissions were inaccurate and/or falsified, and/or that Mr. Dallal could

12   function as represented on surveillance.

13       **DEFENDANTS RESPOND: Disputed and Objected to.** This is argument.

14

15   138.    In deciding to pay benefits, Lincoln relied on the represented accuracy and

16   truthfulness of the information submitted in connection with the claim, including, the

17   representations made in the routine claim documentation, through communications with

18   the Dallals, and by the Dallals in the nurse assessments. [Exhs. 48, 308, 312, 314, 350-

19   362; Seeman TT 1068:5-13, 1070:2-25; 1080:14-1081:20; 1090:3-14; 1095:20-1096:21;

20   1099:23-1100:24; 1113:6-1115:9; 1118:1-16; 1119:6-8; Sarkisian TT 230:3-236:6,

21   238:22-24; 292:8-13]

22       **DEFENDANTS RESPOND: Disputed.** Policy benefits were payable upon

23   certification by a physician. Exh. 301-6 at para. 3.A, definition of "Chronically Ill

24   Individual." The Policy only requires that a licensed physician provide that certification.

25   Seeman TT 1139:10-23. Seeman testified that Feld met all the requirements of a

26   qualified physician in certifying Mr. Dallal and that was all that was required to certify

27   and insured as eligible under the Policy. Seeman TT 1140:1-25; 1141:1-8.

28       Dr. Feld testified that her medical chart notes indicated that Mr. Dallal suffered at

least two neurological and neurosurgical events which changed Mr. Dallal's neurological behavior. Feld explained that the two events: resection of the the brain tumor and the small strokes caused cognitive changes which could be both intermittent and permanent. Feld also testified that her medical chart notes indicated that Mr. Dallal had poor insight into his own abilities, issues with falling and wandering, and always refusing care including medications and medical exam follow ups. Feld testified that Mr. Dallal was severely cognitively impaired for many reasons including his poor judgment for his safety expressing severe concerns and need for supervision. Feld's medical chart notes include her recommendation for Namenda a dementia medication and further neuropsychiatric testing in 2015. Feld Depo 76:25 – 77:19; 92:14 - 93:3; 93:21 – 94:3; 95:13-22; 101:1 - 102:4; 103:20 -104:21; 147:4 – 148:1; 160:14-24; 190:1-21; 211:19 - 212:4; 223:2-14; 237:19 - 238:8; 273:13-22.

139.    Had it known of the Dallals' false representations and/or concealments and the true facts regarding the claim, Lincoln would not have paid benefits.  [Seeman TT 1080:14-1089:23 (ADL falsities); 1090:15-1092:18 (claims for reimbursement when care not provided as represented or when Ms. Genovea performing other tasks); 1092:19-1094:15 (trips with no caregiver); 1092:19-1094:15 (no reimbursement for holidays off); 1097:19-1099:22 (concealments and misrepresentations re: Power of Attorney and cognitive abilities/activities); 1100:25-1101:16, 1113:6-1115:9 (re: Mrs. Dallal completing and signing claim submissions); 1115:10-1116:3, 1117:10-25 (Ms. Genovea not providing care as represented); 1116:4-16 (no knowledge of other alleged caregivers);  1118:17-1119:1 (altered APS forms); 1120:8-13 (re: Dallals' allegations in litigation); 1120:14-16 (re: Mr. Dallal's functioning); Sarkisian TT 277:1-6, 279:14-283:20 (untrustworthy claim submissions)].

**DEFENDANTS RESPOND: Undisputed** that this is Lincoln's position. **Disputed** as to the factual claims being made. Dr. Feld testified that her medical chart notes indicated that Mr. Dallal suffered at least two neurological and neurosurgical

events which changed Mr. Dallal's neurological behavior. Feld explained that the two events: resection of the the brain tumor and the small strokes caused cognitive changes which could be both intermittent and permanent. Feld also testified that her medical chart notes indicated that Mr. Dallal had poor insight into his own abilities, issues with falling and wandering, and always refusing care including medications and medical exam follow ups. Feld testified that Mr. Dallal was severely cognitively impaired for many reasons including his poor judgment for his safety expressing severe concerns and need for supervision. Feld's medical chart notes include her recommendation for Namenda a dementia medication and further neuropsychiatric testing in 2015. Feld Depo 76:25 – 77:19; 92:14 - 93:3; 93:21 – 94:3; 95:13-22; 101:1 - 102:4; 103:20 - 104:21; 147:4 – 148:1; 160:14-24; 190:1-21; 211:19 - 212:4; 223:2-14; 237:19 - 238:8; 273:13-22.

140.   If Lincoln had known Mr. Dallal did not need or require the Substantial Assistance as represented during the claim, it would not have paid benefits.  If Lincoln had known Mr. Dallal did not need or require Substantial Supervision for severe cognitive impairment as represented during the claim, it would not have paid benefits. [Seeman TT 1119:9-1120:7].

**DEFENDANTS RESPOND: Undisputed** that this is Lincoln's position. **Disputed** as to the factual claims being made. Dr. Feld testified that her medical chart notes indicated that Mr. Dallal suffered at least two neurological and neurosurgical events which changed Mr. Dallal's neurological behavior. Feld explained that the two events: resection of the the brain tumor and the small strokes caused cognitive changes which could be both intermittent and permanent. Feld also testified that her medical chart notes indicated that Mr. Dallal had poor insight into his own abilities, issues with falling and wandering, and always refusing care including medications and medical exam follow ups. Feld testified that Mr. Dallal was severely cognitively impaired for many reasons including his poor judgment for his safety expressing severe concerns and

DEFENDANTS' OPPOSITION TO PLAINTIFF'S PROPOSED FINDINGS OF FACT

need for supervision. Feld's medical chart notes include her recommendation for Namenda a dementia medication and further neuropsychiatric testing in 2015. Feld Depo 76:25 – 77:19; 92:14 - 93:3; 93:21 – 94:3; 95:13-22; 101:1 - 102:4; 103:20 - 104:21; 147:4 – 148:1; 160:14-24; 190:1-21; 211:19 - 212:4; 223:2-14; 237:19 - 238:8; 273:13-22.

141.    Lincoln has paid out a total of $761,225.89 in reimbursement benefits jointly to the Dallals for Mr. Dallal's claim under the LTC Policy.  [AF23]

**DEFENDANTS RESPOND: Undisputed.**

142.    Lincoln filed this lawsuit on December 16, 2016.  [AF24]

**DEFENDANTS RESPOND: Undisputed.**

## The Dallals Continued their Misrepresentations After the Lawsuit Was Filed And Through Trial

143.    Once the lawsuit was filed, the Dallals concocted more lies and excuses – ranging from coming up with new caregivers never before identified to a "consent" phone call with Lincoln that never happened to implausible stories of Ms. Genovea giving out cash stowed in a kitchen drawer to fabricated caregiver logs that were created in 2017.

**DEFENDANTS RESPOND: Disputed and Objected to.**  Plaintiff's proposed fact is argument without evidentiary support.

144.    First, Mrs. Dallal admitted at trial that Ms. Genovea was the only person she ever identified to Lincoln.  However, she admitted that after the litigation began, she indicated for the first time at deposition that she allegedly had other caregivers –

Disnarda (Narda) Sosnowski, "Lorena" and "Maricela".[11]  [Mrs. Dallal TT 451:22-452:10; Exhs. 350-362]  Mrs. Dallal admitted that if, as she represented at trial that Ms. Genovea was not providing the care, then the information on the Caregiver Activity Notes, Fraud Notices and cash receipts, was inaccurate.  [Mrs. Dallal TT 452:11-20]

**DEFENDANTS RESPOND: Undisputed.**


145.    Mrs. Dallal admitted at trial that she never sent any document to Lincoln that any private caregiver took care of her husband other than Ms. Genovea.  [Mrs. Dallal TT 457:25-458:4]

**DEFENDANTS RESPOND: Undisputed.** However, Mrs. Dallal testified that she had Lincoln's consent to do so. Mrs. Dallal TT 884:1 – 885:20.


