EXHIBIT 2

1     UNITED STATES DISTRICT COURT
2   CENTRAL DISTRICT OF CALIFORNIA, CENTRAL DIVISION
3
4   ————————————————————————

             )
5  LINCOLN BENEFIT LIFE COMPANY,)
  a Nebraska Corporation,  )
6             )
      Plaintiff,   )
7             ) Case No. 2:16-CV-9307
    vs.       )   MWF (Ex)
8             )
  ALEXANDER DALLAL, an   )
9  individual; CLAIRE DALLAL, an)
  individual; and DOES 1  )
10  through 10, Inclusive,  )
             )
11      Defendants.  )
  ————————————————————————)
12  AND CROSS-COMPLAINT.   )
  ————————————————————————)
13
14
15
16     DEPOSITION OF JOY S. FELD, M.D.
17      Los Angeles, California
18     Wednesday, November 29, 2017
19       Volume I
20
21
22
23  Reported by:
  KATHLEEN E. BARNEY
24  CSR No. 5698
  Job No. 2754990
25  PAGES 1 - 174

               Page 1

```
 1   do.  And that was it.  It was a very limited-scope
 2   examination.
 3       Q    And would you agree with me that at least
 4   since you've treated Mr. Dallal, he has not had any
 5   seizures?
 6       A    I don't know, actually.  I couldn't say.
 7       Q    And why is that?
 8       A    Because I can't recall.  I don't recall
 9   exactly back to the earlier times.  I don't think I
10   have any notations of any seizure activity.
11       Q    I'll represent to you that on the following
12   dates, there are representations of no seizures.
13       A    Uh-huh.
14       Q    The typed ones are April 30, 2012; 12/16/14.
15   And then the handwritten notes, and I'm going to go
16   backwards.
17       A    Uh-huh.
18       Q    Beside the typed, 1/13/12, 12/2/11, 5/31/11,
19   1/31/11, 4/28/09, 12/7/07, 10/17/06, and then
20   9/27/04.  Those are all indications where there's no
21   seizures.
22       A    Where I said no seizures?
23       Q    Correct, no seizures.
24       A    Okay.
25       Q    So as you sit here today, is there any
```

1    recollection you have of him actually having a

2    seizure?

3        A    Not a full grand mal seizure.   There were two

4    episodes I think that I've noted that had change in

5    neurologic behavior and it was questionable whether

6    these were stroke-like symptoms or seizure activity.

7    So they were -- subsequently I think he was seen by

8    the neurologist and it was determined that these

9    were small strokes.

10       Q    Okay.   And I believe the first reference

11   would be on the next page, 5/2/05.   Is that what

12   you're referring to?

13       A    Yes.

14       Q    So this is your visit with Mr. Dallal?

15       A    Yes.

16       Q    Would you read for us what it says on the

17   top.

18       A    "Family complains of episode of drooling with

19   a facial droop and personality changes."

20       Q    On the left-hand side, what does it say with

21   a circle around it?

22       A    "No dysarthria," which means no trouble

23   speaking.   "Patient denies chest pain, dizziness

24   headache, blurry vision.   No trouble chewing or

25   swallowing."

Hahn & Bowersock, A Veritext Company
800.660.3187

```
 1   couldn't speak to it exactly.
 2        Q    You've indicated he had the strokes and you
 3   were not treating him for these strokes, correct?
 4        A    Uh-huh.
 5        Q    Correct?
 6        A    Well, I was treating him -- like I said
 7   before, my role is to make note -- refer -- you
 8   know, refer when appropriate to make sure that he's
 9   having the correct followup care and to control the
10   blood pressure as his internist.
11        Q    And correct followup care means what?
12        A    Correct followup care with a neurologist
13   and/or whomever else might be necessary.
14        Q    And what -- as his internist, what residuals,
15   if any, do you believe he has had from his strokes
16   or stroke?
17        A    Given that he's had two different
18   neurological problems, one being the resection of a
19   brain tumor and the other these small strokes, I
20   think it would be difficult to clarify.  And I'm not
21   qualified to say which has the greater effect in
22   terms of having any residual effect on him.
23   But when -- and I think a neurologist is more
24   qualified to say in the long run what the sequelae
25   could be expected to be, but cognitive change,
```