146.    The alleged involvement of other caregivers in the Dallals' lives was highly suspect.  The Dallals' argument of other caregivers lacks credibility because they were on notice Lincoln needed to know the identity of all caregivers.  They likewise had plenty of opportunities to identify "other" caregivers on near monthly claim submissions, in four nurse assessments, and in written/verbal contact with Lincoln.  They never did so, but only identified Ms. Genovea as the sole hired caregiver of Mr. Dallal.  This allegation of "other" caregivers was never even raised in the letter submitted by the Dallals' counsel to appeal the denial of benefits.  [Seeman TT 1079:15-1080:9, 1116:17-1117:7; Exhs. 6; 11; 16; 18; 25; 47-05; 48-08; 150-05; 302; 305; 307; 308; 308-05; 312-01; 314-05; 350-362; 369]

---

[11] The Dallals could not come up with any valid proof of Lorena or Maricela's existence.  There are no pictures, no copies of IDs, no paychecks, no applications, and no contact information.  Mrs. Dallal claims that Lorena and Maricela (whose last name she did not know) both left the United States to go back to their countries, but she made no effort to contact them.  Mrs. Dallal also never told these other alleged caregivers about the Policy, nor did she ask them to prepare any claim forms for Lincoln. [Mrs. Dallal TT 444:13-446:16; 447:1-448:24].  The services which Mrs. Dallal testified were allegedly performed by Lorena and Maricela (i.e., laundry, medications, changing linens) do not comport with the Substantial Assistance and Substantial Supervision reflected on the Caregiver Activity Notes Mrs. Dallal prepared nor her representations to Lincoln and the nurses, nor would they be compensable under the Policy.  [Mrs. Dallal TT 446:17-25; 448:25-449:3]

Mrs. Dallal altered the APS forms to include Ms. Genovea's name as the caregiver, even though Dr. Feld did not know the name of any caregiver and only assumed a caregiver existed based on the Dallal family's report.  [Exhs. 51-02; 52-01; Feld TT 149:1-9; 149:16-20; 212:18-24; 232:20-233:13]  Although Lincoln regularly notified Mrs. Dallal throughout the claim that Ms. Genovea needed to provide ongoing claim submissions, Mrs. Dallal never corrected Lincoln to advise of any other alleged caregiver.  [Seeman TT 1105:16-24]

**DEFENDANTS RESPOND: Disputed and Objected to** as argumentative and conclusory.  Plaintiff made no argument at trial regarding Lorena or Marciela. The services they provided are permitted under the Policy. Exhibit 301 at p. 7, Part 3.E (definitions of "Personal Care", "Instrumental Activities of Daily Living," and "Homemaker Services").

147.    Moreover, although the caregivers were purportedly part of the family for over a decade (and Ms. Sosnowski allegedly lived with the Dallals rent-free[12]), there are no pictures of the alleged caregivers with the Dallals; Ms. Sosnowski did not know the name of the Dallals' housekeeper even though she was supposedly living with the Dallals; no caregiver was invited to their son's wedding or Mr. Dallal's mother's funeral (nor did they care for Mr. Dallal on those occasions); and they were unaware of the  Dallal's many trips. [Genovea TT 803:12-806:9; Sosnowski's TT 1455:1-5; 1470:15-1471:18; 1471:21-1472:19; 1480:10-25; Mrs. Dallal TT 575:15-576:9]

**DEFENDANTS RESPOND: Disputed and Objected to.**  The alleged factual proof is irrelevant to the determination of the First and Third Claims for Relief.

---

[12] Without getting a background check, application, or anything in writing, Mrs. Dallal claimed she had Ms. Sosnowski live with her and drive her expensive cars (Mercedes and BMW).  [Mrs. Dallal TT 449:10-19, 450:7-16]  Mrs. Dallal was impeached with her deposition testimony, whereby she had previously testified under oath that she had never told Ms. Sosnowski about the LTC Policy and never asked her to complete a claim form.  [Mrs. Dallal TT 451:2-12]

DEFENDANTS' OPPOSITION TO PLAINTIFF'S PROPOSED FINDINGS OF FACT

148.    Second, to explain away Mrs. Dallal's forgeries on the Caregiver Activity Notes and the fraud notices, the Dallals tried to create a "consent" theory at trial.  Mrs. Dallal testified at trial that in July 2004, she had a phone call with claims analyst Faby Alvarez at Lincoln, whom she claimed allowed her to sign Caregiver Activity Notes on behalf of a new Spanish-speaking caregiver "Lorena" who had just been hired because Lorena could not read or write.[13]

**DEFENDANTS RESPOND: Disputed.** The first sentence is argument. The alleged factual inconsistencies described in the second sentence are unsurprising given the more-than-12-years between Mr. Dallal's surgery and the filing of this lawsuit. Mrs. Genovea testified that she witnessed a call between Mrs. Dallal and plaintiff at which permission was given. Genovea TT 882:5-14.

149.    There was never such a phone call and never any alleged "consent".  As shown through the testimony of Norman Seeman and the claim file, including the claim activity

---

[13] Mrs. Dallal was impeached at trial with her own lies and contradicted by the evidence.  Mrs. Dallal testified in her deposition that this purported conversation about "Lorena" took place in May 2004, but that she did not know with whom she spoke at the company.  She then claimed at trial that she "made a mistake" on the timing and suddenly remembered she spoke with a Spanish speaker Faby Alvarez because she had consulted her notes to remember for trial; she later claimed she could not remember certain points.  Mrs. Dallal was shown to have lied at trial because at deposition she had denied keeping any notes, and, as shown above, Ms. Alvarez was not involved in the claim during this time and there is no record of any call with Ms. Alvarez in July 2004 or otherwise.  Furthermore, since Mrs. Dallal claimed at trial that Lorena started in July 2004, which meant the concocted call could not have happened in May as she said in deposition, Mrs. Dallal changed her story at trial to adjust her manufactured timeline.  She claimed Ms. Genovea filled out the first three Caregiver Activity Notes. [Mrs. Dallal TT 356:3-358:24; 411:22-412:13]  However, Mrs. Dallal's story fell apart because Ms. Genovea testified that she personally signed only the first Caregiver Activity Note on April 21, 2004, and that Mrs. Dallal completed and signed all forms thereafter.  [Genovea TT 820:25-821:5]  Mrs. Dallal was also impeached because at deposition, she admitted filling out and signing the form in June 2004, but claimed at trial she could not remember.  [Exh. 350-10; Mrs. Dallal TT 370:2-372:9]  In addition, Mrs. Dallal was impeached on her failure to tell Lincoln that she was filling out and signing the forms.  She had previously testified in deposition that she never told Lincoln that she signed the claim forms because there was no reason to.  [Mrs. Dallal TT 360:6-23]  Simply put, Mrs. Dallal was making up her story.
**DEFENDANTS RESPOND: Disputed and objected to** as inflammatory and prejudicial rhetoric, derived from Plaintiff's unreasonable and unsupported conclusions.

1  report that summarized all activities and calls on the file, there was no call between Mrs.

2  Dallal and Ms. Alvarez.  Ms. Alvarez was involved in the claim only at the intake stage

3  *before* Mr. Dallal's surgery on April 8, 2004; Ms. Alvarez had no calls on the claim in May,

4  June, July or any other time thereafter.  In fact, Ms. Alvarez had no involvement in the claim

5  until a payment made in 2011, and then again when she began working on the claim in 2014.

6  Mrs. Dallal knew that the claims adjustor assigned to Mr. Dallal's claim as of the time of her

7  husband's surgery was Mick Orend, particularly since she had communicated with him by

8  letter and phone.  Indeed, had Mrs. Dallal made a call regarding Mr. Dallal's claim, Mr.

9  Seeman explained that the call would have been directed to Mr. Orend (as Ms. Alvarez would

10 not have been linked to the claim). Furthermore, Mrs. Dallal never corrected Lincoln about

11 who was supposed to be completing the forms or the identity of the caregiver when Lincoln

12 reminded her to provide Ms. Genova's claim submissions every month. Finally, Lincoln

13 would never have given permission to Mrs. Dallal to sign claim forms, as it is Lincoln's

14 practice not to permit this.  [Seeman TT 1101:17-22; 1105:11-1106:18; 1107:2-1113:5;

15 1183:11-1184:7; Exhs. 302; 305; 307-01; 350-10-14, 29; 360-190; 363-01-04]

16      **DEFENDANTS RESPOND: Disputed.** There are records of telephone calls

17 between Mrs. Dallal and Lincoln on April 5, April 6, April 29, May 5, June 29, July 1,

18 July 8, July 21, and September 3, 2004. There are also records of correspondence

19 between Lincoln and Mrs. Dallal on April 6, April 12, April 16, April 26, May 4, May

20 14, May 19, May 24, June 17, June 18, July 19, August 20, September 8, September 29,

21 and October 22, 2004. Ex. 363:1-5. Mrs. Genovea testified that she witnessed a call

22 between Mrs. Dallal and plaintiff at which permission was given. Genovea TT 882:5-

23 14.

24

25      150.    Mr. Seeman also explained that Ms. Alvarez would not have given the

26 consent that Mrs. Dallal alleged.  Not only did Ms. Alvarez speak Spanish, but she had a

27 practice of speaking with Spanish-speaking caregivers.  Lincoln also permitted claim

28 forms to be submitted in Spanish and had bilingual claims adjustors who reviewed them.

[Seeman TT 1104:21-1105:10]

**DEFENDANTS RESPOND: Disputed and Objected to.** Whether Ms. Alvarez spoke Spanish, or whether Lincoln had Spanish claims forms is not relevant to the determination of the First and Third Claims for Relief. What is relevant is whether that was communicated to Mrs. Dallal, and there is no evidence of that. Mrs. Genovea testified that she witnessed a call between Mrs. Dallal and Lincoln at which permission was given. Genovea TT 882:5-14.

151.    There is also nothing in the claim file identifying a Spanish-speaking person named Lorena who was a purported caregiver. Mrs. Dallal never identified Lorena on any claim submissions or in any letters accompanying the forms.  [Exhs. 350-362, and specifically 350-28, 351-13; Mrs. Dallal TT 372:12-17; 373:22-374:16]  Mr. Seeman testified that once notified of a new caregiver, Lincoln would have requested information of the caregiver, like it did for Ms. Genovea, to approve her services for reimbursement.  However, Mrs. Dallal never identified anyone but Ms. Genovea. [Seeman TT: 1063:8-22; 1065:9-1066:10]

**DEFENDANTS RESPOND: Disputed.** Lincoln introduced no evidence that Mrs. Dallal was told to provide information regarding any new caregiver.