Page 92

 1    depending on the location of the tumor and of the
 2    strokes can be -- can vary and be intermittent but
 3    permanent.
 4        Q   So you already said you don't know where the
 5    tumor was for the meningioma, correct?
 6        A   I don't recall.  It's not that I don't know.
 7    I don't recall exactly.  I'd have to refresh my
 8    notes.  I've seen his reports before to say where it
 9    was, but I don't -- I'd be, you know, guessing if I
10    said where it was.
11        Q   But you would have to rely upon a neurologist
12    to opine as to whether there were any true effects
13    from the location of that meningioma on his
14    cognitive ability; is that not correct?
15        A   No.
16        Q   And why is that?
17        A   I would -- I would -- it's distinguishing
18    between which of them is having the greater
19    causative effect, not that he's having a problem, is
20    the issue.
21        Q   So you've also indicated that a stroke could
22    have caused this -- cognitive changes.  And where
23    was the placement of the stroke?
24        A   The one notation in the chart, which was
25    reported I guess to me via the MRI report and the

Page 93

```
 1    neurologist, was that it was in the basal ganglia.
 2    Again, I'm not qualified to say what the long term
 3    sequelae of that are.
 4         Q    And so how is it then -- if you're not
 5    qualified to say what the long term effects would
 6    be, how is it then you're saying any cognitive
 7    impairment he would have is related to the stroke?
 8    How can you say that?
 9         A    If somebody has cognitive impairment, it
10    could be from the fact he that he's had a brain
11    tumor resected; it could be from the fact that he's
12    had stroke; it could be from the fact that he's
13    developing dementia despite these other two things;
14    or it could be all three.  The source I don't know
15    is relevant to the discussion.
16         Q    What cognitive problems have you identified?
17         A    The family has reported to me that he's had
18    confusion at times and wandering.
19         Q    Any others?
20         A    I don't know anything beyond that.
21         Q    So your opinion that he's had cognitive
22    problems is based on what the family has reported;
23    is that right?
24         A    Well --
25              MR. FELD:  I'm going to object as to form.
```

Page 94

```
 1    Can you clarify or restate the question?
 2    BY MS. COWAN:
 3        Q    It's a very basic question.
 4             Your belief that he has had cognitive issues
 5    of confusion and wandering is based upon what the
 6    family told you?
 7             MR. FELD:  I don't think it's a basic
 8    question.  I think it's -- are you asking if it's
 9    only based on that or are you asking if it's based
10    upon that among other things?  Can you clarify that?
11    BY MS. COWAN:
12        Q    What is your basis for the conclusion -- my
13    question was what was your basis for your conclusion
14    that he has cognitive problems, and you said the
15    family's reporting.
16        A    Uh-huh.
17        Q    Correct?  Is that accurate?
18        A    The wandering was reported to me by the
19    family.
20        Q    Okay.  And that he has confusion at times,
21    the family reported that to you?
22        A    Yes.
23        Q    Anything else?
24        A    No, I don't recall.
25        Q    Any other basis other than the family reports
```

                                                    Page 95

1    Q    Okay.  Now, that acting without inhibition,
2  do you understand what I mean?  People who have
3  dementia oftentimes act without inhibition.  They
4  strip down, they act out.  Have you ever seen him
5  act like that?
6    A    He doesn't have that degree of loss of
7  inhibition.  The issues with him more are having
8  sort of poor insight into what his abilities are.
9  And I think sometimes where there have been issues
10  with wandering and things like that, wandering off
11  alone, falling because he thinks he can handle
12  walking in certain areas that are a little
13  treacherous, things like that.
14    Q    All right.  And actually he's only -- it's
15  only been told to you once that he wandered off, in
16  2017?
17    A    I believe so, yeah.
18    Q    And has he ever -- strike that.
19        And he's capable of making medical decisions
20  for himself, at least as with regard to your
21  treatment?
22    A    I would disagree with that.  I think that he
23  has -- because he refuses a lot of things, I think
24  he has poor insight into what his needs are.  He
25  feels like he doesn't need anything.  And I think