152.    Although Mrs. Dallal claimed she had "consent" from Ms. Genovea to sign the Caregiver Activity Notes, she never once noted that on the forms or in the letters she sent indicating that the claim forms were from Helen.  Mrs. Dallal admitted at trial that she did not have any documents that she sent to Lincoln showing that she paid another caregiver other than Ms. Genovea, that Ms. Genovea only worked limited days, and that Ms. Genovea was paid every bit of caregiving expense for which she sought reimbursement from Lincoln.  [Mrs. Dallal TT 457:20-458:4; 458:10-21; Exhs. 350-362]

**DEFENDANTS RESPOND: Disputed.** Genovea testified that she provided Mrs. Dallal consent to prepare and sign the caregiver activity notes and all the

paperwork and fraud notices that go along with the claim submission consistently without wavering at trial. Genovea TT 821:6-21; 822:10-25; 827:3-19.

153.    It is further irrelevant that Mrs. Dallal claimed Ms. Genovea consented to sign the Caregiver Activity Notes.  Alleged "consent" by Ms. Genovea just meant that Ms. Genovea was brought into the fraud.  Ms. Genovea never reviewed the forms and admitted at trial that Mr. Dallal could perform those ADLs that Mrs. Dallal stated on the forms he could not.  Ms. Genovea was either turning a blind eye to Mrs. Dallal's actions or was a part of the fraudulent scheme.

**DEFENDANTS RESPOND: Disputed.** Genovea testified that she provided Mrs. Dallal consent to prepare and sign the caregiver activity notes and all the paperwork and fraud notices that go along with the claim submission consistently without wavering at trial. Genovea TT 821:6-21; 822:10-25; 827:3-19.

154.    Third, Mrs. Dallal concocted a "kitchen drawer full of cash" story to explain how she allegedly paid the other caregivers.  Mrs. Dallal supposedly would leave thousands of dollars of cash in a kitchen drawer for Ms. Genovea to hand out to the other caregivers.  Over $761,000 in cash purportedly sifted through Ms. Genovea's hands in 12 years.  Mrs. Dallal contended she therefore "paid" Ms. Genovea the amounts identified on the receipts sent to Lincoln and that she was reimbursed by Lincoln. However, when Ms. Genovea tried to change her testimony to say she was paid the full amount that Lincoln paid out in benefits each year in order to comport with Mrs. Dallal's far-fetched claim, Ms. Genovea was impeached with her deposition testimony in which she admitted she did not recall how much she was paid by the Dallals for each year from 2004 through 2016.  [Genovea TT 839:11-24; 840:4-844:6]

**DEFENDANTS RESPOND: Disputed.** There is nothing inconsistent with Ms. Genovea being unable to recall the exact amount she was paid and stating that she was paid the full amount that Lincoln paid. Mrs. Genovea testified that she received and

disbursed the reimbursement money that was paid by Lincoln Benefit. Genovea TT
844:20-24; 882:16-22.

155.    Significantly, no W-2s or 1099s were ever issued to Ms. Genovea or any
purported caregiver.  [Genovea TT 845:14-18; Sosnowski TT 1482:16-18]  Ms. Genovea
also admitted that she never received monies for when she did not work.  [AF20]  Thus,
she could not have been paid the monies for which Lincoln reimbursed the Dallals.

**DEFENDANTS RESPOND: Undisputed.** Mrs**.** Genovea testified that she
received and disbursed the reimbursement money that was paid by Lincoln Benefit.
Genovea TT 844:20-24; 882:16-22.

156.    Next, although Mrs. Dallal never identified any documentation that she
actually had or paid caregivers, Ms. Genovea and Ms. Sosnowski referenced notebooks
or journals in which they purportedly detailed the days they worked.  [Genovea TT 837:13-
18; 845:6-13; 858:15-861:1; Sosnowski TT 1483:22-1484:5]  However, these notebooks were
never provided to Lincoln during the claim and were produced for the first time during
litigation. [Seeman TT 1116:17-1117:7]

**DEFENDANTS RESPOND: Undisputed.**

157.    These so-called caregiver logs were fabricated and written in 2017, not
contemporaneously with the dates recorded in the logs, as claimed by Ms. Genovea and Ms.
Sosnowski.  The notebooks contained multiple alterations changing the year from 2017 to a
prior backdated year (e.g. 2010, 2011, 2013).  [Exh. 403]  Handwriting expert Linton
Mohammed, Ph.D. testified that the entries in the caregiver logs were backdated from 2017.
[Mohammed TT 1006:14- 1007:6; 1007:22-1009:24; 1010:7-1011:4]

**DEFENDANTS RESPOND: Disputed.** The caregiver logs showed the time
spent by the caregivers. Mrs. Genovea testified that she maintained records between
herself, the other caregivers and Mrs. Dallal. Genovea testified that these logs were

between themselves and never intended to be used or relied upon with the insurance company. Genovea TT 858:15-25; 859:1-3;7-11;15-17;860:2-9.

158.    For example, Ms. Sosnowski wrote "5-09-17" purportedly in 2011, which is just one example of many altered entries evidenced in Exhibit 403:



[Exh. 403-2]

**DEFENDANTS RESPOND: Undisputed.**

159.    Significantly, the Dallals did not introduce these submit these notebooks into evidence, nor did they even identify them on the Joint Exhibit List.  Only selected pages were admitted into evidence by Lincoln with Ms. Genovea and Ms. Sosnowski which demonstrated the false entries on the notebooks, including entries reflecting alterations and dates from surveillance on which these women were not providing care.  [Exhs. 30-34; 403, *cf.* Exhs. 315, 317, 319, 323, 325]

**DEFENDANTS RESPOND: Disputed.** Mrs. Genovea testified that she maintained records between herself, the other caregivers and Mrs. Dallal. Genovea testified that these logs were between themselves and never intended to be used or relied upon with the insurance company. Genovea TT 858:15-25; 859:1-3;7-11;15-17; 860:2-9.

160.    Simply put, the Dallals never offered any credible proof of their payment to any caregiver at trial.  The "cash receipts" submitted to Lincoln during the claim were

fake.  The caregiver logs produced in litigation were fabricated (and remarkably not relied upon by the Dallals as evidence to support their case).  The testimony of Ms. Genovea and Ms. Sosnowski was not credible.

**DEFENDANTS RESPOND: Disputed and Objected to.** This is purely prejudicial and inflammatory argument. Mrs. Genovea testified that she received and disbursed the reimbursement money that was paid by Lincoln Benefit. Genovea testified that she maintained records between herself, the other caregivers and Mrs. Dallal. Genovea testified that these logs were between themselves and never intended to be used or relied upon with the insurance company. Genovea TT 844:20-24; 858:15-25; 859:1-3;7-11;15-17;860: 2-9;882:16-22.

161.    Notably, Ms. Genovea admitted that her work for the Dallals involved performing services for Mrs. Dallal – like errands (e.g., going to the market, getting toilet paper, putting up the Christmas tree, supervising others who allegedly did work).  Such tasks would not be compensable.  [Genovea TT 795:2-9; 799:22-800:7; Seeman TT 1090:21-1092-18]

**DEFENDANTS RESPOND: Disputed.** The services they provided are permitted under the Policy. Exhibit 301 at p. 7, Part 3.E (definitions of "Personal Care", "Instrumental Activities of Daily Living," and "Homemaker Services").

162.    Finally, the Dallals' efforts to excuse the surveillance of Mr. Dallal by claiming that the video only depicted about four hours out of multiple days is a red herring.  There was no evidence introduced to reflect that the surveillance was incomplete or "edited".  To the contrary, investigators Anthony Peters and Ian Farrell both testified, describing how they took the footage (i.e. filming whenever Mr. Dallal was in sight) and confirmed that all the footage they took of Mr. Dallal was included in

the applicable Trial Exhibits.[14]  [Exhs. 317, 319, 323, 325, Farrell TT 595:18-596:7; 598:15-23; 599:21-25; 600:16-601:22; 602:12-604:21; Peters TT 633:12-634:1; 637:4-639:22]

**DEFENDANTS RESPOND: Disputed.** There was no testimony regarding how the footage was edited. Because the only evidence of the methodology of taking the footage came from Lincoln's hired witnesses, there is no possible way for the Dallals to have proved that the footage was not altered or edited. That the Dallals advertised their business in a box at the Peninsula Hotel is irrelevant on the issue of cognitive impairment and would not have affected Dr. Weiss's opinion. Weiss testified that she didn't place any significant weight on the surveillance in her forensic examination which directly contradicted Folk Baron, Gold and Hinkin's testimony. Weiss TT 1385:11-25; 1386:1-25; 1387:1-7.

163.    The Dallals never addressed or explained away the significant functionality Mr. Dallal exhibited during the surveillance.  They never explained away the surveillance taken of Ms. Genovea.  They likewise never demonstrated that *any* hired caregiver took care of him on the surveillance dates, as Mrs. Dallal had represented in the Caregiver Activity Notes.