Page 101

```
 1    that if he weren't attended to by his family to make

 2    sure he takes his medications, goes for his medical

 3    checkups, you know, gets his blood tested, none of

 4    those things would happen.

 5         Q    Has he made a decision whether to get flu

 6    shots or not get flu shots?

 7         A    I don't know.

 8         Q    Whether to get a shingles vaccine or not get

 9    a shingles vaccine?

10         A    I don't know.

11         Q    Where it's written in there where he gets the

12    flu shot --

13         A    Right.

14         Q    -- he's agreed to have them?

15         A    He's agreed to have them.  I don't think that

16    it was at his request that he obtain them.

17         Q    And also with regard to the shingles vaccine,

18    he declined it.  So he made that call not to get the

19    shingles vaccine at one point?

20         A    He makes the call a lot to decline things, so

21    I think it's often the family talking to him

22    about -- suggesting that taking certain medications

23    or treatments would be to his benefit, and he --

24    some things he'll agree to and some things he won't.

25              MS. COWAN:  All right.  Let's take your
```

Page 102

```
 1    break.
 2              MR. FELD:  Okay.  Give us about ten minutes.
 3              MS. COWAN:  Okay.  No problem.
 4              (Recess.)
 5              MS. COWAN:  Let's go back on the record.
 6    BY MS. COWAN:
 7         Q    Thank you for coming back after our break and
 8    I have just a follow-up question.  Mr. Tanenbaum has
 9    joined us during the deposition.  Is he the attorney
10    you met with?
11         A    Yes.  He came with Mrs. Dallal to my office.
12         Q    And you've only met with him once?
13         A    Once.
14         Q    Any phone calls with him subsequently?
15         A    Never.
16         Q    I'm remiss.  I don't believe I asked you this
17    question when we talked about what you were treating
18    Mr. Dallal for early on.  And I made a list, and one
19    of the things was confusion you had said.  And I
20    just would appreciate clarification.  What
21    treatment, if any, have you given Mr. Dallal for
22    confusion?
23         A    I made a suggestion to him and the family
24    that we do formal testing, neuropsychiatric testing,
25    to see what degree of cognitive deficit there really
```

Page 103

```
 1    is.  Because sometimes there are certain things you
 2    can't find without that.  And I made a suggestion I
 3    think somewhere in my notes that I would consider
 4    treating with medication for dementia.  But I don't
 5    think we ever initiated the treatment because he has
 6    probably refused to undergo the formal testing.  He
 7    hasn't wanted to do it or see a neurologist further.
 8        Q   Is that your speculation that that's what
 9    he's going to do or has he told you he refuses?
10        A   I don't recall specifically over it because I
11    probably made the suggestion a few times and then
12    maybe, if I recall, the family said -- you know, I
13    told them it's a four-hour test to go and sit
14    through and you're answering a lot of questions and
15    filling out forms.  And it was a matter of I think
16    being concerned that he wouldn't cooperate for it,
17    so I don't know if it was -- how many times it was
18    broached with him, but I know that it never got done
19    even though I made the referral.
20        Q   Let's take a look at September 24, 2015, your
21    note.  And it's towards the end.
22        A   Two thousand what?
23        Q   September 24, 2015.
24        A   I'm sorry.  Say the date one more time.
25        Q   September 24, 2015.
```