**DEFENDANTS RESPOND: Disputed.** Mr. Dallal's functionality was consistent with the APSs, which stated that he was independent in ambulation and not in need of assistance in that area. There was no sound on the footage and so Mr. Dallal's level of cognitive impairment could not be determined. There was negligible footage

---

[14] The Dallals also tried to attack the surveillance through their "expert," Dr. Weiss, who testified that Mrs. Dallal told her Mr. Dallal wandered across the street to the Peninsula Hotel.  However, Dr. Weiss accepted what Mrs. Dallal said as true, was never shown the surveillance of Mr. Dallal crossing the street to/from the Peninsula Hotel multiple times (but was shown a few isolated instances of which she does not know the dates/locations and not the entire surveillance), was not given the surveillance reports, and was never told that the Dallals paid for a window box (a "vitrine") at the Peninsula Hotel where they advertised services by *Mr. Alex*.  [Dr. Weiss TT 1408:21-1409:4, 1409:13-25; 1411:12-14; 1415:15-1416:14; 1417:12-15; Mrs. Dallal TT 458:22-459:1]  Notably, the surveillance video showed Mr. Dallal viewing a vitrine at the Peninsula on September 16, 2016.  [Exh. 317]

that did not involve Mr. Dallal's walking independently, for which he did not need assistance. Dr. Feld testified repeatedly to certifying Mr. Dallal using Lincoln Benefits provided APS forms which consistently showed that Mr. Dallal could ambulate on his own. Feld also testified that she never placed restrictions on Mr. Dallal including crossing the street or walking. Feld Depo 153:21-23; 210:5-12; 211:1-7; 249:19-21.

## Mr. Dallal Continued to Feign Cognitive Impairment Post-Litigation

164.    In January 2018, Mr. Dallal was examined and tested by board-certified neurologist Michael Gold, M.D. and board-certified neuropsychologist Charles Hinkin, Ph.D.  [Gold TT 933:3-935:22; Dr. Charles Hinkin ("Hinkin") TT 1193:8-1194:7]  (Both doctors were identified as experts by Plaintiff.)  In addition to conducting their examinations, interviews, and testing, both doctors reviewed thousands of pages of records (including medical records since at least 2004, depositions, surveillance, and other materials) as part of their forensic assessments.  [Gold TT 936:11-16, 937:15-938:16, 998:15-25; Hinkin TT 1198:11-1200:14]  They explained that a forensic examination is different than a clinical evaluation.  In a clinical setting, a doctor accepts the patient's report to treat complaints and does not typically review extensive third-party information; in a forensic examination, additional review and analysis is necessary because the doctor is trying to assess the validity and truthfulness of an individual's complaints.  [Gold 936:17-937:14; Hinkin 1194:21-1196:4]

**DEFENDANTS RESPOND: Undisputed.**

## Dr. Gold's Assessment

165.    Dr. Gold testified that Mr. Dallal's medical records dating back to 2004, confirmed that he had no residual effects from the removal of the meningioma. Although language and memory problems could "potentially" (but not inevitably) arise from a meningioma removal, he confirmed through the records that no doctor found any

1
2
such disturbances for Mr. Dallal through the years.  [Gold TT 938:17-939:7, 939:22-941:21]

3
4
5
6
7
8
9
10
11
12
**DEFENDANTS RESPOND: Disputed.** Dr. Gold could not find that Mr. Dallal suffered from memory and language difficulties over the years. Dr. Weiss testified that Mr. Dallal didn't portray himself to be brain damaged by choosing not to answer or lack of being conversational as Hinkin testified. Weiss also testified that in all the years she's seen geriatric patients they don't respond well to testing. Weiss stated that testing could not elicit a valid representation and Mr. Dallal wasn't trying to make himself look worse off. Weiss testified that if someone's attention is severely or significantly disrupted it can affect performance on the measurement. Weiss TT 1428:3-19;1430:18-21;1433:22-25;1443:1-7; 1435:12-23.

13
14
15
16
17
166.    Dr. Gold testified that Mr. Dallal had a left basal ganglia hemorrhage (bleed) documented in 2005.  Such a bleed could potentially affect movement and limb coordination on the right side.  However, Dr. Gold confirmed that the medical records showed the bleed had reabsorbed into Mr. Dallal's body and that there was no evidence that he ever experienced any residual effects.  [Gold TT 941:22-943:1]

18
19
20
21
22
23
24
25
26
27
28
**DEFENDANTS RESPOND: Disputed.** Dr. Feld testified that her medical chart notes indicated that Mr. Dallal suffered at least two neurological and neurosurgical events which changed Mr. Dallal's neurological behavior. Feld explained that the two events: resection of the the brain tumor and the small strokes caused cognitive changes which could be both intermittent and permanent. Feld also testified that her medical chart notes indicated that Mr. Dallal had poor insight into his own abilities, issues with falling and wandering, and always refusing care including medications and medical exam follow ups. Feld testified that Mr. Dallal was severely cognitively impaired for many reasons including his poor judgment for his safety expressing severe concerns and need for supervision. Feld's medical chart notes include her recommendation for Namenda a dementia medication and further neuropsychiatric testing in 2015. Feld

Depo 76:25 – 77:19; 92:14 - 93:3; 93:21 – 94:3; 95:13-22; 101:1 - 102:4; 103:20 - 104:21; 147:4 – 148:1; 160:14-24; 190:1-21; 211:19 - 212:4; 223:2-14; 237:19 - 238:8; 273:13-22. Ex. 313-4.

Dr. Ananda testified that the area resection of the brain tumor in the front temporal lobe could cause issues with learning, memory and vision except that wasn't the reason for the follow up with Mr. Dallal. Ananda explained to the jury that although the tumor was removed and required follow up there are thousands of cells that remain and that the recurrence could be months, years or even a decade. Ananda testified that her certified Mr. Dallal and that his signatures were authentic at trial. Ananda TT 481:3-16; 482:5-7; 484:10-25; 485:1-17; 503:21-25; 504:1-14; 521:18-25; 522:1-5; 526:7-21.

167.    Based on his records review and evaluation, Dr. Gold testified that he found no evidence that Mr. Dallal had a neurological condition affecting his functioning. Rather, Mr. Dallal tried to demonstrate that he had a severe language disturbance, a severe balance disturbance, and a severe memory disturbance during his exam.  Dr. Gold did not find any of Mr. Dallal's responses to be believable or credible.  [Gold TT 943:2-16]

**DEFENDANTS RESPOND: Disputed.** Dr. Gold's assessment was based on a single brief interview of Mr. Dallal in 2018. Dr. Weiss testified that Mr. Dallal didn't portray himself to be brain damaged by choosing not to answer or lack of being conversational as Hinkin testified. Dr. Weiss also testified that in all the years she's seen geriatric patients they don't respond well to testing. Weiss stated that testing could not elicit a valid representation and Mr. Dallal wasn't trying to make himself look worse off. Dr. Weiss testified that if someone's attention is severely or significantly disrupted it can affect performance on the measurement. Weiss TT 1428:3-19;1430:18-21;1433:22-25;1443:1-7; 1435:12-23. Dr. Feld testified that her medical chart notes indicated that Mr. Dallal suffered at least two neurological and neurosurgical events which changed Mr. Dallal's neurological behavior. Feld explained that the two events: resection of the the brain tumor and the small strokes caused cognitive changes which

could be both intermittent and permanent. Feld also testified that her medical chart notes indicated that Mr. Dallal had poor insight into his own abilities, issues with falling and wandering, and always refusing care including medications and medical exam follow ups. Feld testified that Mr. Dallal was severely cognitively impaired for many reasons including his poor judgment for his safety expressing severe concerns and need for supervision. Feld's medical chart notes include her recommendation for Namenda a dementia medication and further neuropsychiatric testing in 2015. Feld Depo 76:25 – 77:19; 92:14 - 93:3; 93:21 – 94:3; 95:13-22; 101:1 - 102:4; 103:20 -104:21; 147:4 – 148:1; 160:14-24; 190:1-21; 211:19 - 212:4; 223:2-14; 237:19 - 238:8; 273:13-22. Exh. 313-4.

Dr. Ananda testified that the area resection of the brain tumor in the front temporal lobe could cause issues with learning, memory and vision except that wasn't the reason for the follow up with Mr. Dallal. Ananda explained to the jury that although the tumor was removed and required follow up there are thousands of cells that remain and that the recurrence could be months, years or even a decade. Ananda testified that her certified Mr. Dallal and that his signatures were authentic at trial. Ananda TT 481:3-16; 482:5-7; 484:10-25; 485:1-17; 503:21-25; 504:1-14; 521:18-25; 522:1-5; 526:7-21.

168.    Dr. Gold assessed Mr. Dallal's identification, recall, and memory.  Dr. Gold found Mr. Dallal's responses to exam questions and testing not credible, not genuine, and not reflective of how the brain works.  Examples included:

- Mr. Dallal claimed not to recognize his own name when written.  When Dr. Gold showed him his last name, he stared at it for a while, and then he pronounced it in some sort of baby language or slowed speech ("doll-lol").
- Dr. Gold asked him his occupation, something he has performed for decades, but Mr. Dallal claimed he did not know it.  Dr. Gold found this response not genuine because for those who have worked for a long period of time, occupational information is one of the last-to-go memories.

- Mr. Dallal was able to more precisely indicate he had two grandchildren and a son, Alexander Dallal, Jr., which suggested that he was able to recall better than he was letting on.

- Mr. Dallal claimed he could not recall items of clothing. However, when asked the color of his shoes, he inconsistently (a) looked at his shoes; (b) said "coat, cold" when asked if he could take off his jacket; and (c) reached in his pocket when asked what was in his pocket.