                                                Page 104

```
 1          You certified attending physician forms for
 2   Mr. Dallal's long-term care claim, correct?
 3      A    Yes.
 4      Q    What's the protocol or your process which you
 5   prepared --
 6      A    I'm sorry.  What was that?
 7      Q    Strike that.
 8          What was the protocol or the process that you
 9   had for completing those forms?
10      A    To discuss it with the family in terms of
11   what the use of this particular benefit would be,
12   why he needed it, what the ongoing issues were, what
13   the justification for it was.
14      Q    In this instance for Mr. Dallal, what was
15   said -- what was said with regard to --
16      A    I think what I normally do and what I have
17   always done with this form is I sit down with the
18   family and the patient at the time when the form has
19   been presented to me and I go through it with them
20   to see what their experiences have been in terms of
21   any changes from his prior needs, what he's
22   requiring assistance with at home, if anything, and
23   what he -- you know, why he still requires any care.
24   So it's more of a discussion to assess it.
25      Q    And you accept the accuracy of what the
```

Page 134

1    reviewed the chart.

2        Q    And when was that?

3        A    Honestly, I saw this last night.

4        Q    If you look at the second page, "Cognitive

5    Information," does the patient have a cognitive

6    impairment, including any deficiency in short or

7    long term memory, orientation as to person, place

8    and time, deductive or abject reasoning or judgment

9    as it relates to safety awareness?

10           Did you mark that?

11       A    Yes, I would imagine I did.

12       Q    Which portion of those is he cognitively

13   impaired for?  Which one of those does he

14   demonstrate cognitive impairment for?

15       A    Judgment as it relates to safety awareness.

16       Q    And that's based on what the family has told

17   you?

18       A    Yes.  And also my assessment that he tends to

19   refuse a lot of things and downplays symptoms so

20   that it shows to me poor insight and judgment into

21   his own medical condition.

22       Q    But that doesn't affect safety, though,

23   correct?

24       A    It can affect safety.  Somebody can think

25   that they don't require medication, not take it, and

1   have very detrimental effects.

2       Q   So you're talking with regard to safety as to

3   the medical elements?

4       A   No.  It could encompass a great deal of

5   things.

6       Q   For Mr. Dallal, do you have any specifics,

7   any specific examples as to -- other than what the

8   family has told you for -- I believe it says here

9   occasional confusion, do you have any specific

10  examples you can provide?

11      A   Just that he has often refused treatment for

12  various things, refused follow-up on various

13  problems that I believe shows poor insight and poor

14  judgment into what's appropriate for his care.

15      Q   With regard -- and "occasional confusion" is

16  written here.  Those are the words that were

17  referenced in that January 16th, 2009 note that we

18  just looked at.

19      A   Right.

20      Q   And you say you filled this out on the same

21  day with them when they were there for that visit?

22      A   It must have been, yes.

23      Q   Did you fill it out while they were present

24  in the room?

25      A   I couldn't recall that.

Page 148

```
 1              (Exhibit 52 was marked for identification by

 2        the court reporter and is attached hereto.)

 3    BY MS. COWAN:

 4        Q    Is this a form that you prepared yourself for

 5    the Dallals?

 6        A    This seems to be the same, is it not?

 7        Q    Well, it was received by the company

 8    January 14, 2010.

 9        A    Oh.

10        Q    So I'm --

11        A    So it looks like it's misdated.  That's why

12    it's sort of throwing me off.

13        Q    Well, and because there's also a 1/12/10

14    visit with you.

15        A    Right.

16        Q    And that's what I was going to --

17        A    This must be -- yes, this must have been

18    mistakenly dated '09 instead of 2010.  That's why

19    it's confusing me because I didn't understand why

20    there would be two in the same year.

21        Q    But this is your signature on the second

22    page?

23        A    Yes, it is.

24        Q    And did you mail it to the company?

25        A    I wouldn't know.
```

Page 153

1    Q   So can you provide any testimony today as to

2    what you believed at the time --

3    A   No.

4    Q   -- Mr. Dallal required assistance with?

5    A   No.

6    Q   However, you marked here on the second page,

7    "I certify that my patient is a chronically ill

8    individual as defined above."  And it recites here

9    as to -- as being unable to perform without

10   substantial assistance at least two activities of

11   daily living and/or requiring substantial

12   supervision to protect such individual due to severe

13   cognitive impairment."

14        Which one do you believe Mr. Dallal had, if

15   any, at this point this time in 2010, whatever he

16   required assistance or supervision for?