- Dr. Gold asked Mr. Dallal to identify letters, which were in large 72-point font. Mr. Dallal incorrectly identified the letters, replacing them with a different letter (e.g., calling a "B" a "T"). Dr. Gold explained that when people legitimately lose memory, they do not substitute in new letters, which is new learning.

- When Dr. Gold asked Mr. Dallal to repeat three numbers, he responded with three different numbers. By responding in this way, Dr. Gold testified that it meant Mr. Dallal remembered he was given three numbers, but intentionally identified the wrong three numbers. The brain does not work that way if someone has a real problem.

- In the course of giving Mr. Dallal a detailed mental status examination, Dr. Gold asked him to identify the names of three animals shown in pictures. Mr. Dallal gave different names for those animals – calling a lion a dog, a rhinoceros a cow, and a camel a horse. If someone had a true memory or identification disturbance, he would not pick a different animal because that would mean he had to learn something new (e.g., that a dog had shaggy hair around its head, or a cow had thick legs and two horn, or that a horse had a hump). Dr. Gold again explained that was not the way the nervous system deteriorates, so Mr. Dallal's responses were not credible.

[Gold TT 943:25-951:7]

**DEFENDANTS RESPOND: Disputed.** Dr. Gold's assessment was based on a single brief interview of Mr. Dallal in 2018. Dr. Weiss testified that Mr. Dallal didn't portray himself to be brain damaged by choosing not to answer or lack of being conversational as Hinkin testified. Dr. Weiss also testified that in all the years she's seen geriatric patients they don't respond well to testing. Weiss stated that testing could not elicit a valid representation and Mr. Dallal wasn't trying to make himself look worse off. Dr. Weiss testified that if someone's attention is severely or significantly disrupted it can affect performance on the measurement. Weiss TT 1428:3-19;1430:18-21;1433:22-25;1443:1-7; 1435:12-23.

169.     Based on his medical records and surveillance review, Dr. Gold confirmed that Mr. Dallal did not have any memory deficits.  He likewise provided specific examples from the surveillance video, which demonstrated Mr. Dallal's memory and recall capabilities.  These included Mr. Dallal talking on and using a cell phone; pulling up his socks (knowing what socks are); holding a newspaper (which contradicted his representation at the exam of not being able to identify letters); purchasing coffee, which reflected his ability to remember and communicate.  [Gold TT 951:8-953:3]

**DEFENDANTS RESPOND: Disputed.** Dr. Gold's assessment was based on a single brief interview of Mr. Dallal in 2018, and viewing the video surveillance. The few examples given are based entirely on the surveillance, which were never properly authenticated. Dr. Gold sets up his tests so that whatever way Mr. Dallal performs it will support one of his hypotheses. If he does something that shows good judgment, he has cognitive abilities. If he does something that shows bad judgment, he is faking. Either way, Dr. Gold's testimony inevitably favors Lincoln. Dr. Weiss testified that Mr. Dallal didn't portray himself to be brain damaged by choosing not to answer or lack of being conversational as Hinkin testified. Dr. Weiss also testified that in all the years she's seen geriatric patients they don't respond well to testing. Weiss stated that testing could not elicit a valid representation and Mr. Dallal wasn't trying to make himself look worse

DEFENDANTS' OPPOSITION TO PLAINTIFF'S PROPOSED FINDINGS OF FACT

off. Dr. Weiss testified that if someone's attention is severely or significantly disrupted it can affect performance on the measurement. Weiss TT 1428:3-19;1430:18-21;1433:22-25;1443:1-7; 1435:12-23. Dr. Feld testified that her medical chart notes indicated that Mr. Dallal suffered at least two neurological and neurosurgical events which changed Mr. Dallal's neurological behavior. Feld explained that the two events: resection of the the brain tumor and the small strokes caused cognitive changes which could be both intermittent and permanent. Feld also testified that her medical chart notes indicated that Mr. Dallal had poor insight into his own abilities, issues with falling and wandering, and always refusing care including medications and medical exam follow ups. Feld testified that Mr. Dallal was severely cognitively impaired for many reasons including his poor judgment for his safety expressing severe concerns and need for supervision. Feld's medical chart notes include her recommendation for Namenda a dementia medication and further neuropsychiatric testing in 2015. Feld Depo 76:25 – 77:19; 92:14 - 93:3; 93:21 – 94:3; 95:13-22; 101:1 - 102:4; 103:20 -104:21; 147:4 – 148:1; 160:14-24; 190:1-21; 211:19 - 212:4; 223:2-14; 237:19 - 238:8; 273:13-22. Exh. 313-4.

170.    Dr. Gold determined that the language, comprehension, and communication disturbance that Mr. Dallal tried to portray during his evaluation was not credible or believable.  Mr. Dallal tried to make himself look impaired by using primitive "baby talk" during the exam.  Yet, Mr. Dallal understood Dr. Gold's communication; for example, with regard to looking for the color of his shoes or pulling a prayer card from his pocket.  Dr. Gold testified that the surveillance provided a very different picture because it demonstrated Mr. Dallal's language and communication abilities.  He identified still photos showing from the video showing Mr. Dallal communicating/chatting with law enforcement officers, customers, and friends.  Dr. Gold believed Mr. Dallal was normal in this area because the medical records and surveillance did not reflect any disturbance in this area, as well as Mr. Dallal's lack of

credibility in the evaluation.  [Gold TT 953:9-955:13]

**DEFENDANTS RESPOND: Disputed.** Dr. Gold's assessment was based on a single brief interview of Mr. Dallal in 2018, and viewing the video surveillance. The few examples given are based entirely on the surveillance, which were never properly authenticated. Dr. Gold sets up his tests so that whatever way Mr. Dallal performs it will support one of his hypotheses. If he does something that shows good judgment, he has cognitive abilities. If he does something that shows bad judgment, he is faking. Either way, Dr. Gold's testimony inevitably favors Lincoln. Dr. Weiss testified that Mr. Dallal didn't portray himself to be brain damaged by choosing not to answer or lack of being conversational as Hinkin testified. Dr. Weiss also testified that in all the years she's seen geriatric patients they don't respond well to testing. Weiss stated that testing could not elicit a valid representation and Mr. Dallal wasn't trying to make himself look worse off. Weiss TT 1428:3-19;1430:18-21;1433:22-25;1443:1-7; 1435:12-23.

171.    Dr. Gold testified that he found no indication that Mr. Dallal had any impaired judgment, although he appeared to try to act impaired during the exam.  Rather, he found that Mr. Dallal had the cognitive ability to exercise judgment to protect his health and safety.  During the evaluation, Dr. Gold asked what Mr. Dallal would do in the event of a fire or gas leak.  Mr. Dallal indicated he would go to his wife – which Dr. Gold found demonstrated good judgment.  On surveillance, Dr. Gold also found examples of appropriate judgment:  Mr. Dallal thanked drivers for letting him pass through when walking across the street from *Mr. Alex* to the Peninsula Hotel (meaning he understood when he could cross, when to be polite); he directed his family member how to park in a parking spot; he knew what to do with a sharpener and tailor's chalk while on the street outside his store; he used a piece of paper or a rag to protect himself when taking trash to the dumpster (judging where the dumpster was, whether the door was dirty, where to put the trash); and he held his keys, and then unlocked and locked his store on multiple occasions (judging that someone could enter the store if not locked and

1  double-checking the lock).  [Gold TT 955:14-958:11]

2  **DEFENDANTS RESPOND: Disputed.** Dr. Gold sets up his tests so that

3  whatever way Mr. Dallal performs it will support one of his hypotheses. If he does

4  something that shows good judgment, he has cognitive abilities. If he does something

5  that shows bad judgment, he is faking. Either way, Dr. Gold's testimony inevitably

6  favors Lincoln. Dr. Weiss testified that Mr. Dallal didn't portray himself to be brain

7  damaged by choosing not to answer or lack of being conversational as Hinkin testified.

8  Dr. Weiss also testified that in all the years she's seen geriatric patients they don't

9  respond well to testing. Weiss stated that testing could not elicit a valid representation

10 and Mr. Dallal wasn't trying to make himself look worse off. Dr. Weiss testified that if

11 someone's attention is severely or significantly disrupted it can affect performance on

12 the measurement. Weiss TT 1428:3-19;1430:18-21;1433:22-25;1443:1-7; 1435:12-23.

13

14 172.    Dr. Gold testified that the Dallals' attempts to portray Mr. Dallal as having

15 problems with balance, gait, and transferring during the examination were not credible.