17   A   I would say due to cognitive impairment.  I

18   have trouble with the language because I don't

19   consider it a severe cognitive impairment, but I do

20   consider it above when they say lack of judgment as

21   it relates to safety and awareness.  If they

22   consider that severe cognitive impairment, then I

23   agree with the term severe cognitive impairment.  So

24   that's why I checked yes.

25   Q   Okay.

Page 160

```
 1      A    Oh, okay.

 2      Q    So that's -- it's directed at --

 3      A    No.  Well --

 4      Q    -- 2004.

 5      A    -- oh, I see.  I see.  Date of last treatment.

 6  Date of next visit.

 7      Q    So my question is:  Did you have an opinion as to

 8  Mr. Dallal's capabilities as inquired on this form?  Any

 9  opinion?

10      A    I don't know if I had an opinion.

11      Q    I'd like to mark Exhibit 188, an additional form

12  that I secured from records subpoenaed from Monarch in

13  this case.

14           Dr. Feld, is this your signature on the bottom --

15      A    Yes.

16      Q    -- of this document?

17           (Exhibit 188 was marked for identification

18      by the court reporter and is attached hereto.)

19  BY MS. COWAN:

20      Q    And is this an attending physician statement you

21  signed for Mr. Dallal?

22      A    Yes, I believe so.

23      Q    And did you sign it on or about May 2nd, 2005?

24      A    I believe so.  Although, again, the date is

25  unclear based on my writing.
```

Page 189

1       Q     And feel free to look at your records in Exhibit
2    51, but that is the date in which you remarked that there
3    was a facial droop and an indication which you later
4    believed constituted a stroke.
5            Do you recall that?
6       A     Yes.
7       Q     That was the day you saw him for this?
8       A     Yes.
9       Q     Okay.  All right.  And you wrote down "diagnosis
10   of atypical meningioma and hypertension," correct?
11      A     Yes.
12      Q     And that's your diagnosis at that time?
13      A     Yes.
14      Q     And the subjective findings, would you -- BP of
15   160 over 100?
16      A     Yes.
17      Q     And left facial droop?
18      A     Yes.
19      Q     And for objective findings, you wrote down
20   nothing?
21      A     Yes, there's nothing there.
22      Q     All right.  Under assessment, you did fill out
23   something this year.  Under capabilities, what your
24   patient can or cannot do, would you read that for me
25   so we can make sure that I'm not misinterpreting what

                                             Page 190

```
 1    you state?

 2         A    "Able to dress, bathe, and feed self.  Needs help

 3    with heavy chores and housework."

 4         Q    And what did you base that on?

 5         A    I don't recall.

 6         Q    Would you have based that upon what the family or

 7    what Mr. Dallal told you?

 8         A    Probably.

 9         Q    Did -- was that your independent conclusion or

10    was that derived some -- from some other source?

11              MR. FELD:  Objection.  If you don't recall, don't

12    speculate.  Just --

13              THE WITNESS:  Again, I don't recall what the

14    conversation or who provided assistance in coming to those

15    conclusions.

16    BY MS. COWAN:

17         Q    You would just have to stick with what you wrote

18    here?

19         A    Exactly.

20         Q    Now, Dr. Feld, we talked last time about your

21    understanding that Mr. Dallal had a stroke, and you

22    indicated twice -- that he had possibly two small strokes.

23              The only one that I could identify was around the

24    time from May 2005.  Do you know when the other one

25    occurred or was there a mistake?
```

Page 191

```
 1        Q     So you're cert- --- you understood you were
 2   certifying Mr. Dallal is chronically ill for the purposes
 3   of him getting long-term care benefits, correct?
 4        A     Yes.
 5        Q     Let's take a look under activities of daily
 6   living.  Under ambulation, it was your determination he
 7   was independent in ambulation?
 8        A     Yes.
 9        Q     All right.  And what is that based upon?
10        A     Again, the same thing I attested to previously.
11        Q     The family?
12        A     Family, patient, general assessment.
13        Q     Under bathing, it says, "He requires stand-by
14   assistance."  Now, that's different from the prior form
15   where there was nothing on it.
16              Did you base this reference that Mr. Dallal
17   required stand-by assistance on what the family or
18   Mr. Dallal told you?
19        A     I would only be speculating.  I would assume so.
20   I don't recall.
21        Q     And as to continence, as to independence in
22   continence, was that likewise based upon what the family
23   told you he was capable on?
24        A     Again, I would be speculating, but I assume that
25   that's how the information was gathered.
```