16 Mr. Dallal could get up and down from his chair, but his wife would rush in to help him.

17 Mr. Dallal brought a cane, but he did not seem to use it and held it when he walked.  Mr.

18 Dallal said he could not move his limbs, but yet was able to walk and reach for a prayer

19 card in his pocket.  Moreover, Dr. Gold determined that Mr. Dallal's balance, gait and

20 transfer abilities were normal based on medical records and surveillance.  He identified

21 examples of Mr. Dallal's abilities from different days and time periods through still

22 photos taken from the surveillance, including, Mr. Dallal walking and holding garbage,

23 walking upstairs with a bag, walking briskly down the street holding coffee, walking

24 with coffee and then stepping down off a curb, walking while he balanced a tray,

25 bending down to pick something up, and getting up and down from seating position

26 multiple times.  [Gold TT 958:12-961:19]

27

28

DEFENDANTS' OPPOSITION TO PLAINTIFF'S PROPOSED FINDINGS OF FACT

**DEFENDANTS RESPOND: Disputed.** Mr. Dallal's abilities in ambulation were adjudged to be independent in the APS's by Dr. Feld. Dr. Gold sets up his tests so that whatever way Mr. Dallal performs it will support one of his hypotheses. If he does something that shows good judgment, he has cognitive abilities. If he does something that shows bad judgment, he is faking. Either way, Dr. Gold's testimony inevitably favors Lincoln and is not independent. Dr. Weiss testified that she didn't place any significant weight on the surveillance in her forensic examination which directly contradicted Gold and Hinkin's testimony at trial. In addition Weiss testified that Mr. Dallal had severe safety issues due to being cognitively compromised from the years of neurological and neurosurgical events and impairments. In addition to these points Weiss concluded concerns with Mr. Dallal's poor judgment. Weiss TT 1385:11-25; 1386:1-25; 1387:1-7.

173.     Dr. Gold testified that Mr. Dallal attempted to show a lack of coordination and inability to multi-task during the examination (e.g., he claimed he could not use a toothbrush).  His presentation was not genuine.  Dr. Gold found he had no such impairment, particularly since there was no evidence of impairment in years of medical records and on surveillance.  Dr. Gold showed examples of Mr. Dallal's good coordination and complex multi-tasking from photos taken from the surveillance, including Mr. Dallal sweeping (even little crevices near/around the tree), using window blinds, walking while holding coffee, talking on a cell phone, and then coordinating those items while stepping down a curb and getting into a vehicle (9/14/16) [Gold TT 961:20-964:5]

**DEFENDANTS RESPOND: Disputed.** Mr. Dallal's abilities in ambulation were adjudged to be independent in the APS's by Dr. Feld. Dr. Gold sets up his tests so that whatever way Mr. Dallal performs it will support one of his hypotheses. If he does something that shows good judgment, he has cognitive abilities. If he does something that shows bad judgment, he is faking. Either way, Dr. Gold's testimony inevitably

favors Lincoln. The few examples given are based entirely on the surveillance, which were never properly authenticated. Dr. Weiss testified that she didn't place any significant weight on the surveillance in her forensic examination which directly contradicted Gold and Hinkin's testimony at trial. In addition Weiss testified that Mr. Dallal had severe safety issues due to being cognitively compromised from the years of neurological and neurosurgical events and impairments. In addition to these points Weiss concluded concerns with Mr. Dallal's poor judgment. Weiss TT 1385:11-25; 1386:1-25; 1387:1-7.

174.    Dr. Gold testified that although he knew Mr. Dallal had represented during the claim that he could independently eat/drink, when he asked Mr. Dallal to drink from a glass, Mrs. Dallal tried to intervene to help him.  Such hovering and attempt to portray Mr. Dallal as worse off than he was were not genuine.  Dr. Gold provided several examples of Mr. Dallal's abilities to independently eat and drink on surveillance, including eating chips/dip, using a spoon and fork to eat, drinking coffee, and eating a sandwich.  He concluded Mr. Dallal had no problems with eating or drinking.  [Gold TT 964:6-965:13]

**DEFENDANTS RESPOND: Disputed.** Mr. Dallal's abilities in eating were adjudged to be independent in the APS's by Dr. Feld. Dr. Gold sets up his tests so that whatever way Mr. Dallal performs it will support one of his hypotheses. If he does something that shows good judgment, he has cognitive abilities. If he does something that shows bad judgment, he is faking. Either way, Dr. Gold's testimony inevitably favors Lincoln. The few examples given are based entirely on the surveillance, which were never properly authenticated. Dr. Weiss testified that she didn't place any significant weight on the surveillance in her forensic examination which directly contradicted Gold and Hinkin's testimony at trial. In addition Weiss testified that Mr. Dallal had severe safety issues due to being cognitively compromised from the years of neurological and neurosurgical events and impairments. In addition to these points

Weiss concluded concerns with Mr. Dallal's poor judgment. Weiss TT 1385:11-25; 1386:1-25; 1387:1-7.

175.    Dr. Gold testified that it was likewise difficult to assess Mr. Dallal's true ability to dress because Mrs. Dallal was hovering and indicated he needed help (e.g., she put on and buttoned his coat, took off his socks). Nonetheless, Dr. Gold found no reason that Mr. Dallal could not dress himself based on the medical records and surveillance. Some examples from surveillance that Mr. Dallal was capable of dressing included his ability to pull up his socks, pull up his pants, and adjust his belt. [Gold TT 965:14-967:3]

**DEFENDANTS RESPOND: Disputed.** Dr. Gold sets up his tests so that whatever way Mr. Dallal performs it will support one of his hypotheses. If he does something that shows good judgment, he has cognitive abilities. If he does something that shows bad judgment, he is faking. Either way, Dr. Gold's testimony inevitably favors Lincoln and is not independent. The few examples given are based entirely on the surveillance, which were never properly authenticated. Dr. Weiss testified that Mr. Dallal required substantial assistance with full time supervision and a caregiver based on the neurological issues; not speaking of the physical issues. Weiss summarized that with Mr. Dallal's age the neurological issues only worsen. Weiss recommended a full time caregiver based on her forensic assessment. Weiss TT 1388:23-25; 1389:1-9; 1430:5-13.

176.    Dr. Gold testified that Mrs. Dallal's claim that Mr. Dallal needed help from her or a caregiver in the restroom and with unzipping his pants was not credible. Mrs. Dallal admitted to Dr. Gold that Mr. Dallal was capable of actually performing the actions related to going to the bathroom on his own. Based on what Mrs. Dallal indicated, Mr. Dallal would have had to have been aware of his body functions and hygiene. Dr. Gold also testified that Mr. Dallal would have had no problems with going

to the bathroom or tending to his hygiene based on the medical records and surveillance. He offered different examples from the surveillance videos of Mr. Dallal physically wiping down tables and chairs and protecting himself from contamination when he took out the garbage. These reflected his ability to handle his hygiene and did not fit with his presentation at the exam. [Gold TT 967:4-969:3]

**DEFENDANTS RESPOND: Disputed.** Dr. Gold sets up his tests so that whatever way Mr. Dallal performs it will support one of his hypotheses. If he does something that shows good judgment, he has cognitive abilities. If he does something that shows bad judgment, he is faking. Either way, Dr. Gold's testimony inevitably favors Lincoln and is not independent. The few examples given are based entirely on the surveillance, which were never properly authenticated. Dr. Weiss testified that Mr. Dallal required substantial assistance with full time supervision and a caregiver based on the neurological issues; not speaking of the physical issues. Weiss summarized that with Mr. Dallal's age the neurological issues only worsen. Weiss recommended a full time caregiver based on her forensic assessment. Weiss TT 1388:23-25; 1389:1-9; 1430:5-13.

177.    Dr. Gold testified that the Dallals' portrayal of Mr. Dallal as severely impaired and Mrs. Dallal's intervention/assistance were inconsistent with the lack of problems reflected in the medical records and surveillance. Dr. Gold provided additional examples of Mr. Dallal's independence and his family's lack of interference from the surveillance, including Mr. Dallal following behind his family when walking outside, loading/unloading items alone, carrying items alone, and being unsupervised. [Gold TT 969:4- 970:11]

**DEFENDANTS RESPOND: Undisputed.** Mr. Dallal's abilities in ambulation were adjudged to be independent in the APS's by Dr. Feld. Dr. Gold sets up his tests so that whatever way Mr. Dallal performs it will support one of his hypotheses. If he does something that shows good judgment, he has cognitive abilities. If he does something

that shows bad judgment, he is faking. Either way, Dr. Gold's testimony inevitably favors Lincoln. The few examples given are based entirely on the surveillance, which were never properly authenticated. Dr. Weiss testified that she didn't place any significant weight on the surveillance in her forensic examination which directly contradicted Gold and Hinkin's testimony at trial. In addition Weiss testified that Mr. Dallal had severe safety issues due to being cognitively compromised from the years of neurological and neurosurgical events and impairments. In addition to these points Weiss concluded concerns with Mr. Dallal's poor judgment. Weiss TT 1385:11-25; 1386:1-25; 1387:1-7.