Page 210

1     Q     Well, you signed the form, and I'm just verifying

2   that you're not going to deviate from what's written on

3   this form.  So that's what I'm trying to confirm.

4     A     I'm not deviating.  I'm just saying that I don't

5   recall what I was thinking at the time when I filled it

6   out.  I'm just assuming that I -- given that I made those

7   notations, that's what I felt at the time was correct.

8     Q     Correct based upon what the family told you?

9     A     Yes.

10    Q     And dressing, likewise, that would have been

11  based on what the family told you?

12    A     Correct.

13    Q     Eating, independent in eating, that was based

14  upon what the family told you?

15    A     Yes.

16    Q     And for toileting, needing stand-by assistance,

17  again, that was what the family told you?

18    A     Yes.

19    Q     And for transferring, there's two marked --

20  independent and stand-by.  What is meant by that?

21    A     I don't know.  It could have been an error.

22    Q     And was this a situation like we experienced last

23  time where you indicated the forms were altered because

24  multiple items were checked or is this just an error?

25    A     I couldn't speculate.  It could be altered or it

```
1    could have been oversight where I changed my mark and
2    forgot to cross out the other one or make it more clear.
3             I wouldn't know between the two given that
4    there's only one like this.
5        Q    So -- so you can't determine as of, at least 2012
6    in November, whether he was independent or stand-by as to
7    his needs for transferring?
8        A    I couldn't say now.
9        Q    Take a look at this next page.  At this point in
10   time, in November 2012, did you believe Mr. Dallal had
11   occasional confusion personally or is this something based
12   upon what the family told you?
13       A    This is probably what the family told me.
14       Q    All right.  And on that basis, you determined
15   that he had cognitive impairment based upon what the
16   family told you, right?
17       A    Yes.
18       Q    It states here, "Who is providing the necessary
19   supervision?  Wife, caregiver."  Was that what the family
20   told you?
21       A    I would assume.
22       Q    And you'd have no independent resource other than
23   the family, right?
24       A    Correct.
25       Q    In your medical opinion as to response to
```

Page 212

1    transferring, the medical basis for that is what?

2        A    As of I've already attested to on numerous

3    occasions, he does have some -- at times, he's had falls.

4    He's had a history of stroke with some weakness in

5    ability.  He's had a brain tumor.

6            So it was based on the assessment, that risk of

7    falls, risk of instability, you know, risk of dizziness,

8    all of these things that could cause injury to him.

9        Q    And although you --

10       A    If there wasn't somebody close by during those

11   activities, you know, on the same premises and he was left

12   unattended for several hours and decided to take a shower

13   and became dizzy and passed out or fell or tripped or

14   something like that, then it would be dangerous to him.

15       Q    All right.  And just so I'm clear, you said on

16   this they just have to be on the same premises in order

17   for it to satisfy the stand-by requirement?

18       A    I think that's reasonable.

19       Q    Do you know if there's any aspect of the

20   showering process as of this point in time he could do

21   independently?

22       A    Independently?

23       Q    Correct.

24       A    Well, when I say -- I think I attested to

25   stand-by assistance.