178.    Based on the medical records, the surveillance, his evaluation of Mr. Dallal, and all the reasons stated during his testimony, Dr. Gold testified that with reasonable medical certainty through December 2016, Mr. Dallal (a) did not need hands-on or standby assistance with his activities of daily living, and (b) did not have severe cognitive impairment requiring substantial supervision to protect his health and safety. Dr. Gold explained that Mr. Dallal's presentation during his examination was simply not believable and was not representative of how the brain worked if he had been truly impaired.  [Gold TT 970:20-971:17]

**DEFENDANTS RESPOND: Disputed.** It is undisputed that these are Gold's conclusions, which are disputed. Dr. Weiss testified that Mr. Dallal didn't portray himself to be brain damaged by choosing not to answer or lack of being conversational as Hinkin testified. Dr. Weiss also testified that in all the years she's seen geriatric patients they don't respond well to testing. Weiss stated that testing could not elicit a valid representation and Mr. Dallal wasn't trying to make himself look worse off. Dr. Weiss testified that if someone's attention is severely or significantly disrupted it can affect performance on the measurement. Weiss TT 1428:3-19;1430:18-21;1433:22-25;1443:1-7; 1435:12-23. Dr. Feld testified that her medical chart notes indicated that Mr. Dallal suffered at least two neurological and neurosurgical events which changed

Mr. Dallal's neurological behavior. Feld explained that the two events: resection of the the brain tumor and the small strokes caused cognitive changes which could be both intermittent and permanent. Feld also testified that her medical chart notes indicated that Mr. Dallal had poor insight into his own abilities, issues with falling and wandering, and always refusing care including medications and medical exam follow ups. Feld testified that Mr. Dallal was severely cognitively impaired for many reasons including his poor judgment for his safety expressing severe concerns and need for supervision. Feld's medical chart notes include her recommendation for Namenda a dementia medication and further neuropsychiatric testing in 2015. Feld Depo 76:25 – 77:19; 92:14 - 93:3; 93:21 – 94:3; 95:13-22; 101:1 - 102:4; 103:20 -104:21; 147:4 – 148:1; 160:14-24; 190:1-21; 211:19 - 212:4; 223:2-14; 237:19 - 238:8; 273:13-22.

179.    Finally, Dr. Gold explained that it was not medically possible for Mr. Dallal to have had a functional loss and severe cognitive impairment from his surgery in 2004 up until the day before the surveillance, and then to improve enough to function as he did on the surveillance, only to revert back to an impaired state.  He said the brain does not work that way.  Mr. Dallal could not have a progressive deterioration and then one day be able to function as he was shown on surveillance.  [Gold TT 971:18-972:7]

**DEFENDANTS RESPOND: Disputed.** It is undisputed that these are Gold's conclusions, which are disputed. Dr. Weiss testified that Mr. Dallal didn't portray himself to be brain damaged by choosing not to answer or lack of being conversational as Hinkin testified. Dr. Weiss also testified that in all the years she's seen geriatric patients they don't respond well to testing. Weiss stated that testing could not elicit a valid representation and Mr. Dallal wasn't trying to make himself look worse off. Dr. Weiss testified that if someone's attention is severely or significantly disrupted it can affect performance on the measurement. Weiss TT 1428:3-19;1430:18-21;1433:22-25;1443:1-7; 1435:12-23. Dr. Feld testified that her medical chart notes indicated that Mr. Dallal suffered at least two neurological and neurosurgical events which changed

Mr. Dallal's neurological behavior. Feld explained that the two events: resection of the the brain tumor and the small strokes caused cognitive changes which could be both intermittent and permanent. Feld also testified that her medical chart notes indicated that Mr. Dallal had poor insight into his own abilities, issues with falling and wandering, and always refusing care including medications and medical exam follow ups. Feld testified that Mr. Dallal was severely cognitively impaired for many reasons including his poor judgment for his safety expressing severe concerns and need for supervision. Feld's medical chart notes include her recommendation for Namenda a dementia medication and further neuropsychiatric testing in 2015. Feld Depo 76:25 – 77:19; 92:14 - 93:3; 93:21 – 94:3; 95:13-22; 101:1 - 102:4; 103:20 -104:21; 147:4 – 148:1; 160:14-24; 190:1-21; 211:19 - 212:4; 223:2-14; 237:19 - 238:8; 273:13-22.

### Dr. Hinkin's Assessment

180.    Dr. Hinkin's neuropsychological testing included performance validity testing to assess whether Mr. Dallal was faking or pretending to have problems he did not really have.  [Hinkin TT 1202:17-1203:13]  For example, Dr. Hinkin administered the Test of Memory Malingering, which he gave by showing Mr. Dallal 50 picture cards and asking him to point to a specific picture.  Dr. Hinkin advised that even patients with very severe brain damage can perform basically perfectly.  Someone who is blindfolded would get at least half right.  However, Mr. Dallal consistently pointed to the wrong picture 43 out of 50 times.  Sample questions Dr. Hinkin asked are as follows.  When asked to point to the mouse, he pointed to a dustpan.  When asked to point to the elephant, he pointed to the safety pin.  When asked to point to the knife, he pointed to the motorcycle.  When asked to point to the toaster, he pointed to the bow and arrow.  When asked to point to the light bulb, he pointed to the TV.  When asked to point to the mountains, he pointed to the life preserver.  When asked to point to the carrot, he pointed to the book.  To get only 7 out of 50 right took intentional effort by Mr. Dallal because he knew the right answers and intentionally chose the wrong answers to appear worse off

than he was.  To be wrong on 43 out of 50 trials, the odds of that happening due to chance, due to someone having the worst disease imaginable, would be 1 in 10 million. Dr. Hinkin determined Mr. Dallal's results were simply not plausible.  A real patient, even with a severe disease, would perform perfectly.  [Hinkin TT 1204:1-1206:8]

**DEFENDANTS RESPOND: Disputed.** Undisputed that these are Hinkin's conclusions, which are disputed. Weiss testified that malingering is only one part of the test and she has to observe the patient's effort as well and that there are several factors that could subdue a patient's effort not malingering.  Weiss TT 1393:25; 1394:1-12.

181.    Dr. Hinkin also administered another performance validity test – the Rey 15 test, which is an easy test used to assess symptom exaggeration.  He explained that research has shown that patients with real problems do not do poorly on this test.  For 15 seconds, Dr. Hinkin showed Mr. Dallal a picture of 15 items, 3 on each line:  (A, B, C; 1, 2, 3; a, b, c; circle, square, triangle; and then I, II, and III).  He then asked Mr. Dallal to write those items down.  Mr. Dallal only got 4 of 15 correct[15] – a score falling well below the cut point indicative of symptom exaggeration.  Dr. Hinkin explained that the way we learn information, if a patient is going to get the A, he is going to get the A, B, C.  The patient would not answer with just the A and not the B and the C; or to have 1, 2, and not remember the 3.  Mr. Dallal answered A, O, 0, 1 on the first line; and then 1, D, and small circle on the second line.  He concluded that Mr. Dallal's performance demonstrated symptom exaggeration, so much that this was not how a person with genuine problems would test.  [Hinkin TT 1206:9-1210:6]

**DEFENDANTS RESPOND: Disputed.** It is undisputed that these are Hinkin's conclusions, which are disputed. Dr. Weiss found that Mr. Dallal was severely cognitively impaired. She performed the Rey 15 performance validity test and found Mr. Dallal to be severely cognitively impaired due to the poor results. She also

---

[15] Mr. Dallal also scored similarly on the Rey 15 when tested by his own expert, Dr. Weiss, which again was indicative of symptom exaggeration. [Hinkin TT 1208:15-1209:3]

conducted another performance validity test Long Delay Forced Recognition test which was also consistent with her findings that Mr. Dallal suffered severe cognitive impairment. Weiss stated that the she had to go beyond what the test scores indicate and offer her professional opinion as an expert. Weiss TT 1434:15-25; 1435:1-23; 1437:8-13.

Dr. Weiss also testified that malingering is only one part of the test and she has to observe the patient's effort as well and that there are several factors that could subdue a patient's effort not malingering. Weiss TT 1393:25; 1394:1-12.

182.   Mr. Dallal also faked results on the Boston Diagnostic Aphasia Examination, which tests language.  Dr. Hinkin showed Mr. Dallal cards with two words on them, and then asked him to point to a specific word.  When Dr. Hinkin showed him a card that had the words "flower" and "match," and told him to point to "flower," Mr. Dallal pointed to the word "match."  When Dr. Hinkin showed him the card with the words "screwdriver" and "comb," and told him to point to "comb", Mr. Dallal pointed to "screwdriver."  When Dr. Hinkin showed him the card with the words "cup" and "matches," and told him to point to "cup", Mr. Dallal pointed to "matches."  When Dr. Hinkin showed him the card with the words "cloth" and "chair," and told him to point to "cloth", Mr. Dallal pointed to "chair."  When Dr. Hinkin showed him the card with the words "table" and "fable," and told him to point to "table", Mr. Dallal pointed to "fable."  When Dr. Hinkin showed him the card with the words "flower" and "tree," and told him to point to "tree", Mr. Dallal pointed to "flower."  When Dr. Hinkin showed him the card with the words "power" and "garden," and told him to point to "garden", Mr. Dallal pointed to "power."  Mr. Dallal got all seven cards wrong.  Dr. Hinkin testified that the fact Mr. Dallal was wrong on all seven tests showed not only that he was able to read the words accurately, but that he then intentionally chose the wrong answer in an effort to appear like he had severe problems.  If Mr. Dallal had been unable to read, as he claimed, he would have gotten at least half of the questions right based on pure chance.

[Hinkin TT 1210:7-1212:8]

**DEFENDANTS RESPOND: Disputed.** It is undisputed that these are Hinkin's conclusions, which are disputed. Weiss testified that as part of her assessment of her forensic examination she identifies whether patients are faking and appearing to make themselves worse. Weiss determined that at the time of her evaluation she didn't find Mr. Dallal to be doing any of things mentioned by Hinkin. Weiss TT 1428:3-19.