                                            Page 223

```
 1    judgment as to his medical treatment.  You're with me,
 2    right?
 3              MR. FELD:  Ob- -- objection.
 4              THE WITNESS:  I -- I believe that that's part of
 5    the -- of my assessment, not the entirety of it.
 6              MR. FELD:  Yeah, objection as to characterizing
 7    the witness's testimony.  Let -- let's just try to focus
 8    on a -- on a specific question.
 9    BY MS. COWAN:
10        Q    That's -- that is your opinion, right?
11              MR. FELD:  Well, ob- -- objection.  Objection
12    again as it's asked and answered.  It -- well, her
13    testimony is -- speaks for itself.
14    BY MS. COWAN:
15        Q    Which part am I missing?  Which part am I
16    missing?
17        A    Could you just restate the question a little more
18    clearly because I'm getting confused?
19        Q    Okay.  Last time, you testified that it was your
20    opinion that Mr. Dallal was cognitively impaired because
21    he lacked judgment as to his -- his decision-making about
22    medical treatment.  Am I inaccurate in stating that or
23    accurate?
24        A    You're accurate in stating that I testified that
25    I believe that is one of -- those were my findings that
```

Page 237

```
 1    contributed to my conclusion.  Those aren't all of the

 2    findings or all the information that would indicate his

 3    level of impairment.

 4         Q    The other one though, I -- I had pinned it down,

 5    and you had said it was as to occasional confusion

 6    reported by the family was the other aspect; is that

 7    right?

 8         A    Correct.

 9         Q    All right.  So I have -- we have those down.

10              Now, let's focus on your opinion as to the

11    medical treatment impairment or the -- the view that he is

12    cognitively impaired due to his lack of judgment about his

13    medical treatment.

14              MR. FELD:  Ob- -- objection as far as -- can you

15    repeat that last question?

16              MS. COWAN:  Counsel, it's very simplistic.

17         Q    I'm trying to understand, Doctor, the definition

18    of cognitive impairment requires there to be continual --

19    or excuse me, requires there to be substantial supervision

20    of an individual.

21              If you'd like to go back, we'll look at the

22    definition.  It says, "To have" -- you have "to have

23    substantial supervision to protect such individual from

24    threats to health and safety due to severe cognitive

25    impairment."
```

Page 238

```
 1      A      Correct.

 2      Q      "Across street last night and it started hurting

 3   after" -- "last Saturday and it started hurting after

 4   that."  Where did this information come from that --

 5      A      I believe -- if I -- I actually recall that

 6   visit.  What he had told me was he was crossing the street

 7   and sped up his gait to cross quickly, like a -- almost

 8   like a jog pace, not -- I mean, jogging for a 72-year-old

 9   man or whatever he was.

10            And it put too much strain on his knee when he

11   tried to speed up to cross the street quickly.

12      Q      And so he explained that to you?

13      A      Yes, I remember him telling me that.

14      Q      And you weren't limiting him from walking across

15   the street, were you, doing activities such as walking

16   across the street?

17      A      I don't understand your question.  I wasn't

18   limiting him?

19      Q      Yeah.  You weren't restricting him, you weren't

20   telling him don't do those things, right?

21      A      No, I wouldn't tell him not to cross the street.

22      Q      Do you know if he was with a caregiver at this --

23      A      I wouldn't know.

24      Q      He didn't tell you?

25      A      No.
```

Page 249

```
 1    his health care --

 2        A    Mm-hmm.

 3        Q    -- power of attorney over his health care, did

 4    you ever advise her that she should get testing for her

 5    husband -- neuro- -- neuropsych testing?

 6        A    Yes, I've made a note of that in the chart, I

 7    believe.  We -- we discussed that previously.

 8        Q    All right.  Other than Mr. Dallal not making the

 9    decision, you understood the power of attorney, she could

10    be the one with authority to have him take the test,

11    correct?

12        A    Yes.

13        Q    All right.  And with regard to medications, you

14    mentioned Namenda, I think, in a 2015 note.  You could

15    advise Claire as the power of attorney that her husband

16    should be taking Namenda, right?

17        A    Yes, I can make the -- I can advise her as to

18    that, yes.

19        Q    And you can write out a prescription for it?

20        A    I could.

21        Q    And give it to her?

22        A    Yes.

23        Q    And she could go fill it as a power of attorney?

24        A    She could.

25        Q    All right.  And to your understanding, did that
```

Page 273