183.     Dr. Hinkin asked Mr. Dallal Ganser-type questions that are used to demonstrate when somebody is trying to fake dysfunction in a truly absurd way, which a patient with a genuine problem would not do.  Mr. Dallal gave absurd answers to simple questions.  For example, when asked what animal gives milk, Mr. Dallal answered fish; when asked what noise does a dog make, he responded sheep; when asked what color is grass, he responded blue; when asked what color is an orange, he responded brown; when asked what color is a lemon, he responded green; when asked what color is blood, he responded blue; when asked what color is snow, he responded blue; when asked if is sugar sour or sweet, he responded sour; when asked what shape is a ball, he responded square.  Dr. Hinkin testified that a person with severe cognitive impairment would not answer in this fashion. [Hinkin TT 1212:9-1214:23]

**DEFENDANTS RESPOND: Disputed.** Undisputed that these are Hinkin's conclusions, which are disputed. Dr. Weiss contradicted Hinkin's conclusions. Dr. Weiss testified that Mr. Dallal didn't portray himself to be brain damaged by choosing not to answer or lack of being conversational as Hinkin testified. Dr. Weiss also testified that in all the years she's seen geriatric patients they don't respond well to testing. Weiss stated that testing could not elicit a valid representation and Mr. Dallal wasn't trying to make himself look worse off. Dr. Weiss testified that if someone's attention is severely or significantly disrupted it can affect performance on the measurement. Weiss TT 1428:3-19; 1430:18-21; 1433:22-25; 1443:1-7; 1435:12-23.

184.    When asked autobiographical information, including matters relating to clothing (involving his occupation), Mr. Dallal feigned forgetfulness. Such autobiographical information is the typically the last to go in patients with real problems. Mr. Dallal could not remember the names of his grandchildren or children, except for Alex, Jr., but could remember a semblance of Dr. Hinkin's name.  Dr. Hinkin explained that Mr. Dallal responded in an unsophisticated way to his questions in order to look brain damaged, but that is not the way patients with genuine problems perform.  [Hinkin TT 1214:24-1217:1]

**DEFENDANTS RESPOND: Disputed.** Undisputed that these are Hinkin's conclusions, which are disputed. Dr. Weiss contradicted Hinkin's conclusions. Dr. Weiss testified that Mr. Dallal didn't portray himself to be brain damaged by choosing not to answer or lack of being conversational as Hinkin testified. Dr. Weiss also testified that in all the years she's seen geriatric patients they don't respond well to testing. Weiss stated that testing could not elicit a valid representation and Mr. Dallal wasn't trying to make himself look worse off. Dr. Weiss testified that if someone's attention is severely or significantly disrupted it can affect performance on the measurement. Weiss TT 1428:3-19; 1430:18-21; 1433:22-25; 1443:1-7; 1435:12-23.

185.    Dr. Hinkin asked Mr. Dallal to perform simple tasks that are overlearned, such as reciting months of the year, counting, and writing numbers.  He explained that Mr. Dallal responded in such a way that he was trying to appear like he had problems. However, Dr. Hinkin found that Mr. Dallal's answers were absurd and he actually used a strategic pattern of responding (i.e., identifying every other month or number) which patients with genuine cognitive problems would not do.  [Hinkin TT 1217:2-1221:5]

**DEFENDANTS RESPOND: Disputed.** Undisputed that these are Hinkin's conclusions, which are disputed. Dr. Weiss contradicted Hinkin's conclusions. Weiss testified that she had spoken to Dr. Feld for fifteen minutes confirming her concerns Mr. Dallal's cognitive abilities and function and that she had been trying to refer him for

over three years for neuropsychological testing. Weiss also testified that Mr. Dallal had evaded many medical appointments and tests throughout the years and that she had serious concerns for his cognitive abilities and safety due to neurological and neurosurgical history. Weiss TT 1412:5-14; 1413:12-21.

186.    Dr. Hinkin explained that Defendants' expert, Dr. Weiss, gave Mr. Dallal a test called the Dementia Rating Scale (DRS) a little more than a week before Dr. Hinkin's evaluation.  Mr. Dallal scored a 20 of a possible 144 on that DRS.  Alzheimer's patients typically score in the 80 range.  Dr. Hinkin testified that Mr. Dallal's score was invalid because it was so far below the score of patients with a true cognitive dysfunction, that it could not be believed.  [Hinkin TT 1221:6-1224:22]

**DEFENDANTS RESPOND: Disputed.** Undisputed that these are Hinkin's conclusions, which are disputed. Dr. Weiss contradicted Hinkin's conclusions. Weiss testified that she had spoken to Dr. Feld for fifteen minutes confirming her concerns Mr. Dallal's cognitive abilities and function and that she had been trying to refer him for over three years for neuropsychological testing. Weiss also testified that Mr. Dallal had evaded many medical appointments and tests throughout the years and that she had serious concerns for his cognitive abilities and safety due to neurological and neurosurgical history. Weiss TT 1412:5-14; 1413:12-21.

187.    Overall on his evaluation and testing, Dr. Hinkin determined that Mr. Dallal was trying to pretend as if he had severe brain damage and severe cognitive impairment.  That presentation was simply not credible.  He found that Mr. Dallal was malingering, with the essential feature being the intentional production of false or grossly exaggerated physical or psychological symptoms, motivated by external incentives, such as obtaining financial compensation.  [Hinkin TT 1225:9-1226:6]

**DEFENDANTS RESPOND: Disputed.** Undisputed that these are Hinkin's conclusions, which are disputed. Dr. Weiss contradicted Hinkin's conclusions. Dr.

Weiss testified that Mr. Dallal was not eager to participate in the testing portion and
although not testing optimally had a vast history of neurological events and
impairments. Weiss TT 1386:1-13. Dr. Feld testified that her medical chart notes
indicated that Mr. Dallal suffered at least two neurological and neurosurgical events
which changed Mr. Dallal's neurological behavior. Feld explained that the two events:
resection of the the brain tumor and the small strokes caused cognitive changes which
could be both intermittent and permanent. Feld also testified that her medical chart notes
indicated that Mr. Dallal had poor insight into his own abilities, issues with falling and
wandering, and always refusing care including medications and medical exam follow
ups. Feld testified that Mr. Dallal was severely cognitively impaired for many reasons
including his poor judgment for his safety expressing severe concerns and need for
supervision. Feld's medical chart notes include her recommendation for Namenda a
dementia medication and further neuropsychiatric testing in 2015. Feld Depo 76:25 –
77:19; 92:14 - 93:3; 93:21 – 94:3; 95:13-22; 101:1 - 102:4; 103:20 -104:21; 147:4 –
148:1; 160:14-24; 190:1-21; 211:19 - 212:4; 223:2-14; 237:19 - 238:8; 273:13-22.


188.    Dr. Hinkin likewise testified that there was a real disconnect between how
Mr. Dallal was trying to portray himself at the evaluation, which was not credible in light
of his functionality on surveillance and his prior medical records.  Dr. Hinkin testified
that he would have expected to see severe impairment in the years of medical records,
but he found no evidence of any such impairment.  Dr. Hinkin determined that Mr.
Dallal's alleged cognitive impairment was not credible now, nor was it dating back to the
time he was seeing Dr. Ananda.  [Hinkin TT 1201:9-13; 1228:14-1229:23]

**DEFENDANTS RESPOND: Disputed.** Undisputed that these are Hinkin's
conclusions, which are disputed. Dr. Weiss contradicted Hinkin's conclusions. Weiss
testified that Mr. Dallal required further neurological testing as referenced in Dr. Feld's
chart notes. Weiss also testified as to Mr. Dallal's severe safety issues in reviewing the
surveillance of him crossing a busy street. Weiss testified that Mr. Dallal had cognitive

impairment. Weiss TT 1386:10-13; 15-25; 1387:1-7; 1388:20-22. Dr. Feld testified that her medical chart notes indicated that Mr. Dallal suffered at least two neurological and neurosurgical events which changed Mr. Dallal's neurological behavior. Feld explained that the two events: resection of the the brain tumor and the small strokes caused cognitive changes which could be both intermittent and permanent. Feld also testified that her medical chart notes indicated that Mr. Dallal had poor insight into his own abilities, issues with falling and wandering, and always refusing care including medications and medical exam follow ups. Feld testified that Mr. Dallal was severely cognitively impaired for many reasons including his poor judgment for his safety expressing severe concerns and need for supervision. Feld's medical chart notes include her recommendation for Namenda a dementia medication and further neuropsychiatric testing in 2015. Feld Depo 76:25 – 77:19; 92:14 - 93:3; 93:21 – 94:3; 95:13-22; 101:1 - 102:4; 103:20 -104:21; 147:4 – 148:1; 160:14-24; 190:1-21; 211:19 - 212:4; 223:2-14; 237:19 - 238:8; 273:13-22.

Dated: September 10, 2018                Respectfully submitted,

                                         **THE LAW OFFICES OF COLLIN SEALS**


                                         By: */s/Collin Seals*

                                         COLLIN SEALS
                                         Attorney for Defendants
                                         ALEXANDER DALLAL and CLAIRE DALLAL


Dated:  September 10, 2018               **Law Offices of Joseph F. Hart**


                                         /s/ Joseph F. Hart
                                         By Joseph F. Hart, attorneys for
                                         defendants Alex Dallal and Claire Dallal

DEFENDANTS' OPPOSITION TO PLAINTIFF'S PROPOSED FINDINGS OF FACT